UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DEWAYNE ROY WILSON,

                                        Plaintiff,

                                                                9:18-CV-00416
v.
                                                                (DNH/TWD)
J. BOLT AND K. HAYES,


                                        Defendants.
_____

APPEARANCES:                              OF COUNSEL:

DEWAYNE ROY WILSON
07731-084
Plaintiff *pro se*
Ray Brook Federal Correctional
 Institution
P.O. Box 900
Ray Brook, New York 12977

GRANT C. JAQUITH                          MARY E. LANGAN, ESQ.
United States Attorney                    Assistant United States Attorney
Northern District of New York
100 South Clinton Street
Syracuse, New York 13261

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

## I.    INTRODUCTION

        Plaintiff Dewayne Roy Wilson, an inmate presently housed at Ray Brook Federal

Correctional Institution ("Ray Brook"), has commenced this *pro se* civil rights action pursuant to

*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics* ("*Bivens*"), 403 U.S.

388 (1971).  (Dkt. No. 1.)  The Defendants and claims remaining following *sua sponte* review of

the complaint by the Hon. David N. Hurd, U.S. District Judge, are First Amendment claims for retaliation against Defendants J. Bolt ("Bolt") and K. Hayes ("Hayes"). (Dkt. No. 8 at 20.[1])

Defendant Bolt has now moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for dismissal of Plaintiff's complaint on the following grounds: (1) failure to exhaust administrative remedies; (2) the court should decline to extend *Bivens* to Plaintiff's First Amendment retaliation claim; and (3) Defendant Bolt is entitled to qualified immunity.[2] (Dkt. No. 34-1 at 2.) Plaintiff has opposed the motion. (Dkt. No. 37.) Defendant Bolt served a reply (Dkt. No. 38), and Plaintiff filed a sur-reply. (Dkt. No. 39.) For reasons explained below, the Court recommends that Defendant Bolt's Rule 12(b)(6) motion to dismiss for failure to state a claim be granted.

## II.    COMPLAINT

On May 8, 2013, Plaintiff was convicted of controlled substance offenses and on August 20, 2013, was sentenced to a term of imprisonment and supervised release, along with a $400.00 special assessment and a $1,000.00 fine. (Dkt. No. 1-1 at 19.) Plaintiff was required to make a lump sum payment of $400.00 immediately, with the balance payable in monthly installments of $25.00 or 50% of his prison income, whichever was less, during his incarceration. *Id*. Plaintiff was housed at Ray Brook during the time period relevant to this claims. (*See generally* Dkt. No.

---

[1] Page references to documents identified by docket number are to the page numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[2] According to defense counsel, Defendant Hayes had not been served at the time the motion to dismiss was filed on October 15, 2018. (Dkt. No. 34-1 at 3 n.2.) The Court notes that Plaintiff filed a motion for entry of default against Hayes on September 5, 2018. (Dkt. No. 33.) The motion was most likely motivated by the acknowledgment of service on Hayes on August 29, 2018, noted on the Docket. (Dkt. No. 30.)

1.)

Plaintiff alleges in his complaint that on May 16, 2016, while he was in the Ray Brook Special Housing Unit ("SHU"), he filed a Request for Administrative Remedies related to his inmate financial responsibility payments and the collection of payments. (Dkt. No. 1 at 4.) According to Plaintiff, the response from Defendant Bolt, who was his Unit Manager, was back-dated and untimely the day he received it. *Id*. In the response Bolt indicated that Plaintiff's correctional counselor would meet with him at some point in time to "correct his contract." *Id*. at 4-5. However, the problem was not corrected. *Id*. at 5.

On August 23, 2016, Bolt told Plaintiff he was being transferred to a more secure facility based upon his custody points. *Id*. at 6. Plaintiff was then placed in SHU for two days before being released back to general population at Ray Brook. *Id*. On November 16, 2016, Plaintiff received notice from the Administrative Remedy Coordinator that his Administrative Remedy Request, No. 882854-F1, had been rejected as untimely because the incident had occurred on August 23, 2016, and the informal resolution was not attached. *Id*. at 6; Dkt. No. 1-1 at 5. Plaintiff denies that the filing was untimely. (Dkt. No. 1 at 6.)

Plaintiff claims that Bolt placed him in the SHU on August 23, 2016, in retaliation for grievances Plaintiff had filed regarding deductions being taken from his prison fund. *Id*. at 6-7. Plaintiff is seeking injunctive and declaratory relief regarding the terms of the collection of money through the Bureau of Prison ("BOP") Inmate Financial Responsibility Program ("IFRP"), along with compensatory and punitive damages against each Defendant. *Id*. at 10.

## III.    LEGAL STANDARD GOVERNING RULE 12(b)(6) MOTIONS TO DISMISS

A defendant may move to dismiss a complaint "for failure to state a claim upon which

relief can be granted" under Rule 12(b)(6).  The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y. 1972).  Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Id.* at 679  (internal citation and punctuation omitted).  "Factual allegations must be enough to raise a right to relief above a speculative level." *Twombly*, 550 U.S. 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Id.*  at 570.  While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678 (citation and internal quotation marks omitted).  A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id.*  (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).

4

However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*).

Rule 12(d) provides that "[i]f on a motion under R. 12(b)(6) . . . matters outside the pleading are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P 12(d).  Accordingly, where a court considering a motion to dismiss is "presented with matters outside the pleading," other than those described in the following paragraph, the court has two discretionary options. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002).  The court either may exclude the extrinsic documents from consideration, or may convert the motion to a Rule 56 summary judgment motion on notice to the parties, "giv[ing] the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56." *Id*.

On a motion to dismiss for failure to state a claim, "the complaint is deemed to include any written instrument attached to it as an exhibit or any statement or documents incorporated in it by reference. *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991); *see also Chambers,* 282 F.3d at 153 ("even where a document is not incorporated by reference [in the complaint], the court may nevertheless consider it [on a Rule 12(b)(6) motion without converting

5

the motion to one for summary judgment] where the complaint 'relies heavily upon its terms and

effect,' which renders the document 'integral' to the complaint," quoting *Int'l Audiotext Network,*

*Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).  The Court may also consider

documents  "possessed by or known to the plaintiff and upon which [he] relied in bringing the

suit."  *ASTI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  In

addition, "the mandate to read the papers of *pro se* litigants generously makes it appropriate to

consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively

amending the allegations of the plaintiff's complaint, to the extent that those factual allegations

are consistent with the allegations of the Plaintiff's complaint."  *Robles v. Bleau*, No. 07-CV-

0464, 2008 WL 4693153, at * 6 and n.41 (N.D.N.Y. Oct. 22, 2008)[3] (collecting cases).

    Where a *pro se* complaint fails to state a cause of action, the court generally "should not

dismiss without granting leave to amend at least once when a liberal reading of the complaint

gives any indication that a valid claim might be stated."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112

(2d Cir. 2000) (citation and internal quotation marks omitted).  An opportunity to amend is not

required where "the problem with [the plaintiff's] causes of action is substantive" such that

"better pleading will not cure it."  *Cuoco*, 222 F.3d at 112 (citation omitted).

## IV.    ANALYSIS

### A.    Exhaustion

#### 1.    Legal Standard

Under the Prison Litigation Reform Act of 1995 ("PLRA), as amended, a prisoner

---

[3]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

pursuing a federal lawsuit, including a *Bivens* action, is required to exhaust available administrative remedies before a court may hear his case. *See* 42 U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also Ross v. Blake*, ___ U.S. ___, 136 S.Ct. 1850, 1854-55 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). *See also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

Prisoners in BOP custody exhaust their administrative remedies by completing the BOP four-step Administrative Remedy Program ("ARP"). *See generally* 28 C.F.R. Part 542, Subpart B. First, a prisoner must attempt informal resolution of his complaint by presenting the matter to prison staff members using a BP-8 form. *See* 28 C.F.R. § 542.13(a); *Banks v. United States*, No. 10 Civ. 6613 (GBD) (GWG), 2011 WL 4100454, at *10 (S.D.N.Y. Sept. 15, 2011). Second, if the matter is not resolved informally, the prisoner must submit a formal written Administrative Remedy Request to the warden using a BP-9 form. *See* 28 C.F.R. § 542.14; *Banks,* 2011 WL 4100454, at *10. Third, if the formal complaint is denied, an inmate may submit an appeal to the

requisite BOP Regional Direction using a BP-10 form.  *See* 28 C.F.R. § 542.15; *Banks,* 2011 WL 4100454, at *10.  Fourth, an adverse decision from a Regional Director may be appealed to the BOP General Counsel's Office on form BP-11.  *Id.*  An administrative appeal is considered finally exhausted when it has been considered by the BOP General Counsel's Office in the BOP Central Office.  *See* C.F.R. §§ 542, 542.15.

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion."  *Ross*, 136 S. Ct. at 1858.  More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotations and citations omitted).  In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of."  *Ross*, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA.  *Id*. at 1859-60.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id*. at 1859.  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  *Id*.  Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id*. at 1860.

8

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second

Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]"

The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry.  *See Mena v.*

*City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Non-exhaustion is an affirmative defense, and defendants bear the burden of showing that

a prisoner has failed to satisfy the exhaustion requirements.  *See Jones,* 549 U.S. at 216; *Johnson*

*v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds, Woodford*, 548 U.S.

at 94-95.  Plaintiff must then establish that the IGP grievance procedure was unavailable to him.

*See Jones*, 549 U.S. at 216.

Because failure to exhaust under the PLRA is an affirmative defense, an inmate plaintiff

is under no obligation to plead facts demonstrating that he has complied with the PLRA's

exhaustion requirement.  *Jones,* 549 U.S. at 211-17.  *See also Huggins v. Schiriro*, No. 14-CV-

6488 (GBD) (JLC), 2015 WL 7345750, at *3 (S.D.N.Y. Nov. 19, 2015) (since a plaintiff is not

required to plead exhaustion, "when a prisoner indicates he has taken some steps toward

exhaustion, district courts will normally not infer from his silence that he failed to take the

remaining steps that full exhaustion would require").  Further, a court may not dismiss for failure

to exhaust administrative remedies unless it determines that such remedies are available.  *Rossi v.*

*Fischer*, No. 13-CV-3167, 2015 WL 769551, at *4 (S.D.N.Y. Feb. 24, 2015).

> 2.   Bolt's Submission of Declarations and Exhibits in Support of his Rule
>       12(b)(6) Motion

Defendant Bolt has submitted declarations and exhibits in support of its Rule 12(b)(6)

motion to dismiss Plaintiff's complaint.  More specifically, Bolt has submitted the declaration of

BOP legal assistant, Darlene Liebert ("Liebert"), on the exhaustion issue (Dkt. No. 34-10), and

Bolt's own declaration addressing the exhaustion issue and touching upon the merits of

Plaintiff's First Amendment retaliation claim.  (Dkt. No. 34-12.)  Exhibit A to both Liebert's and

Bolt's declarations is a computer printout generated on September 21, 2018, listing Plaintiff's

Administrative Remedy requests from 2004 through September of 2018.  (Dkt. Nos. 34-11; 34-

13.)

     A Rule 12(b)(6)motion to dismiss for failure to exhaust is only appropriate if such failure

"is evidenced on the face of the complaint and incorporated documents."  *Lee v. O'Harer*, No.

13-CV-1022, 2014 WL 7343997, at *3 (N.D.N.Y. Dec. 23, 2014).  When either non-exhaustion

or the availability of the grievance procedure is not clear from the face of the complaint, the court

should generally convert the motion to summary judgment "limited to the narrow issue of

exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust,

[and] whether remedies were available. . . ."  *Stevens v. City of New York*, No. 12 Civ. 1918

(JPO) (JLC), 2012 WL 4948051, at *3 (S.D.N.Y. Oct. 11, 2012).  When converting a defendant's

motion to dismiss to one for summary judgment where plaintiff is a *pro se* prisoner, the court

must first explain the potential consequences of a motion for summary judgment and the

procedural requirements for responding to the plaintiff and allow plaintiff to take discovery and

respond to the motion.  *See Hernández v. Coffey*, 582 F.3d 303, 305, 307-08 (2d Cir. 2009).

     3.   <u>Analysis</u>

     The Court finds that the availability to Plaintiff of the BOP ARP is not clear from his

complaint and the attached exhibits.  Plaintiff alleges that Bolt placed him in the SHU for two

days, beginning August 23, 2016, in retaliation for filing grievances.  (Dkt. No. 1 at 6.)  Plaintiff

has included as an exhibit a Rejection Notice – Administrative Remedy, dated November 16, 2016, regarding Remedy ID 882854-F1, which he received from the Ray Brook Administrative Remedy Coordinator.  (Dkt. No. 1-1 at 5.)  The subject matter of the incident involved was identified as "unprofessional, inappropriate conduct or misconduct by staff." *Id*.  According to the Notice, the Coordinator received Remedy ID 882854-F1 on November 15, 2016, which rendered it untimely because Form BP-09 must be received within twenty days of the incident. *Id*.  The date of the incident was August 23, 2016, the date of Bolt's allegedly retaliatory act.  *Id*.

Plaintiff alleges in his complaint that his submission of the Administration Remedy, which complained about Bolt, was not untimely.  (Dkt. No. 1 at 6.)  Moreover, many of the allegations in his complaint are devoted to complaints that his administrative remedies were purposely delayed and not available to him for a significant period of time.  (*See* Dkt. No. 1 at 4-7.)  Accepting the material facts alleged in the complaint as true, and construing all reasonable inferences Plaintiff's favor, *Hernandez,* 18 F.3d at 136, the Court concludes that the issue of the availability of the BOP ARP with regard to Plaintiff's retaliation claim against Bolt is not clear on the face of the complaint and the attached exhibits.

Ordinarily the Court would go through the procedure for converting that part of Defendant's motion seeking dismissal on exhaustion grounds to one for summary judgment. However, because the Court is recommending dismissal of the complaint as against Bolt under Rule 12(b)(6) for failure to state a claim under *Bivens*, it is unnecessary.

### B.    *Bivens* Claim

Plaintiff claims that Bolt placed him in the SHU for two days beginning August 23, 2016, in retaliation for filing a grievance regarding the IFRP, as well as other grievances, and has

asserted a *Bivens* claim against Bolt.  (Dkt. Nos. 1 at 6-7; 37 at 5, 13.)

    1.   Legal Standard

 In *Bivens*, 403 U.S. 388, the Supreme Court recognized an "implied private right of action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 6 (2001).  In the more than forty years since the Supreme Court authorized *Bivens* damages, the Supreme Court has recognized *Bivens* claims in only three circumstances.  *See Sanford v. Bruno*, No. 17-cv-5132 (BMC), 2018 WL 2198759, at *3 (E.D.N.Y. May 14, 2018) listing *Bivens*, 403 U.S. 388 (unreasonable search and seizure under the Fourth Amendment); *Davis v. Passman*, 442 U.S. 228 (1979) (gender discrimination under the Fifth Amendment Due Process Clause); and *Carlson v. Green*, 446 U.S. 14 (1980) (cruel and unusual punishment under the Eighth Amendment for failure to treat asthma).

In *Malesko*, 534 U.S. at 67 n.3, the Supreme Court majority observed that since *Bivens*, "we have retreated from our previous willingness to imply a cause of action where Congress has not provided one."  More recently, in *Ziglar v. Abbasi*, ___ U.S. ___, 137 S.Ct. 1843, 1857 (2017), the Supreme Court urged lower courts to exercise restraint in creating implied causes of action against federal officials to enforce constitutional rights in new contexts, and went so far as to clarify that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity."  *Id*. (quoting *Iqbal*, 556 U.S. at 675.

The recognition of a cause of action was found to be context specific in *Ziglar*, and the Supreme Court established a rigorous two-step inquiry for determining whether to apply a *Bivens* remedy in a new context.  First, the court must decide whether a plaintiff is seeking a *Bivens* remedy in a new *Bivens* context.  *Ziglar*, 137 S.Ct. at 1859-60.  A case arises in a new *Bivens*

context if "[i]t is different in a meaningful way from previous *Bivens* cases decided by the

[Supreme] Court." *Id.* at 1859.  The Supreme Court provided a non-exhaustive list of

considerations that might make a case meaningfully different, including:

> [T]he rank of the officers involved; the constitutional right at issue;
> the generality or specificity of the official action; the extent of
> judicial guidance as to how an officer should respond to the
> problem or emergency to be confronted; the statutory or other legal
> mandate under which the officer was operating; the risk of
> disruptive intrusions by the Judiciary into the functioning of other
> branches; or the presence of special factors that previous Bivens
> cases did not consider.

*Id*. at 1860.

If a new *Bivens* context is found, the Court must proceed to the second step and ask

"whether any alternative, existing process for protecting the interest amounts to a convincing

reason for the Judicial Branch to refrain from providing a new and freestanding remedy in

damages." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007).  Irrespective of whether an alternative

remedy exists, a federal court must also conduct a specific analysis "paying particular heed . . . to

any special factors counselling hesitation in the absence of affirmative action by Congress." *Id*.

(internal quotation marks omitted).

"The second step is often referred to as the special-factors analysis," and "'[t]he

[Supreme] Court's precedents now make clear that a *Bivens* remedy will not be available if there

are special factors counselling hesitation in the absence of affirmative action by Congress.'"

*Sanford,* 2018 WL 2198759, at *5 (quoting *Ziglar*, 137 S.Ct. at 1857) (internal quotation marks

omitted); *see also Rivera v. Samilo*, No. 16-cv-1105 (DLI), 2019 WL 1466893, at *4 (E.D.N.Y.

March 31, 2019) (same).  In *Ziglar*, 137 S.Ct. at 1857-58, the Supreme Court noted that the

13

Court had not defined the phrase "special factors counselling hesitation," but observed that "[t]he necessary inference, though, is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed.  Thus, to be a 'special factor counseling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative."

 2.    Analysis

The Supreme Court has never recognized a First Amendment right to be free from retaliation as a cognizable *Bivens* claim.  *See, e.g., Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims.")  Thus, Plaintiff's First Amendment retaliation claim against Bolt arises in a new *Bivens* context.  *See, e.g., Ramirez v. Tatum*, No. 17 Civ. 7801 (LGS), 2018 WL 6655600, at *5 (S.D.N.Y. Dec. 19, 2018) (prisoner's First Amendment retaliation claim found to present a new *Bivens* context); *Atkinson v. Broe*, No. 15-cv-386-wmc, 2019 WL 231754, at *2 (W.D. Wisc. Jan. 15, 2019) (same).

The majority of courts considering the question post-*Ziglar* have concluded that a *Bivens* claim is not available for violation of the First Amendment, including a retaliation claim.  *See Rager v. Augustine*, 760 F. App'x 947 (11th Cir. 2019) (affirming *sua sponte* dismissal of First Amendment retaliation claim because *Bivens* did not create a remedy); *Bistrian v. Levi*, 912 F.3d 79, 95-96 (3d Cir. 2018) (expressly holding that post-*Ziglar*, First Amendment retaliation claims under *Bivens* are no longer recognized in the Third Circuit); *Pinkney v. Lockett*, No. 5:16–cv–00103-Oc-02PRL, 2019 WL 1254851, at *6 (M.D. Fl. March 19, 2019) (declining to extend *Bivens* to First Amendment retaliation claim); *Silva v. Canarozzi*, No. 3:18-cv-1771 (MPS), 2019 WL 1596346, at *3 (D. Conn. April 15, 2019) (declining to extend *Bivens* to encompass First

14

Amendment retaliation claim); *Atkinson*, 2019 WL 231754, at *2-6 (*Bivens* not available for a

First Amendment retaliation claim); *Akande v. Philips*, No. 1:17-CV-01243 EAW, 2018 WL

3425009 at *7 (W.D.N.Y. July 11, 2018) ("[n]ationwide district courts seem to be in agreement

that, post-*Abbasi*, prisoners have no right to bring a *Bivens* action for violation of the First

Amendment." (citation and internal quotations omitted) (collecting cases)); ; *Andrews v. Miner,*

301 F. Supp. 3d 1128, 1134-36 (N.D. Ala. 2017) (declining to allow *Bivens* retaliation claim).

 A number of district courts considering the availability of alternative remedies at step

two of the analysis have suggested that the BOP ARP arguably provides an alternative remedy.

*See, e.g., Atkinson,* 2019 WL 231754, at *3; *Sanford ,* 2018 WL 2198759, at *6; *Andrews*, 301 F.

Supp. 3d at 1134-36 (finding the BOP alternative remedial process provided an alternative

remedy); *Early v. Shepherd*, No. 2:16-cv-00085-JMS-MJD, 2018 WL 4539230, at *15-16 (S.D.

Ind. Sept. 21, 2018) (recognizing alternative remedies, including the BOP administrative process,

and finding retaliation claim foreclosed by *Ziglar*).

District courts have also found in significant number the presence of special factors

counselling against recognizing a new *Bivens* claim for retaliation under the First Amendment,

irrespective of whether Plaintiff had an alternate remedy.  In *Ziglar*, the Supreme Court identified

legislative action which suggested Congress did not want a damages remedy as a factor

counselling hesitation, specifically identifying the PLRA and writing:

> Some 15 years after Carlson was decided, Congress passed the
> Prison Litigation Reform Act of 1995, which made comprehensive
> changes to the way prisoner abuse cases must be brought to federal
> court.  *See* 42 U.S.C. § 1997e.  So it seems clear that Congress had
> specific occasion to consider the matter of prisoner abuse and to
> consider the proper way to remedy those wrongs.  This Court has
> said in dicta that the Act's exhaustion provisions would apply to

> *Bivens suits.* (citation omitted).   But the Act itself does not provide
> for a standalone damages remedy against federal jailers.   It could
> be argued that this suggests Congress chose not to extend the
> *Carlson* damages remedy to cases involving other types of prisoner
> mistreatment.

*Ziglar*, 137 S.Ct. at 1865; *see Sanford*, 2018 WL 2198759, at *6 ("The fact that Congress chose

not to codify, expand, or restrict *Bivens* [in the PLRA], indicates that it sought to address and

resolve prisoner claims through an administrative process, despite the imperfection of that (or,

indeed, any) process."); *Ramirez,* 2018 WL 6655600, at *5 (citing *Ziglar* language on the

PLRA).

Based upon the foregoing, the Court finds that *Bivens* is not available for a First

Amendment retaliation claim under the facts of this case and recommends that Defendant Bolt's

Rule 12(b)(6) motion to dismiss for failure to state a claim be granted.   Because the problem with

Plaintiff's First Amendment retaliation claim under *Bivens* is substantive and cannot be cured by

a better pleading, *see Cuoco*, 222 F.3d at 112, the Court recommends that dismissal be with

prejudice.

### C.    Qualified Immunity

Bolt has also sought dismissal on qualified immunity grounds.   Because the Court is

recommending dismissal in Bolt's favor for failure to state a claim under *Bivens*, the Court finds

it unnecessary to consider the issue of qualified immunity.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant Bolt's Rule 12(b)(6) motion to dismiss for failure to

state claim (Dkt. No. 34) be **GRANTED** with prejudice; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[4]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: May 28, 2019
Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[4]  If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2018 WL 3425009
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Jason Shola AKANDE, Plaintiff,

v.

Michael PHILIPS, I.C.E. Field Office Director,
Thomas Feeley, I.C.E. Field Office Director, Thomas
Homan, Acting Director of I.C.E., Washington,
D.C., Kirstjen Nielsen, The Secretary of D.H.S.,
Washington, D.C., John Doe 1, The Owner/Chief
Executive Officer, Giant Airline, New York, John
Doe 2, The Pilot of Giant Airline, and John Doe
3, The Co-Pilot of Giant Airline, Defendants.

1:17-CV-01243 EAW
|
Signed 07/11/2018

**Attorneys and Law Firms**

Jason Shola Akande, Bloomfield, CT, pro se.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District
Judge

## INTRODUCTION

 **\*1** Plaintiff Jason Shola Akande ("Plaintiff") filed this
*pro se* action on November 30, 2017, seeking relief for
violations of his constitutional rights pursuant to *Bivens v.
Six Unknown Named Agents of Fed. Bureau of Narcotics*,
403 U.S. 388 (1971). (Dkt. 1). Plaintiff has also submitted
an application to proceed *in forma pauperis* pursuant to
28 U.S.C. § 1915, and has submitted an affirmation of
poverty in support of this request. (Dkt. 2).

The Court has reviewed Plaintiff's motion for *in forma
pauperis* status. For the reasons detailed below, the motion
is granted. The Court has also reviewed the complaint
as required by 28 U.S.C. § 1915(e)(2). For the following
reasons, Plaintiff's claims of excessive force may proceed,
but his remaining claims are dismissed.

## BACKGROUND

On November 30, 2017, Plaintiff filed a Complaint
claiming that Defendant Michael Philips, who was
employed as the Immigration and Customs Enforcement
("ICE") Field Office Director in Buffalo ("Philips"),
connived with unnamed ICE agents and unnamed
" 'rogue' Connecticut Law Enforcement Officers" to
unlawfully remove Plaintiff to Nigeria by forging
a travel certificate. (Dkt. 1 at 6). These acts
were allegedly performed in an effort to undermine
Plaintiff's then-pending civil rights lawsuits against "the
'rogue' Connecticut Law Enforcement Officers." (*Id.*).
Plaintiff's civil rights actions involved allegations of
"multiple illegal arrests," "[seven] years of unlawful
federal imprisonment," and "[two] years Federal Prison
Overtime." (*See id.*). Plaintiff contends that Philips used
the travel certificate to deport Plaintiff from the United
States to Lagos, Nigeria, on a private airline called,
"Giant Airline," and that Philips presented the forged
travel certificate to "Nigerian Immigration Officials" to
authorize his removal. (*Id.* at 7).

Plaintiff alleges that the "Forensic Experts of Interpol
Nigeria Branch/Nigeria Police" examined the travel
certificate and concluded that it was forged. (*Id.*). In
addition, the Nigerian Consular General and the Nigerian
Ambassador to the United States both declared that "they
did 'not' issue the forged travel certificate." (*Id.*). On
January 23. 2015, the Nigerian Government "certified"
that the travel certificate was forged, and declared that
Plaintiff's removal from the United States and his entry
into Nigeria were illegal. (*Id.* at 8).

As a result of his removal, Plaintiff claims that he lost
"most of his pending civil suits," and "is now leaving [sic]
in limbo and illegally in Nigeria." [1] Plaintiff alleges that
Philips violated his rights under the Fifth Amendment's
Due Process Clause and his Fourth Amendment rights
to be secure from unlawful seizures, by forging a foreign
government's travel document and using it to remove him
from the United States. (*Id.* at 8-9).

 **\*2** Plaintiff also claims that Philips violated his Fifth,
Eighth, and Fourteenth Amendment rights by "brutally"
and "forcefully" removing him from the United States.
(*Id.* at 9, 11). Specifically, Plaintiff claims that he was
forced to strip off his clothing, and was then "severely

beat[en]" by ICE agents, tied to chains, and taken "into the removal flight (Giant Private Airline)." (*Id.* at 10). Plaintiff was so removed despite the fact that his "immigration court case was still pending in court." (*Id.*). Finally, Plaintiff also claims that Philips committed the crime of obstruction of justice by destroying Plaintiff's legal documents and materials necessary for his self-representation in his previously-filed civil rights lawsuits. (*Id.* at 11-12).

Plaintiff further claims that he has since mailed two certified letters to defendants Thomas Feeley, the current ICE Field Office Director in Buffalo, Thomas Homan, the Acting Director of ICE, and Kirstjen Nielsen, the Secretary of the Department of Homeland Security, notifying them that the travel certificate was forged and that he was unlawfully deported. (*Id.* at 13-19). Plaintiff alleges that while these defendants were not direct participants in his unlawful removal, they refused to respond to Plaintiff's letters, and have not made any efforts to reverse his removal from this country. (*Id.*). Plaintiff claims that these defendants have also violated his rights under the Fifth Amendment's Due Process Clause by failing to take any remedial action. (*Id.*).

Lastly, Plaintiff claims that John Doe 1, the owner or CEO of the Giant Private Airline, John Doe 2, the airplane's pilot, and John Doe 3, the co-pilot, each "connived" with Philips and other ICE agents to violate his Fourth, Fifth, Eighth, and Fourteenth Amendment rights by facilitating Plaintiff's unlawful removal to Nigeria. (*See id.* at 20-24).

Plaintiff requests that: (1) the Court issue a declaratory judgment stating that Defendants did not have the legal authority to remove Plaintiff to Nigeria, and that Defendants violated his constitutional rights in doing so; (2) Defendants be ordered to reverse Plaintiff's removal and bring Plaintiff back to the United States; (3) Defendants be ordered to pay Plaintiff $10 million each; (4) Defendants be enjoined from "arresting or prosecuting Plaintiff for any immigration charges"; and (5) Plaintiff's lawful permanent resident status be reinstated. (*Id.* at 27).

On May 21, 2018, Plaintiff filed a supplemental submission to his Complaint, where he again alleged that his "removal order was still under appeal ... as of the date of the illegal removal." (Dkt. 5 at 1).

## DISCUSSION

### I. Plaintiff's Motion for *In Forma Pauperis* Status is Granted

Plaintiff's affirmation of poverty has been reviewed in accordance with 28 U.S.C. § 1915(a)(1). Plaintiff has met the statutory requirements for *in forma pauperis* status, and, therefore, permission to proceed *in forma pauperis* is granted. The Court now turns to its obligation to screen Plaintiff's complaint pursuant to 28 U.S.C. § 1915.

### II. Standard of Review

"Section 1915 requires the Court to conduct an initial screening of complaints filed by civil litigants proceeding *in forma pauperis*, to ensure that the case goes forward only if it meets certain requirements." *Guess v. Jahromi*, No. 6:17-CV-06121(MAT), 2017 WL 1063474. at *2 (W.D.N.Y. Mar. 21, 2017), *reconsideration denied*, No. 6:17-CV-06121 (MAT), 2017 WL 1489142 (W.D.N.Y. Apr. 26, 2017). In evaluating the complaint, a court must accept as true all of the plaintiff's factual allegations, and must draw all inferences in the plaintiff's favor. *See, e.g., Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003). While "a court is obliged to construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), *even pro se* pleadings must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure, *Wynder v. McMahon*, 360 F.3d 73, 79 n.11 (2d Cir. 2004) ("[T]he basic requirements of Rule 8 apply to self-represented and counseled plaintiff's alike.").

**\*3** Upon conducting this initial screening, a court must dismiss the case pursuant to § 1915(e)(2)(B) "if the [c]ourt determines that the action (i) is frivolous or malicious; (ii) fails to state a claim upon which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." *Eckert v. Schroeder, Joseph & Assocs.*, 364 F. Supp. 2d 326, 327 (W.D.N.Y. 2005). "In addition, if the Court 'determines at any time that it lacks subject-matter jurisdiction, the Court must dismiss the action.' " *West v. Sanchez*, No. 17-CV-2482 (MKB), 2017 WL 1628887, at *1 (E.D.N.Y. May 1, 2017) (quoting Fed. R. Civ. P. 12(h)(3) ); *see English v. Sellers*, No. 07-CV-6611L, 2008 WL 189645, at *1 (W.D.N.Y. Jan. 18, 2008) ("[E]ven pleadings submitted *pro se* must fit within the subject matter jurisdiction of an Article III court....").

## III. The Court Lacks Subject Matter Jurisdiction to Entertain Plaintiff's Claims Arising From the Execution of His Removal Order

Questions concerning "[f]ederal subject matter jurisdiction may be raised at any time during litigation and must be raised *sua sponte* by a federal court when there is an indication that jurisdiction is lacking." *Hughes v. Patrolmen's Benevolent Ass'n of City of N.Y., Inc.*, 850 F.2d 876, 881 (2d Cir. 1988). Plaintiff's complaint seeks relief for constitutional violations pursuant to the principles of *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). (Dkt. 1 at 2). As outlined above, Plaintiff asserts that he was unlawfully removed from the United States as a result of a forged travel certificate, and that he was stripped of his clothing, beaten by ICE officials, tied in chains, and carried to the transport airplane for deportation. (*See, e.g., id.* at 6-10).

The Immigration and Nationality Act. 8 U.S.C. § 1101 *et seq.* ("INA"). provides, in relevant part, that:

"[E]xcept as provided by [§ 1252] and notwithstanding any other provision of law ..., including [28 U.S.C. § 2241], or any other habeas corpus provision, ... no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

*Michalski v. Decker*, 279 F. Supp. 3d 487, 495 (S.D.N.Y. 2018) (quoting 8 U.S.C. § 1252(g) ). "The Supreme Court has advised that section 1252(g) should not be construed too broadly, and that it does not cover all claims with some connection to deportation proceedings." *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 124 (D. Conn. 2010) (citing *Reno v. Am.-Arab Anti–Discrimination Comm.*, 525 U.S. 471, 478 (1999) ("*AAADC*") ). Instead, "this 'provision applies only to three discrete actions that the Attorney General ma[y] take: [his] 'decision or action' to "commence proceedings, adjudicate cases, or execute removal orders.' " " *Batalla Vidal v. Duke*, 295 F. Supp. 3d 127, 152 (E.D.N.Y. 2017) (quoting *AAADC*, 525 U.S. at 482); *see also Silva v. United States*, 866 F.3d 938, 941 (8th Cir. 2017) (rejecting the argument that § 1252(g) does not apply "to constitutional claims based on *Bivens*," and explaining that "[t]he limitation on jurisdiction ... applies to 'any cause or claim by or on behalf of any alien' that arises

from a decision to execute a removal order"); *Gupta v. McGahey*, 709 F.3d 1062, 1065 (11th Cir. 2013) ("Section 1252(g) is unambiguous: it bars federal courts' subject-matter jurisdiction over any claim for which the 'decision or action' of the Attorney General (usually acting through subordinates) to commence proceedings, adjudicate cases, or execute removal orders is the basis of the claim."); *see also Magallanes v. United States*, 184 F. Supp. 3d 1372, 1376 (N.D. Ga. 2015) ("Section 1252(g) is not limited to the Attorney General's decisions and actions, but also applies to decisions and actions taken by the Attorney General's subordinates." (citing *Gupta*, 709 F.3d at 1065) ).

**\*4** Plaintiff's allegations pertaining to his unlawful removal are directly connected to the execution of his removal order. The Court finds *Namgyal Tsering v. U.S. Immigration & Customs Enf't*, 403 Fed.Appx. 339 (10th Cir. 2010) to be instructive in reviewing Plaintiff's allegation that he was unlawfully removed based upon a forged travel certificate. In *Tsering*, the plaintiff claimed that he was denied substantive and procedural due process as a result of his removal to Nepal because ICE "submitted a request for travel documents for [the plaintiff] to the Nepal Embassy and included in its request a false Nepali passport that portrayed [the plaintiff] as a Nepali citizen." *Id.* at 343. The Tenth Circuit applied § 1252(g) in finding that subject matter jurisdiction was absent, noting that the plaintiff's claims of falsely procured travel documents "allowed for [the plaintiff]'s removal to Nepal," and thus, were "directly and immediately connected to the execution of his removal order." *Id.*

Similarly. Plaintiff contends that Philips fabricated the travel certificate, and that this document was misrepresented to government officials in Nigeria in order to permit his entry to that country. (Dkt. 1 at 6-7). Since Plaintiff's allegation of unlawful deportation arises from the execution of his removal order, the Court is without subject matter jurisdiction to entertain this claim. *See Tsering*. 403 Fed.Appx. at 343: *Asturias v. Smith*, No. 4:15-CV-00176-CLS-SGC, 2016 WL 4435702, at \*7-8 (N.D. Ala. June 22, 2016) (applying § 1252(g) to the plaintiff's claim that he was "removed from the United States 'without seeing El Salvador's consulate, nor signing any type of paperwork confirming removal [n]or taking into account [his] physical medical condition.' " and holding that "to the extent the plaintiff seeks damages based on his alleged 'unlawful' removal from the United States,

his claim is not cognizable in this court"), *report and recommendation adopted*, No. 4:15-CV-00176-CLS-SGC, 2016 WL 4379522 (N.D. Ala. Aug. 17, 2016); *Magallanes*, 184 F. Supp. 3d at 1376 ("[The p]laintiffs' sole basis for this claim is that the removal was unlawful. Because the claim challenges the lawfulness of the removal, a decision made by a subordinate of the Attorney General, this Court lacks jurisdiction to hear it under § 1252(g)."); *see also Alvarez v. U.S. Immigration & Customs Enf't*, 818 F.3d 1194, 1204 (11th Cir. 2016) (applying § 1252(g) to the plaintiff's claim that "he was detained by means of misrepresentations and disregard for the Department of Justice's commitment in his plea agreement"), *cert. denied sub nom. Alvarez v. Skinner*, 137 S. Ct. 2321 (2017).

The Court notes that Plaintiff also alleges that his removal took place while his "immigration court case was still pending in court." (Dkt. 1 at 10; *see* Dkt. 5 at 1 (alleging that his "removal order was still under appeal ... as of the date of the illegal removal") ). The applicable regulations provide for an automatic stay of the execution of a removal order pending an appeal from the issuance of such an order to the Board of Immigration Appeals. 8 C.F.R. § 1003.6(a). While it is not entirely clear whether Plaintiff seeks relief on this ground, the Court agrees with the Eighth Circuit that a challenge to the execution of a removal order pending an administrative appeal in violation of the administrative stay is "directly connected to the execution of the removal order." *Silva*, 866 F.3d at 940 (citing *Foster v. Townsley*, 243 F.3d 210, 214-15 (5th Cir. 2001) ). As such, even construing Plaintiff's allegations in the light most favorable to him, the Court still finds that it is absent subject matter jurisdiction to entertain such a claim pursuant to § 1252(g).

Therefore, to the extent Plaintiff's allegations of wrongful conduct arise from the execution of his removal order, those claims are dismissed with prejudice for lack of subject matter jurisdiction pursuant to § 1252(g). [2]

## IV. At this Stage, the Court Will Not Dismiss Plaintiff's Claims of Excessive Use of Force and the Destruction of His Legal Materials Pursuant to Section 1252(g)

### A. Excessive Use of Force
**\*5** Plaintiff also claims that his Fifth, Eighth, and Fourteenth Amendment rights were violated when he was forced to strip off his clothing, was severely beaten, and was then tied up and carried to the airplane used to

remove him to Nigeria. (*See* Dkt. 1 at 9, 11). [3] The Court questions whether it has jurisdiction over an excessive use of force claim that appears to arise from the very act of physically removing Plaintiff to an airplane pursuant to his immigration removal order. In *Foster*, the plaintiff filed a *Bivens* action seeking monetary damages and declaratory relief for an allegedly improper removal from the United States. 243 F.3d at 212. Among other things, the plaintiff claimed that the "immigration officers used excessive force when removing him." *Id.* The Fifth Circuit stated that "[t]he particular acts that form the basis of [the plaintiff]'s lawsuit arise from the officials' decision to execute his removal order," and thus, "[h]is claims of excessive force, denial of due process, denial of equal protection and retaliation are all directly connected to the execution of the deportation order." *Id.* at 214. The *Foster* court affirmed the district court's decision to dismiss the action for lack of subject matter jurisdiction pursuant to § 1252(g). *Id.* at 215.

Nonetheless, the Second Circuit has not yet addressed this issue, and it is not completely clear whether Plaintiff also claims that he experienced mistreatment simply while he was detained and awaiting the execution of his removal order. *See Humphries v. Various Fed. USINS Emps.*, 164 F.3d 936, 944 (5th Cir. 1999) (holding that claims of mistreatment while in detention "bear no more than a remote relationship to the Attorney General's decision to 'execute [Humphries's] removal order' "). "In reviewing a *pro se* complaint, the court must be mindful that a plaintiff's pleadings should be held 'to less stringent standards than formal pleadings drafted by lawyers.' " *Bahr v. City Univ. of N.Y./ York Coll.*, No. 15-CV-4380 (MKB), 2016 WL 8711060, at \*3 (E.D.N.Y. Dec. 9, 2016) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ); *see Phillips v. Girdich*, 408 F.3d 124, 127-28 (2d Cir. 2005) ("We also have held that, when reviewing *pro se* submissions, a district court should look at them with a lenient eye, allowing borderline cases to proceed." (quotation marks and citation omitted) ). Accordingly, the Court will assume, for screening purposes only, that Plaintiff's excessive use of force allegations fall outside the jurisdictional bar of § 1252(g). Nothing contained in this Decision and Order shall be construed to prevent Defendants from seeking dismissal on this or any other ground.

### B. Destruction of Legal Documents and Materials

Plaintiff also alleges that Philips destroyed certain legal materials that were necessary to his self-representation in his previously-filed civil rights actions. (Dkt. 1 at 11-12). Given the sparse nature of Plaintiff's allegations, it is difficult to ascertain whether the destruction of his legal materials was directly connected to the execution of his removal order. However, since Plaintiff alleges that Philips destroyed his legal documents *before* he was removed, and in giving Plaintiff's complaint a liberal construction, it appears that "these claims bear no more than a remote relationship to the Attorney General's decision to 'execute [Plaintiff's] removal order.' " *Humphries*, 164 F.3d at 944. Thus, for purposes of this Court's initial screening, Plaintiff has sufficiently alleged facts outside this jurisdictional bar.

## V. Plaintiff Fails to Sufficiently Allege a Cause of Action for the Destruction of his Legal Materials

### A. Plaintiff's Claim of Obstruction of Justice Based Upon the Destruction of His Legal Materials is Dismissed as Frivolous

**\*6** In allegedly destroying his legal materials, Plaintiff claims that Philips committed the crime of obstruction of justice. (Dkt. 1 at 11-12). However, where a private citizen seeks to enforce or prosecute a criminal statute, courts have routinely found that the citizen does not have standing to do so. *See, e.g., Salvador v. State of New York*, No. 12 Civ. 7299 (LAP), 2013 WL 12080930, at *1 (S.D.N.Y. Feb. 19, 2013) ("[A] private party does not have standing to file or prosecute a criminal case because 'a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.' " (quoting *Leeke v. Timmerman*, 454 U.S. 83, 86 (1981) ) ), *aff'd sub nom. Salvador v. New York*, 550 Fed.Appx. 56 (2d Cir. 2014); *Truong v. Litman*, No. 06 Civ. 1431 (SHS), 2006 WL 3408573, at *4 (S.D.N.Y. Nov. 22, 2006) (stating that "private citizens cannot generally enforce the U.S. Criminal Code"), *aff'd*, 312 Fed.Appx. 377 (2d Cir. 2009). Title 18 of the United States Criminal Code criminalizes the obstruction of justice and contains several sections, *see* 18 U.S.C. § 1501 *et seq.*—none of which permit the assertion of a private right to action, *see Brown v. State Farm Fire & Cas. Co.*, No. 3:11CV1435 (JBA), 2013 WL 951726, at *3 n.2 (D. Conn. Mar. 12, 2013) ("18 U.S.C. §§ 1501-07 is a federal criminal statute that does not give rise to a private cause of action."); *Garay v. U.S. Bancorp*, 303 F. Supp. 2d 299, 303 (E.D.N.Y. 2004) ("Because obstruction of justice is a criminal matter, there is no

private cause of action."); *see also Clissuras v. City of Univ. of N.Y.*, 90 Fed.Appx. 566, 568 n.1 (2d Cir. 2004) ("In their cavalcade of claims, plaintiff's make creative arguments regarding obstruction of justice and theft of identity. These claims are either time-barred or do not constitute private federal causes of action, or both."). Therefore, to the extent that Plaintiff attempts to assert a claim for obstruction of justice, this claim is dismissed with prejudice as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).

### B. Fourth Amendment Claim

Although Plaintiff primarily grounds his claim for the destruction of his legal materials upon the crime of obstruction of justice, the Court is obligated to construe the allegations in Plaintiff's *pro se* complaint as raising "the strongest arguments that they suggest." *See Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 Fed.Appx. 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471. 474-75 (2d Cir. 2006) ). Thus, the Court also recognizes that Plaintiff alleges that his Fourth Amendment rights were violated when Philips destroyed his legal documents. (Dkt. 1 at 12). Nonetheless, Plaintiff does not allege facts that demonstrate an infringement upon any reasonable expectation of privacy, as is necessary to support a violation of the Fourth Amendment. While it is not entirely clear from Plaintiff's allegations whether he was still imprisoned at the time Philips allegedly destroyed his legal materials, it appears likely that Plaintiff was still in ICE custody and awaiting the execution of his removal order when his papers were allegedly removed from his possession. *See Hudson v. Palmer*, 468 U.S. 517, 526 (1984) (holding that a prisoner does not have a reasonable expectation of privacy in his prison cell).

Accordingly, any *Bivens* claims for destruction of legal materials based upon the Fourth Amendment are dismissed without prejudice for failure to state a claim. *See* 28 U.S.C. § 1915(e)(2)(B)(ii).

### C. Plaintiff's Right of Access to the Courts Claim

Additionally. Plaintiff alleges that the legal documents and materials that were destroyed were necessary for his self-representation in his prior civil rights actions. (Dkt. 1 at 12). The Court construes this allegation as raising a claim for the violation of his right of access to the courts pursuant to the First and Fifth Amendments. *See Garcia*

*v. Lawrence*, 118 Fed.Appx. 436, 439 n.6 (10th Cir. 2004) ("The due process clause protects the right of access to the courts."); *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) ("Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution."); *Adekoya v. Herron*, No. 6:10-CV-6646 (MAT). 2013 WL 6092507. at *12 (W.D.N.Y. Nov. 19, 2013) ("The constitutional right of access to the courts is protected by the First Amendment's right to petition the government for redress of grievances. In addition, a corollary to the constitutional guarantee of due process of law is the requirement that prisoners be afforded access to the courts in order to seek redress for violations of their constitutional rights." (citation omitted) ); *Miner v. Sheriden*, No. 3:94CV1443 (AHN), 1996 WL 684386, at *5 (D. Conn. Sept. 17, 1996) (same), *aff'd sub nom. Miner v. Sheridan*, 199 F.3d 1322 (2d Cir. 1999).

### D. The *Bivens* Analysis

**\*7** In *Bivens*, the Supreme Court found a private right of action for monetary damages for the violation of one's constitutional rights by a federal agent acting under color of federal authority. *Bivens*, 403 U.S. at 389; *see, e.g., Arar v. Ashcroft*, 585 F.3d 559, 571 (2d Cir. 2009). "The purpose of the *Bivens* remedy 'is to deter individual federal officers from committing constitutional violations.' " *Arar*, 585 F.3d at 571 (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) ). The *Bivens* remedy is applicable only in an extremely narrow set of circumstances. "In the forty-six years since *Bivens* was decided, the Supreme Court has extended the precedent's reach only twice, and it has otherwise consistently declined to broaden *Bivens* to permit new claims." *Doe v. Hagenbeck*, 870 F.3d 36, 43 (2d Cir. 2017) (footnotes omitted). "Recently, the Supreme Court reiterated that courts should not imply rights and remedies as a matter of course, 'no matter how desirable that might be as a policy matter, or how compatible with the statute [or constitutional provision].' " *Gonzalez v. Hasty*, 269 F. Supp. 3d 45. 57 (E.D.N.Y. 2017) (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017) ). *appeal filed*, No. 17-3790 (2d Cir. Nov. 21, 2017). "Given the notable change in the Court's approach to recognizing implied causes of action, ... the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Ziglar*, 137 S. Ct. at 1857 (quoting *Ashcroft v. Iqbal* 556 U.S. 662, 675 (2009) ).

In determining whether to recognize an implied *Bivens* cause of action, a court must first "determine whether a plaintiff's claims arise in a new *Bivens* context." *Sanford v. Bruno*, No. 17-CV-5132 (BMC), 2018 WL 2198759, at *5 (E.D.N.Y. May 14, 2018). "If the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court], then the context is new." *Ziglar*, 137 S. Ct. at 1859. If the case presents a new *Bivens* context, then the court must determine "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). "This second step is often referred to as the special-factors analysis." *Sanford*, 2018 WL 2198759, at *5. "The Court's precedents now make clear that a *Bivens* remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.' " *Ziglar*, 137 S. Ct. at 1857 (quoting *Carlson v. Green*, 446 U.S. 14, 18 (1980) ).

### E. Plaintiff's Right of Access to the Courts Claim Presents a New *Bivens* Context

Plaintiff's allegations present a new *Bivens* context. *See Vega v. United States*, 724 Fed.Appx. 536, 539 (9th Cir. 2018) (finding that the plaintiff's "First Amendment access to courts and Fifth Amendment due process claims under *Bivens*" presented a new *Bivens* context); *see Ziglar*, 137 S. Ct. at 1859 (stating that a new *Bivens* context will arise if "the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court]"). Indeed, "[t]he Supreme Court has never explicitly recognized a *Bivens* remedy for a First Amendment claim." *Vega v. United States*, 881 F.3d 1146, 1153 (9th Cir. 2018) (citing *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims.") ). [4] Accordingly, the Court must determine whether any "special factors" counsel against extending *Bivens* into this new context.

**\*8** The Court notes that "[n]ationwide, district courts seem to be in agreement that, post-*Abbasi*, prisoners have no right to bring a *Bivens* action for violation of the First Amendment." *Free v. Peikar*, No. 1:17-CV-00159-AWI-MJS (PC). 2018 WL 1569030, at *2 (E.D. Cal. Mar. 30, 2018) (collecting cases); *see Winstead v. Matevousian*, No. 1:17-CV-00951-LJO-BAM (PC), 2018 WL 2021040, at *3 (E.D. Cal. May 1, 2018) (declining to extend *Bivens* to a

First Amendment denial of access to courts claim because "[i]t is clear that [the p]laintiff had or has alternative remedies available to him, including the Bureau of Prisons administrative grievance process, a federal tort claims action, the filing of a writ of habeas corpus, or injunctive relief"); *Howard v. Lackey*, No. CV 7:16-129-KKC, 2018 WL 1211113, at *3 (E.D. Ky. Mar. 7, 2018) (noting that "to extend *Bivens* liability in the First Amendment context presented here would impose substantial costs, in both time and money, upon individual officers and employees of the Federal Government"); *see also Ziglar*, 137 S. Ct. at 1858 (stating that "the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide[,] ... include[ing] the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies"). Several of these considerations appear to apply with equal force to Plaintiff's allegations. *See Borowski v. Mordino*, No. 16-CV-999-LJV(MJR), 2017 WL 4683980, at *1 (W.D.N.Y. Oct. 19, 2017) (dismissing the plaintiff's claim seeking to expand *Bivens* into the First Amendment context because to do so would be a " 'disfavored' judicial activity" (quoting *Ziglar*, 137 S. Ct. at 1857) ); *see also Arar*, 585 F.3d at 574 (stating that the "threshold" for whether a factor " 'counsels hesitation' " in recognizing a new implied *Bivens* remedy is "remarkably low").

However, whether "special factors" caution against extending *Bivens* in the context of Plaintiff's right of access to the courts claim is an issue that the Court elects not to decide upon screening of a complaint pursuant to § 1915(e)(2)(B) and without briefing by the parties upon either a motion to dismiss or for summary judgment. Therefore, for purposes of screening only, the Court assumes *arguendo* a remedy under *Bivens* is available to Plaintiff for this cause of action.

### F. Even Assuming the Existence of an Implied *Bivens* Remedy, Plaintiff Failed to Sufficiently Allege a Cause of Action for the Violation of the Right of Access to the Courts

Nevertheless, even assuming that Plaintiff's right of access to the courts claim raises a cognizable *Bivens* remedy, Plaintiff has failed to allege that "he lost a claim due to interference with his right of access to the courts."

*Moorer-Bey v. Fed. Bureau of Prisons*, No. CIV. 12-212-GPM, 2012 WL 1409500, at *3 (S.D. Ill. Apr. 22, 2012) (dismissing right of access to court claim at the screening stage); *see Pacheco v. Connecticut*, 471 Fed.Appx. 46, 47 (2d Cir. 2012) ("A plaintiff asserting a claim for a violation of his right of access to the courts 'must demonstrate that a defendant caused actual injury,' meaning that the defendant 'took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim.' " (quoting *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997) ) ); *Harrod v. Kaminski*, 134 Fed.Appx. 603, 605 (3d Cir. 2005) ("Actual injury can be demonstrated by showing that a defendant's actions resulted in the loss or rejection of a legal claim. [The plaintiff] made no such allegation in his amended complaint." (quotation marks and citation omitted) ); *Nwaokocha v. Sadowski*, 369 F. Supp. 2d 362, 370-71 (E.D.N.Y. 2005) ("The loss of law books and appeal papers will not be found to constitute a denial of due process rights unless the plaintiff has suffered actual injury because, 'denial of legal resources [has] prejudiced pending litigation.' " (quoting *Lewis v. Casey*, 518 U.S. 343, 353 (1996) ) ); *Cancel v. Goord*, No. 00 CIV 2042 LMM, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (stating that the plaintiff must allege "that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim").

Plaintiff alleges that he lost his previously-filed civil rights lawsuits because he was unlawfully removed from this country (Dkt. 1 at 8); however, he does not allege that the loss of his legal materials ultimately resulted in the dismissal of those actions. Accordingly, Plaintiff has failed to allege an "actual injury" as a result of the alleged destruction of his legal materials, and thus, he has failed to state a claim for the violation of the right of access to the courts and its corollary right under the Fifth Amendment's Due Process Clause. However, since "a *pro se* litigant should be afforded every reasonable opportunity to demonstrate that he has a valid claim," *Satchell v. Dilworth*, 745 F.2d 781, 785 (2d Cir. 1984); *see Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) ("A *pro se* complaint is to be read liberally. Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." (quotations omitted) ), Plaintiff is granted leave to file an amended complaint **within thirty (30) days of the filing of this Decision and Order.**

## VI. Plaintiff's Excessive Use of Force Claim Will Be Permitted to Proceed to Service

### A. For Screening Purposes, the Court Will Assume that Plaintiff's Excessive Use of Force Claim Falls Within the Scope of Either the Fifth or the Eighth Amendments

**\*9** Plaintiff also argues that he was subjected to excessive force by ICE agents in violation of his Fifth and Eighth Amendment rights. (Dkt. 1 at 10-11). However, since it is not clear whether Plaintiff's claims of mistreatment arose while serving his criminal sentence or only after he had been placed into ICE's custody during his removal proceedings, it is also not completely apparent whether his claim of excessive force arises under the Fifth or Eighth Amendments. *See Adekoya v. Chertoff,* 431 Fed.Appx. 85, 88 (3d Cir. 2011) ("Because Adekoya was an immigration detainee at the time of the alleged constitutional violations, he was entitled to the same protections as a pretrial detainee."); *Porro v. Barnes,* 624 F.3d 1322. 1326 (10th Cir. 2010) (holding that it is the due process "standard that controls excessive force claims brought by federal immigration detainees"); *accord Zikianda v. County of Albany,* No. 1:12-CV-1194, 2015 WL 5510956, at \*14 n.5 (N.D.N.Y. Sept. 15, 2015) ("The deliberate indifference standard recognizes the unique demands for health care in jails, and the same logic that would apply that standard to pre-trial detainees counsels that the standard apply to civil immigration detainees like the Decedent."); *see also Ortiz v. Pearson,* 88 F. Supp. 2d 151, 160 (S.D.N.Y. 2000) (stating that the Fifth Amendment's Due Process Clause, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment, governed a pretrial detainee's claim of excessive force). In the absence of any briefing, the most prudent course is to permit Plaintiff's claim of excessive use of force to proceed under both the Fifth and Eighth Amendments for screening purposes since Plaintiff's allegations, at this stage, would state a claim for relief under either constitutional amendment.

### B. Plaintiff's Excessive Use of Force Claim Presents a New *Bivens* Context

In *Carlson v. Green,* 446 U.S. 14 (1980), the Supreme Court extended the *Bivens* remedy in the context of an Eighth Amendment cruel and unusual punishment claim based upon the defendants' deliberate indifference to the plaintiff's medical needs. *Id.* at 18-21. The

Supreme Court has also extended *Bivens* to claims of gender discrimination under the Fifth Amendment's Due Process Clause. *See Davis v. Passman,* 442 U.S. 228, 248 (1979). However, "[a] Fifth Amendment excessive force claim clearly places a different constitutional right at issue than the Eighth and Fourth Amendment claims in *Carlson* and *Bivens*, respectively[, and] ... there are obvious meaningful differences between excessive force and gender discrimination claims." *Abdoulaye v. Cimaglia,* No. 15-CV-4921 (PKC), 2018 WL 1890488, at \*6 (S.D.N.Y. Mar. 30, 2018). Furthermore, to the extent that Plaintiff's excessive use of force claim arises under the Eighth Amendment, there are also meaningful differences between Plaintiff's allegations of severe physical abuse, and the indifference to medical needs at issue in *Carlson*. (*See* Dkt. 1 at 9-11); *see also Ziglar,* 137 S. Ct. at 1860 ("A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider."). Since no Supreme Court decision has ever extended *Bivens* to encompass the specific context presented by Plaintiff's excessive use of force claim, this claim presents a new *Bivens* context as well.

However, for the same reasons discussed above regarding Plaintiff's right of access to the courts claim, the Court elects not to delve into the issue of whether "special factors" counsel against the extension of *Bivens* to this context without the benefit of briefing by the parties upon a dispositive motion. Therefore, for screening purposes only, the Court assumes *arguendo* a remedy under *Bivens* is available to Plaintiff regarding his claim of excessive force. [5]

## CONCLUSION

**\*10** For the foregoing reasons. Plaintiff's motion to proceed *in forma pauperis* (Dkt. 2) is granted. Plaintiff's first claim for unlawful removal against Philips, and his claims against Feeley. Homan, and Nielsen are dismissed with prejudice. Plaintiff's third cause of action against Philips related to the destruction of his legal materials

is dismissed without prejudice, with the exception of Plaintiff's associated claim for obstruction of justice which is dismissed with prejudice. Plaintiff's claims against John Doe 1, John Doe 2, and John Doe 3 are also dismissed without prejudice. However, Plaintiff's second claim against Philips for the use of excessive force may proceed to service.

Plaintiff is granted leave to file an amended complaint consistent with this Decision and Order **within thirty (30) days of the filing of this Decision and Order**. The Clerk of the Court is directed to send to Plaintiff with this Order a copy of the original complaint, a blank complaint form, and the instructions for preparing an amended complaint. Plaintiff's failure to file an amended complaint **within thirty (30) days of the entry date of this Decision and Order** will result in this case proceeding only as to Plaintiff's

second claim against Philips, as currently alleged, and all other claims will be dismissed with prejudice without further order of the Court. Plaintiff is advised that an amended complaint is intended to completely replace the prior complaint in the action, and thus it "renders [any prior complaint] of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977); *see, e.g., Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, Plaintiff's amended complaint must include all necessary allegations so that it may stand alone as the sole complaint in this action.

SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 3425009

Footnotes

1   The Court notes that Plaintiff's signature in the Complaint is followed by a mailing address located at 31 Sutton Place, Bloomfield, Connecticut 06002, as well as what appears to be Plaintiff's email address. (Dkt. 1 at 28).

2   Plaintiff's allegations relating to Defendants Thomas Feeley ("Feeley"), Thomas Homan ("Homan"), and Kirstjen Nielsen ("Nielsen") are also dismissed with prejudice. Plaintiff seeks to hold Feeley, Homan, and Nielsen liable based upon their alleged failure to act after Plaintiff sent them letters describing the alleged unlawful nature of his removal. (Dkt. 1 at 13. 15-16, 18). As explained above, the Court is without jurisdiction to review any alleged wrongful conduct arising from the execution of Plaintiff's removal order.

3   Since "[t]he Fourteenth Amendment applies to state action and not federal action," inasmuch as Plaintiff alleges wrongful conduct by federal actors and private actors, while acting under color of federal authority, Plaintiff's Fourteenth Amendment claim must be dismissed. *Russo v. Glasser*, 279 F. Supp. 2d 136, 142 (D. Conn. 2003); *see, e.g., Taylor v. Dunlap.* No. 07-CV-253 (NAM) (DRH), 2009 WL 666441, at *2 n.1 (N.D.N.Y. Mar. 11, 2009) ("Any due process claim would necessarily be a Fifth Amendment claim; the Fourteenth Amendment applies only to the states, not to federal defendants.").

4   The Court notes that while "the Second Circuit has not recognized a *Bivens* action sounding in the First Amendment," *Zherka v. Ryan*, 52 F. Supp. 3d 571, 579 (S.D.N.Y. 2014); *cf. Gonzalez v. Hasty*, 802 F.3d 212, 222 n.10 (2d Cir. 2015) ("We assume without deciding that a First Amendment claim is cognizable under *Bivens*."), "the Second Circuit has recognized that 'a deprivation of procedural due process rights can give rise to a *Bivens* claims [sic],' " *Lewis v. Weiss*, No. 12-CV-07242 (ALC), 2016 WL 1718251, at *4 (S.D.N.Y. Apr. 27, 2016) (quoting *Zielinski v. DeFreest*, No. 12 Civ. 1160 (JPO), 2013 WL 4838833, at *4 (S.D.N.Y. Sept. 10, 2013) ). Nonetheless, *Ziglar* has clarified that the only implied *Bivens* rights are those expressly recognized by the Supreme Court. *See Sanford*, 2018 WL 2198759, at *4 ("Practically speaking, ... post-*Ziglar*, even where a Court of Appeals had previously found a *Bivens* remedy, that court or a district court must reconsider whether one is available."); *Gonzalez*, 269 F. Supp. 3d at 57 ("*Ziglar* also made it clear that the only recognized implied rights of action were the narrow situations presented in *Bivens*, *Davis*, and *Carlson*, and lower courts must scrutinize attempts to expand the *Bivens* remedy, even where courts had assumed the availability of such a remedy."); *see also Vanderklok v. United States*, 868 F.3d 189, 199 (3d Cir. 2017) (stating that after *Ziglar*, the court's "past pronouncements are ... not controlling in the specific circumstances now at issue." and that the court "must look at the issue anew in this particular context ... and as it pertains to this particular category of defendants"). Therefore, this Court's review of Plaintiff's *Bivens* claims is guided by the Supreme Court's analysis in *Ziglar*, and its admonishment that "expanding the *Bivens* remedy is now a disfavored judicial activity." *Ziglar*, 137 S. Ct. at 1857 (quotation marks and citation omitted).

5   To the extent that Plaintiff seeks to hold John Doe 1, John Doe 2, and John Doe 3 liable for "conniving" and otherwise conspiring with Philips to violate his constitutional rights (Dkt. 1 at 20, 22-24), these conclusory and vague allegations

of conspiracy are insufficient to state a claim under *Bivens* against these defendants as well. *See Arar,* 585 F.3d at 569 ("[A] plaintiff in a *Bivens* action is required to allege facts indicating that the defendants were personally involved in the claimed constitutional violation."); *see also Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir. 1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); *Russo v. Glasser,* 279 F. Supp. 2d 136, 14445 (D. Conn. 2003) (dismissing the plaintiff's *Bivens* claim because his "claims of conspiracy are vague and conclusory"). Accordingly, Plaintiff's claims against John Doe 1, John Doe 2, and John Doe 3 are dismissed without prejudice for failure to state a claim pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii).

---

**End of Document**                                             © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Atkinson v. Broe, Slip Copy (2019)

2019 WL 231754

2019 WL 231754
Only the Westlaw citation is currently available.
United States District Court, W.D. Wisconsin.

Christopher Scott ATKINSON, Plaintiff,

v.

A.C. BROE, K. Garstka, T. Roberts, A.
Weber, and L.C. Ward, Defendants.

15-cv-386-wmc
|
Signed 01/15/2019
|
Filed 01/16/2019

**Attorneys and Law Firms**

Christopher Scott Atkinson, Grand Rapids, MI, pro se.

Barbara L. Oswald, Leslie K. Herje, United States Attorney's Office, Madison, WI, for Defendants.

## OPINION AND ORDER

WILLIAM M. CONLEY, District Judge

**\*1**  *Pro se* plaintiff Christopher Scott Atkinson was granted leave to proceed on a number of claims against Federal Bureau of Prisons employees in Oxford, Wisconsin under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for alleged unauthorized withdrawal of money from his prison trust fund account and for alleged retaliation against him for complaining about those withdrawals.[1] Specifically, plaintiff was granted leave to proceed on: (1) a due process claim under the Fifth Amendment against defendants Garstka, Roberts and Ward; (2) a takings claim under the Fifth Amendment against defendant Garska; and (3) First Amendment claims against defendants Garska, Weber, Broe, Roberts and Ward. After the parties completed the summary judgment briefing, defendants sought leave to file a motion for judgment on the pleadings under Rule 12(c) based on the Supreme Court's decision in *Ziglar v. Abbasi*, ––– U.S. ––––, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017), as well as the motion itself. (*See* dkt. ##63, 63-1, 63-2.) For the reasons enumerated below, defendants' unopposed motions will be granted.

## OPINION

Under Rule 12(c), "a party may move for judgment on the pleadings" once "the pleadings are closed -- but early enough not to delay trial." Fed. R. Civ. P. 12(c). A motion for judgment on the pleadings is reviewed under the same standard as Rule 12(b)(6), except that the court considers not only the complaint and referenced documents, but all pleadings, as well as documents that are incorporated into any pleading by reference. *See Gill v. City of Milwaukee*, 850 F.3d 335, 339 (7th Cir. 2017) ("A motion for judgment on the pleadings is subject to the same standard as a motion to dismiss under Rule 12(b) (6).") (citing *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) ). To succeed, "the moving party must demonstrate that there are no material issues of fact to be resolved," even with the court viewing all facts in the light most favorable to the nonmoving party. *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998). While the non-moving party's factual allegations are generally accepted as true in response to a 12(c) motion, "allegations in the form of legal conclusions are insufficient to survive." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012) ).

Defendants seek judgment on the pleadings, arguing that plaintiff's claims present new contexts for a *Bivens* suit expressly precluded post-*Abbasi*; and "special factors" identified in *Abbasi* militate against extending the *Bivens* remedy. Given that the plaintiff has not opposed dismissal under *Abbasi*, the court could simply grant the motion. However, acting *pro se*, plaintiff did oppose defendants' motion for summary judgment, and therefore, it seems appropriate to examine how this new development in the law applies to plaintiff's *Bivens* claims.

### I. Prohibition on Any "Meaningful" Expansion of *Bivens* Remedy

**\*2**  The Supreme Court noted in *Abbasi* that "expanding the *Bivens* remedy is now a 'disfavored' judicial activity" such that the Court "has 'consistently refused to extend *Bivens* to any new context or new category of defendants' " over the past thirty years. *Abbasi*, 137 S.Ct. at 1857 (internal citations omitted) (collecting cases). As a result,

*Abbasi* directs that the first question a court must consider is whether the relief sought would expand the *Bivens* remedy to a new context or category of defendants? *Id.* at 1859, 1864. Moreover, "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme] Court, then the context is new." *Id.* at 1859. The cases considered for comparison by the *Abbasi* Court were: *Bivens, Davis* and *Carlson. Id.* at 1854-55, 1860, 1864-65 (citing *Bivens*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (FBI agents handcuffed a man in his home without a warrant); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979) (Congressman fired female secretary); and *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980) (prison officials failed to treat inmate's asthma) ).

"Meaningful" differences can be found based on:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond ...; the statutory or legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860. The Supreme Court further cautioned that "even a modest extension is still an extension." *Id.* at 1864.

Accordingly, after *Abbasi*, "additional scrutiny is required before a plaintiff may proceed with a *Bivens* action if the claims arise 'in a new *Bivens* context.' " *Harris v. Dunbar*, No. 2:17-cv-00536-WTL-DLP, 2018 WL 3574736 at *2 (S.D. Ind. July 25, 2018) (quoting *Abbasi*, 137 S.Ct. at 1864) (declining to extend *Bivens* remedy to First Amendment interference with mail and Fifth Amendment due process claims). "[E]ven where a circuit court has previously found a *Bivens* remedy, that court must still consider the availability of an implied right of action in subsequent cases relying on the same precedent." *Gonzalez v. Hasty*, 269 F.Supp.3d 45, 58 (E.D.N.Y. 2017) (citing

*Vanderklok v. United States*, 868 F.3d 189, 199-200 (3d Cir. 2017) ), *appeal filed.*

## II. Application of *Abbasi* to Plaintiff's Bivens Claims

In this case, plaintiff is asserting claims for retaliation under the First Amendment and for due process and takings clause violations under the Fifth Amendment. (*See* Order Leave to Proceed (dkt. #9) 1, 19.) Given their different constitutional footing, therefore, plaintiff's retaliation and takings claims are arguably meaningfully different from the Fourth, Fifth and Eighth Amendment claims recognized in *Bivens, Davis* and *Carlson. See Harris*, 2018 WL 3574736 at *2-*3 ("Nationwide, district courts seem to be in agreement that, post-*Abbasi*, prisoners have no right to bring a *Bivens* action for violation of the First Amendment.") (quoting *Akande v. Philips*, No. 1:17-cv-01243-EAW, 2018 WL 3425009 at *8 (W.D.N.Y. July 11, 2018) ) (comparing plaintiff's claims with claims in *Bivens, Davis*, and *Carlson* and collecting Southern District of Indiana cases concluding that prisoners cannot bring a *Bivens* action for a First Amendment violation); *Davinci Aircraft, Inc. v. United States*, No. 2:16-cv-05864-CAS( ), 2017 WL 440232, at *8 (C.D. Cal. Jan. 30, 2017) (citing *Anoushiravani v. Fishel*, No. 04-cv-212-MO, 2004 WL 1630240, at *9 (D. Or. July 19, 2004) ) (declining to find "a basis for permitting a *Bivens* claim against [air force officials] in their individual capacities" for a takings claim).[2] Even plaintiff's due process claims arise in a different context than that recognized in *Davis*. (*Compare* Order Leave to Proceed (dkt. #9) 7 *with* ) *Davis*, 442 U.S. at 230-31, 99 S.Ct. 2264 (employment-discrimination claim against congressman); *see also Gonzalez*, 269 F.Supp.3d at 58 (explaining that "the Supreme Court has refused to extend *Bivens* contexts beyond the specific clauses of the specific amendments for which a cause of action had been implied, or even to other classes of defendants facing liability under those same clauses" (citing *Davis*, 442 U.S. at 243-44, 99 S.Ct. 2264 and *Schweiker v. Chilicky*, 487 U.S. 412, 428-29, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) ) ).

**\*3** Further, plaintiff's *Bivens* claims fall short under a "special factors analysis." *See Abbasi*, 137 S.Ct. at 1865. As the *Abbasi* Court instructed, "a *Bivens* remedy will not be available if there are 'special factors counselling hesitation in the absence of affirmative action by Congress.' " *Id.* at 1857 (quoting *Carlson*, 446 U.S. at 18, 100 S.Ct. 1468). This "inquiry must concentrate on

whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1858. A factor that causes the court to "hesitate before answering that question in the affirmative" is a "special factor counselling hesitation." *Id.* The Court explained that

> if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts *must* refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal court jurisdiction under Article III.

*Id.* (emphasis added). Defendants identify four, specific "special factors" that they contend militate against extending *Bivens* to any of plaintiff's claims.

### A. Alternative Processes

The Supreme Court noted in *Abbasi* that "if there is an alternative remedial structure present ... that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action" because the alternative process may convincingly caution the Judiciary against "providing a new and freestanding remedy in damages." 137 S.Ct. at 1858. Accordingly, the Court cautioned, "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Id.* at 1863 (collecting cases). Defendants note three alternative processes through which this plaintiff could have sought relief here: the Tucker Act, the Bureau of Prison's Administrative Remedy Process, and other administrative remedies. (Mot. J. Pleadings Br. (dkt. #63-2) 12-15.) The court agrees.

First, plaintiff could have asserted claims against the United States for just compensation for public takings under the Tucker Act. *Davinci Aircraft, Inc.*, 2017 WL 440232, at *8 (citing *Anoushiravani*, 2004 WL 1630240, at *9). The Tucker Act grants the Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded ... upon the Constitution." 28

U.S.C. § 1491(a)(1). Claims under the Constitution against the United States for $10,000 or less can also be brought in the federal district courts. 28 U.S.C. § 1346(a)(2).

Second, the Administrative Remedy Process Program, which "allow[s] an inmate to seek formal review of an issue relating to any aspect of his/her own confinement," "applies to all inmates in institutions operated by the Bureau of Prisons." Administrative Remedy Program Purpose and Scope, 28 C.F.R. § 542.10(a)-(b) (2018). While an institution's warden is responsible for "[e]stablish[ing] procedures" to address requests and appeals, including "investigating and responding," 28 C.F.R. § 542.11(a)(1) (2018), plaintiff did not dispute the availability of this program at summary judgment, nor the existence of a separate process for inmates seeking money for damaged or lost property. (Defs.' Reply to Pl.'s Resp. to Defs.' PFOF (dkt. #48) ¶¶ 73, 75.) Likewise, plaintiff does not dispute that he submitted resolution forms and participated in the appellate review process. (*Id.* at ¶¶ 84, 93, 104, 106.) Accordingly, plaintiff had another alternative process available to him. *See Gonzalez*, 269 F.Supp.3d at 60, 63 (declining to expand *Bivens* cause of action for Eighth Amendment conditions-of-confinement and Fifth Amendment due process claims because administrative complaint process and other "special factors" counseled against expansion).

**\*4** Third, federal agencies can settle "claim[s] for not more than $1,000 for damage to, or loss of, privately owned property that ... is caused by the negligence of an officer or employee of the United States Government acting within the scope of employment." 31 U.S.C. § 3723(a)(1). This procedure is available to inmates. *See Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 228 n.7, 128 S.Ct. 831, 169 L.Ed.2d 680 (2008). Likewise, as defendants note, the attorney general is authorized to settle a claim for "damage to, or loss of, privately owned property, caused by an investigative or law enforcement officer" for up to $50,000. [3] 31 U.S.C. § 3724. Assuming that the unauthorized withdrawal of money from plaintiff's trust fund account "damage[d]" the account, these processes could also have been available to plaintiff. [4]

Accordingly, plaintiff had alternative processes available to him and this factor weighs against expanding *Bivens* for all of his claims. *See Goree v. Serio*, 735 Fed. App'x 894, 895 (7th Cir. 2018) ("Where Congress has established an

alternative remedial structure to protect a constitutional right, the Supreme Court has strongly cautioned that the courts should not create a secondary remedy." (citing *Abbasi*, 137 S.Ct. at 1857-58) ); *Vega v. United States*, 724 Fed. App'x 536, 539 (9th Cir. 2018) (affirming district court's refusal to extend *Bivens* to prisoner plaintiff's access to courts and due process claims finding that plaintiff had adequate alternative processes available to him); *Gonzalez*, 269 F.Supp.3d at 60 ("The existence of an 'alternative, existing process' to resolve an issue, whether judicial or non-judicial, 'constitutes a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.' " (quoting *Minneci v. Pollard*, 565 U.S. 118, 125-26, 132 S.Ct. 617, 181 L.Ed.2d 606 (2012) ) ).

Even so, plaintiff's retaliation claim gives the court additional pause because it is of a different character: he alleges that he was punished for complaining, which if true, would likely act as a deterrent to complaining further about retaliation, especially if the retaliatory punishment were harsh. *Cf. Jerra v. United States*, 2018 WL 1605563 (C.D. Cal. Mar. 29, 2018) (refusing to grant post-trial relief to defendants following jury verdict for plaintiff, concluding *Abbasi* did not foreclose plaintiff's *Bivens* retaliation claim in part because the retaliation claim was derivative of his use of the BOP administrative remedies), *appeal docketed*; *Loumiet v. United States*, 292 F.Supp.3d 222 (D. D.C. 2017) (permitting *Bivens* retaliation claim to proceed because there was no alternate process), *appeal docketed*; [5] *Burgett v. Puckett*, No. 18-cv-01372-JPG, 2018 WL 4409948, at *2 (S.D. Ill. Sept. 17, 2018) (declining to dismiss retaliation claim at screening because the "complex legal issue" of whether the claim is viable after *Abbasi* "would benefit from briefing by attorneys").

**\*5** Still, the majority of courts considering this question have concluded that a *Bivens* claim is no longer available for a First Amendment retaliation claim, including the Third Circuit in *Bistrian v. Levi*, 912 F.3d 79, 95–96 (3d Cir. 2018) (refusing to extend *Bivens* claims after *Abbasi* to cover retaliation claim of pretrial detainee). *See, e.g.*, *Vanaman v. Molinar*, No. CV-17-00222-TUC-JGZ, 2018 WL 4698655, at *4 (D. Ariz. Sept. 28, 2018) (relying in part on BOP administrative remedy process and special factors to counsel against extending *Bivens* to First Amendment claims); *Early v. Shepherd*, No. 2:16-cv-00085-JMS-MJD, 2018 WL 4539230, at *15-*16 (S.D. Ind. Sept. 21, 2018) (finding retaliation claim "foreclosed" by *Abbasi* and

recognizing alternative remedies -- including the BOP administrative process -- to address claim); *Gonzalez v. Bendt*, No.4:16-cv-04038-KES, 2018 WL 1524752, at *3-*4 (D.S.D. Mar. 28, 2018) (declining to extend *Bivens* to retaliation claim where plaintiff alleged prison official "retaliated by not providing [him] with required administrative forms when [plaintiff] tried to utilize the administrative process a second time" because "the cost, time and energy associated with defending" such a case would be "significant"), *appeal docketed*; *Andrews v. Miner*, 301 F.Supp.3d 1128, 1134-36 (N.D. Ala. 2017) (declining to allow plaintiff's *Bivens* retaliation claim to proceed, as it was a new *Bivens* context, there were alternative remedial processes, including that provided by the BOP); [6] *Rodriguez v. Hamel*, No. 15-cv-7980 (NHL) (KMW), 2018 WL 2254557, at *4-*5 (D. N.J. May 15, 2018) (granting motion to dismiss plaintiff's First Amendment retaliation claim even though there were no alternative remedial processes for damages available because "prison housing and the prison workplace are special factors precluding the extension of *Bivens*"); *McLean v. Gutierrez*, No. ED CV 15-275-RGK (SP), 2017 WL 6887309, at *8 (C.D. Cal. Sept. 28, 2017) (explaining that "a hostile interaction between a prisoner and prison staff does not necessarily render the grievance system unavailable, even if a threat of violence was included" (citing *McBride v. Lopez*, 807 F.3d 982, 988 (9th Cir. 2015) (addressing unavailability of grievance process) ). This court will follow suit.

**B. Separation of Powers Concerns**
Next, defendants contend that separation of powers concerns counsel against extending *Bivens*. (Mot. J. Pleadings Br. (dkt. #63-2) 15-20.) In *Abbasi*, the Supreme Court advised that "separation-of-powers principles are or should be central to the analysis" in considering whether any implied cause of action exists, because Congress "most often" is in the best position to decide if a damages remedy serves the public interest. 137 S.Ct. at 1857. Accordingly, creating and enforcing a cause of action for damages against federal officials to correct a constitutional violation under the judicial power "is a significant step under separation-of-powers principles." *Id.* at 1856. In particular, as a possible special factor counselling hesitation, the *Abbasi* Court identified "a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere." *Id.*

2019 WL 231754

at 1858. The Court warned that "Congress' failure to provide a damages remedy might be more than mere oversight, and that congressional silence might be more than 'inadvertent' "; with that "possibility counsel[ing] hesitation 'in the absence of affirmative action by Congress.' " *Id.* at 1862 (internal citations omitted).

The Supreme Court further noted that the promulgation of the Prison Litigation Reform Act ("PLRA") in 1995, "which made comprehensive changes to the way prisoner abuse claims must be brought in federal court," afforded Congress "specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs," and arguably "suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Id.* at 1865. Not surprisingly, the PLRA is the first separation of powers concern identified by defendants. (*See* Mot. J. Pleadings Br. (dkt. #63-2) 16-19.) Defendants argue that it was promulgated to "limit" prisoner litigation and to reduce the strain on the legal system by stopping district courts from supervising the daily operations of prisons, pointing to 42 U.S.C. § 1997e(a), (c) and (e). (*Id.* at 16, 100 S.Ct. 1468 (citations omitted).) These provisions *do* restrict prisoner litigation by: (1) requiring exhaustion of available administrative remedies before bringing suit; (2) permitting *sua sponte* dismissal of prisoner suits that "the court is satisfied" are "frivolous, malicious, fail[ ] to state a claim upon which relief can be granted, or seek[ ] monetary relief from a defendant who is immune from such relief"; and (3) permitting suits seeking compensation for "mental or emotional injury suffered while in custody" only if the plaintiff makes "a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. § 1997e(a), (c) & (e). Defendants also point to the *in forma pauperis* statute that likewise seeks to limit prisoner litigation. (Mot. J. Pleadings Br. (dkt. #63-2) 18.) Again, Congress appears to have restricted prisoner litigation, this time by preventing a prisoner plaintiff from bringing suit or appealing "unless the prisoner is under imminent danger of serious physical injury" if that individual has had three or more cases or appeals dismissed due to frivolity, maliciousness, or failure to state a claim. 28 U.S.C. § 1915(g). Thus, Congress's actions in the field of prisoner litigation caution against expanding *Bivens*.

**\*6** The second separation of powers concern raised by defendants is Congress's failure to waive sovereign immunity under the Federal Tort Claims Act for the

detention of goods by law enforcement, and the existence of congressionally authorized alternatives, 31 U.S.C. §§ 3723-24, which defendants contend are "further evidence that 'Congress would [*not*] want the Judiciary to entertain a damages suit.' " (Mot. J. Pleadings Br. (dkt. #63-2) 19 (quoting *Abbasi*, 137 S.Ct. at 1858).) As addressed above, these possible alternatives counsel hesitation in expanding *Bivens* to the context here.

### C. System-Wide Costs & Effect on Duty-Performance

Defendants also argue that the system-wide costs resulting from the extension of *Bivens* counsel against expansion because of "the sheer volume of potential suits arising from the creation of a new *Bivens* remedy" in the prison context, noting that "there are more than 185,000 inmates in BOP custody and nearly 40,000 BOP employees." (Mot. J. Pleadings Br. (dkt. #63-2) 19-20.) Defendants add that "unfettered" prisoner litigation has "unique societal costs" because the prisoner plaintiffs stand to gain more than they lose by filing frivolous suits. (*Id.* at 20) (citing *Cruz v. Beto*, 405 U.S. 319, 326-27, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (Rehnquist, J., dissenting).) Likewise, defendants contend that expanding *Bivens* here would harmfully impact officials' discharge of duties, and that this is "particularly significant" with regards to plaintiff's retaliation claims (*id.* at 22, 100 S.Ct. 1468), which the court has already noted "present[ ] a classic example of a claim that is easy to allege but hard to prove" (Order Leave to Proceed (dkt. #9) 17).

The *Abbasi* Court instructed courts to consider the "impact on governmental operations systemwide," including "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies." 137 S.Ct. at 1858. Likewise, the Court warned that creating a *Bivens* cause of action may result in officers "refrain[ing] from taking urgent and lawful action in a time of crisis," plus "the costs and difficulties of later litigation might intrude upon and interfere with the proper exercise of their office." *Id.* at 1863. As defendants note, prison officials "need to be able to make split-second decisions and balance the needs of a diverse inmate population without fear that every decision could land them in court with their personal assets on the line." (Mot. J. Pleadings Br. (dkt. #63-2) 22.)

2019 WL 231754

Accordingly, these, too, are "special factors" cautioning against extending *Bivens* in the prison context.

### D. Workability

The final factor advanced by defendants as weighing against extending *Bivens* to plaintiff's claims is the "[d]ifficulty in creating workable causes of action." (*Id.* at 20, 100 S.Ct. 1468.) Defendants argue that: (1) plaintiff's claims regarding how defendants "handled his grievances or placed him in a particular status ... clearly implicate numerous BOP policies and procedures," making "judicial intervention in this realm" disfavored (*id.* at 21, 100 S.Ct. 1468); and (2) the risk of "secondary or tertiary personal liability" for the conduct of other BOP staff members raises "questions about causation, what kind of notice triggers liability, and other elements of the claims that could be 'knotty to work out' " (*id.* (quoting *Wilkie v. Robbins*, 551 U.S. 537, 562, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007) ) ).

*Abbasi* recognized this concern as a consideration in determining whether to extend *Bivens* to a new context: where the legal standard for the claim is "less [than] clear," that is a factor weighing against extension. 137 S.Ct. at 1864-65; *see also Vanderklok*, 868 F.3d at 209 (explaining that "the inherent uncertainty surrounding the probable cause standard is itself a factor counseling hesitation" (citing *Abbasi*, 137 S.Ct. at 1864-65) ).

Likewise, claims that are easy to state but hard to prove weigh against extension.

**\*7** As there are at least four "special factors" militating against extending *Bivens* here, defendants' motion for judgment on the pleadings is granted. *See Goree*, 735 Fed. App'x at 895("[Plaintiff's] *Bivens* claims [that defendants unlawfully encumbered his trust fund account] are premised on due-process violations that the Supreme Court does not recognize as cognizable under *Bivens*, and it would be improper to recognize a new theory of relief in this case.").

### ORDER

IT IS ORDERED that:

1) Defendants' motion for leave to file a motion for judgment on the pleadings (dkt. #63) is GRANTED.

2) Defendants' motion for judgment on the pleadings (dkt. #63-1) is GRANTED.

3) Defendants' motion for summary judgment (dkt. #26) is MOOT.

**All Citations**

Slip Copy, 2019 WL 231754

---

Footnotes

1   Leave to proceed was granted by the Honorable Barbara B. Crabb. Following summary judgment briefing, this case was transferred to me for further proceedings. (Dkt. #49.)

2   This court has been unable to find any case addressing whether a takings claim under *Bivens* survived post-*Abbasi* under any context.

3   An "investigative or law enforcement officer" is "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h). The definition of a "law enforcement officer" likely encompasses those working for the Bureau of Prisons. *See Ali*, 552 U.S. at 216, 128 S.Ct. 831 (concluding that § 2680(c) "cover[ed] all law enforcement officers," including Bureau of Prisons employees).

4   Of course, if the unauthorized withdrawal of funds was the detention of property, 28 U.S.C. § 2680(c) does not extend the government's sovereign immunity waiver. *See Ali*, 552 U.S. at 220-21, 128 S.Ct. 831.

5   In *Loumiet*, the D.C. District Court was "not persuaded that *Abbasi* should be read" to add an additional presumption against finding a *Bivens* remedy separate from the special factors and alternative process inquiries. 292 F.Supp.3d at 228. Likewise, the court was not persuaded that *Abbasi* prevents district courts from considering circuit precedent recognizing additional contexts for *Bivens* actions. *Id.* at 229. Finally, the factual underpinning is completely different as *Loumiet* arose in the context of retaliatory prosecution.

6   In *Andrews*, the plaintiff alleged that defendant had used excessive force against him because he had exercised his First Amendment rights. 301 F.Supp.3d at 1135. The court explained that if it recognized "an implied *Bivens* remedy for First

**Atkinson v. Broe, Slip Copy (2019)**

2019 WL 231754

Amendment retaliation by use of excessive force, it could lead to the unwanted result of inmates filing grievances against correctional officers and then claiming that any use of force by the officers resulted from retaliatory animus." *Id.*

---

**End of Document**                                             © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 4100454

2011 WL 4100454
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Alvin BANKS, Plaintiff,
v.
UNITED STATES of America, et al., Defendants.

No. 10 Civ. 6613(GBD)(GWG).
|
Sept. 15, 2011.

**Attorneys and Law Firms**

Alvin Banks, Bronx, NY, pro se.

Carina Hyatt Schoenberger, United States Attorney's
Office, Bruce Morgan Brady, Wilson Elser Moskowitz
Edelman & Dicker LLP, Robert Michael Drucker, Jason
Harris Bresler, Martin Clearwater & Bell LLP, New York,
NY, for Defendants.

*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate
Judge.

**\*1** Plaintiff Alvin Banks, proceeding pro se, has brought
this suit pursuant to 42 U.S.C. § 1983 against the
United States and 19 of its employees (collectively, the
"Federal Defendants"),[1] New York Downtown Hospital
("NYDH"), and Doctors Eric Crone, Kenneth Rose,
Gerald D. Ginsberg, and Chenzhong Fu (collectively,
the "Doctors") alleging various violations of his
constitutional rights.[2] The Federal Defendants and the
Doctors have moved to dismiss pursuant to Federal Rules
of Civil Procedure 12(b)(1) and 12(b)(6), and NYDH has
moved pursuant to Federal Rules of Civil Procedure 12(b)
(1) and 12(c). For the reasons discussed below, the Federal
Defendants' motions should be granted in part and denied
in part and the remaining defendants' motions should be
granted.

I. *BACKGROUND*

A. *Facts*

For purposes of deciding the defendants' motions, the
Court assumes the allegations in plaintiff's complaint
are true and draws all reasonable inferences from those
facts in favor of the plaintiff. *See, e.g., Global Network
Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d
Cir.2006). In addition, the Court may consider documents
that are attached to the complaint, are incorporated in it
by reference, or are integral to the complaint. *See DiFolco
v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010).

As is described further below, the Federal Defendants
and NYDH have asked the court to consider additional
documents in adjudicating their motion to dismiss. To the
extent we consider these papers, we have noted where a
factual dispute exists.

1. *Plaintiff's Injury and Medical Treatment*
Plaintiff's injuries occurred while he was a pre-trial
detainee at the MCC. On November 17, 2009, "plaintiff
was engaged in an altercation with Inmate Gjoka." *See*
Amended Complaint, filed Nov. 4, 2010 (Docket # 8)
("Am.Compl.") ¶ 5(a). Officer Hurtado witnessed the
altercation and intervened. *Id.* Hurtado ordered the two
inmates to "stop and place their hands on the wall." *Id* .
"The plaintiff complied, and Officer Hurtado then left the
area to secure the unit, failing to separate the plaintiff
and Inmate Gjoka." *Id.* Gjoka then grabbed a chair and
attempted to use it to hit plaintiff "on or around the head."
*Id.* The plaintiff "block[ed] the attack with his left hand,
subsequently breaking and dislocating the index finger on
[his] left hand and causing a laceration between the second
and third fingers of [his] left hand." *Id.*

Following the incident, Joaquin attended to plaintiff's
injury. *Id.* ¶ 5(b). Joaquin "provided the initial medical
attention to the injury and filed the injury assessment
and followup [sic] documenting the cause and probable
condition of the damaged hand." *Id.;* Inmate Injury
Assessment and Follow-up (annexed as Ex. 7 to Am.
Compl.); Bureau of Prisons Health Services Clinical
Encounter—Administrative Note (annexed as Ex. 8 to
Am. CompL). Plaintiff's finger was not reset. Am. Compl.
¶ 5(b). A splint was placed on plaintiff's index finger and a
bandage was placed on the laceration. *Id.* "[P]laintiff was
immediately placed in the Special Housing Unit (SHU),
where he informed the officers, administrative staff, and
medical staff of the condition of his hand ." *Id.* ¶ 5(c).
While in the SHU, plaintiff "displayed and explained to
all parties involved that [his] index finger was discolored,

had increased swelling, no range of motion and extreme pain." *Id.* Plaintiff was taken for an x-ray. *Id.* ¶ 5(d). The "x-ray technician and Officer Gonzalez observed fractures of the index finger in two places." *Id.* On November 20, 2009, the attending radiologist, Ross Filice, submitted a written report, which stated that the x-ray was "negative except for degenerative joint disease/disc disease." *See* DIANAssociates University of Maryland Radiology Report (annexed as Ex. 10 to Am. CompL); Am. Compl. ¶ 5(f).

**\*2** "After a week of no action taken on the part of the medical staff or the facility's administration, the plaintiff observed there was increased swelling, increased pain, discoloration, and no range of motion in the finger." Am. Compl. ¶ 5(e). In addition, plaintiff's pain "had extended down the arm through the wrist and forearm." *Id.* Banks was told by Ramos, Joaquin, and Evangelista "that the x-ray report ... was 'negative' and 'to exercise the finger in order to reduce the swelling.' " *Id.* In addition, plaintiff was told by MCC medical staff that if he exercised, " 'eventually the range of motion would return.' " *Id.*

Banks informed "Officer Bratton and Chief Pharmacist Scharage of excruciating pain and that the condition of [his] finger had gotten worse." *Id.* ¶ 5(g) Bratton and Scharage made phone calls "that got the plaintiff assessed by the medical staff." *Id.* On January 15, 2010, Banks was examined by Dr. Glover, the attending physician, who ordered a second x-ray of plaintiff's hand. *Id.* ¶ 5(h). A second x-ray was taken on January 19, 2010, and the attending radiologist, Allen Skrenta, submitted a written report. *Id.* ¶ 5(1). The report provided the following finding: "Abnormal. fxs mid and distal phalanges 2nd finger." *Id.;* DIANAssociates University of Maryland Radiology Report (annexed as Ex. 18 to Am. Compl.). That same day, "Dr. Glover and the x-ray technician confirmed there was a double fracture/dislocation [in plaintiff's finger] and that the initial x-ray was misdiagnosed." Am. Compl. ¶ 5(i).

On March 3, 2010, plaintiff was referred to Dr. G.D. Ginsberg of NYDH, and a third set of x-rays were taken. Dr. Ginsberg's diagnosis revealed "displaced intra-articular fractures of the left middle and distal phalanges." *Id.* ¶ 5(j); Bureau of Prisons Health Services Consultation Request (annexed as Exs. 31–32 to Am. Compl.) ("Ginsberg Consultation"). In addition, Dr. Ginsberg noted that Banks should be referred to "hand

surgeon: Dr. Ken Rose." Ginsberg Consultation at 2; Am. Compl. ¶ 5(j). On March 17, 2010, "the plaintiff was examined by Dr. K. Rose, of [NYDH], at which time Dr. Rose offered two opinions: ... leave finger in current condition or amputate. Time since fracture (approx. four months) would deem any attempt at corrective surgery, (i [.]e.—volar plate arhtroplasty) futile." Am. Compl. ¶ 5(k) (internal quotation marks omitted). [3] Dr. Glover consulted with Dr. Rose and determined that a second opinion was necessary. Am. Compl. ¶ 5(l) (citing Bureau of Prisons Clinical Encounter (annexed as Exs. 36–37 to Am. Compl.). On March 19, 2010, Banks met with Guillaume to discuss the injury to his finger. Am. Compl. ¶ 5(m). During this conversation and subsequent conversations with Drs. Glover, Bussanich, and HSA Okoth, Banks was assured "that everything was being done to remedy the situation." *Id.*

From November 17, 2009 onward, Banks told medical staff at the MCC of his "inability to sleep for extended periods of time due to constant pain and inflammation of [his] finger." *Id.* ¶ 5(n). Drs. Glover and Bussanich prescribed Banks Motrin, Tylenol 3, Codine and Meloxicam in an attempt to alleviate plaintiff's pain and inflammation. *Id.* ¶ 5(o); Prescription Slips (annexed as Exs. 49, 50 to Am. Compl.). On March 22, 2010, "Dr. Bussanich [,] acting in the role of Institution Clinical Director, scheduled a second opinion with a second hand surgeon, Dr. E. Crone." *Id.* ¶ 5(p). On April 20, 2010, "Dr. Crone had x-rays taken at his office ... which confirmed the extent of the damage." *Id.* ¶ 5(q). Dr. Crone advised Banks that his two options were to undergo either (1) a "fixed placement of [his] finger," or (2) "corrective surgery to regain partial movement." *Id.* Banks consented to corrective surgery. *Id.* On May 18, 2010, "Dr. Crone and the plaintiff met for a second consultation at which time the plaintiff confirmed his decision to have the corrective surgery." *Id.* ¶ 5(r).

**\*3** On June 28, 2010, Banks was told by Officers Jenkins and Schuppel that "he would be taken to the SHU and MPO'd [sic] for a medical trip later that day." *Id.* ¶ 5(s). [4] Later that same day, Banks was removed from the SHU and returned to his housing unit. Jenkins and Schuppel told Banks that his procedure had been cancelled "due to the fact the plaintiff wasn't MPO'd [sic] the previous day." *Id.* ¶ 5(t). On August 2, 2010, Jenkins and Officer Monche approached Banks and "asked him 'if he'd eaten anything.' " The plaintiff responded, "no," but stated that

he had had a cup of tea. *Id.* ¶ 5(u). The officers then conferred with someone on the telephone "to ask if it was okay to proceed with the medical transfer for surgery." *Id.* The officers told Banks that he could not be transferred "because 'it could not be certain whether the plaintiff had eaten or not.' " *Id.* Banks later learned, from members of the medical staff, that the procedure had been cancelled because "Dr. Crone had become ill and had cancelled the procedure." *Id.*

On August 24, 2010, Banks was taken to Dr. Crone's office for a medical visit. *Id.* ¶ 5(v). During the visit, "Dr. Crone, plaintiff, and [Jenkins and Schuppel] viewed various x-rays of the injured index finger." *Id.* Dr. Crone advised Banks that the scheduled surgery was not in plaintiff's " 'best interest' because 'it was highly unlikely that surgery would restore full range of motion to the finger.' " *Id.* Dr. Crone instead "proposed occupational therapy in hopes of restoring partial range of motion." *Id.* On September 13, 2010, Banks was taken to NYDH where he met with Dr. Fu to discuss a "plan of care." *Id.* ¶ 5(w). "At the time of the consultation, Dr. Fu was unprepared and unaware of the plaintiff's condition." *Id.* The medical record from Dr. Fu indicates that she suggested that he start certain specified therapies "ASAP." Bureau of Prisons Health Services Consultation Report (annexed as Exs. 57–59 to Am. Compl.) at 2.

Banks alleges that Drs. Crone, Ginsberg, Rose and Fu are "outside contractors" hired by the United States and the MCC. *Id* . ¶ 3(e), (f). Plaintiff contends that all of the named defendants "are acting agents, servants, and employees of the ... United States ..., who in the course of their employment committed acts of negligence and or medical indifference...." *Id.* ¶ 3(f). NYDH is a domestic, not-for-profit, and private corporation, which is registered as such with the New York State Department of State. Affidavit of Marie Cavanagh (annexed as Ex. C to Declaration in Support, dated June 22, 2011, attached to Notice of Motion, filed July 8, 2011 (Docket # 70) ("NYDH Notice")) ¶¶ 2–3.

### 2. *Exhaustion*

Between November 29, 2009 and January 15, 2010, Banks "filed several BP–8s that were not acknowledged by any staff member in the medical department or the administration." *Id.* ¶ 5(g); *see id.* ¶ 5(x). [5] On January 21, 2010, Banks submitted a letter, which the

Government characterizes as a "BP–10," Johnson Decl. ¶¶ 15, alleging "unprofessional, inappropriate conduct or misconduct by staff." *See* Letter from Alvin Banks to Regional Office, dated January 21, 2010 (annexed as Ex. D to Johnson Decl.). [6] On January 27, 2010, the regional office rejected Banks's BP–10 as "not sensitive" [7] and advised him to "file a BP–9 request through the [MCC] for the warden's review and response before filing an appeal [at the BP–10] level." *See* Rejection Notice —Administrative Remedy (annexed as Ex. 27 to Am. Compl. and Ex. D. Johnson Decl.). "Plaintiff never filed a BP–9 Request for Administrative Remedy or BP–11 Central Administrative Remedy Appeal at Central Office regarding the allegations made in the [c]omplaint." Johnson Decl. ¶ 14. Banks contends that two unit counselors and a unit manager at the MCC "fail[ed] to provide [him] with the proper documentation needed to file for the proper administrative relief." Am. Compl. ¶ 6(f).

### 3. *Administrative Tort Claim History*

**\*4** On January 26, 2010, "the plaintiff timely filed an administrative claim for the matters in dispute in this action in the amount of [$2,500,000] with the Northeast Regional Office, Federal Bureau of Prisons ["BOP"]." Am. Compl. ¶ 2(a); Claim for Damage, Injury, or Death (annexed as Exs. 14–17 to Am. Compl.) ("Admin.Claim"). On March 25, 2010, plaintiff "moved to implement amendments to [his] initial claim, including but not limited to additional damages of [$10,000,000]." Am. Compl. ¶ 2(b). The Northeast Regional Office denied plaintiff's claim on July 28, 2010, finding, *inter alia,* that "[t]he officer appropriately secured the situation and requested staff assistance ... [and t]here [was] no evidence to suggest [plaintiff] experience[d] a compensable loss as a result of negligence on the part of any [BOP] employee." Memorandum (annexed as Ex. F to Johnson Decl.); Johnson Decl. ¶¶ 21–22.

### B. *Procedural History*

Plaintiff commenced this action by filing a complaint on September 7, 2010. *See* Complaint, filed Sept. 7, 2010 (Docket # 2). On November 1, 2010, plaintiff filed a motion to amend the complaint pursuant to [Fed.R.Civ.P. 15(a)](). *See* Notice of Motion to Amend the Complaint, filed Nov. 1, 2010 (Docket # 6). Plaintiff's motion was granted on November 4, 2010, Memorandum

2011 WL 4100454

Endorsement, dated Nov. 4, 2010 (Docket # 7), and the amended complaint was filed that same day.

The Federal Defendants filed their motion to dismiss the amended complaint on June 1, 2011,[8] the Doctors' motion was filed on June 6, 2011,[9] and NYDH filed its motion on July 8, 2011.[10] Plaintiff submitted a short affirmation dated June 22, 2011. *See* Affirmation (annexed to Order, filed July 8, 2011 (Docket # 69) ("July 8 Order")). The Court directed that "any party [that wished] to respond to [the] Affirmation ... do so on or before July 15, 2011." *See* July 8 Order. No party submitted any further response.

## II. *STANDARD OF REVIEW*

### A. *Conversion of the Federal Defendants and NYDH's Motions*

The Federal Defendants and NYDH have moved pursuant to Fed.R.Civ.P. 12(b)(1), (6) and 12(c). In support of their motions they have included in their papers some documents not contained in the pleadings. While the Court may refer to evidence outside the pleadings when determining a motion pursuant to Rule 12(b)(1), *see Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000), the Court is limited to the pleadings when considering a motion made pursuant to Rules 12(b)(6) and 12(c). Where such materials are considered by a court for the purpose of deciding a Rule 12(b)(6) or 12(c) motion, "the motion must be treated as one for summary judgment," disposed of as provided in Rule 56, and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d); *accord Friedl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000) (where materials outside the pleadings are presented on a motion to dismiss, a court "must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed.R.Civ.P. 56 and afford all parties the opportunity to present supporting material") (citations and internal quotations omitted). Before treating the motion as one for summary judgment, however, the court must be assured that there is no dispute regarding the "authenticity or accuracy" or "relevance" of the documents considered. *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006) (citations omitted). Additionally, a court must ask whether the parties "should reasonably have recognized the possibility that the motion might be

converted into one for summary judgment" or whether they were "deprived of a reasonable opportunity to meet facts outside the pleadings." *In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir.1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986).

**\*5** In accordance with Local Civil Rule 12.1, the Federal Defendants and NYDH served Banks with a "Notice to Pro Se Litigant Opposing its Motion to Dismiss." *See* Fed. Notice; NYDH Pro Se Notice. The notices warned Banks that this Court might treat the Federal Defendants and NYDH's motions as motions for summary judgment under Fed.R.Civ.P. 56, and informed Banks of his obligation to submit evidence. Fed. Notice at 1–2; NYDH Pro Se Notice at 1–2. The parties also informed Banks that if he did not provide "affidavits or documentary evidence contradicting the facts asserted by the [defendants], the court may accept [the defendants'] factual assertions as true." Fed. Notice at 2; NYDH Pro Se Notice at 2.

Here, it is appropriate to treat the Federal Defendants and NYDH's motions as motions for summary judgment because Banks was put on notice of the possibility of such treatment and was informed of his obligation to submit evidence contradicting the facts asserted by the Federal Defendants and NYDH. Furthermore, Banks submitted an affirmation in response to the Federal Defendants' motion and at no point has disputed the authenticity, accuracy, or the relevance of the documents submitted by the Federal Defendants and NYDH.

The Court notes that because the Doctors have not relied upon any evidence other than the pleadings in support of their motion, the Court will not convert their motion to a Rule 56 motion and will instead apply the standard of review for a motion to dismiss made pursuant to Rules 12(b)(6).

### B. *Law Governing Motions to Dismiss*

#### 1. *Motions Under Fed.R.Civ.P. 12(b)(1)*

Where subject-matter jurisdiction is lacking, a party may move for judgment pursuant to Fed.R.Civ.P. 12(b)(1). *See* Fed.R.Civ.P. 12(b)(1). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova,* 201 F.3d at 113; *accord Wiggins v. Justices of the Supreme Court of N.Y.,* 2011 WL 1486070, at *1 (2d Cir. Apr.20,

2011). A party asserting subject matter jurisdiction bears the burden of proving by a preponderance of the evidence that it exists. *Makarova,* 201 F.3d at 113; *accord Morrison v. Nat'l Austrl. Bank Ltd.,* 547 F.3d 167, 170 (2d Cir.2008), *aff'd,* —— U.S. ——, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010); *see also Whitmore v. Arkansas,* 495 U.S. 149, 154, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) ("It is well established, however, that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue."). When considering such a motion, a court "may refer to evidence outside the pleading." *Makarova,* 201 F.3d at 113; *accord Kamen v. Am. Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986) ("[W]hen, as here, subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise."); *TradeComet.com LLC v. Google, Inc.,* 693 F.Supp.2d 370, 375 n. 3 (S.D.N.Y.2010) ("In deciding a motion to dismiss pursuant to ... Federal Rule of Civil Procedure 12(b)(1) ... a court may consider evidentiary matters outside the pleadings, by affidavit or otherwise, regarding the existence of jurisdiction.") (citation and internal quotation marks omitted).

### 2. *Motions Under Fed.R.Civ.P. 12(b)(6)*

**\*6** A party may move to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) where the opposing party has "fail[ed] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Separately, Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Under this rule, a complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests .' " *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007) (quoting *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

Nonetheless, the Supreme Court has held that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level...." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (citations, internal quotation marks, and brackets omitted); *see also id.* at 557 (pleading must "possess enough heft to show that the pleader is entitled to relief") (internal quotation marks

and brackets omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citation and internal quotation marks omitted); *accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007) ("a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion") (citations omitted).

In the case of *pro se* plaintiffs, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (citations and internal quotation marks omitted); *accord In re Sims,* 534 F.3d 117, 133 (2d Cir.2008); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a *pro se* party's pleadings should be construed liberally and interpreted "to raise the strongest arguments that they suggest") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

### C. *Law Governing Summary Judgment Motions*

Rule 56(a) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**\*7** In determining whether a genuine issue of material fact exists, "[t]he evidence of the non-movant is to be believed" and the court must draw "all justifiable inferences" in favor of the nonmoving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*

2011 WL 4100454

475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *Fed.R.Civ.P. 56(e)*) (additional citation omitted) (emphasis in original), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998) (citations omitted). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson,* 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.' " *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993) (quoting *Celotex,* 477 U.S. at 322) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996) (citing *Anderson,* 477 U.S. at 247–48). The same rules apply to a *pro se* litigant. *See, e.g., Bennett v. James,* 737 F.Supp.2d 219, 226 (S.D.N.Y.2010) ("Notwithstanding the deference to which a *pro se* litigant is entitled, as well as the deference accorded to a non-movant on a summary judgment motion, the non-movant must produce specific facts to rebut the movant's showing and to establish that there are material issues of fact requiring a trial.") (internal punctuation and citations omitted).

## III. *DISCUSSION*
The Court will discuss each motion in turn.

### A. *Federal Defendants' Motion*
In his amended complaint, Plaintiff alleges claims only pursuant to 42 U.S.C. § 1983, *see* Am. Compl. ¶ 1, which provides a cause of action when parties are deprived of a constitutional or statutory right by a person acting under the color of state law. Federal employees act under the color of federal law, not state law, however, and therefore cannot be subject to liability under § 1983. *See Dotson v. Griesa,* 398 F.3d 156, 162 (2d Cir.2005) ( "This court has long construed the phrase 'under color of state law' as used in related civil rights statutes, notably 42 U.S.C. § 1983, to apply only to state actors, not federal officials.") (quoting *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 n. 4 (2d Cir.1991)), *cert. denied,* 547 U.S. 1191 (2006); *Roseboro v. Gillespie,* —— F.Supp.2d ——, 2011 WL 2070104, at *1

n. 1 (S.D.N.Y. May 24, 2011) ("[Plaintiff] cannot assert claims under section 1983 against defendants since they are federal employees."). Thus, the Court will construe plaintiff's § 1983 claims as arising under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), in order to afford the complaint the liberal construction to which it is entitled. *See Tavarez v. Reno,* 54 F.3d 109, 109–10 (2d Cir.1995) (approving district court's conversion of *pro se* plaintiff's § 1983 claims to *Bivens* claims).

### 1. *Bivens Claims*
**\*8** As the Second Circuit has explained,

> where an individual "has been deprived of a constitutional right by a federal agent acting under color of federal authority," the individual may bring a so-called *Bivens* action for damages against that federal agent in an individual capacity, *Thomas v. Ashcroft,* 470 F.3d 491, 496 (2d Cir.2006), provided that Congress has not forbidden such an action and that the situation presents "no special factors counselling hesitation in the absence of affirmative action by Congress," [*Hudson Valley Black Press v. I.R.S.,* 409 F.3d 106, 108 (2d Cir.2005) ] (quoting *Bivens,* 403 U.S. at 396).

*Lombardi v. Whitman,* 485 F.3d 73, 78 (2d Cir.2007).

### a. *Claims Against the United States, MCC, and Federal Employees in Their Official Capacities*
Suits against a federal agency or a federal official in his or her official capacity are considered suits against the United States and are thus barred unless the United States has waived sovereign immunity. *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994) ("Because an action against a federal agency or federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived."); *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (" '[T]he United States, as sovereign, is immune from suit....' ") (quoting *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). Any waiver of sovereign immunity " 'cannot be implied but must be unequivocally expressed' " through an act of Congress. *Mitchell,* 445 U.S. at 538 (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)); *accord Adelke v. United States,*

355 F.3d 144, 150 (2d Cir.2004) (quoting *United States v. Nordic Vill., Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992)). The United States has not waived its immunity "with respect to claims that its employees have committed constitutional torts." *Castro v. United States,* 34 F.3d 106, 110 (2d Cir.1994); *accord Hollman v. Lindsay,* 2009 WL 3112076, at *8 (E.D.N.Y. Sept.25, 2009). Thus, where a *Bivens* action is filed against the United States, its agencies, or its employees in their official capacities, courts lacks jurisdiction to hear the claim and the action must be dismissed. *See Hollman,* 2009 WL 3112076, at *8 (citing *Hamm v. United States,* 483 F.3d 135, 137 (2d Cir.2007) ("[T]he terms of [the United States's] consent to be sued in any court define that court's jurisdiction to entertain the suit.")). Accordingly, plaintiff's *Bivens* claims against the United States and the MCC must be dismissed. While plaintiff has not specified in what capacity he has sued the individually-named Federal Defendants, to the extent he intended to sue them in their official capacities, those claims also must be dismissed pursuant to Rule 12(b)(1).

### b. *Claims Against Federal Defendants Hammonds and Zee*

**\*9** Federal Defendants Hammonds and Zee are both employees of the Commissioned Corps of the United States Public Health Service ("PHS"). Johnson Decl. ¶¶ 6–7; *see* Hammonds PHS Assignment Order (annexed as Ex. A to Johnson Decl.); Zee PHS Assignment Order (annexed as Ex. B to Johnson Decl.). The Public Health Service Act ("PHSA"), provides in pertinent part:

> The remedy against the United States provided by sections 1346(b) and 2672 of Title 28 ... for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or

employee (or his estate) whose act or omission gave rise to the claim.

42 U.S.C. § 233(a). The Supreme Court has interpreted this language as "grant[ing] absolute immunity for PHS officers and employees for actions arising out of the performance of medical or related functions within the scope of their employment by barring all actions against them for such conduct." *Hui v. Castaneda,* —— U.S. ——, ——, 130 S.Ct. 1845, 1851, 176 L.Ed.2d 703 (2010). Thus, "§ 233(a) precludes *Bivens* actions against individual PHS officers or employees for harms arising out of conduct described in that section." *Id.* at 1854; *accord Cuoco v. Moritsugu,* 222 F.3d 99, 108 (2d Cir.2000) (the PHSA "protects commissioned officers or employees of the [PHS] from being subject to suit while performing medical and similar functions by requiring that such lawsuits be brought against the United States instead.").

At the time of the acts complained of in the amended complaint, Hammonds and Zee were PHS employees. *See* Johnson Decl. ¶¶ 6–7. The amended complaint alleges that Hammonds and Zee improperly performed a medical or related function. *See* Am. Compl. ¶ 6(g) ("Ms. Hammonds, Registered Nurse [and] Mr. Zee, Pharmacist [,] were negligent in failing to provide the plaintiff with the proper pain medication in a timely manner."). Because plaintiff's *Bivens* claims against these defendants relate to their performance of a medical or related function, any claim against them in their individual capacities is barred. *See Hui,* 130 S.Ct. at 1851.

### c. *Claims Against all Other Federal Defendants in Their Individual Capacities*

To the extent plaintiff alleges *Bivens* claims against the remaining Federal Defendants in their individual capacities, these claims fail because Banks did not exhaust administrative remedies prior to initiating his lawsuit. The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), provides in relevant part that

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or

other correctional facility until such administrative remedies as are available are exhausted.

**\*10** *Id.* Section 1997e(a)'s exhaustion requirement is mandatory and applies to all inmate suits about prison life, "whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (citation omitted). "Complete exhaustion of ... administrative remedies through the highest level for each claim is required," *Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.2004) (citation omitted), *aff'd,* 178 F. App'x. 39 (2d Cir.2006); *see also Porter,* 534 U.S. at 524 ("All available remedies must now be exhausted; those remedies need not meet federal standards, nor must they be plain, speedy, and effective.") (citations and internal quotation marks omitted), and the exhaustion must be "[p]roper"— that is, "compl[y] with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings," *Woodford v. Ngo,* 548 U.S. 81, 90–91, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). Failure to exhaust thus bars an inmate's action in federal court. *See Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (section 1997e(a) "requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court *at all* ") (internal quotation marks and citations omitted) (emphasis in original). This is true even where the plaintiff alleges a *Bivens* claim. *See Porter,* 534 U.S. at 524 ("federal prisoners suing under *Bivens* ... must first exhaust inmate grievance procedures just as state prisoners must exhaust administrative processes prior to instituting a § 1983 suit"); *Macias v. Zenk,* 495 F.3d 37, 40–42 (2d Cir.2007). The exhaustion requirement is excused, however, where:

> (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such [a] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the

prisoner's failure to comply with the exhaustion requirement.

*Ruggiero v. Cnty. of Orange,* 467 F.3d 170, 175–76 (2d Cir.2006) (quoting *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).

"The BOP has established an administrative remedy procedure [the "Program"] whereby inmates can seek formal review of any complaint regarding any aspect of their imprisonment." Johnson Decl. ¶ 10. "This Program applies to all inmates in institutions operated by the [BOP]...." 28 C.F.R. § 542.10(b). The contours of the Program are outlined in 28 C.F.R. Part 542. Under the Program, inmates must "first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before an inmate submits a Request for Administrative Remedy. Each Warden shall establish procedures to allow for the informal resolution of inmate complaints." 28 C.F.R. § 542.13(a). "Informal requests should be submitted in writing using a BP–8 form ." Johnson Decl. ¶ 10. If the inmate's complaint cannot be resolved informally, the inmate shall submit, within "20 calendar days following the date on which the basis for the Request occurred," a formal "Administrative Remedy Request" to the Warden on a BP–9 form. 28 C.F.R. § 542.14(a); *see* Johnson Decl. ¶ 10. "An inmate who is not satisfied with the Warden's response may submit an Appeal on the appropriate form (BP–10) to the appropriate Regional Director within 20 calendar days of the date the Warden signed the response." 28 C.F.R. § 542.15(a). In the event an inmate is dissatisfied with the opinion of the Regional Director, the inmate "may submit an Appeal on the appropriate form (BP–11) to the General Counsel within 30 calendar days of the date the Regional Director signed the response." *Id.* "No administrative remedy appeal is considered to have been finally exhausted until considered by the BOP's Central Office." Johnson Decl. ¶ 11; *see* 28 C.F.R. § 542.15(a) ( "Appeal to the General Counsel is the final administrative appeal."); *Macias,* 495 F.3d at 42 (discussing BOP's administrative remedy program).

**\*11** Here, there is no evidence that Banks exhausted these administrative remedies. While Banks alleges that he filed "several BP–8s," Am. Compl. ¶ 5(g); *see id.* ¶ 5(x), he does not allege that he submitted a BP–9 form with the MCC's Warden. Nor does he assert that his claims were appealed

2011 WL 4100454

to the BOP's Central Office. Indeed, evidence submitted by the Federal Defendants, and undisputed by plaintiff, shows that plaintiff failed to file a BP–9 form. *See* Johnson Decl. ¶¶ 12–14. [11]

Furthermore, Banks has not demonstrated that he should be excused from having to comply with the PLRA's exhaustion requirements. While plaintiff's complaint states that his informal complaints "were not acknowledged" by MCC personnel, Am. Compl. ¶ 5(g), he provides no explanation as to why he could not have submitted the BP–9 grievance form as required by the regulations. Plaintiff's amended complaint states that certain defendants "fail[ed] to provide [Banks] with the proper documentation needed to file for the proper administrative relief." Am. Compl. ¶ 6(f). But this conclusory allegation is simply insufficient to allow a finding that administrative remedies were "not available" to him or that any of the other *Ruggiero* exceptions excused exhaustion here. Accordingly, there is no reason to excuse the exhaustion requirement. *See Ruggiero,* 467 F.3d at 178 (plaintiff's allegations that "he was not timely provided an inmate handbook," were insufficient to establish "an exception to the PLRA's administrative exhaustion requirement"); *Clarke v. Thornton,* 515 F.Supp.2d 435, 439–40 (S.D.N.Y.2007) ("A correctional facility's failure to make forms ... 'available' to the prisoner does not relieve the inmate from [his exhaustion] burden. The 'reasonable efforts' standard still requires a serious effort by the prisoner to appeal through the proper statutory channels."); *Indelicato v. Suarez,* 207 F.Supp.2d 216, 219 (S.D.N.Y.2002) (plaintiff's allegation that he was denied forms is insufficient evidence to establish a PLRA exception since "[d]enial of forms ... does not itself constitute a denial of remedies.").

Finally, the fact that Banks filed a tort claim form with the BOP's Northeast Regional office, *see* Am. Compl. ¶ 2(a)-(e), does not render his *Bivens* claims properly exhausted. To hold otherwise, would conflate the distinction between "procedural exhaustion and substantive exhaustion." *Macias,* 495 F.3d at 43 (citing *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004)). While the administrative tort claims may have "put the prison officials on notice of [Banks's] grievance in a substantive sense, ... to satisfy the PLRA [he] must also procedurally exhaust his available administrative remedies." *Macias,* 495 F.3d at 43 (internal quotation marks and citations omitted); *accord Bailey v. Fortier,* 2010 WL 4005258, at *4 n. 4 (N.D.N.Y. Aug.20,

2010). In any event, Banks's administrative tort claim form was filed in January 2010, *see* Admin. Claim, long after the 20–day filing period for a prison grievance had elapsed, *see* 28 C.F.R. § 542.14(a).

**\*12** Because Banks failed to file a form BP–9 and properly appeal his informal complaints, his *Bivens* claims are not exhausted and thus must be dismissed. *See Porter,* 534 U.S. at 524.

### 2. *FTCA Claims*

While the amended complaint makes no mention of the Federal Tort Claims Act ("FTCA"), *see* 28 U.S.C. §§ 1346(b), 2401(b), 2671–2680, the Court will liberally construe the complaint to raise such a claim. As discussed above, "[t]he United States, as sovereign, is immune from suit save as it consents to be sued, and hence may be sued only to the extent that it has waived sovereign immunity by enacting a statute consenting to suit.... The FTCA constitutes a limited waiver by the United States of its sovereign immunity." *Milares Guiraldes de Tineo v. United States,* 137 F.3d 715, 719 (2d Cir.1998) (citations omitted); *accord Hamm,* 483 F.3d at 137. Under the FTCA, a private citizen may sue the United States for injuries caused by "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Hamm,* 483 F.3d at 137. The only proper defendant, however, in an FTCA action is the United States. Accordingly, to the extent Banks has alleged FTCA claims against the individually named Federal Defendants, these claims must be dismissed pursuant to Rule 12(b)(1). *Castro,* 34 F.3d at 110 ("a claimant's exclusive remedy for nonconstitutional torts by a government employee acting within the scope of his employment is a suit against the government under the FTCA"); *accord Chen v. United States,* 2011 WL 2039433, at *11 n. 4 (E.D.N.Y. May 24, 2011).

We now turn to the claims in the complaint insofar as they are pled against the United States.

### a. *Hurtado's Failure to Separate Two Inmates*

Any tort claim against the United States predicated on Hurtado's response to plaintiff's fight with Gjoka is not within the waiver of sovereign immunity contained in the FTCA. 28 U.S.C. § 2680(a) provides that the FTCA shall not apply to

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Id. "The discretionary function exception ... marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." United States v. S.A. Empresa de Vicao Aerea Rio Grandense, 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984); accord In re World Trade Ctr. Disaster Site Litig., 521 F.3d 169, 190 (2d Cir.2008). "The Supreme Court has noted that the discretionary function exception was intended to 'avoid[ ] any possibility that the [FTCA] may be construed to authorize damage suits against the Government growing out of a legally authorized activity, merely because the same conduct by a private individual would be tortious.' " In re World Trade Ctr., 521 F.3d at 190 (alteration in original) (quoting Dalehite v. United States, 346 U.S. 15, 27, 73 S.Ct. 956, 97 L.Ed. 1427 (1956)). The exception is meant to prevent "judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " United States v. Gaubert, 499 U.S. 315, 325, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (internal quotation marks and citations omitted); accord Hartman v. Holder, 2005 WL 2002455, at *9 (E.D.N.Y. Aug.21, 2005). Where the plaintiff's claim falls within the exception, federal courts lack subject matter jurisdiction over the claim. Fazi v.

United States, 935 F.2d 535, 537–38 (2d Cir.1991); accord Chen, 2011 WL 2039433, at *5.

**\*13** The exception applies "only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis." Coulthurst v. United States, 214 F.3d 106, 109 (2d Cir.2000) (internal quotation marks omitted); accord Doe v. United States, 2010 WL 3562568, at *4 (S.D.N.Y. Sept.8, 2010). With respect to the second prong, "the court's inquiry is not on the 'agent's subjective intent in exercising the discretion conferred ... but on the nature of the actions taken and on whether they are susceptible to policy analysis.' " King v. United States, 491 F.Supp.2d 286, 297 (quoting Gaubert, 499 U.S. at 325) (ellipsis in original). "The interplay between the first and second prongs of the [analysis] means that certain acts, although discretionary, are not covered by the exception because they involve 'negligence unrelated to any plausible policy objective .' " Doe, 2010 WL 3562568, at *4 (citing Coulthurst, 214 F.3d at 109). Indeed, the Second Circuit has held that an official's "lazy or careless failure to perform his or her discretionary duties" constitutes negligent conduct that "neither involve an element of judgment or choice within the meaning of [the exception] nor are grounded in considerations of governmental policy ." Coulthurst, 214 F.3d at 109–110; see Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir.2006). This carve-out to the discretionary function exception is referred to as the "negligent-guard theory." Triestman, 470 F.3d at 475–76. "The negligent guard theory is a theory of liability under the FTCA over which the district court clearly has subject matter jurisdiction." Id. at 476 (citations omitted); accord Chen, 2011 WL 2039433, at *6.

Here, there is no question that Hurtado's conduct was the product of a "judgment or choice." While prison officials are required to provide for the "safekeeping, care and subsistence of all persons charged with or convicted of offenses against the United States," 18 U.S.C. § 4042(a)(2), officials are given discretion as to how to best execute that duty. See, e.g., Rhodes v. Chapman, 452 U.S. 337, 350 n. 14, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) ("a prison's internal security is peculiarly a matter normally left to the discretion of prison administration"); Chen,

2011 WL 4100454

2011 WL 2039433, at *7 (18 U.S.C. § 4042(a)(2) "sets forth a mandatory duty of care[;] it does not ... direct the manner by which the BOP must fulfill this duty") (alteration in original); *Taveras v. Hasty,* 2005 WL 1594330, at *3 (E.D.N.Y. July 5, 2005) ("Although [18 U.S.C. § 4042(a)(2) ] imposes a duty of care on the BOP, it addresses only the general responsibilities of BOP employees and sets forth no particular conduct BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates."). Certainly, "the statute 'does not compel an officer to act in a particular way when supervising inmates or when confronted with inmate-on-inmate violence.' " *Chen,* 2011 WL 2039433, at *7 (quoting *Hartman,* 2005 WL 2002455, at *10). Nor is a specific course of conduct proscribed by the federal regulations governing the protection and discipline of inmates. *Chen,* 2011 WL 2039433, at *7 (citing 28 C.F.R. §§ 541.10, 541.22(a)). Because Hurtado acted in accordance with a statute that affords officials discretion, the first prong of the analysis has been satisfied. *See Fazi,* 935 F.2d at 538 (where an official acts pursuant to a statute or regulation that "is not sufficiently specific to control the conduct in question ..., or is not mandatory, there is room for discretion" and the official's conduct can be considered the product of judgment or choice); *accord Chen,* 2011 WL 2039433, at *6.

**\*14**  The second prong of the analysis has also been satisfied. "[I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert,* 499 U.S. at 324; *accord Enigwe v. Zenk,* 2007 WL 2713849, at *9 (E.D.N.Y. Sept.14, 2007). This presumption may be rebutted, however, upon a showing that "the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert,* 499 U.S. at 324–35; *accord Chen,* 2011 WL 2039433, at *7. Courts have consistently held that the decision as to how to respond to inmate violence is one grounded in policy considerations. *See, e.g., Santana–Rosa v. United States,* 335 F.3d 39, 43–44 (1st Cir.2003) (prisoner's FTCA claim based on prison official's decision to assign plaintiff's assailant to post as a kitchen orderly and failure to secure weapon is barred by discretionary exception of FTCA); *Alfrey v. United States,* 276 F.3d 557, 565 (9th Cir.2002) (officers have discretion as to how to respond to a reported threat made against an

inmate); *Cohen v. United States,* 151 F.3d 1338, 1344 (11th Cir.1998) (plaintiff's claim that his assault was caused by prison officials' negligent classification and placement of inmates is barred by the discretionary exception to FTCA), *cert. denied,* 526 U.S. 1130, 119 S.Ct. 1803, 143 L.Ed.2d 1008 (1999); *Calderon v. United States,* 123 F.3d 947, 951 (7th Cir.1997) ("It is clear that balancing the need to provide inmate security with the rights of the inmates to circulate and socialize within the prison involves considerations based upon public policy."); *Buchanan v. United States,* 915 F.2d 969, 972 (5th Cir.1990) ("Prison officials' minute-to-minute decision making in the chaotic circumstances of a riot is a classic example of an activity requiring the exercise of discretion."); *Tavarez,* 2005 WL 1594330, at *4 (prison guards decision to wait for back-up before separating inmates was "presumptively grounded in public policy, and reflected the BOP standard operating procedure"); *Carter v. United States,* 2002 WL 32332081, at *4 (D.S.C. Dec.13, 2002) (prison official's decision not to transfer an inmate to higher security facility after attack on another inmate falls within the discretionary exception of the FTCA). "In particular, courts have held that prison officials' decisions about how best to respond to violence between inmates implicate policy considerations." *Chen,* 2011 WL 2039433, at *8 (citing cases); *Michtavi v. United States,* 2009 WL 578535, at *10 (M.D.Pa.) ("how best to protect one inmate from the threat of attack by another is of the kind that the discretionary function exception was designed to shield"), *aff'd,* 345 F. App'x 727 (3d Cir.2009).

Here, the allegations in the amended complaint establish that Hurtado made a decision that was grounded in policy considerations. Hurtado, after observing the beginnings of an "altercation" between Gjoka and Banks, "interrupted" the incident, "ordered [the inmates] to stop and place their hands on the wall," and then left the area to "secure the unit." Am. Compl. ¶ 5(a). While Hurtado "fail[ed]" to separate the inmates" prior to leaving, thus providing Gjoka an opportunity to further assault Banks, there is no reason to believe that his failure to separate the two constituted conduct that was not grounded in the policy of the regulatory regime. Instead, what the allegations establish is that Hurtado observed a safety risk and made an on-the-spot assessment of how best to resolve it. This decision logically involved "considerations of economy, efficiency, and safety." *Chen,* 2011 WL 2039433, at *8 (citations and internal quotation marks omitted).

**\*15** Furthermore, there is no reason to believe that Hurtado's conduct falls within the bounds of the negligent guard theory. Unlike cases such as *Coulthurst* and *Triestman,* where the doctrine has been applied, here it is specifically alleged that Hurtado responded to the safety risk. While Hurtado's actions ultimately failed to prevent Banks's injury, Banks has not alleged any facts suggesting that Hurtado's actions were born of "laziness or inattentiveness," *Triestman,* 470 F.3d at 475. To the contrary, the amended complaint alleges that Hurtado left the two inmates so that he could continue to respond to the safety risk by "securing the unit."

Accordingly, because both prongs of the discretionary function exemption test have been satisfied, the Court lacks subject matter jurisdiction to hear plaintiff's claim.

### b. *Negligence and Medical Malpractice Claims*

Plaintiff's amended complaint can also be interpreted as alleging negligence claims against the United States based on the Federal Defendants' failure to perform the following acts: (1) respond to requests for medical attention, (2) provide Banks with a plan of care, (3) provide pain medication, and (4) coordinate trips for scheduled medical visits. In addition, the amended complaint alleges claims for medical malpractice. We discuss each next.

Under the FTCA, the United States is "liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Here, the alleged conduct took place within the MCC, which is located in New York. Accordingly, New York law applies. Under New York law, to establish a claim for negligence a plaintiff must prove that: "(1) defendant owed plaintiff a duty of care; (2) defendant breached that duty; and (3) the breach proximately caused plaintiff's injuries." *Kane v. United States,* 189 F.Supp.2d 40, 51 (S.D.N.Y.2002); *Hyowon Kim v. Cruz,* 2009 WL 5103157, at \*2 (S.D.N.Y. Dec.17, 2009).

Banks contends that Williams, Hastings, Hazelwood, and N'Diaye "were negligent in failing to respond to plaintiff's requests for medical attention," Am. Compl. ¶ 6(b), but has failed to set forth any facts to support this conclusory allegation. Banks's amended complaint is devoid of any factual allegations that tend to show that these defendants

were responsible for responding to plaintiff's requests or that they breached this duty by failing to respond.

Similarly, Banks has failed to allege any facts that tend to show that Okoth and Guillaume were negligent in failing "to provide [Banks] an adequate plan of care." Am. Compl. ¶ 6(e). In fact, all that is known about these two defendants is that they spoke with Banks about his condition. *Id.* ¶ 5(m). This fact alone, however, is not enough to establish any of the elements of a negligence claim—specifically, that Okoth and Guillaume owed Banks a duty to provide him with a plan of care, that they breached that duty, or that Banks suffered an injury as a result of their breach.

**\*16** Any negligence claims based Hammonds and Zee's alleged failure to provide Banks with pain medication in a timely fashion, Am. Compl. ¶ 6(g), or Kumm's failure to properly coordinate medical visits or prepare Banks for surgery, *id.* ¶ 6(i), also fail. With respect to Hammonds and Zee, the amended complaint is devoid of allegations that tend to show that they breached any duty owed to Banks. Plaintiff does not contend that the defendants were required to provide him with medications within a certain time period. Nor does he allege that he was never provided with pain pills. To the contrary, Banks's own statements show that he received pain medication. *See id.* ¶ 5(o). With respect to Kumm's actions, plaintiff has not made any allegations that Kumm was responsible for Banks's medical trips, that the cancellations of these trips were themselves a breach of any duty to use due care, or that Banks was injured as a result of Kumm's breach. Notably, Banks's surgery was ultimately cancelled by Dr. Crone. *See id.* ¶ 5(u).

To the extent plaintiff alleges medical malpractice claims, the requisite elements of a medical malpractice action under New York law are "(1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage." *Torres v. City of New York,* 154 F.Supp.2d 814, 819 (S.D.N.Y.2001) (citing *Lyons v. McCauley,* 252 A.D.2d 516, 517, 675 N.Y.S.2d 375 (2d Dep't 1998)); *accord Lorenz v. Managing Dir., St. Luke's Hosp.,* 2010 WL 4922267, at \*11 (S.D.N.Y. Nov.5, 2010). "[I]n order to make out a prima facie case for medical malpractice, plaintiff must allege that (1) the physician owed a duty of care to the plaintiff; (2) the physician breached that duty by deviating from accepted medical practice; and (3) the

alleged deviation proximately caused plaintiff's injuries." *Lorenz,* 2010 WL 4922267, at *11.

The amended complaint describes a course of treatment that resulted in Banks continuing to have significant pain and loss of use in his finger. But this unfortunate outcome does not by itself reflect a deviation from accepted medical practice. Putting aside plaintiff's repeated legal conclusions that various defendants were "negligent" or demonstrated "deliberate indifference," *see, e.g.,* Am. Compl. ¶ 6 (multiple subparagraphs), the allegations regarding medical treatment, largely amount to a recounting of the course of his medical treatment and the fact that it was unsuccessful in repairing plaintiff's finger or relieving his pain. Construing the complaint as liberally as possible, the only allegation that sets forth a "plausible" claim that there was a deviation from medical practice is the allegation that plaintiff was "misdiagnose[d]," *id.* ¶ 5(f), (i), when a radiologist, Ross Filice, reported that plaintiff did not have a fracture at the time of the initial x-ray in November 2009, *id.* ¶ 5(f), and that the passage of time between the incorrect diagnosis and the correct one had make any attempt at corrective surgery "futile," *id.* ¶ 5(k).

**\*17**  While plaintiff alleges that all the defendants are federal agents or employees, *id.* ¶ 3(f), the Government counters that the radiologist alleged to have made the mis-diagnosis, Ross Filice, is not a federal employee but rather the employee of a contractor. *See* Johnson Decl. ¶ 8.

The FTCA renders the United States liable only for the conduct of its "employee[s]." *See* 28 U.S.C. § 1346(b). But the statute defines "employee" relatively broadly as "officers or employees of any federal agency, ... and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671. "Federal agency," in turn, is defined to include, *inter alia,* "corporations primarily acting as instrumentalities or agencies of the United States, but does not include any *contractor* with the United States." *Id.* (emphasis added). Thus, liability for Filice's actions under the FTCA turns on whether Filice is an "independent contractor" or whether he is an "employee" of the Government within the meaning of the FTCA. *See Gibbons v. Fronton,* 533 F.Supp.2d 449, 453 (S.D.N.Y.2008). The Court cannot resolve this question on the current record, however, and thus summary

judgment should be denied with respect to the claim of medical malpractice based on the alleged mis-diagnosis of his fracture in November 2009.

### B. *NYDH and the Doctors' Motions*

#### 1. *Federal Claims*
To the extent that plaintiff attempts to sue NYDH and the Doctors for constitutional violations on the theory that they were acting under color of federal law, these claims are barred for the same reasons already discussed with respect to the *Bivens* claims against the federal employees.

#### 2. *State Claims*
Liberally construing the complaint, Banks may be attempting to assert state law claims sounding in medical malpractice against the Doctors or NYDH. 28 U.S.C. § 1367 provides that a district court has supplemental jurisdiction over such claims if they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." Exercising such supplemental jurisdiction is appropriate here but the claims against NYDH and the Doctors should be dismissed for the reasons already stated: that is, nothing in the complaint points to any deviation in care by NYDH or the Doctors.

### IV. *CONCLUSION*
For the foregoing reasons, the Federal Defendants' motion (Docket # 61) should be granted in part and denied in part; NYDH's motion (Docket # 70) should be granted; and the Doctors' motion (Docket # 57) should be granted.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to any objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. George B. Daniels, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an

extension of time to file objections must be directed to Judge Daniels. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis,*

*Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4100454

Footnotes

1    The "Federal Defendants" are (1) the United States of America, (2) the Metropolitan Correctional Center (the "MCC"), (3) Victor Hurtado, (4) Anthony Bussanich, (5) Mark Glover, (6) Ysmael Joaquin, (7) Erwin Ramos, (8) Chito Evangelista, (9) Jane Okoth, (10) Ralph Guillaume, (11) Anthony Williams, (13) Suzanne R. Hastings, (14) Robert G. Hazlewood, (15) Lamine N'Diaye, (16) Sharon Fields, (17) Deborah Luongo, (18) Kenneth B. Haas, (19) Nadina Hammonds, (20) Jerry Zee, and (21) Arthur Kimm.

2    Defendants Ross Filice and Allen Skrenta were purportedly served with a copy of the summons and amended complaint, *see* Marshall's Process Receipt and Return of Service Executed, filed Mar. 14, 2011 (Docket # 15); Marshall's Process Receipt and Return of Service Executed, filed Mar. 15, 2011 (Docket # 16), but have not yet appeared in this action. Nor has plaintiff taken any further action with respect to these defendants.

3    The medical record cited and attached to the complaint indicates that the "patient's complaints" were the "main reasons for offering the option of amputation to the inmate." It indicates that another option "is to leave finger in current condition" and that the doctor "did not advocate either amputation or conservative measures but left that decision up to the patient." *See* Bureau of Prisons Health Services Clinical Encounter—Administrative Note (annexed as Ex. 35 to Am. Compl.).

4    Plaintiff may have intended to indicate "NPO"—nulla per orem—meaning an instruction for a patient not to eat or drink.

5    A "BP–8" is a form to initiate an informal administrative complaint. *See* Declaration of Adam M. Johnson, filed June 1, 2011 (Docket # 63) ("Johnson Decl.") ¶ 10.

6    A "BP–10" refers to a form used by inmates to appeal a Warden's response to a grievance, 28 C.F.R. § 542.15(a).

7    *See* footnote 11 below.

8    *See* Notice of Motion, filed June 1, 2011 (Docket # 61); Memorandum of Law in Support of the Federal Defendants' Motion to Dismiss, filed June 1, 2011 (Docket # 62); Johnson Decl.; Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings, filed June 1, 2011 (Docket # 64) ("Fed.Notice").

9    *See* Notice of Motion, filed June 6, 2011 (Docket # 57); Declaration of Bruce M. Brady, filed June 6, 2011 (Docket # 58); Memorandum of Law in Support of Defendants Eric Crone, M.D., Kenneth Rose, M.D., Gerald D. Ginsberg, M.D. and Chenzhong Fu, M.D.'s Motion to Dismiss the Amended Complaint Pursuant to FRCP § 12(b)(1), (6), filed June 6, 2011 (Docket # 59).

10    *See* NYDH Notice; Memorandum of Law in Support of Motion to Dismiss by Defendant New York Downtown Hospital, filed July 8, 2011 (Docket # 71); Notice to Pro Se Litigant Who Opposes a Rule 12 Motion by Matters Outside the Pleadings, filed July 8, 2011 (Docket # 72) ("NYDH Pro Se Notice").

11    There is an exception to the requirement for the filing of a BP–9 form in instances where the inmate "reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution." 28 C.F.R. § 542.14(d)(1). In such an instance,

the inmate may submit the Request directly to the appropriate Regional Director. The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution. If the Regional Administrative Remedy Coordinator agrees that the Request is sensitive, the Request shall be accepted. Otherwise, the Request will not be accepted, and the inmate shall be advised in writing of that determination, without a return of the Request. The inmate may pursue the matter by submitting an Administrative Remedy Request locally to the Warden. The Warden shall allow a reasonable extension of time for such a resubmission.

*Id.* This procedure was followed here. *See* Johnson Decl., Ex. D. But Banks never submitted a BP–9 and thus never appealed any determination.

2018 WL 4539230
Only the Westlaw citation is currently available.
United States District Court, S.D.
Indiana, Terre Haute Division.

Louis H. EARLY, Plaintiff,
v.
R. D. SHEPHERD, Kimberly Rhoads,
Christopher McCoy, United States, Defendants.

No. 2:16-cv-00085-JMS-MJD
|
Signed 09/21/2018

**Attorneys and Law Firms**

Louis H. Early, Terre Haute, IN, pro se.

Gina M. Shields, United States Attorney's Office,
Indianapolis, IN, for Defendants.

**Entry Granting in Part and Denying in Part Individual
Defendants' Motion for Summary Judgment and
Denying United States' Motion for Summary Judgment**

Hon. Jane Magnus-Stinson, Chief Judge

**\*1** Plaintiff Louis H. Early, a federal inmate, alleges
that he is entitled to monetary relief because he received
inadequate treatment for his abscessed tooth. The United
States of America is allegedly liable under the Federal
Tort Claims Act ("FTCA") based on the theory that Dr.
R.D. Shepherd, the Chief Dental Officer at the Federal
Correctional Complex in Terre Haute, Indiana, provided
Mr. Early with inadequate dental care.[1] Dr. Shepherd,
Ms. Kimberly Rhoads, and Mr. Christopher McCoy
(collectively, the "individual defendants") are allegedly
liable pursuant to the theory recognized in *Bivens v.
Six Unknown Federal Narcotics Agents*, 403 U.S. 388
(1971). Mr. Early alleges that Ms. Rhoads was deliberately
indifferent to his dental needs in violation of the Eighth
Amendment, and that both Ms. Rhoads and Dr. Shepherd
retaliated against him for filing grievances, in violation of
the First Amendment.[2]

All defendants seek resolution of the claims alleged against
them through summary judgment. Mr. Early concedes
that defendant Christopher McCoy should be granted

summary judgment because there is insufficient evidence
to support a claim of deliberate indifference or retaliation
against him. *See* dkt 127 at p. 16. Accordingly, all claims
against Mr. McCoy are dismissed and he is entitled to
judgment as a matter of law.

The United States argues that Mr. Early cannot establish
that the United States was negligent with respect to the
dental care he received from Dr. Shepherd. The individual
defendants argue that they are entitled to summary
judgment because Ms. Rhoads was not sufficiently
involved in the dental treatment that Mr. Early received
and because *Bivens* liability does not extend to retaliation
claims.

For the reasons explained below, the United States'
motion for summary judgment, dkt [117], is **denied.**
The FTCA claim against the United States based on the
dental care provided to Mr. Early shall proceed. The
individual defendants' motion for summary judgment,
dkt [115], is **granted** to the extent that the retaliation
claims are dismissed. This resolves all claims against
Dr. Shepherd. The individual defendants' motion for
summary judgment, dkt [115], is **denied** to the extent
that the Eighth Amendment deliberate indifference claims
against Ms. Rhoads shall proceed. The United States' and
individual defendants' collective motion to exclude the
expert testimony of Dr. Jesus Cortes, dkt [137], is **denied.**

**I. Standard of Review**

**\*2** A motion for summary judgment asks the Court to
find that a trial is unnecessary because there is no genuine
dispute as to any material fact and, instead, the movant
is entitled to judgment as a matter of law. *See* Fed. R.
Civ. P. 56(a). As the current version of Rule 56 makes
clear, whether a party asserts that a fact is undisputed or
genuinely disputed, the party must support the asserted
fact by citing to particular parts of the record, including
depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)
(1)(A). A party can also support a fact by showing that the
materials cited do not establish the absence or presence of
a genuine dispute or that the adverse party cannot produce
admissible evidence to support the fact. Fed. R. Civ. P.
56(c)(1)(B).

On summary judgment, a party must show the Court
what evidence it has that would convince a trier of fact

to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II. Material Facts

Because the Court must view the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor, the following facts are not necessarily objectively true, but are construed in favor of Mr. Early for the purposes of resolving the pending motions for summary judgment.

### A. Dental Care at FCI Terre Haute
Mr. Early has been incarcerated at the Federal Correctional Institution in Terre Haute, Indiana, ("FCI Terre Haute") since November 2013.

Dr. R.D. Shepherd is the Chief Dental Officer for the Federal Correctional Complex in Terre Haute ("FCC Terre Haute"). Dr. Shepherd is primarily responsible for the inmates assigned to FCI Terre Haute and the Federal Prison Camp. Dr. Jesus Cortes and Dr. Buckley are dentists primarily responsible for the United States Penitentiary ("USP") inmates. At FCI Terre Haute, Dr. Shepherd works with one dental hygienist, Kimberly Rhoads, and one dental assistant, Angie Whitlock.

Ms. Rhoads is a registered dental hygienist that began working at FCC Terre Haute in 2013. As a dental hygienist, Ms. Rhoads does not interpret x-rays and cannot prescribe antibiotics.

On weekday mornings, Dr. Shepherd and Ms. Rhoads have dental sick call triage, during which inmates present

a complaint form to either Dr. Shepherd or Ms. Rhoads, who then is supposed to visually examine the inmates and ask questions about their complaints and pain levels. The inmates are then scheduled for an appointment according to their complaints, usually within one to two days.

If someone has a dental issue over the weekend, there are nurses available that can call Dr. Shepherd or Dr. Cortes if there is an urgent dental need or question. The patients who present for sick call take priority over routine dental care.

The Bureau of Prisons (BOP) has a National Waiting List for dental care, which is a data bank for the entire BOP. When an inmate at FCI Terre Haute reaches the top of the National Waiting List, he is placed on the institutional call-out list to come down for his appointment. Ms. Rhoads reviews his medical history in the BOP electronic medical record system, takes x-rays, which usually consist of four bite wings, and cleans his teeth. Once the cleaning is complete, Dr. Shepherd discusses a proposed treatment plan with the inmate and gets him scheduled for that treatment. Inmates can refuse the proposed treatment, such as filling or extraction. As part of the refusal process, inmates are counseled regarding the risks of refusing the treatment and must sign a refusal form.

**\*3** The BOP's electronic medical records can be accessed at a later time and changes can be made, but the original entry is shown in its entirety, even if the provider is making an amendment to the entry.

In 2014 and 2015, Christopher McCoy was the Assistant Health Services Administrator ("AHSA") at FCI Terre Haute, where Mr. Early was housed. As AHSA, Mr. McCoy handled the administrative aspects of the Health Services Department, such as ensuring that there was sufficient staff to run the pill lines and see patients and that there were processes in place to meet the needs of the patient, the doctor's orders, and medication needs. In his role as AHSA, Mr. McCoy was not allowed to dictate clinical practice and was not involved in treating patients at all. He could not prescribe antibiotics. [3]

### B. Early's Dental Care at FCI Terre Haute
Mr. Early's dental care at FCI Terre Haute was delayed because his placement on the National Waiting List was incorrectly altered. Mr. Early originally requested care

on October 20, 2010. Mr. Early was then transferred to FCI Terre Haute and again requested dental care on November 2013. As a result, Mr. Early's original request was marked completed and the new request was started. On or about September 28, 2015, this error was corrected to reflect his original request-for-care date of October 20, 2010. The correction was made by Justin Vos, a dentist and U.S. Public Health Service Program Manager for the BOP in Washington D.C., in response to one of Mr. Early's administrative grievances. Dkt 128-14 at p. 3 (email exchange dated September 28, 2015).

Mr. Early visited health services on April 25, 2015, seeking treatment for throbbing pain in his left, back, lower tooth. He was prescribed Amoxicillin and told to report to dental for follow-up.

On Monday, April 27, 2015, Mr. Early appeared for a dental sick call triage for a tooth complaint on his lower left tooth. Mr. Early reported that he had been placed on antibiotics and pain medication over the weekend. The medical record reflects that Dr. Shepherd noted a "slight swelling on the lower left" and that Mr. Early's pain level was a two on a scale of zero to ten. Mr. Early, however, was not examined by Dr. Shepherd. He was only seen by Ms. Rhoads, the dental hygienist. [4] Ms. Rhoads visually examined Mr. Early in the hallway outside of dental and instructed him to complete the Amoxicillin regimen he was prescribed over the weekend. She said he was to be seen by Dr. Shepherd after that. Mr. Early was scheduled for the next available appointment. Anthony Calabrese, a dental clinic orderly, who witnessed this encounter, testified:

> I observed Early provide a sick call slip to Rhoads, and explain that he was there for emergency sick call, having been prescribed amoxicillin over the weekend, and that he was in pain. Rhoads told Early to continue the antibiotic treatment, and that he would be placed on call-out for treatment. All of the interaction between Rhoads and Early took place in the hallway outside of Dental, and at no time was Early brought into the Dental Office. At

no time was Shepherd present, nor did he examine Early.

**\*4** Dkt 128-10 (Calabrese Aff., ¶¶ 12-15) (quote modified for formatting and to exclude numbering).

If Dr. Shepherd determines that antibiotics are warranted, he usually prescribes a regimen of three to five days because he believes this is a good window for the inmate to be out of pain and comfortable for his follow-up appointment.

From April 27 to April 30, 2015, Mr. Early reported to the pharmacy to receive his Amoxicillin, but was repeatedly denied.

There is an email dated April 29, 2015, at 11:46 a.m. in the record from Nicole Clingerman to Ms. Rhoades and Dr. Shephard with the subject line, "Early" that states in its entirety, "came to pill line looking for ATB???" Dkt 128-12. There is no response to this email in the record.

A dental sick call appointment had been scheduled for Mr. Early that same day, April 29, 2015 (just two days after his sick call visit). Once an appointment for an inmate is made, the appointment is placed on an institutional call-out list, which is placed in the units. However, Mr. Early was not placed on the institutional call-out list for April 29, 2015, as a result of problems with the computer system responsible for the institutional call-out list. Thus, Mr. Early was unaware of and unable to attend his scheduled appointment.

On Thursday, April 30, 2015, Mr. Early returned to dental sick call triage complaining of pain in his lower left tooth. Mr. Early first saw Ms. Rhoads and requested more antibiotics. When Mr. Early provided Ms. Rhoads evidence that he was not on the prison's call out for medical appointments on April 29, 2015 and so did not know to report, Ms. Rhoads responded that it was not her problem and she did not care. The total conversation with Ms. Rhoads was 20 words. Mr. Early never acted in a threatening manner toward Dr. Shepherd or Ms. Rhoads. [5]

**\*5** On May 2, 2015, Mr. Early reported to sick call complaining of pain and discomfort. Mr. Early was seen by RN Corey Pointer. RN Pointer noted swelling to the

outside of his jaw and spoke to PA Daugherty, who prescribed Amoxicillin, 500 mg tablets for seven days. Mr. Early was given a three-day starter pack of Amoxicillin and told to follow up with dental on Monday. The medical record regarding this encounter was entered by RN Pointer many days later on May 14, 2015. After Mr. Early's three-day supply of medication ran out, additional pills were not provided.

Apparently, the failure to provide additional medication after the starter pack was depleted was not an isolated event. Dr. Donald L. Ross ("Ross"), the Regional Chief Dentist, suggested that if inmates seeking dental care are seen during the off-shift, that Dr. Shepherd or Dr. Cortes should be the ones selected for co-sign or review. He stated this would ensure that the dentist is aware of the case and medications can be extended or continued if necessary. He suggested such a change would provide clearer documentation and promote continuity of care. Dkt 128-14 at p. 2-3 (September 28, 2015, email).

On Tuesday, May 5, 2015, Mr. Early visited the dental clinic. This was 10 days after his April 25, 2015, sick call visit regarding his complaints that his lower left molar, Tooth No. 19, was hurting. When Mr. Early first arrived for the appointment, Dr. Shepherd confronted Mr. Early by placing two grievances Mr. Early had filed on the table and stating that Mr. Early was "showing his ass" by filing grievances about his dental care.

At Dr. Shepherd's direction, Angie Whitlock, a dental assistant, took a periapical x-ray of the abscessed tooth, which is a photographic image of the tooth itself. The x-ray showed that Mr. Early had bone loss and a deep large filling on the tooth. Mr. Early came into BOP custody with this pre-existing filling on Tooth No. 19. When a filling on a tooth is large—as Mr. Early's was—the tooth is more likely to need removal because the more tooth structure that is removed, the more likely the tooth will be lost in the long term. The filling on Mr. Early's Tooth No. 19 was an extremely large restoration that was sitting right on the nerve of the tooth. When a filling is that close to the nerve, the long-term chances of saving the tooth are very small. Upon x-ray, Mr. Early had an abscess—or accumulation of pus—at the bottom of his tooth. Antibiotics will not make the abscess go way. However, the antibiotics reduce the infection to alleviate the pain.

The dental record reflects that Dr. Shepherd physically evaluated Mr. Early's tooth, but he did not. According to Mr. Early, Dr. Shepherd did not physically examine him before deciding to pull the tooth and instead based his treatment decision on solely the x-ray. Dr. Shepherd concluded that the tooth was non-restorable and recommended an extraction. An extraction treats an abscess by removing the source of the infection, at which point the body destroys whatever infection is left without the need of antibiotics.

Mr. Early inquired about the withholding of his Amoxicillin prescriptions and asked Dr. Shepherd to at least examine his tooth before deciding it must be removed. In response, Dr. Shepherd got upset and stated:

> [L]et me tell you something, I'm the clinic director, if I don't want to treat you, I won't. And I [Mr. Early] said, well, sir, I'm not going to allow you to pull my tooth without an exam and without explaining to me why the Amoxicillin was discontinued. He started literally yelling at me, shut up, sit down. I said okay. So I sat down, and he went and got Mr. McCoy.

 *6  Dkt 128-2 (Early Dep., 18:22-20:7). The dental orderly, who witnessed the incident, confirms this version of events:

> Shepherd began screaming at Early, telling him he was not the Dentist and words to the effect that he did not have to even treat Early if he did not want to ... Shepherd became louder and louder, yelling at Early to shut up, stay seated, and that he was not getting treated.

Dkt 128-10 (Calabrese Aff., ¶¶ 35-40).

Ms. Rhoads also witnessed this exchange. Mr. Early then met with Mr. McCoy, who had Mr. Early sign a refusal of treatment.

Under "Objective" assessment in Dr. Shepherd's administrative notes from this appointment, Dr. Shepherd wrote:

> Patient points to #19 which has a [sic] overrestored large DO alloy. Class I mobility. No swelling noted. Positive to percussion. X-ray shows defective restoration with periapical changes. Tooth is non restorable. Patient does not want extraction done until put on antibiotics. Patient told antibiotics not warranted at this time. Patient trying to dictate treatment. Wants to argue about tooth not being fixed over a year ago and waiting list policy. Refusal signed.

Dkt 117-13 at p.1 (Health Services Admin. Note by Shepherd, May 5, 2015). Under "Plan" in the same administrative note, Dr. Shepherd stated: "Patient told issue will get worse and antibiotics will not be written due to refusal. Patient just kept interrupting and was escorted out of clinic." *Id.*

That same day, on May 5, 2015, Mr. **Early** filed another grievance describing the incident at the dental clinic earlier that day when Dr. **Shepherd** confronted Mr. **Early** about the grievances he had filed:

> I am writing to request that the dentist Shepherd, not continue to retaliate against me for filing an administrative remedy against dental. After repeated delay, I was scheduled for dental call out on 5-5-2014 [sic]. I reported for the same. The dentist never looked in my mouth.
>
> While I did not accede to his wish that he pull my tooth, I nonetheless was verbally abused for filing a BP-8. He specifically stated that 'I was showing my ass,' that I was not a dentist, and that he could do what he wanted.

I believe that being profanely insulted is inappropriate, and that had I acted or spoken in such an insulting manner, I would have been sanctioned for insolence. His behavior and actions are unprofessional and clearly in retaliation for my exercising my rights under the Administrative remedy process.

Dkt 128-22 (BP-8 Form dated May 5, 2015).

On September 28, 2015, in response to Mr. **Early**'s complaint, Dr. **Shepherd** again corresponded with Dr. Ross about the quality of care provided to inmates. Dkt 128-14 (Shepherd/Ross Emails from September 28, 2015, p. 1-2). Dr. Ross pointed out to Dr. **Shepherd**: "While [**Early**] is 'persistent' he did bring about a point [regarding continuity of care] that needed to be fine-tuned." *Id.* at 1. Dr. Shepherd responded: "Do remember this is the inmate that threatened Rhoads ... We wrote him up, but it didnt [sic] stick due to the Captain didnt [sic] feel it was threatening." *Id.*

On November 17, 2016, Dr. Cortes, the dentist primarily responsible for treating inmates at the USP, came over to FCI Terre Haute with his dental assistant to treat Mr. Early. Upon assessing Mr. Early, Dr. Cortes requested a couple of specific x-rays to determine if some questionable teeth were abscessed. One of those teeth was Tooth No. 19, which had a chronic abscess on it. Dr. Cortes recommended that Tooth No. 19 be extracted because of the abscess.

**\*7** Looking at the previous x-ray taken of Tooth No. 19, Dr. Cortes agreed that the tooth was not restorable at the time and saw little change between the x-ray he ordered in November 2016 and the previous x-ray from May 2015. Dr. Cortes then extracted Tooth No. 19. Although Dr. Cortes prescribed Mr. Early a Schedule 2 narcotic after the extraction, he did not prescribe Mr. Early any antibiotics. On November 29, 2016, Dr. Cortes saw Mr. Early at the FCI Terre Haute again, placing three stainless crowns and replacing a temporary filling with a permanent silver filling.

Subsequently, after Dr. Cortes finished all of Mr. **Early**'s treatment, Mr. **Early** was called back down to the dental clinic for a cleaning, which was to be provided by Dr. **Shepherd** or Ms. Rhoads as Mr. **Early** was housed in the FCI Terre Haute. Ms. Rhoads, however, did not feel comfortable treating Mr. **Early**, leaving Dr. **Shepherd** to

do the cleaning. Mr. **Early** refused to allow Dr. **Shepherd** to perform the cleaning and insisted that he wanted Dr. Cortes to treat him. Mr. Early was removed from the National Waiting List based on this refusal.

### C. Opinion of Dr. Michael E. Sovanich, DDS

Dr. Michael E. Sovanich, a licensed dentist who serves as an Adjunct Assistant Clinical Professor in Comprehensive Care and General Dentistry for Indiana University School of Dentistry, reviewed Mr. Early's dental records from FCI Terre Haute. Dr. Sovanich opined that Dr. **Shepherd** did not deviate from the accepted standard of care during treatment of Mr. **Early**'s lower left molar (Tooth No. 19) and that nothing Dr. **Shepherd** did caused injury to Mr. **Early**.

In Dr. Sovanich's opinion, antibiotics would never have cured Mr. Early's dental infection nor would it have allowed Mr. Early to keep his tooth. As Dr. Sovanich opined, antibiotics are not risk free, nor are they a cure-all. Repeated dosing with antibiotics can result in an allergic reaction, which can be life threatening. Unwarranted use of antibiotics can also result in bacterial resistance, making them less effective when they are truly needed. In Dr. Sovanich's opinion, Dr. **Shepherd** was offering the correct remedy, but, by refusing appropriate treatment by Dr. **Shepherd**, Mr. **Early** was the direct cause of his prolonged infection, pain and suffering.

Dr. Sovanich's testimony does not include any statement approving of the interruption of a prescribed course of antibiotics. Nor is there any dispute that antibiotic treatment can alleviate (at least temporarily) the pain associated with an abscessed tooth.

### D. Opinion of Dr. Jesus Cortes

Dr. Jesus Cortes has worked as a dentist for the BOP for more than seven years and as an Air Force dentist for 26 years before that. He has also served as a fellow of the American Academy of General Dentistry. Dr. Cortes testified regarding his treatment of Mr. Early specifically and prescribing antibiotics to his incarcerated patients generally. Dr. Cortes was asked at his deposition, "When you prescribe antibiotics for a patient, how do they actually get the pills?" In response, Dr. Cortes explained that when he prescribes antibiotics, he normally goes to the pharmacy and gives the patient a starter pack which includes about a three-day supply. He then enters the

prescription into the computer, so the pharmacy can fill the remainder of the prescription. He explained that it takes a few days for the pharmacy to fulfill the order. Dkt 129-4, (deposition pages 12-13).

Dr. Cortes testified that he would never prescribe a patient with a dental infection just three days' worth of antibiotics and that a seven to ten day regimen of antibiotics is the standard prescription for dental infections according to the American Dental Association ("ADA") and American Medical Association ("AMA"). Dr. Cortes further opined that it is very important not to terminate a patient's prescribed antibiotics regimen before it is finished. He explained:

> **\*8** It is important because first of all we like to practice by the book, and that's what the book says it should be given for seven to ten days and I know exactly why because it takes that amount of time to kill a lot of the inoculum [the bulk of the bacterial infection] ... And secondly, because bacteria are consistently multiplying. If you interrupt, you allow them to repopulate.

*Id.* at 13.

When asked whether just giving a patient a three-day starter pack could negatively affect a patient's dental health, Dr. Cortes testified:

> If I'm going to see that patient within the next two or three days it's not a problem because once we render the treatment that we're going to render, name it a root canal or an extraction, the infection pretty much kind of stops there either through the drainage or through the process of doing the root canal.

*Id.* at p. 14. If Dr. Cortes was not going to see a patient within two to three days, he would normally make sure to

get the seven-to-ten day prescription. He then reiterated that a three-day supply of antibiotics is sufficient to treat a dental infection if he sees the patient within that period of time. *Id.* His opinion is based on the standards set forth by the ADA and the AMA. *Id.* at 15.

The defendants seek to exclude the expert testimony of Dr. Cortes on the basis that they had inadequate notice that Mr. Early intended to use Dr. Cortes as an expert. The motion to exclude expert testimony of Dr. Jesus Cortes, dkt [137], is **denied**. The reason for this ruling is that Dr. Cortes's opinion is helpful to understanding the issues in this case. Moreover he is an agent of the United States. If the defendants require additional discovery to address Dr. Cortes' expert opinions, within seven days from the date this Entry is docketed, they may file a motion to reopen discovery with a statement of what additional discovery is necessary given his expert opinion.

### III. Discussion

The following claims remain in this action: (1) FTCA claim against the United States based on the allegedly negligent dental care Mr. Early received; (2) Eighth Amendment deliberate indifference claim against Ms. Rhoads; and (3) First Amendment retaliation claim against Ms. Rhoads and Dr. Shepherd. Each of these claims is discussed below.

### A. FTCA Claim

Mr. Early argues that he endured months of pain as a result of the negligent dental care he received at the hands of Dr. Shepherd. The United States argues that it is entitled to summary judgment because the care Dr. Shepherd offered was appropriate and it was Mr. Early's refusal of the recommended course of treatment that resulted in his continued pain.

The law that applies in this case is the FTCA. Whether a FTCA claim can be made against the United States depends on whether a private entity under like circumstances would be liable "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Because the actions Mr. Early complains of occurred in Indiana, Indiana law applies to this case.

The United States argues that to survive summary judgment, Mr. Early must have evidence to support a medical malpractice claim. The elements of such a claim are: " '(1) that the [United States] owed a duty to the plaintiff; (2) that the [United States] breached that duty; and (3) that the breach proximately caused the plaintiff's injuries.' " *Siner v. Kindred Hosp. Ltd. P'ship*, 51 N.E.3d 1184, 1187 (Ind. 2016) (*quoting Mayhue v. Sparkman*, 653 N.E.2d 1384, 1386 (Ind. 1995) ). To prove causation, a plaintiff must present specific facts that would demonstrate that defendant's allegedly negligent behavior caused the plaintiff's injuries. *Midwest Commerce Banking Co. v. Livings*, 608 N.E.2d 1010, 1013 (Ind. Ct. App. 1993); *see also Topp v. Leffers*, 838 N.E.2d 1027, 1032 (Ind. Ct. App. 2005) (stating that proving proximate causation requires that the plaintiff show "a reasonable connection between a defendant's conduct and the damages which a plaintiff has suffered").

**\*9** There is no disagreement that the BOP owed a duty of care to Mr. Early during his incarceration at FCI Terre Haute. 18 U.S.C. § 4042(a)(2) ("The Bureau of Prisons ... shall provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons ... convicted of offenses against the United States...."); *see also Gottlieb v. United States*, 624 F. Supp. 2d 1011, 1025 (S.D. Ind. 2008) ("Indiana law recognizes that a custodian has a legal duty to exercise reasonable care to preserve the life, health and safety of a person in custody.") (internal citations omitted).

The issue is whether Dr. Shepherd, a BOP employee, breached his duty to Mr. Early. Mr. Early argues that summary judgment cannot be granted because Dr. Shepherd's withholding of antibiotics breached the standard of care and caused Mr. Early pain and suffering. In response, the United States argues that Dr. Shepherd did not breach the standard of care or cause Mr. Early's injuries.

The parties' briefing focuses on whether Dr. Shepherd breached the standard of care in not prescribing Mr. Early antibiotics on May 5, 2015. This reads the claim far too narrowly. This is not an Eighth Amendment medical care claim. This is a FTCA claim where liability can based on the actions of more than one federal employee. For the purpose of this negligence claim, the issue is not solely whether Mr. Early was injured as a result of Dr. Shepherd's failure to prescribe antibiotics to Mr. Early on

May 5, 2015, or whether Mr. **Early**'s ongoing pain was a result of his refusal of treatment on that date.

The scope of the FTCA claim is narrowed only by Mr. Early's Claim for Damage, Injury, or Death that was presented to the BOP on or about July 20, 2015. *See* dkt 139. That claim sought $50,000.00 in damages for loss of tooth, tooth deterioration, recession and or bleeding gums, dental pain, anxiety and anguish. That tort claim explains that Mr. Early received a routine dental cleaning in April 2013 and sought, but was denied, another cleaning until May 5, 2015. [6] On April 25, 2015, he had an abscessed tooth. He was twice prescribed Amoxicillin but was not able to obtain a complete course of that medication. He sought care at the dental clinic, but was not seen by the dentist, even though the dental records inaccurately reflect that he was evaluated by Dr. Shepherd. Mr. Early was scheduled for an appointment but was unable to attend because his name did not appear on the facility's call out list. Mr. Early was blamed for his inability to present himself for the appointment. When Mr. **Early** saw Dr. **Shepherd** on May 5, 2015, Dr. **Shepherd** was abusive and announced that the tooth would be pulled and no antibiotics would be provided before conducting any evaluation.

The record in case considered in the light most favorable to Mr. **Early** reflects that Dr. R.D. **Shepherd** was the Chief Dental Officer responsible for providing dental services to inmates such as Mr. **Early**. The BOP had a duty to provide routine and emergency dental care that Mr. Early did not receive and as a result Mr. Early's teeth deteriorated and he suffered unnecessary pain. The following breaches could be seen to have contributed to the failure to timely provide necessary dental treatment:

1. A mistake in Mr. Early's placement on the National Waiting List resulted in delayed treatment and dental pain.

**\*10** 2. A computer error resulted in Mr. Early's inability to attend a necessary dental appointment which resulted in delayed treatment and dental pain.

3. There was a practice of entering dental records that suggested that Mr. Early was being evaluated by a dentist when he was not. The result is that the records are unreliable and misleading. This resulted in delayed treatment and dental pain for Mr. Early.

4. Mr. **Early** had an abscessed tooth that required evaluation and prescription medication that only Dr. **Shepherd** could provide. Mr. Early was not evaluated by the dentist, instead his mouth was looked at by a dental hygienist in the hallway whose conduct precluded him from receiving the additional medication that sick call had contemplated.

5. On at least two occasions, medical providers prescribed a course of antibiotics to Mr. **Early**, gave him a three-day starter pack, and then BOP employees (including Dr. **Shepherd**) failed to take the necessary steps for the pharmacy to provide Mr. **Early** with the full prescription. This resulted in unnecessary pain.

6. During Mr. **Early**'s May 5, 2015, appointment Dr. **Shepherd** was hostile towards Mr. **Early** for questioning the dental care he had been provided through the grievance processes and failed to conduct any physical examination of Mr. **Early**'s mouth prior to announcing (without patient counseling) that the abscessed tooth would be pulled.

The United States had a duty to provide Mr. Early with dental care. Timely dental care was not provided and Mr. Early suffered unnecessary pain as a result. Accordingly, the United States' motion for summary judgment, dkt [117], is **denied.** This claim shall be resolved through settlement or a bench trial.

**B. Eighth Amendment Claim**

Mr. Early argues that Ms. Rhoads' failure to facilitate appropriate treatment of Mr. Early's tooth abscess caused by a bacterial infection amounts to deliberate indifference. Mr. Early argues that he endured months of pain because Ms. Rhoads repeatedly turned Mr. Early away from the dental clinic without administering proper care. Ms. Rhoads argues that she is entitled to summary judgment because there is no evidence that she was personally involved in treating Mr. Early's periapical abscess on his lower left jaw area.

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see Helling*

*v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

To prevail on an Eighth Amendment deliberate indifference to medical care claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer*, 511 U.S. at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

**\*11** There is no dispute that Mr. Early's abscess was objectively serious. Instead, Ms. Rhoads argues that she was not sufficiently involved in Mr. Early's treatment to give rise to any liability under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and that she lacked the requisite intent for a finding of deliberate indifference. "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner." *Board v. Freeman*, 394 F.3d 469, 478 (7th Cir. 2005).

> To determine if a prison official acted with deliberate indifference, we look into his or her subjective state of mind. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) (citing *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970) .... [T]he Supreme Court has instructed us that a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm. *Id.* at 837, 114 S.Ct. 1970. Officials can avoid liability by proving they were unaware even of an obvious risk to inmate health or safety. *Id.* at 844, 114 S.Ct. 1970.

*Pettis v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). To survive summary judgment, the plaintiff need not prove his case. Instead, the plaintiff is only required to present "evidence from which a reasonable jury could infer a

doctor knew he was providing deficient treatment." *Id.* at 726.

Mr. Early argues that he experienced severe pain as a result of his abscess for nearly two weeks leading up to his appointment with Dr. Shepherd on May 5, 2015. Mr. Early asserts that Ms. Rhoads personally examined Mr. Early on at least two occasions at dental sick call on April 27, 2015, and on April 30, 2015. Based on these physical examinations, a reasonable fact finder could conclude that 1) Ms. Rhoads knew that Mr. Early suffered from an abscessed tooth, which is an objectively serious medical condition; and 2) given her experience as a dental hygienist, Ms. Rhoads knew the substantial risk of harm – including pain – that the abscessed tooth posed.

A reasonable fact finder could further conclude that Ms. Rhoads disregarded that risk. This is because Ms. Rhoads was tasked with participating in dental sick call triage, during which time she would consider the inmate's complaint, visually examine the inmates, consider the inmate's pain level and then schedule the inmate for an appointment. In this way, she was responsible for making determinations about inmates' needs for further treatment.

In response, the defendants argue that Ms. Rhoads should not be held liable for Mr. Early's lack of access to the medication he was prescribed because she herself is unable to prescribe medications. This argument is not persuasive, because Ms. Rhoads could and should have referred Mr. Early to Dr. Shepherd to provide the prescription she was not qualified to administer. The evidence is sufficient for a reasonable fact finder to infer that, although a three pill starter pack of antibiotics was provided to Mr. Early at medical sick call, an order from the dentist was required in order to obtain the remainder of course of the medication. This conclusion is supported by the fact that there is an email in the record dated April 29, 2015, at 11:46 a.m., in the record from Nicole Clingerman to Ms. Rhoades and Dr. Shepherd with the subject line, "Early" that states in its entirety, "came to pill line looking for ATB???" Dkt 128-12. Based on this email, it is reasonable to conclude that Ms. Rhoads had responsibility for following up regarding dental patient's prescriptions. This responsibility (even if misplaced) is consistent with the evidentiary record that reflects that Ms. Rhoades filled out dental records that reflected that Dr. Shepherd was

the one providing treatment even when she was the only provider the patient saw.

**\*12**  In addition, on April 30, 2015, Ms. Rhoads accused Mr. Early of missing an appointment, which he was unaware of and could not have attended because he was not placed on the call-out list. When Mr. Early provided Ms. Rhoads evidence that he was not on the prison's call out for medical appointments on April 29, 2015, Ms. Rhoads responded that it was not her problem and she did not care.

If Mr. Early's evidence is accepted as true, it is sufficient for a fact finder to conclude that Ms. Rhoades was deliberately indifferent to Mr. Early's dental needs. Accordingly, Ms. Rhoads is not entitled to summary judgment in her favor. This claim shall either be resolved through settlement or a jury trial.

### C. Qualified Immunity
The individual defendants argue that Ms. Rhoads is entitled to qualified immunity for her improper actions against Mr. Early. They argue that:

> [Ms.] Rhoads could not have reasonably foreseen that her actions were cruel and unusual, or even negligent. This is particularly in light of Dr. Sovanich's opinion that the treatment Early received for his abscessed tooth did not breach the standard of care.... Case law demonstrates that a disagreement over the course of treatment, or actions that may amount to negligence, do not violate the Eighth Amendment. *See, e.g., Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996).

Dkt 131 at p. 19-20.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would

have known." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (alterations and internal quotation marks omitted). The Supreme Court has explained:

> Although this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate. In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law.

*Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal citations and quotations omitted).

In evaluating a claim of qualified immunity at summary judgment, the threshold question to be considered is: "[t]ken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "The law is clear that deliberate indifference to a serious medical condition is a violation of a clearly established constitutional right." *Bd. v. Farnham*, 394 F.3d 469, 481 (7th Cir. 2005) (holding that defendant not entitled to qualified immunity on claim that inmate was denied toothpaste for an extended period of time). "Indeed, '[d]ental care is one of the most important medical needs of inmates.' " *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (*quoting Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980) ).

For the reasons explained above, a fact finder could conclude that Ms. Rhoads was deliberately indifferent to Mr. Early's serious medical condition in violation of the Eighth Amendment and that a reasonable dental hygienist in Ms. Rhoads' position would have known it was improper to delay Mr. Early's evaluation by a dentist and to ignore the fact that Mr. Early, who was suffering from a dental infection, was unable to obtain the remainder of the antibiotics he had been prescribed.

**\*13**  If a jury finds that Ms. Rhoads was responsible for delaying or denying necessary dental care and that her actions were inadequate to meet Mr. Early's serious medical needs, such conduct violates clearly established

law under the Eighth Amendment. *See Farmer*, 511 U.S. at 837, 114 S.Ct. 1970; *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) (finding refusal to refer patient to a dentist actionable because "a basic dental examination is not an expensive or unconventional treatment, nor is it esoteric or experimental") (internal quotation marks omitted). Given that the threshold factual questions of Ms. Rhoads' states of mind remain disputed, summary judgment on the basis of qualified immunity is inappropriate. *See Petties v. Carter*, 836 F.3d 722, 734 (7th Cir. 2016); *DuFour–Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998).

### D. First Amendment Claims

Mr. Early alleges that Dr. Shepherd retaliated against him for filing grievances by having his cell searched, and Ms. Rhoads retaliated against him by removing him from the National Waiting List for dental care, preventing him from timely obtaining a dental cleaning, and creating inaccurate medical records. [7] The individual defendants argue that they are entitled to judgment as a matter of law on Mr. Early's First Amendment retaliation claims because *Bivens* liability does not extend to these claims.

In *Bivens*, the Supreme Court first recognized an implied right of action for damages against federal officers alleged to have violated a plaintiff's Fourth Amendment right to be free from unlawful search and seizure. *See Bivens*, 403 U.S. at 392–98. Since *Bivens*, the Supreme Court has recognized an implied right of action under the Fifth Amendment's due process clause, *Davis v. Passman*, 442 U.S. 228 (1979), and the Eighth Amendment's prohibition against cruel and unusual punishment, *Carlson v. Green*, 446 U.S. 14 (1980). Following *Carlson*, the Supreme Court has repeatedly refused to recognize *Bivens* actions in any new contexts. *Vanderklok v. United States*, 868 F.3d 189, 198 (3d Cir. 2017).

In *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017), the Supreme Court considered whether "noncitizens who were suspected of having ties to terrorism and detained in harsh conditions in the aftermath of September 11, could pursue *Bivens* remedies against various high-level federal officials responsible for the policy that authorized their detention and the wardens responsible for their treatment thereafter." *Lanuza v. Love*, No. 15-35408, 2018 WL 3848507, at *3 (9th Cir. Aug. 14, 2018) (citing *Abbasi*, 137 S. Ct. at 1853–54). The Supreme Court

declined to extend *Bivens* to these detention policy claims, emphasizing that expanding the *Bivens* remedy is now a "disfavored" judicial activity.

Post-*Abbasi*, additional scrutiny is required before a plaintiff may proceed with a *Bivens* action if the claims arise "in a new *Bivens* context." *Abbasi*, 137 S. Ct. at 1864. "If the case is different in a meaningful way from previous *Bivens* cases determined by this Court, then the context is new." *Id.* at 1859. The Court articulated a two-part test for determining whether *Bivens* remedies should be extended. *Id.* at 1859–60.

> First, courts must determine whether the plaintiff is seeking a *Bivens* remedy in a new context. If the answer to this question is "no," then no further analysis is required. If the answer is "yes," then the court must determine whether "special factors counsel[ ] hesitation."

**\*14** *Lanuza,* 2018 WL 3848507, at *3 (internal citations omitted) (citing *Abbasi*, 137 S. Ct. at 1860).

In response, to the defendants' motion, Mr. Early argues that his claim is not different in any meaningful way from prior *Bivens* cases decided by the Supreme Court. [8] Thus he is not seeking a *Bivens* remedy in a new context and no additional scrutiny is necessary.

In support of this position, Mr. Early argues that the Supreme Court's decision in *Hartman v. Moore*, 547 U.S. 250 (2006), acknowledged a *Bivens* remedy in First Amendment retaliation cases. *Hartman* is the only *Bivens* case where the Supreme Court discussed the merits of a First Amendment retaliation claim. In that case, the plaintiff filed a *Bivens* action against a federal prosecutor and postal inspectors, arguing that they had "engineered his criminal prosecution in retaliation for criticism of the Postal Service [in violation of] the First Amendment." *Id.* at 254. *Abbasi*, Mr. Early argues, does not purport to limit, and does not even mention, *Hartman*, which remains good law. But, Mr. Early is mistaken. In *Hartman*, the

Supreme Court never discussed the propriety of a remedy in the first instance, as this was not raised or briefed before the Court. And importantly, the Supreme Court in *Abbasi* did not mention *Hartman* in its discussion of the three cases in which it recognized an implied right of action for damages under *Bivens*.

*Andrews v. Miner*, 301 F. Supp. 3d 1128, 1134 (N.D. Ala. 2017). *Abbasi* held that the claim at issue in that case was a new *Bivens* context because it "b[ore] little resemblance to the three *Bivens* claims the Court has approved in the past. 137 S. Ct. at 1860. The Supreme Court has not previously recognized a *Bivens* remedy in a First Amendment retaliation claim brought by a prisoner. In fact, "[t]he Supreme Court has never implied a *Bivens* action under any clause of the First Amendment." *Vanderklok*, 868 F.3d at 198 (citing *Reichle v. Howards*, 566 U.S. 658, n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims.") ). "Instead, it has, solely for analytical purposes, assumed that such an action exists. It has not actually decided the matter." *Id.*

*Abassi* held that if the questioned claim is indeed a "new *Bivens* context" claim, then the district court must ask whether " 'any alternative, existing process for protecting the [injured party's] interest.' " *Abbasi*, 137 S. Ct. at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007) ). "[T]he existence of alternative remedies usually precludes a court from authorizing a *Bivens* action." *Abbasi*, 137 S. Ct. at 1865. And this Court must also consider whether special factors counsel hesitation in recognizing a *Bivens* remedy.

**\*15** Accordingly, the Court considers whether the type of "special factors" discussed by the *Abbasi* court as justifying extending *Bivens* liability are present here. In *Abbasi*, the Supreme Court clarified what constitutes a "special facto[r] counselling hesitation." *See* 137 S.Ct. at 1857. "[T]he inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1858. A court must assess the impact of an implied damages

remedy on "governmental operations systemwide," such as "the burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself." *Id.* If "Congress might doubt the efficacy or necessity of a damages remedy" in a particular context, "courts must refrain from creating the remedy" to respect the separation of powers. *Id.*

" 'Nationwide, district courts seem to be in agreement that, post-*Abbasi*, prisoners have no right to bring a *Bivens* action for violation of the First Amendment.' " *Akande v. Philips*, 1:17-cv-01243-EAW, 2018 WL 3425009, at *8 (W.D.N.Y. July 11, 2018) (quoting *Free v. Peikar*, No. 1:17-cv-00159-AWI-MJS, 2018 WL 1569030, at *2 (E.D. Cal. Mar. 30, 2018) ). This District has concluded the same. *See Harris v. Dunbar*, 2:17-cv-536-WTL-DLP, 2018 WL 3574736, at *4 (S.D. Ind. July 25, 2018) (no *Bivens* claim for inmate's First Amendment mail claim); *Badley v. Granger*, 2:17-cv-0041-JMS-DLP, 2018 WL 3022653 (S.D. Ind. June 18, 2018) (no *Bivens* claim for inmate's First Amendment retaliation claim); *Albrechtsen v. Parsons*, 1:17-cv-1665-JMS-TAB, 2018 WL 2100361 (S.D. Ind. May 7, 2018) (no *Bivens* claim for First Amendment retaliation claim); *Muhammad v. Gehrke*, 2:15-cv-334-WTL-MJD, 2018 WL 1334936 (S.D. Ind. Mar. 15, 2018) (inmate's First Amendment retaliation claim not viable under *Bivens* ).

Turning first to whether Mr. Early has alternative remedies he may use to address his retaliation claims, he has, of course, the BOP's administrative remedy process. He may bring retaliatory conduct to the attention of administrators and seek non-monetary remedies. For any injuries he might have sustained, he is able to bring a claim under the Federal Torts Claim Act. Any retaliation that extends his confinement might be actionable in habeas corpus. And any retaliation that results in a violation of a previously recognized *Bivens* claim is another alternate remedy Mr. Early may pursue. Mr. Early is simultaneously litigating an Eighth Amendment claim under *Bivens* and a tort claim under the FTCA in this case, involving many of the same injuries he complains about with regard to his First Amendment claim. He has also filed grievances concerning some of the allegations in this action. Thus, Mr. Early is not without a remedy to address the core concerns of his problems and this Court concludes that Mr. Early has alternative remedies he may use to address the alleged retaliation.

Here, expanding *Bivens* to Mr. Early's retaliation claims would implicate the BOP's policies regarding cell searches, the National BOP Waiting List for dental treatment, and medical record keeping. The federal employees charged with these decisions and responsibilities for these programs would face increased litigation costs in defending such claims. "First Amendment retaliation claims, requiring inquiry into a defendant's subjective state of mind, often would present genuine issues of material fact not easily resolved on summary judgment. This, in turn, would necessitate trials and further increase litigation costs." *Andrews*, 301 F. Supp. 3d at 1135 (N.D. Ala. 2017) (discussing special factors and declining to extend *Bivens* liability to a First Amendment retaliation claim).

Finally, "legislative action suggesting that Congress does not want a damages remedy is itself a factor counseling hesitation." *Abbasi*, 137 S. Ct. at 1865. As noted by the Supreme Court:

> **\*16** Some 15 years after *Carlson [v. Green,* 446 U.S. 14 (1980) ] was decided, Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court. So it seems clear that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs. This Court has said in dicta that the Act's exhaustion provisions would apply to *Bivens* suits. But the Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.

*Id.* (internal citations omitted). Congress has been active in the area of prisoners' rights, and its decision to not create a damages remedy for federal prisoners alleging

mistreatment is a reason for the courts to not create a new *Bivens* claim.

For these reasons, Mr. Early's First Amendment retaliation claims are foreclosed by *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). The retaliation claims are not one of the three *Bivens*-type claims recognized by the Supreme Court. Mr. Early has administrative and other judicial remedies available to him for the underlying incidents that gave rise to the instant claims, and the nature of the instant claims are not of such gravity to require judicial intervention and the creation of a new *Bivens* action. The individual defendants' motion for judgment as a matter of law on the First Amendment claims is **granted**.

### V. Conclusion

For the reasons explained above, the United States' motion for summary judgment, dkt [117], is **denied.** The FTCA claim against the United States based on the dental care provided to Mr. Early shall proceed.

The individual defendants' motion for summary judgment, dkt [115], is **granted in part and denied in part.** The motion is granted to the extent that the retaliation claims are dismissed. This resolves all claims against Dr. Shepherd. The individual defendants' motion for summary judgment is **further granted** to the extent that defendant Christopher McCoy is granted summary judgment as to all claims alleged against him. The individual defendants' motion for summary judgment is **denied** to the extent that the Eighth Amendment deliberate indifference claims against Ms. Rhoads shall proceed.

The United States' and individual defendants' collective motion to exclude the expert testimony of Dr. Jesus Cortes, dkt [137], is **denied.**

The **clerk is directed** to update the docket to reflect that defendants Christopher McCoy and R.D. Shepherd are dismissed. The remaining claims will be resolved through settlement or trial.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2018 WL 4539230

Footnotes

1   For the reasons explained in the Entry of October 17, 2017, Dr. Shepherd is a Public Health Officer and was granted immunity under 42 U.S.C. § 233(a) for the Eighth Amendment claim alleged against him and the retaliation claims related to the performance of dental functions. Consistent with § 233, the Court substituted the United States as defendant to the claim that Dr. **Shepherd** provided Mr. **Early** with inadequate dental care under the FTCA. Dkt 100.

2   Section 233(a) does not shield Dr. Shepherd from responsibility for retaliatory actions that were not taken in the performance of his official duties. Specifically, the claim that Dr. **Shepherd** had Mr. **Early**'s cell searched in retaliation for complaining about his dental care is proceeding against Dr. **Shepherd**.

3   The only dental staff who could prescribe antibiotics were Dr. Shepherd, Dr. Cortes, and Dr. Buckley.

4   In a July 14, 2015, email to Dr. Shepherd, Dr. Donald L. Ross, the Regional Chief Dentist, recommended that Dr. Shepherd change the dental clinic's charting policy so that the patient's records reflect who actually performed the work, not simply who signed off on it after the fact. Specifically, Dr. Ross stated:

   Looking at Mr. Early's notes it gives the appearance that you personally examined him and made a disposition. If the RDH/DA [dental hygienist/dental assistant] do the triage but youi [sic] have not had the patient in the chair and looked at him, even if you are in the room/clinic, the RDH/DA should make a triage note (even taking an x-ray if needed) and you co-sign. Based on that you can then make the disposition for scheduling, prescribing empirically if needed, in an administrative note.

   Dkt 128-11 (Email exchange dated July 14, 2015, at 8:16 a.m.).

5   There is a dispute regarding whether Mr. Early raised his voice and became angry or aggressive. Ms. Rhoads testified that she felt uncomfortable and asked Dr. **Shepherd** to step in. There is a further dispute regarding whether Dr. **Shepherd** stepped in and examined Mr. **Early** on April 30, 2015. Dr. **Shepherd** testified that he noted no swelling or drainage at the time and that Mr. **Early**'s pain level was two out of ten.

6   This is the date, Mr. **Early** refused Dr. **Shepherd**'s treatment. Apparently, he was not offered a cleaning until November 17, 2016, when Dr. Cortes provided care.

7   As explained in the Entry of October 17, 2017, Dr. Shephard is entitled to absolute immunity as to those alleged retaliatory acts that relate to the "performance of medical, surgical, dental, or related functions," that are "within the scope of [Defendant Shepherd's] office or employment." 42 U.S.C. § 233(a). Dkt 100 at 6-7.

8   Determining whether a case presents a new *Bivens* context is not based on whether a particular circuit has recognized a *Bivens* remedy in a specific context, but whether the Supreme Court itself has recognized a *Bivens* claim in that context. *See Abbasi*, 137 S. Ct. at 1859 ("If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new.").

**End of Document**                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-00416-DNH-TWD    Document 45    Filed 05/28/19    Page 63 of 146

Huggins v. Schriro, Not Reported in Fed. Supp. (2015)

2015 WL 7345750

2015 WL 7345750
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Diral HUGGINS, Plaintiff,
v.
Commissioner Dora SCHRIRO &
Warden Carlton Newton, Defendants.

14–CV–6468 (GBD) (JLC)
|
Signed November 19, 2015

**Attorneys and Law Firms**

Diral Huggins, Auburn, NY, pro se.

Evan Robert Schnittman, New York City Law Department, New York, NY, for Defendants.

### *REPORT AND RECOMMENDATION*

JAMES L. COTT, United States Magistrate Judge.

**\*1 To The Honorable George B. Daniels, United States District Judge:**

Plaintiff Diral Huggins, proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983. He alleges that Defendants Dora B. Schriro, as the Commissioner of New York City's Department of Correction, and Carlton Newton, as the Warden of the Anna M. Kross Center ("AMKC") on Rikers Island, (collectively "Defendants"), violated his constitutional rights during the period of his detention at the AMKC. Defendants have moved to dismiss Huggins' Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, I recommend that the Court dismiss the Amended Complaint with prejudice.

## I. *BACKGROUND*

### A. Factual Background

At the time of the alleged violations of his constitutional rights, [1] Huggins was incarcerated at the AMKC on Rikers Island. *See* Amended Complaint ("Am.Compl."), at 2 (Dkt. No. 10). Huggins alleges that Defendants deprived him of his constitutional rights under the Fifth, Seventh, Eighth, and Fourteenth Amendments. [2] *Id.* at 3.

Specifically, Huggins contends that (1) the sneakers issued by the correctional facility were too thin and slippery, and this prevented him from participating in outdoor recreation during winter months; (2) during the same period, he was consistently served "cold or lukewarm" food; (3) the condition of his cell did not meet heating requirements and he was deprived of sufficient blankets; (4) such conditions—lack of exercise and exposure to cold —exacerbated his asthma and caused his health to decline generally; (5) visitation with his family was limited; (6) his access to the law library was restricted; and (7) his usage of the telephone was limited. *Id.* at 3, 6.

### B. Procedural History

Huggins filed his Complaint on August 12, 2014, alleging various injuries resulting from the "locked down" periods during his incarceration at AMKC. (Dkt. No. 1). However, because Huggins did not specify how he was personally harmed by the lockdown, he was directed to amend his complaint. (Dkt. No. 5). On April 9, 2015, Huggins filed an Amended Complaint in which he asserted the claims identified above. On July 21, 2015, Defendants moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Huggins (1) failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e; (2) failed to sufficiently allege the personal involvement of Defendants in the purported violations of his constitutional rights; and (3) failed to state a claim upon which relief could be granted. Defendants' Motion to Dismiss ("Def.Mem.") (Dkt. No. 22). Huggins opposed this motion on September 29, 2015. Plaintiff's Opposition to Motion to Dismiss ("Pl.Mem.") (Dkt. No. 29). [3] Defendants replied in further support of their motion on October 8, 2015. Defendant's Reply Memorandum ("Def.Reply") (Dkt. No. 31). This motion is before me pursuant to the order of reference dated May 7, 2015. (Dkt. No. 14).

## II. *DISCUSSION*

### A. Standard of Review

**\*2** On a Rule 12(b)(6) motion to dismiss, the Court must accept all allegations in the complaint as true and draw all reasonable inferences in favor of the nonmoving party. *See, e.g., Nwozuzu v. United States,* No. 14–CV–8589 (LGS), 2015 WL 4865772, at \* 3 (S.D.N.Y. Aug. 12, 2015) ("On a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the non-moving party.") However, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged ... Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

While *pro se* complaints must also contain sufficient factual allegations to meet the plausibility standard, *Walker v. Schult,* 717 F.3d 119, 124 (2d Cir.2013), district courts should look proactively for such content by reading *pro se* complaints with "special solicitude" and interpreting them to raise the "strongest [claims] that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006) (per curiam) (internal quotation omitted). Even so, a district court should still dismiss a *pro se* complaint if it "fail[s] to meet minimum pleading requirements." *Kinsey v. Bloomberg,* No. 12–CV–8936 (PAE)(JCF), 2014 WL 630670, at \*3 (S.D.N.Y. Feb. 18, 2014).

**B. Exhaustion of Administrative Remedies**
As a threshold matter, the PLRA prohibits a prisoner from bringing Section 1983 claims "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[C]ourts 'should be careful to look at the applicable set of grievance procedures' " within a prisoner's correctional facility at the time the grievance arose to determine the availability of administrative remedies. *Taylor v. New York State Dep't of Corr.,* No. 03–CV–1929 (PKC), 2004 WL 2979910, at \*6 (S.D.N.Y. Dec. 22, 2004) (quoting *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004)).

Here, the applicable administrative procedure is the Inmate Grievance and Request Program ("IGRP"), a four-step administrative review and appeals system for prisoner grievances within the New York City Department of Correction. [4] The PLRA "requires 'proper exhaustion,' which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir.2009) (quoting *Woodford v. Ngo,* 548 U.S. 81, 90 (2006) (emphasis in original)).

**\*3** The Supreme Court has clarified, however, that prisoners "are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 216 (2007). It cautioned that courts should not impose a heightened pleading requirement that does not exist in the PLRA, particularly because "when Congress meant to depart from the usual procedural requirements, it did so expressly." *Id.* at 216. Rather, failure to exhaust administrative remedies is an affirmative defense that defendants must raise. *Id.*

Although a motion for summary judgment is normally the proper vehicle to address a plaintiff's failure to exhaust, " '[a]n affirmative defense may be raised by a [Rule 12(b)(6) motion to dismiss], without resort to summary judgment procedure, if the defense appears on the face of the complaint.' " *Rodriguez v. Warden, Metropolitan Corr. Fac.,* No. 13–CV–3643 (PAC)(SN), 2015 WL 857817 at \*8 (S.D.N.Y. Feb. 27, 2015) (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74–75 (2d Cir.1998)). Because prisoners are not required to plead compliance with prison grievance procedures in their complaints, courts in this Circuit have denied motions to dismiss based on exhaustion where ambiguity exists as to whether a plaintiff exhausted his administrative remedies. Where a prisoner indicates that he has taken *some* steps toward exhaustion, district courts will normally not infer from his silence that he failed to take the remaining steps that full exhaustion would require. *See, e.g., Rodriguez,* 2015 WL 857817 at \*3–4; *Randolph v. N.Y.C. Dep't of Corr.,* No. 05–CV–8820 (GEL)(MHD), 2007 WL 2660282, at \*8 (S.D.N.Y. Sept. 7, 2007) ("[Plaintiff's] failure to mention some of the required steps cannot be deemed to establish a failure to exhaust; rather, it simply leaves ambiguity as to the extent of his exhaustion efforts."), *adopted by* Order dated Sept. 22, 2007 (Dkt. No. 45).

Accordingly, "a *pro se* plaintiff's pleading references to various efforts that he has made to bring alleged prison violations to the attention of the prison authorities cannot

Case 9:18-cv-00416-DNH-TWD    Document 45    Filed 05/28/19    Page 65 of 146

Huggins v. Schriro, Not Reported in Fed. Supp. (2015)

2015 WL 7345750

be treated as tantamount to an admission that he had not exhausted his remedies." *Wesley v. Muhammad,* No. 05–CV–5833 (GEL)(MHD), 2008 WL 123812, at *3 (S.D.N.Y. Jan. 10, 2008), *adopted by* 2008 WL 236974 (S.D.N.Y. Jan. 28, 2008). *But see Ghee v. Warden Ramos,* No. 13–CV–632 (RWS), 2013 WL 7018543, at *1–2 (S.D.N.Y. Dec. 4, 2013) (dismissing prisoner's complaint for failure to exhaust where he did not respond to question regarding appeal efforts and failed to allege "further actions taken ... to appeal his initial grievance or comply with the remaining requirements under the IGRP"); *Antrobus v. Warden of GRVC,* No. 11–CV–5128 (JMF), 2012 WL 1900542, at *3 (S.D.N.Y. May 25, 2012) (treating prisoner's nonresponsive answer regarding his appeal efforts as "a concession that he did not attempt to appeal the decision at all").

Here, Huggins alleges in his Amended Complaint that he received "no answer" to his initial grievance. Further, in response to the inquiry asking him to describe "all efforts to appeal to the highest level of the grievance process," Huggins writes that "[t]here was no decision unless no answer is a decision." Am. Compl. at 4. While this response does not suggest that Huggins has taken all steps in the administrative process, it is also not a concession that he has failed to take these steps. "It is therefore only clear from [Plaintiff's] allegations that he initiated the IGRP grievance process and that, at the time of filing his complaint, he had not received a response." *Groenow v. Williams,* No. 13–CV–3961 (PAC) (JLC), 2014 WL 941276, at *4 (S.D.N.Y. Mar. 11, 2014), *adopted by* Order dated July 15, 2014 (Dkt. No. 21); *see Randolph,* 2007 WL 2660282 at *7 (declining to dismiss complaint where prisoner alleged that he filed grievance and received no response because "at no point does [prisoner] state that he failed to follow all the required grievance procedures"). Although "[t]he complaint may lack specifics as to how the plaintiff grieved his claim, that is not a valid basis for dismissal under *Jones* [*v. Bock* ]." *Johnson v. Westchester Cnty. Dep't of Corr. Med. Dep't,* No. 10–CV–6309 (JGK), 2011 WL 2946168, at *2 (S.D.N.Y. July 19, 2011) (declining to dismiss prisoner's complaint where he alleged only that he had "filed a complaint within the office of the warden").

**\*4** Accordingly, given the ambiguous answers provided in the Amended Complaint as well as the lack of any other information from Defendants regarding Huggins' exhaustion of the grievance process, the Court concludes

that failure to exhaust the administrative process does not constitute a basis for dismissal at this time.

## C. The Requirement of Personal Involvement

To establish a defendant's individual liability pursuant to Section 1983, a plaintiff must plead each defendant's personal involvement in the alleged constitutional violations. *See, e.g., Liner v. Fischer,* No. 11–CV–6711 (PAC)(JLC), 2013 WL 3168660, at *7 (S.D.N.Y. June 24, 2013) (citing *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) and *Iqbal,* 556 U.S. at 676), *adopted by* 2013 WL 4405539 (S.D.N.Y. Aug. 7, 2013); *see also Grullon v. City of New Haven,* 720 F.3d 133, 138–39 (2d Cir.2013). This requirement can be satisfied by demonstrating that the defendant: (1) participated directly in the alleged constitutional violation; (2) failed to remedy a wrong after learning of it; (3) created a policy or custom under which the violation occurred, or allowed such a policy or custom to continue; (4) was grossly negligent in supervising subordinates who committed the alleged violation; or (5) was deliberately indifferent to ongoing unconstitutional acts. *Id.* at 138–39 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)); *see Liner,* 2013 WL 3168660 at *7.

### *1. Receipt of a grievance is insufficient to establish personal involvement*

Other than in the caption (and in the section of the form complaint where the plaintiff is asked to list the defendants), Huggins does not mention either Defendant by name in the Amended Complaint. Huggins refers to Defendant Newton for the first time in his Opposition to the Motion to Dismiss, alleging that he is personally liable because he "failed to remedy the wrong" after "being informed of the violation through a report or appeal." Pl. Mem. at 8. The only basis Huggins has for Newton knowing of this "wrong" comes from his review of "grievances at the highest level in the facility." *Id.*

However, courts "have repeatedly held that receipt of letters or grievances is insufficient to impute personal involvement. Were it otherwise, virtually every prison inmate who sues for constitutional torts by prison officials could name the supervisor as a defendant since the plaintiff must pursue his prison remedies, and invariably the plaintiff's grievance will have been passed upon by the supervisor." *Acevedo v. Fischer,* No. 12–CV–6866 (RA), 2014 WL 5015470, at *16 (S.D.N.Y. Sept. 29, 2014) (citing *Harris v. Fischer,* No. 11–CV–6260 (CM)

(JLC), 2014 WL 3859242, at *3 (S.D.N.Y. Aug. 1, 2014)); *see also Ramrattan v. Fischer,* No. 13–CV–6890 (KPF), 2015 WL 3604242, at *11 (S.D.N.Y. June 9, 2015) (providing the names and titles of defendants, claiming that they are in the chain-of-command in the prison hierarchy, and that these individuals receive and review letters and grievances is insufficient to allege personal involvement); *Ciaprazi v. Fischer,* No. 13–CV–4967 (VEC) (FM), 2015 WL 1315676, at *2–3 (S.D.N.Y. Mar. 24, 2015) (Defendant Commissioner's receipt of letter and his brief response did not prove he was "aware" of alleged constitutional violations).

As to Commissioner Schriro, Huggins does not specify the nature or extent of Schriro's involvement at all. In fact, neither the Amended Complaint nor his Opposition to the Motion to Dismiss even mentions Commissioner Schriro. *See Harris,* 2014 WL 3859242 at *3 (dismissing claims against defendants where they are named in the caption, but are not otherwise mentioned in the complaint) (citing *Dove v. Fordham University,* 56 F.Supp.2d 330, 335 (S.D.N.Y.1999)).

### 2. *Monell Liability*

**\*5** Alternatively, Huggins alleges that Defendants "created [a] policy or custom" that resulted in the violation of his constitutional rights. Pl. Mem. at 16. Pursuant to *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658 (1978), "a municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven,* 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell,* 436 U.S. at 690–91).

However, Huggins' *Monell* claim fails in a critical respect. As the Court discusses below, Huggins fails to plead a constitutional violation by an individual Defendant. Without an underlying violation, there can be no *Monell* liability. *See, e.g., Jones v. City of New York,* No. 14–CV–0826 (CBA)(RLM), 2015 WL 502227, at *9 (E.D.N.Y. Feb. 4, 2015) ("Plaintiff's failure to plead adequately a constitutional violation by an individual defendant renders her *Monell* claims moot.").

For all these reasons, the Court concludes that Huggins has failed to allege the personal involvement of the two named Defendants. This is fatal to the viability of his Amended Complaint.

### D. Conditions of Confinement Claims

Though the Court recommends dismissal of Huggins claims for failing to allege the personal involvement of the named Defendants, even if he had, his allegations fail to state a cognizable claim.

Huggins argues that his conditions of confinement amounted to a violation of the Eighth Amendment's protections against cruel and unusual punishment.[5] To establish such a violation, an inmate must satisfy both "a subjective component, which focuses on the defendant's motive for his conduct, and an objective component, which focuses on the conduct's effect." *Edwards v. Horn,* No. 10–CV6194 (RJS)(JLC), 2012 WL 760172, at *11 (S.D.N.Y. Mar. 8, 2012) (citing *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009)); *see Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). Subjectively, the defendant must have acted with a "sufficiently culpable state of mind," and objectively the "alleged deprivation must be sufficiently serious ... that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Id.* at 553 (internal citation and quotation omitted). Therefore, "[u]nder the 'deliberate indifference' standard, prison officials violate the Eighth Amendment only if they know of and disregard an excessive risk to inmate health and safety and do not reasonably respond to that risk." *Gamble v. City of New York ex rel. NYC Dep't of Corr.,* No. 04–CV–10203 (TPG), 2009 WL 3097239, at *4 (S.D.N.Y. Sept. 25, 2009) (citing *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996) (internal quotations omitted)).

### 1. *Subjective Element*

**\*6** As to Defendant Newton's subjective state of mind, Huggins suggests that he was on notice, and thus had actual knowledge of the constitutional violations, because the warden "reviews grievances at the highest level in the facility." Pl. Mem. at 8. For the same reasons that receipt of grievances or letters fails to establish personal involvement, it is insufficient to satisfy the deliberate indifference standard for a conditions of confinement claim. *See, e.g., Rivera v. Bloomberg,* No. 11–CV–4325 (PGG), 2012 WL 3655830, at *6 (S.D.N.Y. Aug. 27, 2012) ("[A] prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that the official exhibited deliberate indifference by failing to act on information indicating that the

Huggins v. Schriro, Not Reported in Fed. Supp. (2015)

2015 WL 7345750

violation was occurring.") (internal quotation omitted). As to Defendant Schriro, as previously noted, Huggins never mentions her in his pleadings or motion papers, thus providing no basis for the Court to evaluate her state of mind. Therefore, Huggins allegations do not satisfy the subjective element as to either Defendant.

### 2. *Objective Element*

Even if Huggins could demonstrate that Defendants acted with a culpable state of mind, his allegations nonetheless fail to rise to the level of an Eighth Amendment violation because they do not amount to an "unquestioned and serious [deprivation] of basic human needs or a denial of the minimal civilized measure of life's necessities." *Williams v. Carbello,* 666 F.Supp.2d 373, 378 (S.D.N.Y.2009) (internal quotations and citations omitted). *See Wilson v. Seiter,* 501 U.S. 294, 298 (1991) ("The Constitution ... does not mandate comfortable prisons and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.") (internal quotation omitted); *Phelps v. Kapnolas,* 308 F.3d 180, 185 (2d Cir.2002) (same).

Huggins alleges that (1) the sneakers issued by the correctional facility are too thin and slippery,[7] and that this prevented him from participating in outdoor recreation during winter months; (2) during the same period, he was consistently served "cold or lukewarm" food; (3) the condition of his cell did not meet heating requirements and he was deprived of sufficient blankets; and (4) his visitation privileges were improperly limited. *See* Am. Compl. at 2. As the Court details below, Huggins' claims do not rise to the level of an Eighth Amendment violation.

### a. *Inability to Exercise*

"While courts have found that denial of all opportunity to exercise violates an inmate's constitutional rights, they have found no violation where the inmate has an opportunity for exercise, either in or outside of his cell," *Shakur v. Sieminski,* No. 07–CV–1239 (CFD), 2009 WL 2151174, at *4 (D.Conn. July 15, 2009) (citing *Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996)), and that "[s]poradic infringement of the right to exercise does not

rise to the level of a constitutional deprivation." *Gamble,* 2009 WL 3097239 at *5 (citations omitted).

Here, Huggins does not claim that he was denied the right to exercise. Instead, he alleges that his shoes made it uncomfortable to exercise during cold weather, and that he could not exercise in his cell because it was too small. *See* Am. Compl. at 2–3; Pl. Mem. at 5. However, Huggins does not have a right to outdoor exercise. Therefore, even if the lack of adequate footwear did prevent him from going outside, this does not rise to the level of a constitutional violation. *See Shakur,* 2009 WL 2151174, at *4. Additionally, Huggins does not set forth sufficient facts for the Court to draw a reasonable inference that he could not exercise in his cell. For example, there is no indication that his cell was any smaller than that of other inmates or that there were special circumstances peculiar to him that required more space for exercise. Further, he does not allege how often he was unable to exercise outdoors due to inclement weather. *See Gamble,* 2009 WL 3097239 at *5 (inability to exercise during inclement weather only seven times during a 21–month period did not amount to a constitutional violation).

**\*7** Therefore, the Court concludes that Huggins fails to state a claim that the limitations on his ability to exercise rise to the level of a constitutional violation.

### b. *Cold or Lukewarm Food*

The Constitution requires prisoners be served " 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well-being of the inmates who consume it.' " *Williams v. Ramos,* No. 13–CV–826 (VB), 2013 WL 7017674, at *6 (S.D.N.Y. Dec. 23, 2013) (quoting *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983)). Huggins does not allege that the food served was nutritionally inadequate, but only that it was cold or lukewarm, which does not amount to a constitutional violation. *See, e.g., Fisher v. Dep't of Corr.,* No. 92–CV–6037 (LAP), 1995 WL 608379, at *5 (S.D.N.Y. Oct. 16, 1995) (food sometimes served cold does not rise to the level of constitutional violation). Accordingly, the Court recommends that this claim be dismissed.

Case 9:18-cv-00416-DNH-TWD    Document 45    Filed 05/28/19    Page 68 of 146

Huggins v. Schriro, Not Reported in Fed. Supp. (2015)
2015 WL 7345750

### c. *Heating and Blanket*

While it is "well settled that exposing prisoners to extreme temperatures ... may violate the Eighth Amendment," *Walker v. Schult,* 717 F.3d 119, 126 (2d Cir.2013), Huggins does not claim that his cell was without heat, exposing him to unreasonable temperatures for an extended period, or that he was not issued a blanket during this period. *See Wilson,* 501 U.S. at 304 (stating that a low cell temperature at night combined with a failure to issue blankets might violate the Eighth Amendment); *see also Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (subfreezing temperatures for three months with ice forming in toilet were sufficient to raise issues of fact for jury, even where prison officials gave inmate extra blanket).

Here, Huggins only claims that "the cell did not conform to the heating requirements" and that inconsistency of heating "required more than ... one blanket." Am. Compl. at 3. There is no indication that his cell was exposed to exceptionally cold temperatures for an extended period of time. Further, Huggins admits he was issued the standard blanket, but objects to the failure to provide additional ones. *Id.* Accordingly, the Court concludes that Huggins does not allege sufficient facts for the Court to draw the inference that his cell was cold enough to rise to the level of a constitutional violation. [8]

### d. *Worsening of Asthma and General Health*

While each of the above alleged deprivations, on its own, does not amount to an Eighth Amendment violation, Huggins further suggests that the conditions, in combination, as applied to him who has asthma, amount to a constitutional violation. However, "[b]eing an asthmatic (a person susceptible to asthma attacks) is not a condition, in Eighth Amendment parlance, that is severe or 'sufficiently serious' " to underlie a constitutional violation. *Patterson v. Lilley,* No. 02–CV–6056 (NRB), 2003 WL 21507345, at *4 (S.D.N.Y. June 30, 2003). *See Youngblood v. Artus,* No. 10–CV–00752 (MAD)(DRH), 2011 WL 6337774, at *7 (N.D.N.Y. Dec. 19, 2011) ("Plaintiff's asthma condition itself does not qualify as a serious medical need for the purposes of a section 1983 claim."); *Sulkowska v. City of New York,* 129 F.Supp.2d 274, 292 (S.D.N.Y.2001) (failure to provide asthma medication insufficient to state

cause of action). Therefore, even assuming all of the alleged conditions have collectively worsened his asthma, the alleged deprivation does not state a viable Eighth Amendment claim.

### e. *Visitation Privileges*

**\*8** Huggins also claims that "visits with [his] wife and family were cancelled/shortened." Pl. Mem. at 5; *see also* Am. Compl. at 3. However, "[t]he denial of prison access to a particular visitor 'is well within the terms of confinement ordinarily contemplated by a prison sentence' and therefore is not independently protected by the Due Process Clause." *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 461 (1989) (quoting *Hewitt v. Helms,* 459 U.S. 460, 468 (1983)).

Huggins has "failed to demonstrate that his claim about deprivation of visitation with family during his time [while incarcerated] objectively denied him the minimal civilized measures of life's necessities." *Delgado v. Dembar,* No. 13–CV191 (KBF), 2014 WL 4792068, at *4 (S.D.N.Y. Sept. 24, 2014) (internal quotation omitted); *see Hernandez v. Lindsay,* No. 08–CV–1495 (SJF), 2011 WL 3163078, at *6 (E.D.N.Y. July 22, 2011) ("[L]oss of ... visitation privileges for ten (10) months [is] not objectively serious."). In fact, Huggins indicates that his visitations were affected due to "incidents" in the prison, which only further supports his failure to state a claim. *See* Pl. Mem. at 5. "[T]he Court is required to grant 'wide-ranging deference' to prison administrators 'in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' " [9] *Marrero v. Weir,* No. 13–CV–0028 (RNC), 2014 WL 4799228, at *6 (D.Conn. Sept. 26, 2014) (quoting *Bell v. Wolfish,* 441 U.S. 520, 547 (1979)).

Accordingly, the Court recommends dismissal of this claim.

### E. Law Library and Telephone Usage

In addition to his conditions of confinement claims, Huggins alleges two other constitutional violations, both arising under the First Amendment, which the Court addresses below.

Case 9:18-cv-00416-DNH-TWD    Document 45    Filed 05/28/19    Page 69 of 146

Huggins v. Schriro, Not Reported in Fed. Supp. (2015)
2015 WL 7345750

### 1. *Law Library*

The Supreme Court has recognized that an inmate does not have "an abstract, freestanding right to a law library or legal assistance." *Lewis v. Casey,* 518 U.S. 343, 351 (1996). Rather, a prison facility must ensure that its inmates have " 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.' " *Id.* (quoting *Bounds v. Smith,* 430 U.S. 817, 825 (1977)). [10] Additionally, for a defendant's conduct to violate an inmate's right of access to the courts, it must cause "actual injury" or "materially prejudice[ ]" the inmate. *Salvatierra v. Connolly,* No. 09–CV–3722 (SHS) (DF), 2010 WL 5480756, at *21 (S.D.N.Y. Sept. 1, 2010) (internal citation and quotation omitted), *adopted by* 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011).

Therefore, it is insufficient to merely state, without further elaboration, that he was "[f]requently [ ] denied [access to law library], [a]ffecting right to Court." Pl. Mem. at 5; *see also* Am. Compl. at 3. Because Huggins does not state any facts to imply he suffered injury or prejudice, this claim should be dismissed.

### 2. *Telephone Calls*

**\*9** Lastly, Huggins makes a passing reference that he was denied "phone[ ] usage." [11] *Id.* at 6. However, "[p]hone restrictions do not impinge on a prisoner's constitutional rights where an inmate has alternate means of communicating with the outside world." *Henry v. Davis,* No. 10–CV–7575 (PAC)(JLC), 2011 WL 3295986, at *2 (S.D.N.Y. Aug. 1, 2011) (collecting cases), *adopted by* 2011 WL 5006831 (S.D.N.Y. Oct. 20, 2011). Because inmates "have no right to unlimited telephone calls," *Bellamy v. McMickens,* 692 F.Supp. 205, 214 (S.D.N.Y.1998) (citation omitted), a constitutional violation only exists if the inmate was stripped of alternate methods of communication. *See, e.g., Paulino v. Menifee,* No. 00–CV–5719 (RCC)(KNF), 2001 WL 243207, at *2 (S.D.N.Y. Mar. 9, 2001) (refusing to issue injunction restoring phone privileges where inmate did not allege that alternate means of communication were inadequate).

Here, Huggins does not allege that he was deprived of alternative methods of communication. Accordingly, Huggins has failed to demonstrate that restrictions on his telephone usage deprived him of a constitutional right. Therefore, the Court recommends dismissal of this claim.

### F. Leave to Amend

The Court would ordinarily recommend that a *pro se* plaintiff be given leave to amend his complaint to replead all factually insufficient claims. *See, e.g., JCG v. Ercole,* No. 11–CV–6844 (CM)(JLC), 2014 WL 1630815, at *34– 35 (S.D.N.Y. Apr. 24, 2014), *adopted by* No. ll–CV–6844 (CM)(JLC), 2014 WL 2769120 (S.D.N.Y. June 18, 2014) (citing *Grullon,* 720 F.3d at 139) (district court generally should not dismiss *pro se* complaint without granting at least one opportunity to replead factually insufficient claims). Here, however, Huggins has already had the opportunity to amend his complaint once. *See* Dkt. Nos. 5, 10. Additionally, the Court has liberally construed Huggins' Opposition to the Motion to Dismiss in such a way that it effectively amounts to another pleading. *See Lang v. New York City Health and Hosps. Corp.,* No. 12–CV–5523 (WHP), 2013 WL 4774751, at *4 (S.D.N.Y. Sept. 5, 2013) ("[C]ourts have construed allegations in *pro se* oppositions as motions to amend in view of the duty to construe *pro se* filings liberally.") (citing *Santiago v. Pressley,* No. 10–CV–4797 (PAE), 2011 WL 6748386, at *5 (S.D.N.Y. Dec. 23, 2011)). Accordingly, because Huggins has now had two opportunities to amend his complaint and any further attempt would be futile for the various reasons set forth in this Report, he should not be granted leave to further amend his Complaint. *See, e.g., Hill v. Curcione,* 657 F.3d 116, 123 (2d Cir.2011) ("Where a proposed amendment would be futile, leave to amend need not be given."); *Best v. City of New York,* No. 12– CV–7874 (RJS)(SN), 2014 WL 163899, at *3 (S.D.N.Y. Jan. 15, 2014) (denying leave to amend where plaintiff had already been given two opportunities to do so, and noting that "the Court can only afford [Plaintiff] so many bites at the apple.").

## III. *CONCLUSION*

For the foregoing reasons, I recommend that the Court dismiss the Amended Complaint with prejudice.

### *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have

fourteen (14) days from service of this Report to file written objections. *See* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels and the undersigned, United States Courthouse, 500 Pearl Street, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Daniels.

**\*10 FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A**

**WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010).

**All Citations**

Not Reported in Fed. Supp., 2015 WL 7345750

**Footnotes**

1    Huggins states that he was arrested on October 1, 2013, and that the alleged constitutional violations occurred "[t]hroughout the months of October 2013 up until April 2014," and "from September 2014 up until April 2015." Am. Compl. at 2. Huggins also identifies "September 2015 up until November 2015" as a period of violation, *see id.,* but the Court will not consider this period as it occurs after the date of Huggins' Amended Complaint.

2    While Huggins does not elaborate as to which claims he believes are protected by which amendments, the Court analyzes his claims under the First, Eighth, and Fourteenth Amendments. Though the Court reads his Amended Complaint liberally, it does not identify any claims that could be construed as arising under the Fifth or Seventh Amendments.

3    Due to the non-consecutive pagination of this document, the Court's citations refer to the page as generated by the electronic docketing system.

4    The IGRP requires prisoners to: (1) file a complaint with the IGRP for informal resolution within ten days of the alleged violation; (2) if unsatisfied with the disposition or a disposition has not been reached in a timely manner, request a hearing with the Inmate Grievance Resolution Committee ("IGRC") within five days of the disposition; (3) appeal to the commanding officer of the facility, who must render a decision within five working days; and (4) if the inmate is still unsatisfied with the disposition, appeal to the DOC Central Office Review Committee ("CORC"), which must issue a recommendation within 15 working days. *See* N.Y.C. Dep't of Corr., Directive: Inmate Grievance and Request Program, No. 3376 (effective date Sept. 12, 2012), http://www.nyc.gov/html/doc/downloads/pdf/Directive_3376_Inmate_Grievance_Request_Program.pdf (last visited November 18, 2015); *see also Williams v. Ramos,* No. 13–CV–826 (VB), 2015 WL 864888, at \*2 (S.D.N.Y. Feb. 9, 2015).

5    Because Huggins was a pre-trial detainee when the alleged violations occurred, *see* Pl. Mem. at 9, his conditions of confinement claims are presumed to be brought under the Fourteenth Amendment. However, the deliberate indifference analysis under the Fourteenth and Eighth Amendments is identical. *See Cano v. City of New York,* No. 13–CV–3341 (WFK)(VVP), 2015 WL 4865993, at \*3 (E.D.N.Y. Aug. 13, 2015) ("[T]he analysis is the same under the Fourteenth and Eighth Amendments.") (citing *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009)).

6    "To meet the subjective element, the inmate must show that the defendant acted with more than mere negligence." *Corley v. City of New York,* No. 14–CV–3202 (GHW), 2015 WL 5729985, at \*10 (S.D.N.Y. Sept. 30, 2015) (internal quotation omitted).

7    Courts in this Circuit have "consistently found that pain and other problems resulting from being forced to wear institutional footwear are not 'sufficiently serious' to satisfy the objective prong of the deliberate indifference standard." *Simmons v. Cripps,* No. 12–CV–1061 (PAC)(DCF), 2013 WL 1290268, at \*16 (S.D.N.Y. Feb. 15, 2013) (citations omitted), *adopted by* 2013 WL 1285417 (S.D.N.Y. Mar. 28, 2013). Here, rather than alleging that the shoes at issue caused him to suffer serious physical injury, Huggins alleges that the shoes prevented him from participating in any outdoor recreation, which led to worsening of his asthma and a general decline of his health.

8    In his Opposition to the Motion to Dismiss, Huggins claims that the "heating condition of the [c]ell was nonfunctioning" and "the cell heating system and/or housing unit did not work properly." Pl. Mem. at 5. Without any additional factual context, the Court interprets this phrasing to be a restatement of his claim in the Amended Complaint. There is nothing in the Opposition to the Motion to Dismiss to indicate that the heating system not working properly resulted in sufficiently cold temperatures for an extended period of time to rise to the level of a constitutional violation.

2015 WL 7345750

9    Though Huggins alleges that these "lockdowns" preventing his visits resulted from incidents that "did not [a]ffect the entire jail or its security," the Court must grant wide deference to a prison administrator's determination that an incident in one area of the jail necessitates lockdown measures be taken in another area as well. Am. Compl. at 3.

10    A claim alleging lack of access to the courts arises under the First Amendment. *See, e.g., Martinez v. Healey,* No. 14–CV–302 (NSR), 2014 WL 5090056, at *2 (S.D.N.Y. Oct. 10, 2014).

11    " 'A prison inmate's rights to communicate with family and friends are essentially First Amendment rights subject to § 1983 protection.' " *Banks v. Argo,* No. 11–CV–4222 (LAP), 2012 WL 4471585, at *5 (S.D.N.Y. Sept. 25 2012) (quoting *Morgan v. LaVallee,* 526 F.2d 221, 225 (2d Cir.1975)).

---

**End of Document**                                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 7343997
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kareem LEE, Plaintiff,
v.
David O'HARER, et al., Defendants.

No. 9:13–CV–1022.
|
Signed Dec. 23, 2014.

**Attorneys and Law Firms**

Kareem Lee, pro se.

Rachel M. Kish, AAG, for Defendants.

### DECISION & ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1**  This action, in which Plaintiff seeks review of a decision by the Commissioner of Social Security denying her son's application for Supplemental Security Income ("SSI"), was referred to the Honorable Andrew T. Baxter, United States Magistrate Judge, for a Report–Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

In the Report–Recommendation, dated May 28, 2014, Magistrate Judge Baxter recommends that Defendants' motion to dismiss (dkt.# 23) be granted and the complaint dismissed in its entirety without prejudice for failure to exhaust administrative remedies. Magistrate Judge Baxter also recommends that Plaintiff's First Amendment retaliation claim be dismissed without prejudice for failure to exhaust and for failure to state a claim, and that Plaintiff's claims against Defendants in their official capacities be dismissed with prejudice, as they are barred by the Eleventh Amendment.

Plaintiff has filed objections to the Report–Recommendation. Because objections have been filed, the Court has reviewed the record *de novo. See* 28 U.S.C. § 636(b)(1). After such a review, the Court may "accept, reject, or modify, in whole or in part, the findings or

recommendations made by the magistrate judge. The Court may also receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.* Having reviewed the record *de novo,* the Court has determined to accept and adopt the recommendation for the reasons stated therein.

It is therefore ordered that:

(1) The Report–Recommendation, dkt. # 33, is hereby ADOPTED;

(2) Defendants' motion to dismiss, dkt. # 23, is hereby GRANTED;

(3) Plaintiff's complaint is hereby DISMISSED WITHOUT PREJUDICE for failure to adopt administrative remedies;

(4) Plaintiffs First Amendment retaliation claim is DISMISSED WITHOUT PREJUDICE for failure to exhaust and for failure to state a claim upon which relief can be granted; and

(5) Plaintiff's claims against Defendants in their official capacities are DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

### REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N .Y. 72.3(c), by the Honorable Thomas J. McAvoy, Senior United States District Judge.

In this civil rights complaint, plaintiff alleged that defendants O'Harer and Mattie denied plaintiff access to courts; defendants O'Harer, Mattie, Kimak, and Graham retaliated against plaintiff for filing a New York Court of Claims ("Court of Claims") action; defendants Mattie and Kimak used excessive force against him; defendants O'Harer and Graham failed to conduct adequate investigations; defendant Mattie destroyed some of plaintiff's property; and defendant Graham failed to correct staff misconduct after he learned about the

misconduct through reports. (*See generally* Compl.) (Dkt. No. 1).

**\*2** After initial review, on November 7, 2013, Senior Judge McAvoy dismissed several of the above claims. (Dkt. No. 8). There are two claims remaining in this action: (1) the First Amendment retaliation claim against defendants O'Harer and Mattie (a sergeant and a corrections officer); and (2) an Eighth Amendment excessive force claim against defendants Mattie and Kimak. (Dkt. No. 8 at 14). Presently before the court is the defendants' motion to dismiss this action for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 23). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt.Nos.28, 29). For the following reasons, this court agrees with defendants and will recommend dismissal of the complaint.

**I. *Motion to Dismiss***
To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant ' "fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d

Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). In light of the mandate to read the papers of pro se litigants generously, it is appropriate to consider plaintiff's additional materials, such as the factual statements in his memorandum in opposition to the defendants' motion if those statements clarify or "amplify" matters in the complaint. *Dolan v. Connolly,* No. 13 Civ. 5726, 2014 WL 1876524, at \*1 (S.D.N.Y. May 8, 2014) (Rep't–Rec.) (citing inter alia *Woods v. Goord,* No. 01 Civ. 3255, 2002 WL 731691, at \*1 n. 2 (S.D.N.Y. Apr. 23, 2002)).

**II. *Facts***
**\*3** The court will outline the facts of this case relative to the two remaining claims. The court has examined the complaint and plaintiff's response to defendants' motion to dismiss in which he has clarified the factual assertions that he made in the complaint. Plaintiff's claims arose out of his incarceration at Auburn Correctional Facility ("Auburn"). Plaintiff alleges that on November 2, 2011, he filed an action in the Court of Claims for "medical negligence" against defendants at Attica Correctional Facility ("Attica"). (Compl. at 3). On June 13, 2013, plaintiff was placed on a list at Auburn, granting him "special access" to the law library because he had a June 27, 2013 deadline in his Court of Claims action. (*Id.* at 4). Defendant O'Harer removed plaintiff from the special access list on June 20, 2013 because plaintiff had allegedly missed two library call-outs. (*Id.*) Plaintiff alleged that defendant O'Harer never "investigated" [1] why plaintiff missed the call-outs, but also claims that defendant O'Harer denied plaintiff access to the law library "in retaliation" for plaintiff's pending Court of Claims action. (*Id* . at 5, 12–13). Plaintiff states that on June 28, 2013, he filed a grievance against defendant O'Harer for his actions.

Plaintiff claims that defendant O'Harer had "numerous conversations" with defendant Mattie and discovered that plaintiff was housed in defendant Mattie's "area." (*Id.* at 6, ¶ 15). Apparently at the behest of defendant O'Harer, on June 22, 2013, defendant Mattie misinformed plaintiff that he had a law library call-out, when plaintiff knew he had been removed from the special access list. Plaintiff asserted that defendant Mattie hoped that plaintiff would attempt to go to the library, based upon

this information, and then defendant Mattie would be able to file a misbehavior report against plaintiff for being "out of place, and, or, place something in plaintiff['s] cell that consisted of contraband." (*Id.*) Plaintiff claims that defendant Mattie did this "in retaliation for Officer David O'harer [sic]." [2] (*Id.*)

When defendant Mattie's alleged plan failed, on June 30, 2013, plaintiff claims that defendant Mattie filed a false misbehavior report against plaintiff, alleging that plaintiff approached him while masturbating. (*Id.* at 6–7). Plaintiff claims that defendant Kimak, defendant Mattie, and other unknown officers assaulted plaintiff prior to taking plaintiff to the Special Housing Unit ("SHU"), after issuing the false misbehavior report. (*Id.* at 6–7). Finally, plaintiff alleges that when defendants Mattie and another unknown officer were packing plaintiff's cell on June 30, 2013, they destroyed legal documents in retaliation for plaintiff filing the grievance against defendant O'Harer.

### III. *Exhaustion of Administrative Remedies*

#### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir.2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint,* 660 F.Supp.2d 518, 523 (S.D.N.Y.2009) (citations omitted). Dismissal under Rule 12(b)(6) for failure to exhaust is appropriate if such failure is evidenced on the face of the complaint and incorporated documents. *Weidman v. Wilcox,* No. 6:12–CV–6524, 2014 WL 1056416, at *2–3 (W.D.N.Y. Mar. 17, 2014) (dismissing for failure to state a claim because plaintiff admitted that he failed to exhaust his administrative remedies); *Pagan v. Westchester County,* No. 12 Civ. 7669, 2014 WL 982876,

at *10 (S.D.N.Y. Mar. 12, 2014) (citing inter alia *McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003)).

**\*4** In *Jones v. Bock,* the Supreme Court held that in order to properly exhaust an inmate's administrative remedies, he must complete the administrative review process in accordance with the applicable state rules. 549 U.S. at 218 (citing *Woodford v. Ngo,* 548 U.S. 81, 88 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must *complete* the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90–103.

The grievance procedure in New York is a three-tiered process. The regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). However, if the inmate wishes to file a grievance, he must first file his grievance with the Inmate Grievance Resolution Committee ("IGRC") within twenty one days of the alleged occurrence forming the basis for his grievance. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the facility within seven (7) calendar days after receipt of the IGRC's written response. *Id.* § 701.5(c)(1). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC") within seven calendar days after receipt of the Superintendent's written response. *Id.* § 701.5(d)(1).

There are also special procedures that may be used when the grievance is categorized as "harassment." *Id.* § 701.8. A grievance alleging harassment by staff may be sent directly to the Superintendent, and the Superintendent must issue a decision within twenty-five (25) days. The CORC has thirty (30) days to resolve any appeal. *Id.* §§ 701.8(f), 701.8(i) (incorporating by reference § 701.5(d)(2)(h)).

Extensions of the statutory time deadlines may be granted where the inmate demonstrates "mitigating circumstances." *Id.* § 701 .6(g). However, section 701.6 states that, except when the late appeal asserts a failure to implement a decision, "[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence" *Id.* § 701.6(g)(1) (*b* ). The

inmate may pursue a complaint that he was improperly denied an exception to the time limit by filing a separate grievance. *Id.* § 701.6(g)(1) (*b*) (ii). Finally, matters that are not decided within the statutory time frames, without a request for an extension by facility personnel, and the grievant's consent, may be appealed to the next level by the inmate. *Id.* § 701.6(g)(1) (6)(ii)(2).

Because courts have held that there are still some limited exceptions to the exhaustion requirement, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311–12 (2d Cir.2006) (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id. See also Johnson v. Schriro,* No. 12 Civ. 7239, 2013 WL 5718474, at *3 (S.D.N.Y. Oct. 15, 2013) (citing *Pease v. Hartford Life Accident Ins. Co.,* 449 F.3d 435, 445 (2d Cir.2006)).

### B. Application

**\*5** In this case, plaintiff alleges that he "used the prison grievance procedure" at Auburn "to try and solve the problem, concerning the alleged June 30, 2013 assault. (Compl. ¶ 22; Dkt. No. 1 at 11). Plaintiff states that the grievance was investigated, and plaintiff was informed by the investigating Sergeant that he would "return to see [plaintiff]," but when plaintiff did not hear anything after two weeks, he appealed to the superintendent. (*Id.*) At the time plaintiff filed his complaint, he was "awaiting such decision." (*Id.*)

Plaintiff alleges that he "use[d] the appeal mechanism" for the June 30, 2013 "false" misbehavior proceeding by appealing the adverse determination to the "Commissioner of disciplinary appeals." (*Id.* ¶ 24; Dkt. No. 1 at 12). Plaintiff also alleges that he "used" the prison grievance procedure regarding the June 30, 2013 incident in which defendants allegedly destroyed his property, and at the time he filed his complaint, he was "awaiting a decision." [3]

In plaintiff's response to the defendants' motion to dismiss, plaintiff concedes that the PLRA requires exhaustion of administrative remedies, but argues that he sufficiently exhausted his remedies because the "retaliation for bringing forth such grievance complaints against all named defendants was cruel and unusual punishment," and that this "warranted immediate relief through this court." (Dkt. No. 28 at 7–8). Plaintiff also states that the CORC "now" has up to six months to render a final decision, and implies that this is too long to wait because of the defendants conduct, which plaintiff could not "endure." (*Id.* at 9). Plaintiff is apparently arguing that he was compelled to file this action prematurely because the defendants were "retaliating" against him for filing the grievances, to the point where he had to ask the court for a temporary restraining order ("TRO") to "stop the retaliation." (*Id.* at 8–9).

Plaintiff states that this court denied his motion for injunctive relief, and in the interim, plaintiff exhausted all administrative appeals. (*Id.* at 8) Plaintiff has attached copies of the grievances and the final decisions to his response to the defendants' motion to dismiss. (*Id.* at 19–35). Defendants maintain that plaintiff has still failed to show that he properly exhausted his administrative remedies. (Dkt. No. 29).

This court agrees. As stated above, the plaintiff must "complete" the administrative appeal process *prior to* filing his civil rights action. Although plaintiff filed a grievance against defendant O'Harer, complaining about the lack of access to the law library, he never alleged that the denial was due to retaliation for filing the Court of Claims action. (Dkt. No. 28 at 19–20). Plaintiff also filed a grievance regarding the allegedly false misbehavior report and the alleged assault, but never completed the administrative process until long after he filed this federal complaint. (Dkt. No. 28 at 31–32). The Superintendent referred plaintiff's "staff misconduct" grievance to the DOCCS Inspector General's Office on August 21, 2013. (Dkt. No. 28 at 33). Plaintiff mailed his federal complaint on August 20, 2013. (Dkt. No. 1). Plaintiff admits on the face of his complaint that he was awaiting "responses" from his grievances. (Compl. at ¶¶ 21–23). He *never* mentions any grievances that alleged retaliation for filing his Court of Claims Action. Thus, he admittedly failed to exhaust his administrative remedies, and these admissions are borne out by the documents attached to his response to defendants' motion to dismiss.

Lee v. O'Hare, Not Reported in F.Supp.3d (2014)
Case 9:18-cv-00416-DNH-TWD    Document 45    Filed 05/28/19    Page 76 of 146
2014 WL 7343997

**\*6** In his response to the motion to dismiss, plaintiff claims that the assault grievance also contained the retaliation claim. (Dkt. No. 28, ¶ 16). The grievance that plaintiff filed on July 1, 2013[4] alleges that defendant Mattie filed a false misbehavior report, and then assaulted plaintiff together with "other officers."[5] (Dkt. No. 28 at 31–32). Plaintiff claimed that defendant Mattie "has a history of falsely accusing and setting inmates up ...." (*Id.* at 31). However, there is absolutely no mention of retaliation for filing the June 24th claim against defendant O'Harer, nor is there any mention that defendant O'Harer asked defendant Mattie to falsely accuse plaintiff or assault plaintiff because he filed a Court of Claims action. Thus, plaintiff has completely failed to exhaust any retaliation claims.

Plaintiff believes that he should be excused from the exhaustion requirement with respect to the claims that were exhausted *after* plaintiff filed this federal action, because he claims that he was compelled to file a request for injunctive relief in federal court prior to exhaustion due to the defendants' conduct. (Dkt. No. 28 at 8). However, an examination of plaintiff motion for a TRO, and the court's decision on this issue, shows that the TRO/ Preliminary Injunction was denied because plaintiff was seeking to enjoin speculative "future" conduct. Thus, the court found that there was no "retaliation" occurring, contemporaneous to plaintiff moving for the injunctive relief. The plaintiff's administrative remedies were clearly "available" because plaintiff utilized them; the defendants did not prevent plaintiff from filing grievances; and there are no other "special circumstances" that would excuse plaintiff's failure to wait until the administrative process was complete.

Even though plaintiff ultimately received a response from the CORC regarding the assault, (Dkt. No. 28 at 35), the law is quite clear that if the administrative remedies were completed after plaintiff filed his federal complaint, the action is still subject to dismissal for failure to exhaust. *See e.g. Neal v. Goord,* 267 F.3d 116, 122 (S.D.N.Y.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516 (2002) (subsequent exhaustion after suit is filed is insufficient); *Ford v. Smith,* No. 9:12–CV–1109, 2014 WL 652953, at \*3 (N.D.N.Y. Feb. 19, 2014) (receiving a decision from CORC *after filing* a federal lawsuit does *not* satisfy the exhaustion requirement); *Harris v. Gunsett,* No. 12 Civ. 3578, 2013 WL 3816590, at \*2 (S.D.N.Y. July 22, 2013) (stating that even if plaintiff had exhausted

his administrative remedies since he filed his complaint, it did not "change the fact that he failed to do so at the time at which he initiated the instant litigation"); *Baez v. Kahanowicz,* 469 F.Supp.2d 171, 179 (S.D.N.Y.2007) (claim must be completely exhausted prior to filing suit).

Thus, plaintiff's failure to exhaust his administrative remedies as to his remaining two claims may not be excused, and his failure to do so prior to filing this lawsuit requires dismissal of the entire action. The dismissal would be without prejudice to plaintiff re-filing his complaint, having obtained final dispositions of the grievances that he filed. It appears from the documents submitted by plaintiff that he only completed the administrative process with respect to the excessive force claim, and he never raised his retaliation claims in any of the grievances. Because plaintiff has only 21 days to file a grievance, any grievance that he attempts to file regarding his retaliation claims may be met with dismissal as untimely.[6] If so, plaintiff would not be able to return to federal court to raise the retaliation claims. This court need not engage in speculation about whether plaintiff would be given the opportunity to file a late grievance claiming retaliation because the court finds that plaintiff's retaliation claim may also be dismissed on the merits, leaving only his excessive force claim as a viable claim to re-file.

## IV. *Retaliation*

### A. Legal Standard

**\*7** In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.*

To establish retaliation, the plaintiff must also establish a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389

F.3d 379, 380 (2d Cir.2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action[,]' "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 370 (S.D.N.Y.2011) (citations omitted).

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–90 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. "Threadbare" assertions of retaliation will not survive a motion to dismiss. *Dolan v. Connolly,* 2014 WL 1876524, at *11 (citing inter alia *Crenshaw v. Hartman,* 681 F.Supp.2d 412, 417 (W.D.N.Y.2010) (dismissing retaliation claim where it was unsupported by any facts showing a nexus between the adverse action and any constitutionally protected activity by plaintiff)).

**B. Application**

**\*8** The first of plaintiff's two remaining claims is a First Amendment retaliation claim against defendants O'Harer and Mattie. Plaintiff alleges that the defendant O'Harer's actions in *2013* at *Auburn,* were in retaliation for a Court of Claims action that plaintiff filed in *2011* against medical personnel at *Attica.* While there is no dispute that filing a lawsuit is a constitutionally protected act, there is only

the most conclusory basis for asserting a nexus between the defendant O'Harer's actions and plaintiff's protected activity.

First, plaintiff must state how defendant O'Harer would even be aware of the 2011 lawsuit in order for plaintiff to allege that this defendant retaliated against plaintiff for filing the 2011 action. Plaintiff alleges that defendant O'Harer was well aware of all the details of the action because he had to "approve" the special access. In plaintiff's response to the motion to dismiss, he clarifies the facts of the alleged "retaliation." (Dkt. No. 28 ¶ 8). Plaintiff states that he was granted "special access to the law library on June 13, 2013, and that in order to obtain permission for special access, plaintiff had to "confirm [that plaintiff] does have a Court Order[ed] deadline before the defendant David O'Harer." (*Id.*) Plaintiff claims that he presented his legal documents to defendant O'Harer, [7] who became "angry and hostile" because he disliked the fact that plaintiff was suing New York State and was seeking the names of key witnesses, but he granted plaintiff two weeks of special access. (*Id.*) Assuming that plaintiff was actually granted two weeks of special access, [8] rather than one week, it is not plausible that defendant O'Harer was so upset about plaintiff's lawsuit that he granted plaintiff twice time allowed under the special access rules. [9]

With respect to defendant O'Harer taking plaintiff off of the special access list, plaintiff *admits* that he failed to attend two call-outs. He asserts in his response to the defendants' motion to dismiss that there was a good excuse for failing to attend the call-outs. (*Id.* at 4–5). Plaintiff states in his response and in the grievance he filed regarding this incident that he did not attend the call-outs because he was given a mandatory call-out for his "institutional job," and his supervisor was going to call the library to let someone know about plaintiff missing the library call-out. (*Id.* at 4). Plaintiff claimed in his grievance that Officer Myers and defendant O'Harer failed to properly investigate the plaintiff's reasons. [10] Plaintiff claimed that the officers never called his job supervisor to confirm his whereabouts. (*Id.*) It is clear, however, that plaintiff did miss the call-outs, and that defendant O'Harer could have removed plaintiff from the special access list notwithstanding any intent to retaliate.

Plaintiff's grievance never mentioned that defendant O'Harer was retaliating for plaintiff's lawsuit. [11] In any event, defendant O'Harer was a law library officer, who may or may not have seen plaintiff's documents. Even assuming that he did see the documents, it not plausible that defendant O'Harer would have become angry and hostile because plaintiff was suing "New York State" in the Court of Claims and was looking for the names of witnesses. Most of the inmates who use the law library are doing so because they are filing or have filed a lawsuit. Any time that defendant O'Harer took an adverse action against an inmate, the inmate could claim that defendant O'Harer was retaliating due to the inmate's legal activities. Thus, plaintiff's retaliation claim against defendant O'Harer would be subject to dismissal regardless of his failure to exhaust.

**\*9** Finally, it unlikely that defendant O'Harer, a law library officer at Auburn, would be retaliating against plaintiff for a lawsuit that plaintiff filed two years earlier against New York State, [12] claiming malpractice against medical personnel at Attica that defendant O'Harer probably did not even know. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendants retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir.2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about a prior incident by another corrections officer); *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 369 (S.D.N.Y.2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in) (collecting cases); *Ciaprazi v. Goord,* 9:02–CV–915 (GLS/DEP), 2005 WL 3531464, at *8–9 (N.D.N.Y. Dec. 22, 2005) (granting summary judgment and dismissing retaliation claim based only on plaintiff's conclusory allegations that the manifest falsity of the misbehavior report and testimony during the disciplinary hearing indicated the disciplinary matters were motivated by retaliatory animus due to grievances plaintiff filed against individuals other than the defendants involved in the disciplinary action). Thus, plaintiff's claims of retaliation against defendant O'Harer fail to state a claim.

Plaintiff claims that defendant Mattie's motivation for filing the false misbehavior report, for orchestrating the assault on plaintiff, and for the various forms of property destruction claimed by plaintiff, was plaintiff's grievance against defendant O'Harer. The court would first point out that plaintiff's claims against defendant Mattie for attempting to misinform plaintiff so that he would receive a misbehavior report for "being out of place" occurred on June 22, 2013, six days prior to the grievance committee even receiving plaintiff's grievance against defendant O'Harer on June 28, 2013. It is impossible for defendant Mattie to retaliate for a grievance that would not be filed for six days against another officer.

When plaintiff brought his grievance on July 1, 2013, against defendants Mattie and Kimak, accusing defendant Mattie of filing a false misbehavior report and defendants Mattie and Kimak of the subsequent assault, plaintiff never mentioned that defendant Mattie was retaliating against plaintiff "on behalf of" defendant O'Harer because of the one grievance that he filed against defendant O'Harer. (Dkt. No. 28 at 31). In fact, plaintiff accused defendant Mattie of having mental problems and having a "history" of false accusations against *"inmates."* (*Id.* at 31). This has nothing to do with plaintiff's legal activities or his grievance against defendant O'Harer.

**\*10** Plaintiff similarly accuses defendant Kimak of "retaliation" in addition to the assault. [13] His allegation against defendant Kimak is even more speculative. (Compl.¶ 29). Plaintiff simply alleges that defendant Kimak was called to the housing unit to escort plaintiff to SHU after defendant Mattie accused plaintiff of misbehavior. (Compl. ¶ 15 at p. 7). There is absolutely no indication that defendant Kimak was aware of, or retaliated for, any "grievance" filed by plaintiff against defendant O'Harer, the only one of which plaintiff alleges was filed two days prior to the "assault." Thus, the retaliation claim may be dismissed as against defendant Kimak.

Thus, plaintiff's claims of retaliation may be dismissed without prejudice for failure to state a claim. The only claim that remains is plaintiff's claim against defendants Mattie and Kimak for their involvement with the alleged assault, which is a claim apart from any retaliation claim.

## V. *Eleventh Amendment*

### A. Legal Standards
The state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD,* 64 F.3d 810, 815

(2d Cir.1995) (citing *Will v. Michigan Department of Police,* 491 U.S. 58, 71 (1989)). This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n. 3. An action against state officers in their official capacities is tantamount to an action against the state. *Yorktown Medical Laboratory, Inc. v. Perales,* 948 F.2d 84, 87 & n. 1 (2d Cir.1991) (citations omitted).

**B. Application**

In this case, to the extent that plaintiff is attempting to sue the defendants in their official capacities for *damages,* the Eleventh Amendment would also bar the action. In his response to defendants' motion, plaintiff alleges that he is also seeking injunctive relief that would not be barred by the Eleventh Amendment. The Eleventh Amendment immunity does not preclude suits for prospective declaratory and injunctive relief against state officers in their "official" capacities. *Neroni v. Zayas,* No. 3:13–CV–127, 2014 WL 1311560, at *7 (N.D.N.Y. March 31, 2014) (citing inter alia *Ex Parte Young,* 209 U.S. 123(1908)).

However, in order to avoid the Eleventh Amendment bar, a plaintiff must (a) allege an ongoing violation of federal law, and (b) seek relief that is properly characterized as prospective. *In re Deposit Ins. Agency,* 482 F.3d 612, 618 (2d Cir.2007) (quoting *Verizon Maryland, Inc. v. Pub. Service Comm'n of Maryland,* 535 U .S. 635, 645 (2002); *In re Dairy Mart Convenience Stores, Inc.,* 411 F.3d 367, 372 (2d Cir.2005)). A plaintiff seeking injunctive relief may not rely on past injury, but must show a likelihood that he will be injured in the future and the existence of an official policy or its equivalent. *Peck v. Baldwinsville Cent. School Dist .,* 351 F. App'x 477, 479 (2d Cir.2009) (citations omitted). If he cannot make this showing, he lacks standing for declaratory and prospective injunctive relief. *Id.*

**\*11** In this case, plaintiff cannot meet the first requirement for prospective injunctive relief: an ongoing violation of federal law for his remaining claims.

He claims one incident in which he was assaulted by defendants Mattie and Kimak. His speculation about future harassment, "physical violence, threats, [and] destruction of personal property" are completely speculative. (Compl.¶ 32). Even plaintiff's retaliation claim, if it were to proceed, does not allege anything other than speculative future conduct. There is no allegation of any ongoing policy that could be enjoined.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 23) be **GRANTED AND THE COMPLAINT DISMISSED IN ITS ENTIRETY WITHOUT PREJUDICE FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES,** and it is

**RECOMMENDED,** that plaintiff's First Amendment retaliation claim be dismissed **WITHOUT PREJUDICE FOR FAILURE TO EXHAUST AND FOR FAILURE TO STATE A CLAIM,** and it is

**RECOMMENDED,** that plaintiff's official capacity claims be dismissed **WITH PREJUDICE** as barred by the Eleventh Amendment.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

Dated: May 28, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 7343997

**Footnotes**

1    Plaintiff apparently did not dispute that he missed the call-outs, but asserted that his prison job prevented him from attending the law library. Plaintiffs claim that O'Harer did not properly investigate the reasons for plaintiff's missing the call-outs was dismissed in Senior Judge McAvoy's initial order. (Dkt. No. 8 at 9–10).

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2    Plaintiff's meaning is unclear. When he states that defendant Mattie attempted to have plaintiff receive a misbehavior report on June 22, 2013, it appears that he is stating that defendant Mattie was doing this at the behest of defendant O'Harer, (who wished to retaliate against plaintiff for the Court of Claims action), because plaintiff states that the grievance department did not receive plaintiff's grievance against defendant O'Harer until June 28, 2013, and plaintiff asserts that he wrote the grievance against defendant O'Harer on June 24, 2013. (Compl. at ¶¶ 13–15). Defendant Mattie could not have been retaliating against plaintiff on June 22, 2013 for a grievance that he did not write until June 24 and that was not filed until June 28.

3    It is unclear from the complaint whether plaintiff filed a grievance only with respect to the destruction of his property or whether he included the claim that the destruction of the property was in retaliation for the Court of Claims action. In order to exhaust his retaliation claim, plaintiff would have to include "retaliation" in the grievance. In any event, it is clear that at the time plaintiff filed the complaint, his "use" of the grievance program was not "complete."

4    The grievance is attached to plaintiff's response papers. (Dkt. No. 28 at 31–32).

5    As stated above, this grievance is attached to plaintiff's response to defendants' motion to dismiss. (Dkt. No. 28). Because plaintiff refers to the grievances in his complaint and makes statements in his response about facts contained in those grievances, the court may consider them in conjunction with the motion to dismiss without converting the motion into one for summary judgment.

6    The dismissal of grievances as "untimely" constitutes failure to exhaust. *Robinson v. Hens chel,* No. 10 Civ. 6212, 2014 WL 1257287, at *10 (S.D.N.Y. Mar. 26, 2014) (citing *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004)). Thus, if plaintiff's should return to bring anew grievance with respect to his retaliation claim, and the grievance is dismissed as untimely, he will not be able to re-file his claim in federal court in any event.

7    Although the court is not making such a finding, it appears that the plaintiffs special access request was not approved or signed by defendant O'Harer. (Dkt. No. 28 at 17). Thus, plaintiff may never have submitted his legal documents to this defendant. Plaintiff makes this claim because it is the only way that he could claim that defendant O'Harer became angry over plaintiff's lawsuit.

8    The court will simply assume that plaintiff was granted the two week special access.

9    The court notes that the special access rules only allow "seven (7) consecutive days" of special access, and that the last day of special access would have been June 20, 2013, the second day that plaintiff missed his call-outs. (Dkt. No. 28 at 17–18). Thus, under normal circumstances, plaintiff would not have been allowed to continue his special access to the law library after June 20, 2013 (seven consecutive days after access was granted on June 13, 2013. (Dkt. No. 28 at 17).

10   Plaintiff's library grievance was filed against defendant O'Harer and Officer Myers, who is not a defendant in this action. (Dkt. No. 28 at 19). There is no claim of retaliation in the grievance, and Officer Myers is listed before defendant O'Harer on the grievance. (*Id.*)

11   It is not necessary for the court to base its decision on any information in plaintiff's grievance for this particular issue, because he admits that he failed to appear for two call-outs. However, plaintiff has referred to the grievances specifically in his complaint, and he has filed copies of the grievances in his response to the motion to dismiss. Thus, the court could consider the documents in conjunction with the motion to dismiss for failure to state a claim. As stated above, in deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d at 88; *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).

12   There is no individual liability in the Court of Claims, thus, plaintiff cannot claim that defendant O'Harer was trying to "protect" an individual who he may have known.

13   Senior Judge McAvoy's decision did not address any claim of retaliation as against defendant Kimak. This may be so because plaintiff only briefly alleged retaliation in one conclusory sentence in the complaint. (Compl.¶ 29).

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:18-cv-00416-DNH-TWD    Document 45    Filed 05/28/19    Page 81 of 146
Mena v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 3948100

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan MENA, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City
Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently
incarcerated and proceeding *pro se*, brings this action
pursuant to 42 U.S.C. § 1983 ("Section 1983") against
Correction Officer Benjamin Eason ("Defendant"),
alleging violations of the Eighth Amendment. Now before
the Court is Defendant's motion for summary judgment.
For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

On September 9, 2012, while incarcerated at the Otis
Bantum Correctional Center ("OBCC") on Rikers Island,
Plaintiff was placed in an intake cell in the OBCC's
receiving area, which he shared with two other individuals.
(56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell
was extremely cold, vermin-infested, and too small to
accommodate three men. (*See* Doc. No. 54-1 ("Compl.")
4, 8.) Plaintiff further alleges that these conditions,
coupled with the constant noise made by the two other
inmates, prevented him from sleeping for the entire 60-
hour period that he was held in the cell. (*See id.* at 4.)

Consequently, he asked Defendant, who was on duty,
to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.)
According to Plaintiff, Defendant responded that there
was "nothing he could do" about the situation. (*Id.* ¶ 9; *see
also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC
to complain about his experience in the cell. (*See* Compl.
at 7.) The New York City Department of Correction
("DOC") has an administrative grievance procedure,
known as the Inmate Grievance and Request Program
("IGRP"), for inmates housed at facilities such as the
OBCC. The IGRP, which was available and in effect at all
times relevant to this lawsuit, requires that inmates first
file a complaint with the Inmate Grievance Resolution
Committee ("IGRC") within ten days of the complained-
of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP
Directive") § IV(D)(1).) The IGRC then attempts to
resolve the grievance informally within five days, and if the
grievance is not informally resolved, then the inmate may
request a formal hearing before the IGRC. (56.1 Stmt. ¶
12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may
appeal the IGRC's decision to the commanding officer, or
her designee, and subsequent appeals may be taken to the
Central Office Review Committee ("CORC"). (56.1 Stmt.
¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's
decision is the final and binding decision of the DOC; if
an inmate disputes the decision of the CORC, he may
independently appeal to the Board of Correction. (IGRP
Directive at 47.) Finally, if an inmate does not receive a
timely disposition at any point throughout the grievance
process, he has the option of either granting an extension
of time to the relevant decisionmaker (i.e., the IGRC,
the commanding officer, or the CORC) or appealing and
proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see
also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting
the grievance and receiving no response, he neither
granted the DOC an extension of time nor appealed. (*See*
Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits
that he is "still waiting" for a disposition of his grievance,
but does not indicate any steps he has taken to appeal any
decision before the IGRC. (*See* Compl. 7.) In response
to a question on the Southern District of New York
Prison Complaint form asking a plaintiff to "set forth any
additional information that is relevant to the exhaustion
of your administrative remedies," Plaintiff repeated a
number of his substantive allegations against the OBCC

Case 9:18-cv-00416-DNH-TWD   Document 45   Filed 05/28/19   Page 82 of 146

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court

Case 9:18-cv-00416-DNH-TWD   Document 45   Filed 05/28/19   Page 83 of 146

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at *3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at *1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

### III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's

effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at *3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days[,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at *7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at *8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

*4 At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question," but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly

Case 9:18-cv-00416-DNH-TWD   Document 45   Filed 05/28/19   Page 84 of 146

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ____, ____, 2016 WL 3729383, at \*4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at \*4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no

response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at \*3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D)(9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at \*1, \*5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at \*2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g.*, *Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3948100

Footnotes

1    The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

2    Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

**End of Document**      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

🏷 KeyCite Yellow Flag - Negative Treatment

Distinguished by Adamson v. City of New York, E.D.N.Y., January 10, 2019

2018 WL 6655600
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Julio RAMIREZ, Plaintiff,
v.
E.L. TATUM, Jr., et al., Defendants.

17 Civ. 7801 (LGS)
|
Signed 12/19/2018

**Attorneys and Law Firms**

Julio Ramirez, New York, NY, pro se.

Charles Salim Jacob, United States Attorney's Office, New York, NY, for Defendants.

**OPINION AND ORDER**

Lorna G. Schofield, United States District Judge

*1 Pro se Plaintiff Julio Ramirez, a pretrial detainee at the Metropolitan Correctional Center ("MCC"), brings this action against ten federal employees. Liberally construed, Plaintiff's Amended Complaint (the "Complaint") alleges that Defendants violated his constitutional rights under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and the Federal Torts Claims Act ("FTCA") in relation to medical treatment Plaintiff received at the MCC. Defendants collectively move to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), except as to the post-surgery actions of Defendants Robert Beaudoin and Mandeep Singh, and Defendant Ysmael Joaquin's actions after Plaintiff informed Joaquin of Plaintiff's medical needs in person. [1] Plaintiff opposes the motion. For the following reasons, Defendants' motion is granted in part and denied in part.

**I. BACKGROUND**

The facts are taken from the Complaint, statements made at the June 19, 2018, conference and Plaintiff's opposition

memorandum. *See Coke v. Med., Dep't of Corr. & Cmty. Supervision*, No. 17 Civ. 0866, 2018 WL 2041388, at *1 n. 2 (S.D.N.Y. Apr. 30, 2018) ("[W]hen a *pro se* plaintiff's opposition memoranda raises new allegations that are 'consistent with the allegations' in the Complaint, these allegations may be read as 'supplements to th[e] pleadings.' ") (some alteration in original). As required on a motion to dismiss, these facts are accepted as true and construed in the light most favorable to Plaintiff. *Raymond Loubier Irrevocable Tr. v. Loubier*, 858 F.3d 719, 725 (2d Cir. 2017).

**A. Pre-Surgery**

Since May 2, 2017, Plaintiff Julio Ramirez has been a pre-trial detainee at the MCC. After arriving at the MCC, Plaintiff began feeling severe sharp pains around his groin. A couple of days later, Plaintiff told his housing unit officer that his extreme pain necessitated medical attention. Even though Plaintiff's housing unit officer told the medical department that Plaintiff's pain was a 15 out of 10, Plaintiff was nevertheless directed to submit a message to sick call in order to receive treatment.

For about a month, Plaintiff received no medical treatment even though he filed several messages with sick call and sought help from Defendant Joaquin, a physician's assistant who dispensed medication to detainees. For example, on July 3, 2017, Plaintiff sent a message to sick call, saying that he had requested medical attention several times. On July 30, 2017, Plaintiff sent a message to sick call asking for medical attention for pain in his groin that had persisted for a month. The MCC staff responded on August 1, 2017, saying that Plaintiff would be placed on the sick call list. In addition, an officer in Plaintiff's housing unit tried to help Plaintiff obtain medical treatment, but to no avail. During this time, Plaintiff could not walk upright or use the restroom without extreme discomfort.

*2 The day after Defendant Singh, a registered nurse, placed Plaintiff on the sick call list, Singh saw Plaintiff at sick call. After Plaintiff complained of groin discomfort, Singh examined Plaintiff and concluded that he had hemorrhoids. After browsing the internet, Singh prescribed two pain medications.

After Plaintiff spoke with Defendant Warden Tatum in May 2017 and told Tatum he was in severe pain, Tatum told Plaintiff to write to sick call. On July 22,

2018 WL 6655600

2017, Plaintiff sent a message addressed to Tatum, asking for medical assistance. Although Plaintiff continued to inform medical staff that he was in pain and his criminal lawyer contacted MCC personnel in July 2017, Plaintiff did not receive medical treatment.

### B. Post-Surgery

In August 2017, Plaintiff fell in his cell. An officer called the MCC medical staff and Plaintiff was sent to an outside hospital for an unidentified emergency surgery. After surgery, Plaintiff was pushed in a wheelchair to a four-door sedan for transport back to the MCC. Plaintiff told Defendant Correctional Officers Deonn Richardson and Andres Naranjo that he was unable to get into the car; Plaintiff expressed concern about being placed in a car 24 hours after groin surgery, and said that his mobility was compromised. The officers replied that there was nothing they could do, and did not respond to Plaintiff's request that they request another vehicle, such as an ambulance.

After Naranjo told Plaintiff to get into the car, the officers eventually made Plaintiff bend to get into the vehicle. Plaintiff advised Richardson and Naranjo that he had severe swelling in his lower abdomen and bending his body caused extreme pain. Plaintiff cried as he told the officers that the pain was indescribable and felt as if his surgery wound would reopen. The officers seemed to be upset that Plaintiff was in tears. Naranjo entered the opposite back passenger door and both officers told Plaintiff to reach his hands into the car. Doing so caused Plaintiff overwhelming pain. Richardson grabbed Plaintiff's hands and pulled him into the vehicle as Plaintiff screamed from pain. As the officers drove to MCC, Plaintiff laid on his stomach in the backseat in pain. When Plaintiff asked the officers why they pulled Plaintiff into the car, Naranjo said that he "[did not] have time for this bullshit."

At the MCC, Richardson and Naranjo pulled Plaintiff out of the car as Plaintiff yelled. Defendant Correctional Officer Rosalind Silvia then took Plaintiff via wheelchair to the medical department to see Joaquin. Plaintiff told Joaquin that Plaintiff had been forced into the vehicle transporting him from the hospital to the MCC, which may have reinjured Plaintiff. Joaquin did not look at Plaintiff's sutures, saying that the surgery had been completed perfectly and that Plaintiff did not need any antibiotics or pain medication. Joaquin told Silvia to take Plaintiff to his housing unit. Plaintiff told Joaquin and Silvia that he was in a lot of pain. Joaquin took away the

medication Plaintiff had from the hospital, gave Plaintiff two Tylenol and again directed Silvia to return Plaintiff to his housing unit.

Silvia took Plaintiff to his housing unit. Plaintiff's cell is on the second floor. Sylvia stopped the wheelchair in front of a staircase and told Plaintiff to go up the stairs. Plaintiff responded that his extreme post-surgical pain prevented him from standing and walking up the stairs. Silvia told Plaintiff that she would put him in "the box," which is a special housing unit where Plaintiff would be held in solitary confinement. After some onlooking detainees protested, Sylvia responded that if the other detainees did not help Plaintiff, Plaintiff would be put in the box. When detainees attempted to pick Plaintiff up in the wheelchair, Silvia told them to pick Plaintiff up without it. Holding Plaintiff's arms and legs, two detainees carried Plaintiff up the stairs, causing Plaintiff's surgery site to bleed and partly reopen.

**\*3** Four days later, Plaintiff was given two Tylenol for his discomfort. Plaintiff protested, saying that Tylenol would be insufficient for his pain. Later that morning, Plaintiff went to a drug treatment program. As Plaintiff walked down the stairs, he felt a sharp pain in his groin and fell down several stairs. An officer ran to help Plaintiff, telling Plaintiff not to move while he called for a lieutenant and the medical department. Several minutes later Plaintiff was put in a wheelchair by Defendant Correctional Officer Marquea Rice. Plaintiff told Rice that there was water on the stairs and that Plaintiff had felt a sharp pain before falling. Rice told Plaintiff to "stop fucking lying" about water on the stairs, and stated that he would watch the video of the incident and if Plaintiff was lying, Rice would come to take Plaintiff to the box. Rice took Plaintiff to the medical department and did not come back.

At the medical department, Plaintiff explained to Joaquin that there was water on the stairs and that Plaintiff had felt a sharp pain before falling. Joaquin checked Plaintiff's legs and directed Plaintiff to see the doctor. The doctor asked Plaintiff questions, told Plaintiff that he would send some pain medication, and referred Plaintiff to Plaintiff's appointed doctor, Defendant Beaudouin.

Plaintiff sent two messages to sick call -- on August 21 and August 22, 2017 -- requesting to see a doctor after his operation.

About three weeks after Plaintiff fell down the stairs, Plaintiff still had not seen Beaudouin for a medical appointment. Plaintiff saw Beaudouin in passing several times; each time Plaintiff asked to be seen immediately for his pain and to have his dressing examined. Beaudouin responded that he knew of Plaintiff's ailments, that there were other patients Beaudouin needed to attend to, that Plaintiff was on his list and that Beaudouin would see Plaintiff when he could. When Plaintiff attempted to respond, Beaudouin held up his hands, said that he was busy and walked off.

After an officer asked medical staff to see Plaintiff, Plaintiff saw Singh. Once Plaintiff showed Singh his dressing, Singh told Plaintiff to clean the dirty, puss-oozing wound himself due to the odor emanating from the wound.

Plaintiff filed this lawsuit on October 11, 2017. On October 25, 2017, Plaintiff sent a message addressed to Dr. Beaudoin, saying that his surgeon told him to get a follow-up on his swollen, painful right groin. On October 30, 2017, MCC staff responded that Plaintiff had been given a follow-up with his surgeon.

On November 15, 2017, Plaintiff sent a message to sick call, saying that he was in discomfort after his surgery and that he had not seen a doctor for a follow-up. On November 20, 2017, the chief of the medical department said to Plaintiff that Plaintiff had an issue with the medical staff. On November 22, 2017, Plaintiff saw the doctor who performed Plaintiff's surgery, and that doctor immediately stated that he knew of Plaintiff's lawsuit.

### C. Administrative Remedy Forms

Defendants Erskine Walkes and Flor Olivares, both Bureau of Prison Counselors, told Plaintiff that filling out certain Bureau of Prison ("BOP") forms (i.e. BP forms) would help Plaintiff obtain medical treatment. [2] Plaintiff tried numerous times to acquire a BP-8 form from Walkes. The first time Plaintiff requested a form, Walkes told Plaintiff that he would not receive a form until he explained why it was needed. The next time, Walkes said he was too busy to provide the form. For the next one to two weeks, Plaintiff asked Walkes for a form three to four times a week. Once Walkes gave Plaintiff a BP-8 form, Plaintiff filled it out and gave it back to Walkes the next day. Walkes stated that he would "take care of this" and

laughed. About three weeks later, Plaintiff asked Walkes what happened to the BP-8. Walkes laughed and said that he would take care of Plaintiff. Plaintiff informed Walkes that he had not received an answer on his BP-8, and Walkes stated that he would check on it. When Plaintiff later asked after his BP-8, Walkes stated that he gave it to a counselor, who gave it to the medical department. A week later, Plaintiff asked Walkes about his BP-8. Walkes said not to worry about the BP-8 and told Plaintiff to fill out a BP-9. At some point, Unit Manager Vitale told Plaintiff that he did not receive Plaintiff's BP-8.

**\*4** When Plaintiff tried to hand his BP-9 to Olivares, Olivares tried to avoid taking it and walked away. Olivares then noticed Deputy Warden Skipper-Scott watching and took the BP-9 from Plaintiff saying, "I'm going to make sure it gets in just like the BP-8 or BP-9 did okay?" Afterwards, Plaintiff asked Olivares about his BP forms but Olivares would say she was busy, yell at Plaintiff, walk away, or tell Plaintiff to stop asking about the forms.

On October 1, 2017, Plaintiff filed a request for administrative remedy with the U.S. Department of Justice Federal Bureau of Prisons, saying that he had never heard back on his BP-8.

Plaintiff alleges that since he filed his administrative grievances, the MCC medical staff has taken adverse action against him by not providing medical treatment.

## II. LEGAL PRINCIPLES

### A. Motion to Dismiss

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, *Montero v. City of Yonkers, New York*, 890 F.3d 386, 391 (2d Cir. 2018), but gives "no effect to legal conclusions couched as factual allegations," *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017). To withstand a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Courts must "liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest." *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (internal quotation marks omitted). "The policy of liberally construing pro se submissions is driven by the understanding that implicit in the right to self-representation is an obligation ... of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Id.* at 156–57 (internal quotation marks omitted). "We afford a pro se litigant 'special solicitude' by interpreting a complaint filed pro se to raise the strongest claims that it suggests." *Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (internal quotation marks omitted).

**B.** *Bivens*

In *Bivens*, the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). For individual liability to attach, *Bivens* defendants must be personally involved such that "through their own actions, they satisfy each element of the underlying constitutional tort." *Ashcroft v. Turkmen*, 789 F.3d 218, 250 (2d Cir. 2015), *rev'd on other grounds, Ziglar v. Abbasi*, 137 S. Ct. 1843, 1869 (2017).

A two-step process determines whether a *Bivens* remedy is available for an alleged constitutional injury. First, a court must determine if there is a recognized *Bivens* action encompassing that claim. *Ochoa v. Bratton*, No. 16 Civ. 2852, 2017 WL 5900552, at *6 (S.D.N.Y. Nov. 28, 2017) (quoting *Ziglar*, 137 S. Ct. at 1857) ("Because 'the [Supreme] Court has made clear that expanding the *Bivens* remedy is now a "disfavored" judicial activity,' when confronted with claim under *Bivens*, a district court must first determine whether a *Bivens* action encompassing that claim has already been recognized, or whether the claim presents a potentially new context."). "The Supreme Court has recognized a *Bivens* action in only three contexts: (1) an unreasonable search and seizure in violation of the Fourth Amendment, (2) employment discrimination in violation of the Due Process Clause of the Fifth Amendment, and (3) failure to treat an inmate's medical condition in violation of the Eighth Amendment." *Modest Needs Found. v. Bianco*, No. 16 Civ. 3144, 2017 WL 3130416, at *9 (S.D.N.Y. July 21,

2017) (internal citations omitted). "The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Ziglar*, 137 S. Ct. at 1859. The Supreme Court has provided some examples of ways in which a case "might differ in a meaningful way" including:

> **\*5** the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859–60. Although "the new-context inquiry is easily satisfied," the Supreme Court has recognized that "[s]ome differences, of course, will be so trivial that they will not suffice to create a new *Bivens* context." *Id.* at 1865.

Second, if the claim arises in a new context, a court must consider whether there are special factors counseling hesitation in creating a *Bivens* remedy. *Id.* at 1857. The question of what special factors counsel hesitation "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action or proceed." *Id.* at 1857–58. "Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1858. "[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.* at 1858.

## III. DISCUSSION

### A. Retaliation and Excessive Force

The Complaint is construed to include a retaliation claim because Plaintiff alleges that Olivares was hostile toward him and medical staff did not provide him medical treatment after he submitted his administrative remedy forms. The Complaint is also construed to include an excessive force claim against Defendants Richardson and Naranjo for forcing Plaintiff into the vehicle to transport him from the hospital to MCC. These claims are dismissed. First, both claims present a new *Bivens* context. The Supreme Court has recognized only three *Bivens* contexts, none of which include retaliation or excessive force. Second, there are special factors that counsel against expanding a new *Bivens* remedy, including the availability of alternative relief (the FTCA, discussed below), and Congress's legislation in the area of prisoners' rights. *See Ziglar*, 137 S. Ct. at 1865 (noting that post-*Carlson*, "Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court [without providing for a standalone damages remedy against federal jailers]," therefore "Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs") (internal citation omitted). As a result, there is no *Bivens* remedy for retaliation or excessive force claims. *See Turkmen v. Ashcroft*, No. 02 Civ. 2307, 2018 WL 4026734, at *13 (E.D.N.Y. Aug. 13, 2018) (collecting cases); *Free v. Peikar*, No. 17 Civ. 00159, 2018 WL 1569030, at *6 (E.D. Cal. Mar. 30, 2018) (declining to extend a *Bivens* remedy for retaliation); *Abdoulaye v. Cimaglia*, No. 15 Civ. 4921, 2018 WL 1890488, at *6 (S.D.N.Y. Mar. 30, 2018) (declining to extend a *Bivens* remedy for a pretrial detainee's excessive force claim under the Fifth Amendment).

Therefore, Plaintiff's retaliation and excessive force claims are dismissed.

### B. Deliberate Indifference to Serious Medical Needs

**\*6** Defendants move to dismiss Plaintiff's deliberate indifference to a serious medical need claim based on the Complaint's failure to plead various elements. [3]

### 1. Standard

The Fifth Amendment protects federal pretrial detainees from deliberate indifference to their serious medical needs.

*See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ); *Darnell v. Pineiro*, 849 F.3d 17, 21 n.3, 29 (2d Cir. 2017). [4] To assert a viable constitutional claim for inadequate medical care, a plaintiff must plead facts showing that (1) the deprivation of medical care is objectively "sufficiently serious" in light of a medical condition "that may produce death, degeneration, or extreme pain," *Hill*, 657 F.3d at 122, and (2) "the defendant-official ... intentionally ... or recklessly failed to act with reasonable care ... even though the defendant-official knew, or should have known," that the alleged medical condition "posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35; *see also Hill*, 657 F.3d at 122–23.

A plaintiff must plead "that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious' -- that is, ... that his medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain." *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (internal quotation marks omitted). "Because '[t]he objective component ... is ... [necessarily] contextual' and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (alterations in original) (internal citation omitted) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) ). "Put simply, 'it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes.' " *Whitley v. Bowden*, No. 17 Civ. 3564, 2018 WL 2170313, at *7 (S.D.N.Y. May 10, 2018) (quoting *Smith*, 316 F.3d at 186).

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs." *Estelle*, 429 U.S. at 104–06. Non-medical personal may be deliberately indifferent by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.*; *Johnson*, 412 F.3d at 404 (citing *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) ) ("[A] deliberate indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians."). Still, "a plaintiff must prove that [nonmedical] prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison

personnel or that the inmate suffered a complete denial of medical treatment." *Roundtree v. City of New York*, No. 15 Civ. 8198, 2018 WL 1586473, at \*6 (S.D.N.Y. Mar. 28, 2018) (alteration in original) (internal quotation marks omitted).

### a. Defendants Walkes and Olivares

**\*7** The Complaint fails to state a claim against BOP Counselors Walkes and Olivares for deliberate indifference to a serious medical need. The Complaint alleges that they purposefully prohibited Plaintiff from filing his administrative remedy forms. This allegation would show intentional denial or delaying of access to medical treatment, *see Estelle*, 429 U.S. at 104–06, if Walkes and Olivares were aware of Plaintiff's medical condition at the time. But conclusory allegations, without any factual support, that Walkes and Olivares knew or should have known of Plaintiff's severe medical condition are insufficient to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678. The claims against Walkes and Olivares are dismissed.

### b. Defendant Rice

The Complaint fails to state a plausible claim for deliberate indifference to a serious medical need against Correctional Officer Rice. The Complaint alleges that Rice took Plaintiff to the medical department just several minutes after Rice arrived with a wheelchair. Even though the Complaint alleges that Rice threatened to put Plaintiff in the box if Plaintiff lied about water on the stairs, it also states that Rice never came back to put Plaintiff in the box. The Complaint does not allege that Rice caused any physical injury to Plaintiff or deprived Plaintiff of medical care. *See Santiago v. Pressley*, No. 10 Civ. 4797, 2011 WL 6748386, at \*3 (S.D.N.Y. Dec. 23, 2011) (no deprivation of medical care where the plaintiff was transported to the prison infirmary). The claims against Rice are dismissed.

### c. Defendants Richardson, Naranjo and Silvia

Plaintiff claims for inadequate medical care against Correctional Officers Richardson, Naranjo and Silvia survive Defendants' motion to dismiss.

First, at the motion to dismiss stage, Plaintiff has alleged a plausible objectively serious deprivation of medical care (not calling for an ambulance or allowing the use of a wheelchair to go upstairs) which may (and allegedly did) cause Plaintiff extreme pain and injury. Specifically, as to Richardson and Naranjo, Plaintiff alleges that he was in extreme pain and had limited mobility when he was discharged from the hospital 24 hours after his groin surgery, and that his condition was exacerbated by Richardson and Naranjo physically pulling him into a sedan rather than calling for an ambulance. As to Silvia, Plaintiff alleges that despite Plaintiff's protests of pain, Silvia forced other detainees to move him up the stairs without a wheelchair, which caused his surgical wound to reopen. These allegations are sufficient to satisfy the objective prong at the motion to dismiss stage, where the actions of Richardson, Naranjo and Silvia risked extreme pain to Plaintiff and complications to the surgical wound. *See, e.g., Bruno v. City of Schenectady*, 727 F. App'x 717, 721 (2d Cir. 2018) (summary order) (finding that plaintiff "sufficiently alleged ... a 'serious medical condition' " where she claimed that police officers aggravated her pre-existing traumatic brain injury by forcibly arresting her, which "placed her once again in a 'condition of urgency' "); *Sereika v. Patel*, 411 F. Supp. 2d 397, 406 (S.D.N.Y. 2006) (denying defendants' summary judgment on a *Bivens* inadequate medical care claim because plaintiff allegations of severe pain and reduced mobility due to delay in treatment "raise issues of fact as to whether his ... injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberative indifference standard").

Second, Plaintiff plausibly alleges that Richardson, Naranjo and Silvia were deliberately indifferent because they knew, or should have known, that forcing Plaintiff into a sedan and requiring detainees to carry Plaintiff up the stairs without his wheelchair in his post-operative condition were excessive risks to Plaintiff's heath, and they failed to act with reasonable care. In particular, Plaintiff asserts that he told both Richardson and Naranjo that he had undergone groin surgery 24 hours earlier, repeatedly cried out in pain when they tried to move Plaintiff into the car, asked for an ambulance, and communicated "that it felt like [his surgery] wound would burst open." Plaintiff also contends that he told Silvia he could not walk up the stairs because of his surgery and that he was in extreme pain; yet Silvia forced two prisoners to carry Plaintiff up a flight of stairs without a wheelchair, causing Plaintiff's

surgery incision to partly reopen. Drawing all reasonable inferences in favor of Plaintiff, these allegations are sufficient to show that Richardson, Naranjo and Silvia were deliberately indifferent to Plaintiff's serious post-operative condition. *See Whitley*, 2018 WL 2170313, at *10 (sufficient allegation of a defendant prison guard's deliberate indifference where the plaintiff alleged that the guard knew the plaintiff had already overdosed on pills, swallowed 30 more pills in front of the guard, and the guard walked away); *see also Thomas v. Ashcroft*, 470 F.3d 491, 497 (2d Cir. 2006) (sufficient allegations of personal involvement to maintain a *Bivens* action where the plaintiff "allege[d] that [the defendants] ... knew of [the plaintiff's] urgent medical needs but ignored them, and nevertheless ordered or acquiesced in his transfer to a[nother] facility where he received no medication").

**\*8** For these reasons, the Complaint alleges a plausible claim of deliberate indifference to a serious medical need against Richardson, Naranjo and Silvia, and this claim survives Defendants' motion to dismiss.

### d. Defendant Tatum

The Complaint does not plausibly allege a claim for deliberate indifference to a serious medical need against Warden Tatum. The Complaint does not allege that, as non-medical personnel, Tatum intentionally denied or delayed access to medical treatment, or that Tatum intentionally interfered with prescribed treatment. *Estelle*, 429 U.S. at 104–05. The Complaint alleges that after he spoke with Tatum, Tatum told Plaintiff to write to sick call. As a non-medical professional, Tatum is entitled to delegate medical complaints to medical staff. *See Hernandez v. Keane*, 341 F.3d 137, 148 (2d Cir. 2003) (delegating responsibility to investigate an inmate's medical complaint to other prison staff was not deliberately indifferent when the defendant in question was a non-medical official). The Complaint also alleges that on July 22, 2017, Plaintiff sent a message addressed to Tatum, asking for medical assistance. Construing the facts in the light most favorable to Plaintiff, Tatum received Plaintiff's July 22, 2017, message and ignored it. However, an allegation that Tatum received but ignored Plaintiff's letter is not sufficient to establish personal liability. *See e.g., Jones v. Annucci*, No. 16 Civ. 3516, 2018 WL 910594, at *11 (S.D.N.Y. Feb. 14, 2018) (insufficient to allege that the Acting Commissioner of the New York State

Department of Corrections and Community Supervision received but failed to respond to the plaintiff's letter); *Mabry v. Fischer*, No. 11 Civ. 2887, 2011 WL 6034368, at *3 (S.D.N.Y. Dec. 5, 2011) (insufficient to allege that the New York Commissioner of the Department of Correctional Facilities referred letters of complaint to other officials or did not respond at all). As a result, the claim against Tatum is dismissed.

### e. Defendant Singh For Pre-Surgery Actions

The Complaint does not sufficiently state a claim against nurse Singh for pre-surgery actions. The Complaint alleges that Singh should have diagnosed Plaintiff with a hernia when he first examined Plaintiff. A misdiagnosis by a medical professional, without more, is not a basis for a claim for deliberate indifference. *See e.g., Figueroa v. Cty. of Rockland*, No. 16 Civ. 6519, 2018 WL 3315735, at *6 (S.D.N.Y. July 5, 2018) ("Medical malpractice, misdiagnosis and the decision not to treat based on an erroneous view that the condition is benign or trivial does not rise to the level of deliberate indifference.") (internal quotation marks omitted); *Idowu v. Middleton*, No. 12 Civ. 01238, 2013 WL 4780042, at *9 (S.D.N.Y. Aug. 5, 2013) ("Plaintiff's disagreement with [the doctor]'s diagnostic technique and medical judgment cannot provide the basis for a deliberate indifference claim...."). Plaintiff's pre-surgery claim against Singh is dismissed.

### f. Defendants Beaudoin and Joaquin

Defendants' motion to dismiss is limited to Dr. Beaudoin's pre-surgery actions and physician assistant Joaquin's actions after Plaintiff informed Joaquin of Plaintiff's medical needs in person. As the Complaint has not alleged any such actions, the motion to dismiss in part as to these two Defendants is granted.

### C. Injunctive Relief

**\*9** Injunctive relief is not available in a *Bivens* action. *Kurzberg v. Ashcroft*, 619 F.3d 176, 179 n.2 (2d Cir. 2010). To the extent that Plaintiff seeks injunctive relief -- in particular an order appointing an independent agency to handle administrative remedies or ordering the Bureau of

Prisons to follow proper health care standards -- these requests are dismissed.

### D. FTCA

The Complaint is construed to include an FTCA claim, but that claim is dismissed without prejudice. First, Plaintiff does not sue the United States -- which is the only proper defendant in an FTCA action. *See Spinale v. U.S. Dep't of Agric.*, 621 F. Supp. 2d 112, 117 (S.D.N.Y. 2009), *aff'd* 356 Fed. App'x. 465 (2d Cir. 2009) (summary order) (dismissing claim against federal agency because the only proper defendant in an FTCA action is the United States). Second, the Complaint does not contain sufficient allegations showing that Plaintiff exhausted his administrative remedies. Under the FTCA, a plaintiff must exhaust administrative remedies prior to bringing a tort claim against the United States. The FTCA states in relevant part:

> (a) An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first *presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing....*

28 U.S.C. § 2675(a) (emphasis added). Although the Complaint includes a request filed with the U.S. Department of Justice Federal Bureau of Prisons, there is no indication that there was a final determination by the agency. For these reasons, the FTCA claim is dismissed.

If Plaintiff believes that he can sufficiently replead his FTCA claim or deliberate indifference to a serious medical need claim against Defendants Walkes, Olivares, Rice or Tatum, he may file a letter application (by sending it to the Pro Se Intake Office), not to exceed three single-spaced pages, describing how he would amend

the Complaint to cure the deficiencies described in this Opinion -- including (1) for an FTCA claim, how Plaintiff has exhausted all necessary administrative remedies prior to bringing such a tort claim against the United States; (2) for a deliberate indifference to a serious medical need claim against Walkes and Olivares, how (specifically) Walkes and Olivares knew or should have known of Plaintiff's severe medical condition; (3) for a deliberate indifference to a serious medical need claim against Rice, how Rice caused any physical injury to Plaintiff or deprived Plaintiff of medical care, and knew or should have known of Plaintiff's severe medical condition; and (4) for a deliberate indifference to a serious medical need claim against Tatum, how Tatum was personally involved in Plaintiff's medical treatment. Any such application for leave to replead shall be filed as provided below.

### IV. CONCLUSION

For the following reasons, Defendants' partial motion to dismiss is GRANTED, except it is DENIED as to Defendants Richardson, Naranjo and Silvia for post-surgery actions. For clarity, the only remaining claims are *Bivens* claims for deliberate indifference to a serious medical need against (1) Defendants Richardson, Naranjo and Silvia for post-surgery actions, (2) Defendants Beaudouin and Singh for post-surgery actions and (3) Defendant Joaquin for actions after Plaintiff informed Joaquin of Plaintiff's medical needs in person -- the last two categories of which were not the subject of this motion.

**\*10** If Plaintiff seeks leave to file an amended complaint, he shall file a letter application as described above no later than February 2, 2019. Even if Plaintiff does not seek to file an amended complaint, this case will proceed on Plaintiff's *Bivens* claims for deliberate indifference to a serious medical need against (1) Defendants Richardson, Naranjo and Silvia for post-surgery actions, (2) Defendants Beaudouin and Singh for post-surgery actions and (3) Defendant Joaquin for actions after Plaintiff informed Joaquin of Plaintiff's medical needs in person.

### All Citations

Slip Copy, 2018 WL 6655600

## Footnotes

1   Defendants' Reply Memorandum of Law states that "Beaudouin and Singh no longer move to dismiss Plaintiff's post-surgery claims for deliberate indifference to medical needs, and Joaquin no longer moves to dismiss Plaintiff's deliberate indifference to medical needs claims subsequent to Plaintiff's alleged in-person complaints to him."

2   The BOP Administrative Remedy Program, 28 C.F.R. § 542.10 *et seq.*, lays out the administrative exhaustion requirements for BOP inmates. First, an inmate is first to present an issue informally to a staff member through a BP-8 form to try and resolve the issue. *See* 28 C.F.R. § 542.13(a). Second, if the issue is not resolved informally, then the inmate is to file a formal written Request for Administrative Remedy using a BP-9 form within 20 days of the occurrence which gave rise to the complaint. *See* 28 C.F.R. § 542.13(b). Third, if the BP-9 is denied, the inmate may appeal to the requisite BOP Regional Director using a BP-10 form. *See* 28 C.F.R. § 542.15(a). Fourth, if the BOP Regional Director renders a negative decision, the inmate appeals to the General Counsel. *See id.*

3   Defendants do not question whether a Fifth Amendment *Bivens* remedy for deliberate indifference to a serious medical need exists after *Ziglar*; for the purposes of this motion, its existence is assumed. *See Morgan v. Shivers*, No. 14 Civ., 2018 WL 618451, at *7 n.4 (S.D.N.Y. Jan. 29, 2018) ("The Court notes that, even in light of the proscription against creating new *Bivens* remedies, it would be counterintuitive if a convicted prisoner could remedy a federal officer's failure to provide medical care amounting to punishment, but a pre-trial detainee—who, 'unlike convicted prisoners[,] cannot be punished at all,' could not. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2475 (2015).") (alteration in original).

4   Case law from actions brought under 42 U.S.C. § 1983 may appropriately be applied to *Bivens* actions. *See, e.g., Gonzalez v. Hasty*, 802 F.3d 212, 221 (2d Cir. 2015).

**End of Document**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 1466893
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Jouhan RIVERA, Plaintiff,

v.

DEA Special Agent David T. SAMILO, Defendant.

16-cv-1105 (DLI)

|

Signed March 31, 2019

**Synopsis**

**Background:** Arrestee brought *Bivens* action against Drug Enforcement Administration (DEA) special agent, alleging that agent had used excessive force during arrest in violation of Fourth Amendment.

**[Holding:]** The District Court, Dora L. Irizarry, Chief Judge, held that the District Court would not recognize *Bivens* remedy under given context.

Ordered accordingly.

West Headnotes (21)

**[1]    Constitutional Law**
    Persons Entitled to Raise Constitutional Questions;Standing

For a plaintiff to enforce his constitutional rights he must have a cause of action; that is, there must be a statute passed by Congress or a judicially implied claim for relief.

Cases that cite this headnote

**[2]    United States**
    Constitutional Violations;Bivens Claims

The recognition of a *Bivens* cause of action is context specific.

Cases that cite this headnote

**[3]    United States**
    Constitutional Violations;Bivens Claims

To determine whether to imply a *Bivens* cause of action in a new context or against a new category of defendants, first the court must determine whether a plaintiff's claims arise in a new *Bivens* context; if the case is different in a meaningful way from previous *Bivens* cases decided by the Supreme Court, then the context is new.

Cases that cite this headnote

**[4]    United States**
    Existence and Exclusivity of Other Remedies

In determining whether to imply a *Bivens* claim in a new factual context, the court asks whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.

Cases that cite this headnote

**[5]    United States**
    Constitutional Violations;Bivens Claims
    **United States**
    Existence and Exclusivity of Other Remedies

To determine whether to imply a *Bivens* claim in a new factual context, irrespective of whether an alternative remedy exists, a federal court must conduct a specific analysis paying particular heed to any special factors counseling hesitation before authorizing a new kind of federal litigation.

Cases that cite this headnote

**[6]    United States**
    Constitutional Violations;Bivens Claims

To be a special factor counseling hesitation in determining whether to imply a *Bivens* remedy in a new context, a factor must cause a court

to hesitate before answering that question in the affirmative.

Cases that cite this headnote

**[7]**    **United States**
   Use of force

**United States**
   Particular remedies

District Court would not recognize *Bivens* remedy in case of arrestee alleging that Drug Enforcement Administration (DEA) special agent had, in violation of Fourth Amendment, used excessive force, albeit incident to lawful arrest executed pursuant to probable cause, such arrest having arisen from lawful vehicle search that itself had been executed pursuant to probable cause; arrestee could have pursued tort remedy under Federal Tort Claims Act (FTCA), which provided for tort claims regarding abusive federal law enforcement officers, and arrestee otherwise had some avenues for redress under New York state law to extent that he claimed that agent's actions had placed him outside scope of his federal employment. U.S. Const. Amend. 4; 28 U.S.C.A. §§ 1346, 2671 et seq.

Cases that cite this headnote

**[8]**    **United States**
   Constitutional Violations;Bivens Claims

Simply because a plaintiff asserts one of the three constitutional amendments recognized for *Bivens* claims—the Fourth Amendment, the Fifth Amendment, and the Eighth Amendment—does not mean that the case does not present a new context requiring determination of whether to imply a *Bivens* claim. U.S. Const. Amends. 4, 5, 8.

Cases that cite this headnote

**[9]**    **United States**
   Constitutional Violations;Bivens Claims

In determining whether a case presents a new context requiring determination of whether to imply a *Bivens* remedy, instead of looking only

to which constitutional amendment is cited, the court must assess the constitutional right at issue.

Cases that cite this headnote

**[10]**    **United States**
   Constitutional Violations;Bivens Claims

**United States**
   Existence and Exclusivity of Other Remedies

Determining whether to imply a *Bivens* remedy in a new context focuses on whether there are any special factors counseling against a judicially-created damages remedy, including whether any alternative remedies exist.

Cases that cite this headnote

**[11]**    **United States**
   Existence and Exclusivity of Other Remedies

The present unavailability of a claim is immaterial to the analysis of whether the existence of an adequate alternative process counsels in favor of judicial restraint in determining whether to imply a *Bivens* remedy in a new context.

Cases that cite this headnote

**[12]**    **Constitutional Law**
   Time for proceedings

That a *Bivens* plaintiff allowed the statute of limitations to run on an alternative claim does not change the separation of powers principles at play when assessing, as a factor in determining whether to imply a *Bivens* remedy in a new context, whether Congress has established an alternative remedy.

Cases that cite this headnote

**[13]**    **United States**
   Existence and Exclusivity of Other Remedies

Just because Congress has not enacted a remedial scheme that would satisfy a *Bivens* plaintiff on the facts of his particular case does not mean that the alternative remedial scheme that it did pass is inadequate so as not to counsel in favor of judicial restraint in determining whether to imply a *Bivens* remedy in a new context.

Cases that cite this headnote

**[14]    United States**

🔑 **Existence and Exclusivity of Other Remedies**

The ultimate success of a potential state law claim is irrelevant to the inquiry regarding the adequacy of alternative process, as a factor in determining whether to imply a *Bivens* remedy in a new context.

Cases that cite this headnote

**[15]    United States**

🔑 **Existence and Exclusivity of Other Remedies**

Regarding adequacy of alternative process, as a factor in determining whether to imply a *Bivens* remedy in a new context, it is not relevant whether the relief provided by alternative state or federal law claims is complete.

Cases that cite this headnote

**[16]    United States**

🔑 **Existence and Exclusivity of Other Remedies**

If Congress has created any alternative, existing process for protecting the injured party's interest, that itself may amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages under *Bivens*.

Cases that cite this headnote

**[17]    United States**

🔑 **Existence and Exclusivity of Other Remedies**

An alternative remedy need not be perfectly congruent with *Bivens* to be an adequate alternative remedy counseling in favor of judicial restraint in determining whether to imply a *Bivens* remedy in a new context.

Cases that cite this headnote

**[18]    United States**

🔑 **Existence and Exclusivity of Other Remedies**

When alternative methods of relief are available, a *Bivens* remedy usually is not.

Cases that cite this headnote

**[19]    United States**

🔑 **Existence and Exclusivity of Other Remedies**

A court need not examine all alternative existing processes, and the court need not parse the specific applicability of the web of remedies available in the plaintiff's circumstances, in order to decline inferring a new *Bivens* remedy.

Cases that cite this headnote

**[20]    Constitutional Law**

🔑 **Creation of rights of action**

So long as a plaintiff had an avenue for some redress, bedrock principles of separation of powers foreclose new substantive liability under *Bivens*.

Cases that cite this headnote

**[21]    United States**

🔑 **Existence and Exclusivity of Other Remedies**

If adequate alternative remedies exist, a court need not address whether any other special factors counsel hesitation before declining to infer a new *Bivens* remedy.

Cases that cite this headnote

**Attorneys and Law Firms**

Hector Benjamin Perez, H. Benjamin Perez & Associates, P.C., Tamara M. Harris, The Law Office of Tamara M. Harris, New York, NY, for Plaintiff.

Sean P. Greene, United States Attorney's Office, EDNY, Brooklyn, NY, for Defendant.

## MEMORANDUM AND ORDER

DORA L. IRIZARRY, Chief United States District Judge

 **\*1** On March 4, 2016, Plaintiff Jouhan Rivera ("Plaintiff") initiated this action against Defendant Drug Enforcement Agency Special Agent David T. Samilo ("Samilo") and others for alleged violations of Plaintiff's constitutional rights in connection with his arrest during a traffic stop in 2013. On March 30, 2018, the Court granted in part and denied in part Defendants' motion to dismiss the complaint (the "March 30, 2018 Order"). (Docket Entry No. 58.) The Court dismissed all claims against all Defendants except Plaintiff's damages claim against Samilo for injuries allegedly sustained when Samilo allegedly used excessive force when handcuffing Plaintiff during his arrest.

On July 12, 2018, the Court held a pretrial conference. At the conference, the Court asked the parties to submit supplemental briefing to address the application of the intervening case from the United States Supreme Court captioned *Ziglar v. Abbasi*, ---- U.S. ----, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017). This opinion observes that supplemental briefing. For the reasons set forth below, the Court finds that Plaintiff's claim cannot stand under *Ziglar*, and this action is dismissed.

## I. BACKGROUND

On the evening of October 22, 2013, Samilo and other federal law enforcement officers were surveilling Plaintiff as part of a narcotics investigation. [1] While following a vehicle in which Plaintiff was a passenger, the officers initiated a traffic stop. Plaintiff and the driver were searched for weapons. A search of the vehicle uncovered a duffel bag containing approximately three kilograms of cocaine in the spare tire well of the trunk. Plaintiff was placed under arrest. Plaintiff alleges that he told the arresting officers, including Samilo, that he had a hand injury, and that the handcuffs were too tight and aggravating that injury. Plaintiff alleges that Samilo squeezed the cuffs even tighter, would not let him retrieve a hand brace from the car, and that he sought medical assistance as a result of these injuries.

On March 4, 2016, Plaintiff filed his complaint against Samilo and six other federal officers alleging violations of Plaintiff's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights under *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the seminal case in which the Supreme Court found an implied right of action for money damages against federal officers for certain violations of a plaintiff's constitutional rights. (Docket Entry No. 1.)

On April 21, 2017, the defendants moved to dismiss the Complaint pursuant to Rules 12(b)(1), 12(b)(5), 12(b) (6) of the Federal Rules of Civil Procedure, and, in the alternative, for summary judgment pursuant to Rule 56. (Docket Entry No. 39.) On March 30, 2018, the Court granted in part and denied in part defendants' motion. (Docket Entry No. 58.) The only claim that survived defendants' motion is Plaintiff's claim for a violation of his Fourth Amendment rights against Samilo for allegedly using excessive force in handcuffing Plaintiff.

 **\*2** On June 19, 2017, the Supreme Court issued its decision in *Ziglar v. Abbasi*, ---- U.S. ----, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017), which clarified the analysis to be applied by the lower courts when deciding whether to find an "implied right of action" under *Bivens*.

On July 12, 2018, the Court held a pretrial conference. The Court, *sua sponte*, directed the parties to submit supplemental briefing to address the impact of *Ziglar* on Plaintiff's excessive force claim. The supplemental briefing was completed on August 23, 2018. (*See*, Samilo Br., Docket Entry No. 71; Rivera Br., Docket Entry No. 73; Samilo Rep., Docket Entry No. 75.)

For the reasons that follow, the Court finds that *Ziglar* and separation of powers principles counsel against

finding an implied right of action on the facts of this case. Plaintiff's sole remaining claim is dismissed.

## II. DISCUSSION

[1] For a plaintiff to enforce his constitutional rights he must have a cause of action. That is, there must be a statute passed by Congress or a judicially implied claim for relief. Here, Plaintiff cannot point to any statute that would allow him to prosecute this action. The only question is whether there is a judicially implied claim for relief.

### A. *Bivens*

In *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *McGowan v. United States*, 825 F.3d 118, 123 (2d Cir. 2016) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001) ). The *Bivens* Court implied a private right of action under the Fourth Amendment for an unreasonable search and seizure claim against FBI agents for handcuffing a man in his own home without a warrant. *Bivens*, 403 U.S. at 389, 397, 91 S.Ct. 1999. Since then, the Supreme Court has recognized *Bivens* claims in only two other circumstances: (1) under the Fifth Amendment's Due Process Clause for gender discrimination against a congressman for firing his female secretary, *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and (2) under the Eighth Amendment's prohibition on cruel and unusual punishment against prison officials for failure to treat an inmate's asthma which led to his death, *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).

"Although *Carlson* and *Davis* were handed down within a decade of *Bivens*, they mark the beginning of a still-unbroken period of nearly 40 years since the Supreme Court has authorized a *Bivens* damages action covering the exercise of any other constitutional right." *Sanford v. Bruno*, 2018 WL 2198759, at *3 (E.D.N.Y. May 14, 2018). This supports the majority's observation in *Malesko* that, since *Bivens*, "we have retreated from our previous willingness to imply a cause of action where Congress has not provided one." 534 U.S. at 67 n.3, 122 S.Ct. 515. It also supports the even stronger observation of two concurring Justices that

> *Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action—decreeing them to be "implied" by the mere existence of a statutory or constitutional prohibition.... [W]e have abandoned that power to invent "implications" in the statutory field. There is even greater reason to abandon it in the constitutional field, since an "implication" imagined in the Constitution can presumably not even be repudiated by Congress.

*3 *Malesko*, 534 U.S. at 75, 122 S.Ct. 515 (Scalia, J., concurring) (internal citations omitted).

Notwithstanding the Supreme Court's retreat, lower courts have relied on *Bivens* as a blueprint for implying causes of action. Although acknowledging that the judicial damage remedy in *Bivens* itself is "extraordinary" and should "rarely if ever be applied in 'new contexts,' " *Arar v. Ashcroft*, 585 F.3d 559, 571 (2d Cir. 2009) (en banc) (quoting *Malesko*, 534 U.S. at 69, 122 S.Ct. 515), lower courts have recognized implied rights of action premised on constitutional rights other than the three identified by the Supreme Court.

### B. *Ziglar*

Recently, however, the Supreme Court has re-emphasized that courts should not imply rights and remedies as a matter of course, "no matter how desirable that might be as a policy matter, or how compatible with the statute [or constitutional provision]." *Ziglar*, 137 S.Ct. at 1856 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286-87, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ). "Given the notable change in the [Supreme] Court's approach to recognizing implied causes of action ... the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Id.* at 1857 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ).

*Ziglar* also made it clear that the only recognized implied rights of action are the narrow situations presented in

*Bivens, Davis,* and *Carlson.* Practically speaking, this means that, post-*Ziglar,* even where a Court of Appeals had previously found a *Bivens* remedy, that court or a district court must reconsider whether one is available. *See,* 137 S.Ct. at 1865 (vacating the Second Circuit's holding in *Turkmen v. Hasty,* 789 F.3d 218 (2d Cir. 2015) (panel decision), and *Turkmen v. Hasty,* 808 F.3d 197 (2d Cir. 2015) (en banc), because the court failed to conduct the appropriate *Bivens* analysis); *See also, Vanderklok v. United States,* 868 F.3d 189, 199-200 (3d Cir. 2017) (holding that, even though the Third Circuit previously had found a *Bivens* remedy in a First Amendment retaliation context, that precedent no longer holds in light of *Ziglar* and the court "must look at the issue anew in this particular context, ... and as it pertains to this particular category of defendants").

**[2]** **[3]** The recognition of a cause of action is context specific. The Supreme Court has set out a rigorous two-step inquiry for courts to determine whether to imply a *Bivens* cause of action in a new context or against a new category of defendants. First, the court must determine whether a plaintiff's claims arise in a new *Bivens* context. "If the case is different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court], then the context is new." *Ziglar,* 137 S.Ct. at 1859. The Supreme Court did not offer an "exhaustive list of differences that are meaningful enough to make a given context a new one," but it did offer examples that "might prove instructive." *Id.* at 1859-60. The Court held that

> [a] case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that

previous *Bivens* cases did not consider.

**\*4** *Id.* at 1860.

**[4]** **[5]** If the case presents a new factual context for a *Bivens* claim, then the court proceeds to the second step and asks, "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie v. Robbins,* 551 U.S. 537, 550, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007). Irrespective of whether an alternative remedy exists, a federal court must also conduct a specific analysis, "paying particular heed ... to any special factors counselling hesitation before authorizing a new kind of federal litigation." *Id.* (internal quotation marks omitted). This second step often is referred to as the special factors analysis. "The Court's precedents now make clear that a *Bivens* remedy will not be available if there are special factors counselling hesitation in the absence of affirmative action by Congress." *Ziglar,* 137 S.Ct. at 1857 (internal quotation marks omitted).

**[6]** Although the Supreme Court "has not defined the phrase 'special factors counselling hesitation,' " the Court has observed that "[t]he necessary inference, though, is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857-58. Put more simply, "to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1858.

## C. Analysis

### 1. This Case Presents a New *Bivens* Context

**[7]** What remains of this case is a claim by an arrestee under the Fourth Amendment for use of excessive force incident to a lawful arrest executed pursuant to probable cause. That arrest arose from a lawful vehicle search that itself was executed pursuant to probable cause. This is not one of the narrow situations presented in *Bivens, Davis,* and *Carlson.*

2019 WL 1466893

Both *Davis* and *Carlson* are distinguished easily on both their facts and the constitutional right at issue. *Davis* involved a Fifth Amendment claim against a Congressman for firing his female secretary. *Carlson* involved an Eighth Amendment claim against prison officials for failure to treat an inmate's asthma.

**[8]** Whether this case presents a new context from *Bivens* itself requires a closer examination because, as Plaintiff points out, *Bivens* and the present case involve Fourth Amendment claims for actions of federal narcotics officers of similar rank. Plaintiff essentially argues that the *Ziglar* Court's narrow preservation of *Bivens* establishes that the Court "never indicated an intent to remove a Fourth Amendment claim from the list of long recognized *Bivens* claims." (Rivera Br. (Docket Entry No. 73) at 3.) But it is clear from *Ziglar* and other Supreme Court precedent that simply because a plaintiff asserts the same constitutional right as one of the three recognized cases—the Fourth Amendment (*Bivens* ), the Fifth Amendment (*Davis* ), or the Eighth Amendment (*Carlson* )—does not mean the case does not present a new context. *Ziglar,* 137 S.Ct. at 1859. "[*Ziglar* ] makes plain that even though a *Bivens* action lies for some constitutional violations (like the Fourth Amendment claim in *Bivens* ), it does not lie for all violations (like the Fourth Amendment claim in [*Ziglar* ] )." *Rodriguez v. Swartz,* 899 F.3d 719, 737 (9th Cir. 2018). The Supreme Court has refused to extend *Bivens* to contexts beyond the specific clauses of the specific amendments for which a cause of action had been implied, or even to other classes of defendants facing liability under those same clauses. *Compare, Davis,* 442 U.S. at 243-44, 99 S.Ct. 2264 (permitting *Bivens* action against a Congressman for violation of an employee's Fifth Amendment due process rights) *with Schweiker v. Chilicky,* 487 U.S. 412, 428-29, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988) (refusing to permit a *Bivens* action for violations of Fifth Amendment due process rights in a social security context). *See also, Wilkie,* 551 U.S. at 541, 127 S.Ct. 2588 (refusing to extend *Bivens* to invasion of property rights under the Fifth Amendment); *Malesko,* 534 U.S. at 63, 122 S.Ct. 515 (refusing to extend *Bivens* to alleged Eighth Amendment violations by employees of private prisons).

**\*5** **[9]** Instead of looking only to which constitutional amendment is cited, the Court must assess *Ziglar*'s non-exhaustive list of factors, including "the constitutional *right* at issue." *Ziglar,* 137 S.Ct. at 1859–60 (emphasis

added). The constitutional right at issue in *Bivens* was the plaintiff's privacy right. *Bivens,* 403 U.S. at 390, 91 S.Ct. 1999 ("[T]he rights that [Bivens] asserts [are] primarily rights of privacy ..."); *Id.* at 408, 91 S.Ct. 1999 (Harlan, J., concurring) ("The personal interests protected by the Fourth Amendment are those we attempt to capture by the notion of 'privacy.' "). In this case, Plaintiff's claim is not for a violation of his privacy rights, or for a warrantless invasion of his home and the unreasonable search and seizure of his property. Instead, Plaintiff's claim arises from the force allegedly applied in making a lawful street arrest.

The case also differs meaningfully from *Bivens* because the "legal mandate under which the officer was operating" is materially different. Plaintiff's arrest was made upon probable cause after a valid vehicle search conducted with probable cause. (*See,* March 30, 2018 Order at 16-19). The officers in *Bivens* arrested the plaintiff in his home without a warrant and without probable cause. *Bivens,* 403 U.S. at 389, n.1, 91 S.Ct. 1999.

For the foregoing reasons, this case differs meaningfully from *Bivens.* The Court must now conduct the second step of the *Ziglar* inquiry.

## 2. Alternative Remedies and Special Factors

**[10]** The next step of the analysis focuses on whether there are any special factors counseling against a judicially-created damages remedy, including whether any alternative remedies existed. Here, Plaintiff had an available tort remedy under the Federal Tort Claims Act ("FTCA"), which provides congressional consent for certain tort claims brought against the United States, including certain claims about abusive federal law enforcement officers. *See,* 28 U.S.C. §§ 2674, 2680(h). [2]

**[11]** **[12]** **[13]** Plaintiff argues that, because the statute of limitations of his FTCA claim has run, he has no effective alternative avenue for redress. Plaintiff misreads the case law. The present unavailability of an FTCA claim is immaterial to the analysis of whether the existence of an adequate alternative process counsels in favor of judicial restraint. *See, Sanford,* 2018 WL 2198759, at \*7 (The remedies that existed "to address plaintiff's situation here are thus adequate for purposes of determining whether to imply a *Bivens* remedy—even though those remedies

did not work in this instance."); *See also, Vega v. United States*, 881 F.3d 1146, 1153-54 (9th Cir. 2018) (a plaintiff's failure to bring negligence claims in addition to *Bivens* claims does not affect the status of the negligence claims as an adequate alternative process). That Plaintiff allowed the statute of limitations to run on his claim does not change the separation of powers principles at play when assessing whether Congress has established an alternative remedy. "[J]ust because Congress has not enacted a remedial scheme that would satisfy plaintiff on the facts of his particular case does not mean that the alternative remedial scheme that it did pass is inadequate under *Ziglar*." *Sanford*, 2018 WL 2198759, at *6.

\*6 [14] [15] Additionally, Plaintiff had some avenues for redress under New York state law to the extent he claimed that Samilo's actions placed him outside the scope of his federal employment. *See, Vanderklok*, 868 F.3d at 204 (where the United States does not substitute itself for the individual defendant, "claims against an egregiously erring government employee could not be dismissed on sovereign immunity grounds" and could proceed against the individual in state court). The ultimate success of a potential state law claim is irrelevant to the alternative process inquiry. *See, Vega*, 881 F.3d at 1155 ("That Vega's state law claims ultimately failed to satisfy the requirements of [state] law ... does not mean that he did not have access to alternative or meaningful remedies.") (citing *Minneci v. Pollard*, 565 U.S. 118, 129, 132 S.Ct. 617, 181 L.Ed.2d 606 (2012) ). Nor is it relevant whether state law claims or claims brought under the FTCA "provide complete relief." *Bush v. Lucas*, 462 U.S. 367, 387, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). "[S]tate remedies and a potential *Bivens* remedy need not be perfectly congruent." *Minneci*, 565 U.S. at 129, 132 S.Ct. 617.

[16] [17] [18] The existence of these alternative avenues for redress is a special factor counseling against an implied right of action. As *Ziglar* instructs:

if Congress has created "any alternative, existing process for protecting the [injured party's] interest" that

itself may "amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie, supra*, at 550, 127 S.Ct. 2588; *see also Bush, supra*, at 385–388, 103 S.Ct. 2404 (recognizing that civil-service regulations provided alternative means for relief); *Malesko*, 534 U.S. at 73–74, 122 S.Ct. 515 (recognizing that state tort law provided alternative means for relief); *Minneci, supra*, at 127–130, 132 S.Ct. 617 (same).

*Ziglar* at 1858. An alternative remedy need not be "perfectly congruent" with *Bivens*. *Minneci*, 565 U.S. at 129, 132 S.Ct. 617. "[W]hen alternative methods of relief are available, a *Bivens* remedy usually is not." *Ziglar*, 137 S.Ct. at 1863 (citing cases).

[19] [20] [21] The Court need not examine all alternative existing processes, and the Court need not "parse the specific applicability of th[e] web of ... remedies [available] in [plaintiff's] circumstances," in order to decline inferring a new remedy. *Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 921 (D.C. Cir. 2018). So long as plaintiff had an "avenue for some redress, bedrock principles of separation of powers foreclose ... new substantive liability." *Malesko*, 534 U.S. at 69, 122 S.Ct. 515. These alternative remedies are sufficient to counsel hesitation here. *See, Vega*, 881 F.3d at 1153-54. Because adequate alternative remedies existed here, the Court need not address whether any other special factors counsel hesitation. *See, Id.* at 1153.

## III. CONCLUSION

For the reasons set forth above, Plaintiff's sole remaining claim is dismissed.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2019 WL 1466893

**Footnotes**

1   A complete recitation of the factual and procedural background is contained in the Court's March 30, 2018 Order. (Docket Entry No. 58).

2   The FTCA gives federal district courts exclusive jurisdiction over claims against the United States for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission" of a federal employee "acting within the scope of his office or employment." 28 U.S.C. § 1346(b)(1). This broad waiver of sovereign immunity is subject

2019 WL 1466893

to a number of exceptions set forth in § 2680. One such exception, relating to intentional torts, preserves the Government's immunity from suit for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights." § 2680(h). The Supreme Court has referred to § 2680(h) as the "intentional tort exception." *Levin v. United States*, 568 U.S. 503, 506, 133 S.Ct. 1224, 185 L.Ed.2d 343 (2013) (internal quotation marks omitted).

In 1974, after the Supreme Court decided *Bivens* in 1971, Congress carved out an exception to § 2680(h)'s preservation of the United States' sovereign immunity for intentional torts by adding a proviso covering claims that arise out of the wrongful conduct of law enforcement officers. *See,* Act of Mar. 16, 1974, Pub. L. 93–253, § 2, 88 Stat. 50. Known as the "law enforcement proviso," this provision extends the waiver of sovereign immunity to claims for six intentional torts, including assault and battery, that are based on the "acts or omissions of investigative or law enforcement officers." § 2680(h). The proviso defines " 'investigative or law enforcement officer' " to mean "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.*

---

**End of Document**                                     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Robles v. Bleau, Not Reported in F.Supp.2d (2008)

2008 WL 4693153

2008 WL 4693153
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Raymond ROBLES, Plaintiff,
v.
K. BLEAU, Correctional Officer, Riverview C.F.;
Peacock, Correctional Sergeant, Riverview C.F.;
R. Varkiar, Senior Counsel, Riverview C.F.; and
New York State Dep't of Corr. Servs., Defendants.

No. 9:07-CV-0464.
|
Oct. 22, 2008.

**Attorneys and Law Firms**

Raymond Robles, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State
of New York, David L. Cochran, Esq., of Counsel, New
York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

 **\*1**  This *pro se* civil rights action, brought pursuant to
42 U.S.C. § 1983, was referred to the Hon. George H.
Lowe, United States Magistrate Judge, for a Report-
Recommendation pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c).

The Report-Recommendation dated September 12, 2008
recommended that Defendants motion to dismiss be
granted in part and denied in part. Specifically,
Judge Lowe recommended that Plaintiff's Fourteenth
Amendment procedural due process claim against
Defendant Varkiar regarding his disciplinary hearing
be dismissed if, within thirty (30) days from the
filing of this Final Order, Plaintiff does not file
an Amended Complaint that successfully states a
Fourteenth Amendment procedural due process claim.
It was recommended that Plaintiff's remaining claims be
dismissed with prejudice.

Plaintiff filed objections to the Report-Recommendation,
essentially raising the same arguments presented to the
Magistrate Judge.

When objections to a magistrate judge's Report-
Recommendation are lodged, the Court makes a *"de
novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." *See* 28 U.S.C. § 636(b)(1). After such a
review, the Court may "accept, reject, or modify, in whole
or in part, the findings or recommendations made by
the magistrate judge. The judge may also receive further
evidence or recommit the matter to the magistrate judge
with instructions." *Id.*

Having reviewed the record *de novo* and having considered
the issues raised in the Plaintiff's objections, this Court
has determined to accept and adopt the recommendation
of Magistrate Judge Lowe for the reasons stated in the
Report-Recommendation.

It is therefore

**ORDERED** that Defendants motion to dismiss be
**GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced
pursuant to 42 U.S.C. § 1983, has been referred to me
by the Honorable Thomas J. McAvoy, Senior United
States District Judge, for Report and Recommendation
with regard to any dispositive motions filed, pursuant to
28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally,
in his Complaint, Raymond Robles ("Plaintiff") alleges
that three employees of the New York State Department
of Correctional Services ("DOCS"), as well as DOCS
itself, violated his rights under the Eighth and Fourteenth
Amendments when they (1) required him to submit to
a random urinalysis test when they knew he was taking
a medication that would prevent him from providing a
urine sample, and (2) charged, convicted, and punished
him with eighty-seven days in a Special Housing Unit for
refusing to provide a urine sample. (*See generally* Dkt. No.
1 [Plf.'s Compl.].) Currently pending before the Court is

Defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

**\*2**  As Defendants correctly observe in their Memorandum of Law, Plaintiff's Complaint-which describes the events giving rise to his claims in two brief paragraphs without identifying any role played by Defendants in those events-is hardly a model of *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].) However, as explained below in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [1] Here, I find that the factual allegations contained in Plaintiff's Response Affidavit are consistent with the factual allegations of his Complaint. As a result, in construing Plaintiff's Complaint, I will consider his Response Affidavit as effectively amending the factual allegations of his Complaint. Thus construed, Plaintiff's Complaint alleges as follows:

1. On November 6, 2006, at about 7:28 a.m., Plaintiff was directed to report to the drug testing center at Riverview C.F.; [2]

2. Upon arriving at the drug testing center, Plaintiff was informed by Correctional Officer K. Bleau ("Defendant Bleau") that he had been randomly selected to submit to urinalysis drug testing; [3]

3. Defendant Bleau asked Plaintiff if he would provide a urine sample, and Plaintiff responded yes; [4]

4. Defendant Bleau then asked Plaintiff if he was taking any medications, and Plaintiff explained that (1) yes, he was taking Flomax and Omeprazole due to a prostate condition and a stomach problem, and (2) "d[ue] to the medication [s]" and the fact that he had used the bathroom

at approximately 7:10 a.m. that morning, he would need more water in order to urinate; [5]

5. As Plaintiff was explaining these facts to Defendant Bleau, Defendant Bleau became upset and walked away from Plaintiff; [6]

6. When he returned, Defendant Bleau then informed Plaintiff that, pursuant to DOCS Directive 4937, Plaintiff had three hours provide a urine sample or he would be considered to be refusing to provide the urine sample; [7]

7. Defendant Bleau then gave Plaintiff a cup of water at approximately 7:30 a.m., and a second cup of water at approximately 9:30 a.m., but did not give him a third cup of water at approximately 8:30 a.m., as required by Part D.4. of DOCS Directive 4937; [8]

8. At approximately 10:30 a.m., Plaintiff was still unable to provide a urine sample; [9]

9. At that time, Defendant Bleau notified Correctional Sergeant Peacock ("Defendant Peacock") that Plaintiff was refusing a direct order to provide a urine sample; [10]

10. When Plaintiff tried to explain to Defendant Peacock that his medical condition prevented him from providing the urine sample, Defendant Peacock responded, "Shut up and put [your] hands behind [your] back"; [11]

**\*3**  11. Both Defendants Bleau and Peacock failed to investigate or inquire as to why Plaintiff had been prescribed Flomax and Omeprazole, or what the potential side effects of those drugs were, although that information was readily obtainable from medical staff at Riverview C.F.; [12]

12. Instead, Defendants Bleau and/or Peacock escorted Plaintiff to the Riverview C.F. Special Housing Unit ("S.H.U."); [13]

13. On November 7, 2006, at about 8:55 a.m., while Plaintiff was in S.H.U., he was served with a copy of a misbehavior report authored by Defendant Bleau, charging him with (1) failing to comply with the urinalysis testing procedure, and (2) refusing a direct order to provide a urine sample; [14]

2008 WL 4693153

14. On November 10, 2006, Senior Correctional Counselor R. Varkiar conducted Plaintiff's disciplinary hearing on the misbehavior report;[15]

15. At the hearing, when Plaintiff entered a plea of "Not guilty, with an explanation," Defendant Varkiar gave Plaintiff "an opportunity to explain [him] self";[16]

16. Plaintiff explained that he had a medical condition that prevented him from providing a urine sample, that he had attempted to inform Defendant Bleau of this medical condition (but Defendant Bleau walked away from Plaintiff), and that he had attempted to inform Defendant Peacock of this medical condition (but Defendant Peacock told Plaintiff to "[s]hut up");[17]

17. Defendant Varkiar then made a telephone call; when he was done with the call, he told Plaintiff that (1) he had called the medical unit at Riverview C.F. to ask whether or not the medication that Plaintiff was taking would prevent him from urinating, and (2) someone in the medical unit had responded that no, the medication should not prevent Plaintiff from urinating;[18]

18. Plaintiff then attempted to explain to Defendant Varkiar *why* he was taking one of the medications, specifically, to remedy a prostate problem that itself interfered with his ability to urinate;[19]

19. However, Defendant Varkiar failed to call back the person in the medical unit at Riverview C.F. and request that he or she again answer the question he had posed before, taking into account Plaintiff's prostate condition as shown by his medical records;[20]

20. As a result, Defendant Varkiar found Plaintiff guilty of both disciplinary charges, and sentenced him to ninety (90) days in S.H.U ., with a corresponding loss of privileges;[21]

21. At the conclusion of the hearing, Plaintiff received a written copy of the hearing disposition, which stated that the evidence relied on included (1) the statements in the written misbehavior report of Defendant Bleau (which Defendant Varkiar stated were credible), and (2) Plaintiff's

own hearing testimony (which Defendant Varkiar stated was not credible);[22]

22. On November 27, 2006, Plaintiff appealed his conviction to DOCS Director of Special Housing, Donald Selsky, who reversed the conviction on January 19, 2007;[23] and

**\*4** 23. On February 1, 2007, Plaintiff was finally released from S.H.U., after spending eighty-seven (87) days there.[24]

It should be noted that, in addition to asserting constitutional claims against Defendants Bleau, Peacock, and Varkiar in their individual or personal capacities, Plaintiff's Complaint asserts a constitutional claim also against DOCS itself. It should also be noted that, as relief for Defendants' actions, Plaintiff requests money damages but no injunctive relief.[25]

### B. Summary of Grounds in Support of Defendants' Motion

Generally, Defendants' motion to dismiss for failure to state a claim is premised on two grounds: (1) Plaintiff's claim against DOCS is barred by the Eleventh Amendment; and (2) the allegations of Plaintiff's Complaint are too lacking in detail to give Defendants *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 2-5 [Defs.' Memo. of Law].)

## II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2);[26] or (2) a challenge to the legal cognizability of the claim.[27]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that

2008 WL 4693153

"give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [28] The main purpose of this rule is to "facilitate a proper decision on the merits." [29] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [30]

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. [31] However, it is well established that even this liberal notice pleading standard "has its limits." [32] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard. [33]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007). [34] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Fed.R.Civ.P. 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

**\*5** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2) requires that the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of

course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ). [35] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [36]

It should be emphasized that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gibson,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever. [37] There must still be enough fact alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [38] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the

complaint is submitted *pro se.*"[39]  In other words, as stated above, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality .[40]

**\*6** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[41]  Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest."[42]  Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."[43]  Of course, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[44]  In addition, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading.[45]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has very recently observed),[46] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[47]  Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[48]  Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[49]

## III. ANALYSIS

### A. Whether Plaintiff's Claim Against DOCS is Barred by the Eleventh Amendment

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's constitutional claims against Defendant DOCS are barred by the Eleventh Amendment to the United States

Constitution. (Dkt. No. 16, Part 2, at 2-3 [Defs.' Mem. of Law].) In the interest of brevity, I will not repeat the well-established points of law that they correctly cite in support of their argument. Instead, I will only add three points that Defendants do *not* make in their succinct argument: (1) where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case (or claim), and "the case [or claim] *must* be stricken from the docket";[50]  (2) Plaintiff's civil rights claims against Defendant DOCS (an entity) are barred also by the express language of 42 U.S.C. § 1983, which confers liability upon only any *"person* who ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws .... "[51]; and (3) because the defect with this claim is substantive rather than merely formal, better pleading will not cure it, and thus it should be dismissed with prejudice.[52]

**\*7** For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant DOCS.

It should be noted that, in addition to barring Plaintiff's constitutional claims against Defendant DOCS, the Eleventh Amendment would also bar any claim by Plaintiff against Defendants Bleau, Peacock and Varkiar in their official capacities.[53]  However, because I do not even liberally construe Plaintiff's Complaint (and Response Affidavit) as asserting such claims, no need exists to recommend the dismissal of those claims. (*See generally* Dkt. No 1, 17.)

### B. Whether the Allegations of Plaintiff's Complaint Are Too Lacking in Detail to Give Defendants *Fair Notice* under Fed.R.Civ.P. 8(a)(2)

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's Complaint-when considered alone-is too lacking in detail to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 3-5 [Defs.' Mem. of Law].) However, as explained above in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending

2008 WL 4693153

the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. [54] Here, when construing Plaintiff's Complaint together with his Response Affidavit, I find that Plaintiff's allegations *are* detailed enough to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). *See, supra,* Part I.A. of this Report-Recommendation.

However, this does not end the Court's analysis of Plaintiff's Complaint because, even where a defendant has not advanced a certain argument on a motion to dismiss in a *pro se* prisoner civil rights case, a district court may (and, indeed, has a duty to) *sua sponte* address whether the pleading in such a case has successfully stated a claim upon which relief may be granted. [55] Here, Plaintiff's Complaint is plagued by several defects (some substantive and some formal) [56] that simply cannot be overlooked.

### C. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau, Peacock and Varkiar Arising Out of Plaintiff's Being Required to Provide a Urine Sample Given Their Knowledge of His Medications and/or Medical Condition

Among Plaintiff's claims is a claim that "[i]t is neither lawful nor [ ] reasonable to expect an Inmate to perform a bodily function on command when you know or should know that his medical condition and prescribed treatment plan indicate that when he urinates[,] and when he [can] not[,] can be beyond his control." (Dkt. No. 17, at 5 [Plf.'s Response Affid.].) I liberally construe this claim as one of harassment or perhaps inadequate-prison-conditions under the Eighth Amendment. (To the extent that this allegation is also used to support a procedural due process claim under the Fourteenth Amendment, I address that claim below in Parts III.D. and III.E. of this Report-Recommendation.)

**\*8** The problem with Plaintiff's Eighth Amendment claim is that the rather detailed facts alleged by him in support of that claim do not suggest in any way that any of the three individual Defendants were acting with the sort of mental state that is required for them to incur liability under the Eighth Amendment, namely, *deliberate indifference.* Deliberate indifference is a state of mind akin to *criminal recklessness,* which involves *knowing* of and disregarding an excessive risk to inmate health or safety. [57] Here, Plaintiff himself alleges that the

three individual Defendants did not in fact *understand* that he could not urinate due to his prostate condition. Indeed, as he was trying to explain his medical condition to Defendants, (1) Defendant Bleau became angry and "walked away" from Plaintiff, (2) Defendant Peacock told Plaintiff to "[s]hut up," and (3) Defendant Varkiar failed to call back the person in the medical unit of Riverview C.F. and ask him or her to report (to Varkiar) the impact of Plaintiff's prostate condition on his ability to urinate. *See, supra,* Part I.A. of this Report-Recommendation. [58]

At its heart, Plaintiff's Eighth Amendment claim alleges that the three individual Defendants *should have known* that he could not urinate during the time in question due to his enlarged prostate, but that they did not know that fact because they *failed to investigate* the nature and effects of his prostate condition. In other words, his Eighth Amendment claim is one of *negligence.* Such a claim is simply not actionable under the Eighth Amendment (or any constitutional provision). As is often observed, "[D]eliberate indifference describes a state of mind more blameworthy than negligence." [59] Finally, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [60]

For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau and Peacock Arising Out of His Receipt of an Erroneous or False Misbehavior Report

It is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ). [61] Rather, the only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there is "more, such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *26, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.) [citations omitted].

2008 WL 4693153

Here, Plaintiff alleges no actionable conduct regarding his being issued the misbehavior report in question, such as retaliation against him for exercising a constitutional right. *See, supra,* Part I.A. of this Report-Recommendation. Moreover, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it. [62]

**\*9** For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Fourteenth Amendment false-misbehavior-report claim.

### E. Whether Plaintiff Has Stated an Actionable Claim Against Defendant Varkiar Arising Out of Plaintiff's Erroneous or Unjustified Disciplinary Conviction

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient .... " *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). With regard to the first question, in 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause will not arise from the use of mandatory language of a particular state law or regulation, but "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Here, Plaintiff alleges that the disciplinary hearing conducted by Defendant Varkiar resulted in a sentence of eighty-seven (87) days in the Riverview C.F. S.H.U. with a corresponding loss of privileges. *See, supra,* Part I.A. of this Report-Recommendation. Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of far more than the eighty-seven (87) days alleged here-even where the conditions of confinement in the S.H.U. were, to varying degrees, more restrictive than those in the prison's general population. [63] As a result, I find that Plaintiff has not alleged facts plausibly suggesting that he possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment.

However, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice. This is because it is conceivable to me that Plaintiff's Complaint and Response Affidavit-which are silent with regard to the conditions of confinement he experienced in the Riverview C.F. S.H.U.-may be amended so as to allege facts plausibly suggesting that those conditions were so restrictive as to impose on Plaintiff an *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life* (thus conferring on him a protected liberty interest under the Fourteenth Amendment).

I should also point out that, even assuming (for the sake of argument) that Plaintiff possessed a protected liberty interest with regard to his disciplinary hearing, I find that he has alleged facts plausibly suggesting that he was, in fact, given all the process that he was due under the circumstances. Specifically, Plaintiff alleges that he was given the following: (1) timely notice of the misbehavior report: (2) an "opportunity to explain [him]self" at his disciplinary hearing; (3) a written disciplinary hearing disposition; (4) a disciplinary hearing disposition that was based on at least some evidence (e.g., his own hearing testimony, which Defendant Varkiar found to be not credible); and (5) an opportunity to appeal the disciplinary hearing disposition (which he did so successfully). *See, supra,* Part I.A. of this Report-Recommendation.

**\*10** Of course, the defect that Plaintiff alleges occurred at his disciplinary hearing was Defendant Varkiar's failure to use the telephone to call back the person in the medical unit at Riverview C .F. and request that he or she again answer the question of whether Plaintiff was physically unable to urinate, taking into account his prostate condition as shown by his medical records. *Id.* Generally, it is not the duty of an impartial hearing officer to conduct an investigation of the merit of the disciplinary charges against an inmate; rather, the duty of a hearing officer is merely to review the evidence presented to him at the disciplinary hearing, and in *certain circumstances* identify defense witnesses for the inmate. [64] Here, I find that Plaintiff has alleged no circumstances conferring on Defendant Varkiar a duty to call back the medical unit at Riverview C.F. For example, I find that Plaintiff's Complaint and Response Affidavit are devoid of any allegation that, at his disciplinary hearing, he requested and was denied an adjournment of the hearing so that, with the help of a legal assistant, he could obtain his

Case 9:18-cv-00416-DNH-TWD    Document 45    Filed 05/28/19    Page 111 of 146
**Robles v. Bleau, Not Reported in F.Supp.2d (2008)**
2008 WL 4693153

medical records and call as a witness a member of the medical unit, in order that he himself could introduce testimony that his prostate condition prevented him from urinating during the time in question. *See, supra,* Part I.A. of this Report-Recommendation. However, again, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice, because it is conceivable to me that Plaintiff's Complaint and Response Affidavit may be amended to allege facts plausibly suggesting that, at his disciplinary hearing, he made, and was denied, such a request.

For these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim regarding his disciplinary hearing if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing.

Finally, two points bear mentioning. First, to the extent that Plaintiff is attempting to allege that his procedural due process rights were violated at his disciplinary hearing also because Defendant Bleau violated Part D.4. of DOCS Directive 4937 by giving Plaintiff only two cups of water during the three-hour period in question, that allegation is not actionable under the circumstances. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws. [65] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983. [66] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation; [67] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive. [68]

 **\*11**  Second, in making the above recommendation (that Plaintiff be required to file an Amended Complaint that successfully states a Fourteenth Amendment procedural

due process claim regarding his disciplinary hearing, upon penalty of dismissal), I am in no way "issuing specific instructions [to Plaintiff] mandating the content and format of the putative amended complaint"-instructions that the Second Circuit recently found erroneous in the case of *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at \*6 (2d Cir. Aug.12, 2008). Rather, I am merely reporting my finding that Plaintiff's current Fourteenth Amendment procedural due process claim regarding his disciplinary hearing fails to state a claim upon which relief might be granted, as pleaded.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be *GRANTED* **in part** and *DENIED* **in part** in the following respects:

(1) Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be *DISMISSED* if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing; and

(2) The other claims asserted in Plaintiff's Complaint (as effectively amended by his Response Affidavit) be *DISMISSED* **with prejudice,** and without condition.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/ or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** [69]

**BE ALSO ADVISED that the failure to file timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,*

984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 4693153

**Footnotes**

30    *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion), *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

1     *See, infra,* note 41 of this Report-Recommendation (citing cases).

2     (Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

3     (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

4     (Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"].)

5     (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

6     (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

7     (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid ., attaching page from DOCS Directive 4937].)

8     (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid., attaching page from DOCS Directive 4937].)

9     (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf .'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

10    (Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

11    (Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

12    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 9 [Ex. 2 to Plf.'s Response Affid., attaching page of his Ambulatory Health Record].)

13    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

14    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid ., attaching Inmate Misbehavior Report].)

15    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

16    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

17    (*Id.*)

18    (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

19    (Dkt. No. 17, at 2-3 [Plf.'s Response Affid.]; Dkt. No. 17, at 14-15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid., attaching page of information about Flomax].)

20    (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid ., attaching page of information about Flomax].)

21    (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

2008 WL 4693153

22   (Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 3 [Plf.'s Response Affid.].)

23   (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3-4 [Plf.'s Response Affid.]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 16 [Ex. 8 to Plf.'s Response Affid., attaching Donald Selsky's Review of Superintendent's Hearing, issued on January 19, 2007].)

24   (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 2 [Plf.'s Response Affid.].)

25   (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

26   *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the plaintiff is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

27   *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ]." ) [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

28   *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U .S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

29   *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

31   *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

32   2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

33   *See, e.g., Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary

Robles v. Bleau, Not Reported in F.Supp.2d (2008)

2008 WL 4693153

affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

34    The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

35    *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible.*" ) [emphasis in original].

36    *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

37    For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

38    *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

39    *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

40    *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation marks and citation omitted];

*McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted].

41  "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

42  *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

43  *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

44  *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

45  *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

46  *See Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

47  *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

48  *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

49  *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe,

M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

50    *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) [citation omitted]; *see also* Fed.R.Civ.P. 12(h)(3).

51    42 U.S.C. § 1983 [emphasis added].

52    *See, supra,* note 44 of this Report-Recommendation.

53    *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

54    *See, infra,* note 41 of this Report-Recommendation (citing cases).

55    The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

56    As explained above in Part II of this Report-Recommendation, a dismissal for failure to state a claim may be based not only on a successful challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2), but also on a successful challenge to the legal cognizability of the claims asserted in the pleading. *See, supra,* notes 26 and 27 of this Report-Recommendation.

57    *Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.), *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

58    In addition, it is worth noting that Plaintiff's explanation to Defendant Bleau consisted of a statement that Plaintiff could not urinate because of his prostate *medication,* not because of his prostate *condition. See, supra,* Part I.A. of this Report-Recommendation. As a result, Defendant Bleau would not have become *aware* of the reason for Plaintiff's inability to

2008 WL 4693153

urinate (which Plaintiff now alleges was his prostate *condition,* not his prostate *medication* ), even if Defendant Bleau had remained in Plaintiff's presence and listened to his explanation.

59   *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J .) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

60   *See, supra,* note 44 of this Report-Recommendation.

61   *Accord, Lugo v. Van Orden,* 07-CV-0879, 2008 U.S. Dist. LEXIS 56707, at *7, 2008 WL 2884925 (N.D.N.Y. July 23, 2008) (McAvoy, J.); *Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 60931, 2008 WL 3286250 (N.D.N.Y. Aug. 7, 2008) (Sharpe, J.), *adopting* 2008 U.S. Dist. LEXIS 52797, at *18, n. 5, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.); *Anderson v. Banks,* 06-CV-0625, 2008 U.S. Dist. LEXIS 60896, at *16-17, 2008 WL 3285917 (N.D.N.Y. May 19, 2008) (Homer, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 6, 2008) (Sharpe, J.); *Stewartson v. Almstead,* 04-CV-1097, 2008 U.S. Dist. LEXIS 22178, at *7, 2008 WL 783367 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *McEachin v. Goord,* 06-CV-1192, 2008 U.S. Dist. LEXIS 27479, at *12, 2008 WL 1788440 (N.D.N.Y. Feb. 8, 2008) (Treece, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 31879, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J.); *Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *27, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 23065, 2007 WL 956941 (N.D.N.Y. March 29, 2007) (Kahn, J.); *Madera v. Goord,* 103 F.Supp.2d 536, 542 (N.D.N.Y.2000) (Kahn, J., adopting Report-Recommendation by Di Bianco, M.J.).

62   *See, supra,* note 44 of this Report-Recommendation.

63   *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in relation to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

64   *Jackson v. Onondaga County,* 05-CV-1393, 2008 U.S. Dist. LEXIS 64930, at *40 & n. 46, 549 F. Supp. 2d 204 (N.D.N.Y. Jan. 8, 2008) (Lowe, M.J.) [citations omitted], *adopted on* de novo *review by* 05-CV-1393, 2008 U.S. Dist. LEXIS 22175, 2008 WL 782655 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *see also Martin v. Mitchell,* 92-CV-0716, 1995 U.S. Dist. LEXIS 19006, at *10-12, 1995 WL 760651 (N.D.N.Y. Nov. 24, 1995) (McAvoy, C.J.) (rejecting plaintiff's assertion that prison disciplinary hearing officer "had a duty to investigate the identity of [a correction officer identified by the plaintiff merely as] 'Budd' and call him to testify"); *Hampton v. McGinnis,* 89-CV-6344, 1992 U.S. Dist. LEXIS 15696, at *6, 1992 WL 309553 (S.D.N.Y. Oct. 15, 1992) ("[I]t was not [the disciplinary hearing officer's] duty to investigate [the prisoner's assault] claim, and plaintiff was not precluded from offering his own evidence on that subject."); *cf. Kingsley v. Bureau of Prisons,* 937 F.2d 26, 31 (2d Cir.1991) (under circumstances, a hearing officer did have a duty to identify the name of the plaintiff's desired witness because [1] the plaintiff had an "especially compelling" need for the witness, [2] the witness's identity was "readily available" to the hearing officer, [3] the plaintiff had arrived at the prison only five days earlier, [4] fulfilling the request would not have delayed the imposition of "swift discipline," and [5] "no other institutional objective was implicated").

Robles v. Bleau, Not Reported in F.Supp.2d (2008)

2008 WL 4693153

65  *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States.*") (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United States.*") [emphasis added].

66  *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at * 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.'") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

67  *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

68  *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

69  *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ]") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

---

**End of Document**                                   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 769551
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Randolph ROSSI, Plaintiff,
v.
Brian FISHCER, et al., Defendants.

No. 13–cv–3167 (PKC)(DF).
|
Signed Feb. 24, 2015.

*MEMORANDUM AND ORDER*

CASTEL, District Judge.

**\*1** Plaintiff Randolph Rossi, proceeding *pro se,* brings this action against officials of the New York State Department of Corrections and Community Supervision ("DOCCS"). In his Amended Complaint, plaintiff alleges that defendants violated, and continue to violate, his constitutional rights by denying him the right to freely practice his Rastafarian faith while incarcerated. He brings an action asserting violations of the First and Fourteenth Amendments and affirmatively disaffirms any claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Defendants move to dismiss the Amended Complaint for failure to exhaust claims under the Prisoner Litigation Reform Act ("PLRA"), failure to state a claim under the Free Exercise Clause, failure to meet the standards for injunctive relief, lack of personal involvement of certain defendants, and qualified immunity.

For the reasons stated below, the motion to dismiss is granted in part and denied in part. Plaintiff exhausted his administrative remedies as to certain claims and exhaustion is excused as to others. Certain allegations state a claim for relief, but plaintiff fails to plausibly allege a violation under the Free Exercise Clause, Establishment Clause, or Equal Protection Clause with regard to other claims. Defendants' motion to dismiss for lack of personal involvement fails. Finally, defendants have not demonstrated entitlement to qualified immunity at the pleading stage.

**BACKGROUND**

Plaintiff Rossi is a practicing Nyahbinghi Rastafarian currently incarcerated at the Woodbourne Correctional Facility, maintained by DOCCS. (*See* Amended Complaint ("Am.Compl."), ¶ 3.) He brings this action against the following employees of DOCCS: Brian Fischer, [1] Commissioner of DOCCS; Catherine Jacobsen, Acting Deputy Commissioner for Program Services; Jeff McKoy, [2] Deputy Commissioner for Program Services; Cheryl Morris, Director for Ministerial, Family, and Volunteer Services; Mark Leonard, Director of Ministerial Family and Volunteer Services; Robert Cunningham, Superintendent for the Woodbourne Correctional Facility; Moses Santiago, Coordinating Chaplain; and Dorothy Davis, Drug Counselor at Woodbourne. (*Id.* ¶ ¶ 4–11.) Plaintiff asserts that defendants Fischer, Jacobsen, McKoy, Morris, Leonard, and Cunningham "are responsible for all rules, policies, regulations, and directives governing the religious rights of prisoners under their care and custody." (*Id.* ¶ 13.) He claims that "[d]efendants have denied plaintiff his right to practice his faith in accordance with the traditions, customs, and tenets of Rastafari." (*Id.*)

First, plaintiff claims that he has been denied his right to celebrate, in a manner consistent with his faith, the holy days of April 21, May 25, August 17, and October 7. (*Id.* ¶ ¶ 15–18.) Specifically, plaintiff requests that these four Rastafari holy days be added to the religious calendar with designations that permit plaintiff to (a) refrain from working or attending programs, (b) attend a congregate worship service, and (c) eat a holy day meal with the Rastafarian inmate community. [3] (*Id.;* Hearing before Magistrate Judge Debra Freeman, July 8–9, 2014 ("July Tr."), pp. 82–83.) Plaintiff further requests that April 21 and August 17 be designated as "family events." [4] (Am. Compl., ¶ 16; July Tr., p. 82.) During the pendency of plaintiff's motion, DOCCS added all of the holy days at issue to its "Religious Holy Day Calendar," with varying limitations regarding how each day may be observed. (Religious Holy Day Calendar, Revised July 29, 2014 ("Revised Calendar"), p. 25 (Dkt.82–1).) The revised DOCCS calendar, which was submitted to Magistrate Judge Freeman on the preliminary injunction motion, allows members of the Rastafari faith to be exempt from work and programming, attend a worship service, and share a holy day meal on August 17 and October 7. (*Id.*) For April 21, DOCCS only permits a congregate worship

service and for May 25, DOCCS does not authorize any of these three designations. (*Id.*) The revised calendar does not designate any of the four holy days at issue as "family events." (*Id.*)

**\*2** Second, plaintiff claims that defendants have denied him the right to add food items to the holy day meal menu, giving the "Department of Nutritional Services unfettered authority to dictate the dietary laws of the Rastafarian community for holy day celebrations." (Am.Compl., ¶ 27.) He concludes that DOCCS's "Nutritional Services is in effect acting as an ecclesiastical body for the Rastafarian community," in violation of the First and Fourteenth Amendments. (*Id.* ¶¶ 27, A.9.)

Third, plaintiff alleges that Rastafarians at Woodbourne are forced to hold congregate worship services on Wednesdays instead of Fridays, the day of worship Rastafarians traditionally observe. (*Id.* ¶ 26.) Defendant Cunningham denied plaintiff's grievance on the basis that "there was no room available for Rastafarians to conduct congregate worship on Fridays." (*Id.*)

Fourth, plaintiff claims that defendants have denied him the right to wear the Rastafarian religious turban brought to him by his wife. [5] (*Id.* ¶¶ 20–22.) After wearing the turban his wife sent him for two months, a correction sergeant told plaintiff that he was no longer permitted to wear the headgear. (*Id.* ¶ 20.) The sergeant told plaintiff that according to defendant Santiago, the Coordinating Chaplain, the only religious headgear for Rastafarians was a Tsalot Kob. (*Id.* ¶ 21.) Plaintiff asserts that the Tsalot Kob is "restricted to members of the Ba Beta Kristiyan Church of Haile Selassie I (a Christianized House or Mansion within Rastafari)," and does not apply to the Rastafari sect that plaintiff adheres to, the Nyahbinghi "mansion." (*Id.* ¶¶ 3; 20–21.) At no time did defendant Santiago speak to plaintiff to determine the religious significance of his turban. (*Id.* ¶ 22.) Plaintiff complied with the sergeant's order to mail home his turban, and subsequently filed a grievance that was denied by defendant Cunningham. (*Id.* ¶¶ 21–22.)

Fifth, plaintiff challenges Directive 4760, which requires religious groups engaging in fundraising activities to apply for Special Purpose Organization ("SPO") status. (*Id.* ¶ 23.) He explains that SPO status subjects religious groups to the same mandates as non-religious inmate organizations, including the requirement that

each organization surrender half of the funds it raises to the Inmate Occupational Therapy Fund ("IOTF") for the benefit of the general inmate population. (*Id.*) Plaintiff challenges this requirement, as it applies to Rastafarians, because he claims it has "the effect of a tax on religion" and burdens the Rastafarians' ability to purchase necessary materials for congregate services, religious classes, and holy day celebrations. (*Id.* ¶ 24.)

Sixth, plaintiff claims that defendants violated his First and Fourteenth Amendment rights when they denied his request to gain access to spiritual and religious advisers (*Id.* ¶¶ 19, A(7) .) Defendant Morris denied plaintiff's request for advisers on security grounds, and defendant McKoy upheld Morris's determination after plaintiff sent McKoy a letter seeking intervention. (*Id.* ¶ 19.) Plaintiff claims that "[o]ther religious groups are allowed to have religious and spiritual advisors without breaching security concerns." (*Id.*)

**\*3** Finally, plaintiff claims that defendant Davis, a drug counselor at Woodbourne, falsely reported that plaintiff admitted to using marijuana for religious rituals to justify recommending him to a drug treatment program. (*Id.* ¶ 28.) Davis asked plaintiff in an interview about the "ritual use of marijuana within the Rastafarian faith." (*Id.*) "When plaintiff responded to defendant's request, defendant Davis put in her report that plaintiff admitted using marijuana for religious rituals only," despite the fact that plaintiff claims he "denied ever using substances whatsoever," including marijuana. (*Id.*)

Plaintiff seeks declaratory, injunctive, and monetary relief, including compensatory and punitive damages. (*Id.* ¶¶ A–C.)

## PROCEDURAL HISTORY

Plaintiff commenced this action on May 8, 2013 (Dkt.2), and filed an Amended Complaint on November 19, 2013. (Dkt.11.) Plaintiff moved for a preliminary injunction to enjoin defendants "from continuing to enforce the policies being challenged in this proceeding." (Dkt.17.) Magistrate Judge Debra Freeman, to whom the preliminary injunction motion was referred to hear and report, bifurcated plaintiff's motion on the basis of the temporal proximity of the relief sought. Magistrate Judge Freeman issued a Report and Recommendation ("R & R") as to plaintiff's ability to celebrate April 21 as a holy day (Dkt.27), and a Supplemental R & R, reexamining some

Case 9:18-cv-00416-DNH-TWD   Document 45   Filed 05/28/19   Page 121 of 146
Rossi v. Fischer, Not Reported in F.Supp.3d (2015)

2015 WL 769551

of the issues regarding April 21 and addressing the remaining claims raised by plaintiff's motion. (Dkt.89.) The Court adopted both the R & R (Dkt.37) and the Supplemental R & R. (Dkt.103.) Plaintiff's motion was granted, to the extent that defendants were mandatorily enjoined, pending judgment on the merits, to: (1) permit plaintiff to wear a Rastafari religious turban; (2) allow plaintiff to observe all four of the Rastafari holy days at issue in his motion by (a) refraining from working or attending programs, (b) attending a congregate worship service, and (c) sharing a holy day meal with other Rastafarian inmates; and (3) provide space for Rastafari Sabbath worship services on Friday afternoons, or, at least, pending the final resolution of the case on its merits, to provide an alternative accommodation for such services on Friday evenings. (Order Adopting Supp. R & R.)

Defendants now move to dismiss plaintiff's Amended Complaint in its entirety. (Dkt.56.)

LEGAL STANDARD FOR MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). " 'Labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,' " rather, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly,* 550 U.S. at 555). In considering a Rule 12(b) (6) motion to dismiss, all non-conclusory factual allegations are accepted as true, *see id.* at 678–79, and all reasonable inferences are drawn in favor of the plaintiff. *See In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (per curiam). Moreover, plaintiff's *pro se* pleadings are given a liberal and generous construction and are read "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal quotation marks omitted).

DISCUSSION

   I. Exhaustion of Administrative Remedies

**\*4** The exhaustion requirement of the Prison Litigation Reform Act ("PLRA") "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); 42 U.S.C. § 1997e(a). Exhaustion of administrative remedies is mandatory before an action is commenced. *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds, Porter,* 534 U.S. at 532. The Second Circuit indicated in *Neal,* that "[s]ubsequent exhaustion after suit is filed ... is insufficient" to satisfy the PLRA. *Id.*

While the PLRA's exhaustion requirement is "mandatory," *Woodford v. Ngo,* 548 U.S. 81, 85 (2006), certain caveats apply. *See Hemphill v. N.Y.,* 380 F.3d 680, 686 (2d Cir.2004). A plaintiff's failure to exhaust administrative remedies may be excused if: (1) administrative remedies were not available; (2) defendants forfeited their affirmative defense of non-exhaustion by failing to raise or preserve it or are estopped from raising non-exhaustion because their own actions inhibited the inmate from exhausting his claims; or (3) "special circumstances" have been plausibly alleged that justify the prisoner's failure to comply with the exhaustion requirements.[6] *Id.*

"A court may not dismiss for failure to exhaust administrative remedies unless it determines that such remedies are available." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (alterations omitted) (quoting *Snider v. Melindez,* 199 F.3d 108, 114 (2d Cir.1999)). Courts must look at the applicable set of grievance procedures when determining the availability of an administrative remedy. *Id.* Plaintiff, as an inmates of a New York State correctional facility, is subject to a three-step, administrative procedure for inmate grievances called the Inmate Grievance Program ("IGP"). *See* 7 N.Y.Codes R. & Reg. ("N.Y.C .R.R.") § 701.5. The first step in the IGP is to file a grievance with the Inmate Grievance Resolution Committee (the "IGRC"). *Id .* § 701.5(b). After receiving a response from the IGRC, an inmate has seven calendar days in which to appeal to the superintendent. *Id.* § 701.5(c). Within seven calendar days of receiving a response from the superintendent, the inmate then must appeal to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The CORC is required to render a decision on each appeal and transmit its decision within 30 calendar days from the time the appeal was received. *Id.*

A number of federal circuit courts have held that a failure to respond to a grievance within the time limit prescribed by the prison grievance process renders an administrative

remedy unavailable for purposes of exhaustion. *See Jernigan v. Stuchell,* 304 F.3d 1030, 1032 (10th Cir.2002); *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir.2002); *Foulk v. Charrier,* 262 F.3d 687, 698 (8th Cir.2001); *Underwood v. Wilson,* 151 F.3d 292, 295 (5th Cir.1998). While the Second Circuit has not directly addressed this issue, it has treated the decision cited above favorably. *See Hemphill,* 380 F.3d at 686 n. 6 (citing to the cases above and noting that when an inmate does not receive a response to a grievance there may be a question as to whether administrative remedies were available); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004) (citing favorably to *Underwood* and *Foulk* with regard to availability of administrative remedies). The Second Circuit in *Abney* cited to *Hemphill* for the proposition that "exhaustion may be achieved in situations where prison officials fail to timely advance the inmate's grievance ." 380 F.3d at 667.

 **\*5** Judges in this district, including the undersigned, have also agreed with the proposition that administrative remedies may be deemed unavailable when the prison fails to timely respond to a grievance. *See Peoples v. Fischer,* 11–cv–2694 (SAS), 2012 WL 1575302, at *6 (S.D.N.Y. May 3, 2012) *on reconsideration in part,* 898 F.Supp.2d 618 (S.D.N.Y.2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination." (alterations, internal quotation marks, and citation omitted)); *Manos v. Decker,* 03–cv–2370 (PKC), 2005 WL 545215, at *4 (S.D.N.Y. Mar. 7, 2005) (asserting that *Abney* "held in part that administrative remedies are unavailable when prison officials fail to respond to grievances within the time period prescribed by regulation"); *Dimick v. Baruffo,* 02–cv–2151 (LMM), 2003 WL 660826, at *4 (S.D.N.Y. Feb. 28, 2003) (holding that plaintiff's claims were properly exhausted where CORC rendered an untimely decision and plaintiff filed his complaint almost two months after CORC had been required to respond pursuant to the prison grievance procedures). *But see Bennett v. Wesley,* 11–cv–8715 (JMF), 2013 WL 1798001, at *6 (S.D.N.Y. Apr. 29, 2013) ("[T]he Court of Appeals has not adopted the position that a delay in responding to a grievance demonstrates *per se* unavailability." (alterations omitted) (quoting *Mateo v. O'Connor,* 10–cv–8426 (LAP), 2012 WL 1075830, at *7 (S.D.N.Y. Mar. 29, 2012)); *Rivera v. Anna M. Kross Ctr.,*

10–cv–8696 (RJH), 2012 WL 383941, at *4–5 (S.D.N.Y. Feb. 7, 2012) (asserting that the Second Circuit has declined to hold that administrative remedies are deemed unavailable when a plaintiff receives no response from prison authorities within the prescribed time limits.)

Here, defendants argue that some of plaintiff's claims were not exhausted before plaintiff brought this action. (Def. Memo in Support of Motion to Dismiss ("Def.MTD"), pp. 46.) Defendants show that CORC's decision regarding plaintiff's appeal of his May 2013 grievance was issued after the filing of both the original Compliant and the Amended Complaint. (*Id.* at 5.) The original Complaint was filed on May 8, 2013, the Amended Complaint was filed on November 19, 2013, and CORC's decision regarding plaintiff's appeal was not issued until December 18, 2013. (*Id.*) Defendants, however, overlook two important points. First, plaintiff exhausted some of his claims through grievances filed prior to his May 2013 grievance. Second, in regard to the May 2013 grievance, the CORC failed to issue a decision within the 30 day limit set by the IGP, rendering the administrative remedies unavailable to plaintiff.

Plaintiff's original Complaint sought to enjoin defendants from (1) prohibiting the wearing of his religious turban, (2) prohibiting his celebration of certain religious holy days in a manner consistent with his beliefs, and (3) collecting half of the funds raised by the Rastafari inmate organization. Each of these claims was properly raised and exhausted through grievances filed on June 17, 2009, September 12, 2011, and March 14, 2012. (*See* Hehenberger Decl. Ex. B & D (Dkt.58.)) The CORC issued a decision regarding the June 2009 grievance on August 5, 2009, ruled on the September 2011 grievance on January 4, 2012, and rendered a decision on the March 2012 grievance on September 5, 2012. (*Id.*) The original Complaint was filed eight months after the resolution of the lattermost grievance at issue.

 **\*6** Plaintiff's Amended Complaint, filed on November 19, 2013, seeks additional relief, including: (1) the addition of October 7 to the religious calendar with various designations; (2) that Rastafari congregate worship be moved to Fridays; (3) that defendants be prohibited from making the menu for holy day meals mandatory; (4) that defendants' failure to provide plaintiff with access to Rastafarian advisers be deemed a constitutional violation; and (5) for the removal of information

2015 WL 769551

regarding marijuana use from plaintiff's institutional records. Plaintiff filed a grievance that included these additional claims on May 29, 2013. (*Id.* at Ex. C .) After receiving a response from both the IGRC and the superintendent, plaintiff appealed the superintendent's decision to CORC on July 26, 2013. (*Id.*) More than four months passed between the appeal and CORC's decision, issued on December 18, 2013, which is far longer than the 30 day deadline explicitly set forth in the IGP process. (*Id.*) Had the CORC provided a timely response to plaintiff's appeal, plaintiff would have received a response prior to filing the Amended Complaint. Plaintiff "should not be penalized for the CORC's failure to timely respond, especially where the eventual response denied the requested relief." [7] *Peoples,* 2012 WL 1575302, at *9 n. 125. Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is not appropriate. Defendants' motion to dismiss on this ground is denied.

## II. The Free Exercise Clause

### 1. Legal Standard

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). A prisoner's right to exercise his religion is not absolute and must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Id.* (quoting *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990)). Accordingly, free exercise claims of prisoners are judged " 'under a 'reasonableness' test less restrictive than that ordinarily applied': a regulation that burdens a protected right passes constitutional muster if it is reasonably related to legitimate penological interests.' " *Salahuddin v. Goord,* 467 F .3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987)).

Under this reasonableness test, a prisoner asserting a free exercise claim "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." [8] *Salahuddin,* 467 F.3d at 274–75. "The defendants then bear the relatively limited burden of identifying the legitimate penological interests that

justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Id.* at 275 (alterations and internal quotation marks omitted).

**\*7** A substantial burden on religious exercise exists "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Woodward v. Perez,* 12–cv–8671 (ER), 2014 WL 4276416, at *4 (S.D.N.Y. Aug. 29, 2014) (quoting *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996)) (alterations and internal quotation marks omitted). Plaintiff need not show that the disputed conduct impedes a religious practice mandated by his religion, but he must show that it burdens a religious practice that is "central or important" to his practice of religion. *Ford,* 352 F.3d at 593–94. "Significantly, the plaintiff's burden in demonstrating substantial burden is not a particularly onerous task." *Woodward,* 2014 WL 4276416, at *4 (internal quotation marks omitted); *see also McEachin v. McGuinnis,* 357 F.3d 197, 202 (2d Cir.2004).

Even if a challenged policy substantially burdens the plaintiff's sincerely held religious beliefs, it is nevertheless valid "if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89 (1987); *see also Ford,* 352 F.3d at 595. When evaluating whether a regulation or official action is reasonable, courts are guided by four factors: (1) "whether the challenged regulation or official action has a valid, rational connection to a legitimate governmental objective;" (2) "whether prisoners have alternative means of exercising the burdened right;" (3) "the impact on guards, inmates, and prison resources of accommodating the right;" and (4) "the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests." *Salahuddin,* 467 F.3d at 274 (citing *Turner,* 482 U.S. at 89–91).

### 2. Analysis

#### A. Substantial Burden

On this motion, defendants do not challenge that plaintiff has alleged sincerely held religious beliefs; rather defendants argue that plaintiff fails to allege facts that show that his religious beliefs were substantially burdened. (Def.MTD, pp. 6, 9.) The Court concludes that plaintiff has plausibly alleged that defendants have substantially burdened his right to freely exercise his religion as to some but not all of the religious practices he wishes to engage in.

i. Claims Involving the Religious Calendar
As noted above, DOCCS has added all of the holy days at issue to the religious calendar, but with varying limitations regarding how each day may be celebrated. (Revised Calendar, p. 25.) The requests that were accommodated are moot. The Court must address whether plaintiff states a claim with respect to those requests which have not been voluntarily accommodated, which include: (1) exemption from work and the provision of a shared meal on April 21 and May 25; (2) permission for a congregate worship service on May 25; and (3) the designation of April 21 and August 17 as "family events." Plaintiff has plausibly alleged a substantial burden on his free exercise of religion with regard to all of the contested holy day restrictions, with the exception that plaintiff cannot reach this threshold burden on his claim concerning "family events."

**\*8** Plaintiff has shown that celebrating the four holy days at issue by refraining from work and programming, attending a congregate worship service, and sharing a holy day meal is "central or important" to his faith. *See Ford,* 352 F.3d at 593–94. In the telephone conferences and hearings before Magistrate Judge Freeman, plaintiff explained why the holy days are sacred, stating that April 21 is "the day that Emperor Selassie came to Jamaica" (July Tr., p. 13), May 25 is African Liberation Day (Telephone Conference before Magistrate Judge Freeman, March 18, 2014 ("March Tr."), p. 19), August 17 is the birthday of the Rastafari prophet Marcus Mosiah Garvey, (July Tr., p. 24.) and October 7 "respects the day that Emperor Haile Selassie was named heir apparent prior to his coronation." [9] (March Tr., p. 19.) He testified that each holy day at issue should be celebrated in the same manner, by coming together with other Rastafari observers for a congregate service called a "reasoning" and a shared meal, and by refraining from work. (July Tr., pp. 13, 20, 25–26.) The Court concludes that plaintiff has plausibly alleged a substantial burden on his religious beliefs to the extent that plaintiff alleges defendants continue to deny him an exemption from work and provision of a shared meal on April 21 and May 25 and have failed to permit a congregate worship service on May 25. *See Ford,* 352 F.3d at 593–94 (asserting that being denied a holiday meal would be considered a substantial burden on the plaintiff's religious beliefs if participation in the meal was considered central or important to his

practice of religion); *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) ("It is well established that prisoners have a constitutional right to participate in congregate religious services .").

Plaintiff fails, however, to plausibly allege that his free exercise rights are substantially burdened by the denial of his request to designate April 21 and August 17 as "family events." He asserts, "Rastafari family is the center of Rasta society," (Am. Compl., ¶ 16 n. 1) and that "[d]uring holy days' celebrations, it is necessary for the family to celebrate together, representing the unity established by Emperor Haile Selassie I, Empress Menen, and the Royal Children." (Pl. Objection to Magistrate Judge's R & R ("Pl.Objection"), p. 1.) These conclusory allegations fail to adequately explain the religious significance of the "family event." Nor does plaintiff explain why celebration with family carries religious significance for the holy days of April 21 and August 17, but not for the other holy days at issue. Plaintiff fails to show that celebration with family is "central or important" to his religious beliefs, and thus cannot state a claim under the Free Exercise Clause as to this request.

ii. Holy Day Menus
It has long been established that "prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975); *see also McEachin,* 357 F.3d at 203 ("[C]ourts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights.")

**\*9** Plaintiff has failed to plausibly allege that DOCCS's policy prohibiting inmates from adding items to the holy day menu substantially burdens his religious exercise. (Am.Compl., ¶ 27.) He does not allege that the holy day meals are inconsistent with his religious beliefs nor does he explain how his ability to add certain items to the meals is "central or important" to his religion. *See Kahane,* 527 F.2d at 496 (holding that a prison was required to provide an orthodox Jewish rabbi with a diet that maintained his good health and did not violate Jewish dietary laws, but refusing to mandate any specific food item or method for fulfilling this order, as "[s]uch details are best left to the prison's management which can provide from the food supplies available within budgetary limitations"). Accordingly, plaintiff does not plausibly allege a Free

2015 WL 769551

Exercise Clause claim as to the so-called "mandatory menu" provided by DOCCS for holy day meals.

### iii. Friday Worship

Plaintiff asserts that he has "been forced to have congregate worship on Wednesdays instead of the traditional Fridays." (Am.Compl., ¶ 26.) Plaintiff has plausibly alleged that this restriction substantially burdens his right to free exercise. "It is well established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin,* 993 F.2d at 308; *see also Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.1989) ("Although we recognize that great deference should be accorded to prison officials as they undertake the difficult responsibility of maintaining order in prisons, we have long held that prisoners should be afforded every reasonable opportunity to attend religious services, whenever possible."). In *Lloyd v. City of New York,* 12–cv–03303 (CM), 2014 WL 4229936, at *5–6 (S.D.N.Y. Aug. 4, 2014), the court held that Muslim inmates plausibly alleged a substantial burden on their religious exercise where they were unable to conduct religious services in a manner that complied with their religious beliefs. The plaintiffs in *Lloyd,* for example, were forced to conduct religious services in a chapel where the pews prevented them from kneeling for prayer. *Id.* Here, plaintiff has plausibly alleged that defendants have substantially burdened his ability to participate in religious services in a manner consistent with the practices of his religion. Plaintiff alleges that he is forced to conduct services on Wednesdays, but he asserts that Friday is the traditional day of worship. (*See* Am. Compl., ¶ 26.) He explains that the appropriate day for Rastafari congregate worship is Friday because it "carries the Rastafarian Community into the Sabbath," which begins on Friday at sundown. (*Id.*) Plaintiff plausibly alleges that his inability to hold Friday Sabbath services substantially burdens his free exercise of religion.

### iv. Turban

Plaintiff has plausibly alleged that defendants substantially burden his right to free exercise by denying him the right to wear his religious turban. *See Singh v. Goord,* 520 F.Supp.2d 487, 502–03 (S.D.N.Y.2007) (holding that defendants substantially burdened plaintiff's religious exercise where plaintiff was prohibited from wearing the type of turban required by his religion); *Morgan v. City of New York.,* 12–cv–704 (WFK), 2014 WL 3407714, at *8 (E.D.N.Y. July 10, 2014) ("Plaintiff has shown that the removal of his turban substantially burdens his sincerely held religious beliefs.") Plaintiff has explained the significance of wearing a turban in the Rastafari religion, testifying that the "Nya[h]binghi Rastaman's head must be covered" and that wearing a turban represents "the complete discipline of the Rastaman in terms of a priestly life." [10] (July Tr., p. 37–39.) Plaintiff alleges that the only headgear Rastafari males are permitted to wear at Woodbourne is the Tsalot Kob, which is a type of headgear restricted to members of the Ba Beta Kristiyan Church and does not align with plaintiff's sincerely held religious beliefs. (*Id.* at 38–42; Am. Compl., ¶ ¶ 20–21.) Plaintiff does not provide a full explanation of the how the Rastafari sect that plaintiff adheres to, the Nyahbinghi "mansion," is distinct from the Ba Beta Kristiyan Church, nor does he elaborate on why wearing a Tsalot Kob does not comport with his religious beliefs. Nevertheless, given the special solicitude afforded to *pro se* plaintiffs, the Court concludes that plaintiff has adequately pled that defendants' prohibition on the wearing of his religious turban substantially burdens his sincerely held religious beliefs. The issue may look different at the summary judgment stage.

### v. Fundraising Proceeds

**\*10** Plaintiff challenges defendants' policy of collecting half of the Rastafari inmate organization's fundraising proceeds; however, he fails to adequately explain how this practice constitutes a substantial burden on his religious beliefs. Plaintiff explains that the collection of half of the organization's funds "creates a burden on [the Rastafari group's] ability to purchase necessary materials for congregate services, religious classes, and religious holy day celebrations." (Am.Compl., ¶ 24.) While forbidding or confiscating religious materials may in some instances support a free exercise claim, *see Breland v. Goord,* 94–cv–3696 (HB), 1997 WL 139533, at *5–6 (S.D.N.Y. Mar. 27, 1997) (holding a claim regarding the confiscation of a prisoner's religious literature survives summary judgment), plaintiff does not assert that defendants have prohibited him from obtaining religious materials. Nowhere does plaintiff claim he is restricted from either buying the religious materials he desires with the funds the Rastafari group retains or obtaining the materials from another source. Plaintiff does not show how the deprivation of half of the funds constitutes a substantial burden on his religious beliefs. As plaintiff has failed to

2015 WL 769551

plausibly allege a substantial burden, his free exercise claim challenging defendants' collection of half of the funds raised by the Rastafari organization is dismissed.

### vi. Rastafarian advisers
Plaintiff alleges that defendants violated his rights when they denied his request to gain access to spiritual and religious advisers (Am.Compl., ¶ 19.) Plaintiff fails, however, to plausibly allege that defendants' actions substantially burden his free exercise of religion. He makes no showing regarding how contact with advisers is "central or important" to the practice of his faith. Thus, his free exercise claim based on lack of access to advisers is dismissed.

### vi. Reporting of Marijuana Use
Plaintiff claims that defendant Davis, a drug counselor at Woodbourne, falsely reported that plaintiff admitted to using marijuana for religious rituals to justify recommending him to a drug treatment program. (Am.Compl., ¶ 28.) He claims that defendant's false reporting was a result of "unconstitutional stereotyping of plaintiff based on his religious beliefs" and the ritual use of marijuana within the Rastafari faith. (*Id.*) Plaintiff, however, fails to explain how defendant's purported stereotyping burdened his free exercise of religion, nor does he show how being recommended for a drug treatment program has any effect on his religious practice. Thus, plaintiff does not state a claim under the Free Exercise Clause as to the alleged false reporting of marijuana use.

### B. Penological Interest
With regard to the claims for which plaintiff has plausibly alleged a substantial burden, defendants contend that they have proffered a legitimate penological interest which justifies not allowing the practice in question. (Def.MTD, p. 6.) Defendants cite "safety and security" concerns for their prohibition of plaintiff's turban and identify "spatial restrictions" as the reason for requiring Rastafari Sabbath services to be held on Wednesdays rather than Fridays. (*Id.* at 11, 13–14.) Defendants do not to offer a justification for their policy regarding plaintiff's religious calendar claims. (*Id.* at 8–9.)

**\*11** Determining whether a challenged policy is reasonably related to a legitimate penological interest

is a fact-laden inquiry that is generally ill-suited for resolution on a motion to dismiss. *See Ford,* 352 F.3d at 596 (refusing to determine whether defendants' conduct was reasonably related to legitimate penological interests because "the record [was] insufficient to resolve this fact—and context—specific dispute"). On this motion to dismiss, the Court cannot assess whether there is a "valid, rational connection" between defendants' actions and their purported concerns. *See Turner,* 482 U.S. at 89. Defendants state in a conclusory manner that the ban on plaintiff's religious turban is due to safety and security concerns, but fail to explain how plaintiff's turban presents a security problem or why concerns exist with respect to plaintiff's turban but not with the other types of permitted headgear. (*See* Def. MTD, pp. 13–14.) Next, while defendants explain that there is a lack of available space for Rastafarians to conduct congregate worship on Fridays (*Id.* at 11), the Court is unable to assess, based on the limited record, the impact accommodation would have on the guards, other inmates, and prison resources and whether there is an "absence of ready alternatives." *See Turner,* 482 U.S. at 90. The Court will not, at this stage, dismiss any of plaintiff's claims based on defendants' stated penological interests. The Court acknowledges that the case may look very different at the summary judgment stage.

To recap, the following free exercise claims survive defendant's motion to dismiss: (1) the denial of plaintiff's ability to observe all four of the Rastafari holy days at issue by his motion to (a) refraining from working or attending programs, (b) attending a congregate worship service, and (c) sharing a holy day meal with other Rastafari inmates; (2) the denial of Friday Sabbath services; and (3) the prohibition on plaintiff's religious turban.

### III. The Establishment Clause and the Equal Protection Clause
While plaintiff asserts violations of the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause, the parties only briefed the claims under the Free Exercise Clause. Where plaintiff has plausibly alleged a free exercise violation, the Court need not decide at this time whether plaintiff also states a claim under the Establishment Clause or the Equal Protection Clause. Because these claims have survived, the Court can make this determination at a later stage after the parties have briefed the issues. However, where plaintiff fails to

state a claim under the Free Exercise Clause, the Court will determine whether the claim can nevertheless survive under the Establishment Clause or the Equal Protection Clause.

Plaintiff fails to plead any facts to support a claim under the Establishment Clause with respect to: (1) the designation of April 21 and August 17 as "family events;" (2) the denial of spiritual and religious advisers; and (3) the false reporting regarding plaintiff's marijuana use. Plaintiff fails to plead any facts to support an Equal Protection Clause claim as to: (1) the designation of "family events;" (2) the policy of collecting half of the Rastafari inmate organization's fundraising proceeds; and (3) the mandatory nature of holy day menus. As such, the claim regarding "family events" is dismissed, *see Iqbal, 556 U.S. at 678*, and the Court will analyze plaintiff's holy day menu and fundraising claims under the Establishment Clause and his religious adviser and false reporting claims under the Equal Protection Clause. For reasons to be explained, the Court dismisses each of these four claims.

1. The Establishment Clause

**\*12** The First Amendment of the Constitution provides that "Congress shall make no law respecting an establishment of religion." *U.S. Const. amend. I.* In deciding an Establishment Clause claim, courts in this Circuit continue to apply the three-prong test articulated by the Supreme Court in *Lemon v. Kurtzman, 403 U.S. 602 (1971)*. *See Bronx Household of Faith v. Bd. of Educ. of City of New York, 650 F.3d 30, 40 n. 9 (2d Cir.2011)* ("Although the Lemon test has been much criticized, the Supreme Court has declined to disavow it and it continues to govern the analysis of Establishment Clause claims in this Circuit."); *see also Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338, 355 (2d Cir.2007); Kiryas Joel Alliance v. Vill. of Kiryas Joel, 495 F. App'x 183, 190 (2d Cir.2012)*. Under *Lemon,* "government action which interacts with religion (1) must have a secular purpose, (2) must have a principal or primary effect that neither advances nor inhibits religion, and (3) must not foster an excessive government entanglement with religion." *Bronx Household of Faith, 650 F.3d at 40* (alterations and internal quotation marks omitted) (citing *Lemon, 403 U.S. at 612–13*). "Because plaintiff is a prisoner challenging a Department of Corrections directive, the *Lemon* test is tempered by the test laid out by the Supreme Court in *Turner* ... which found that a prison regulation that impinges on an inmate's constitutional rights is

nevertheless valid if it is reasonably related to legitimate penological interests." *Pugh v. Goord, 571 F.Supp.2d 477, 494 (S.D.N.Y.2008)* (quoting *Salahuddin v. Perez,* 99–cv–10431 (LTS), *2006 WL 266574, at \*9 (S.D.N.Y. Feb. 2, 2006)* (internal quotation marks omitted)).

First, plaintiff claims that by denying him the ability to supplement holy day meals with additional food items, defendants have given the "New York State Department of Nutritional Services unfettered authority to dictate the dietary laws of the Rastafarian community for holy day celebrations." (Am.Compl., ¶ 27.) He concludes that DOCCS's "Nutritional Services is in effect acting as an ecclesiastical body for the Rastafarian community." (*Id.*) Defendants counter that "a perfect accommodation of each inmate's preferential meal choices" would be "prohibitively expensive." (Def.MTD, p. 13.)

Plaintiff fails to state a claim under the Establishment Clause pursuant to the *Lemon* analysis. *See* 403 U.S at 612–13. First, the prison's policy has the permissible purpose of attempting to reasonably accommodate the inmates' religious dietary practices without subjecting the prison "to prohibitively expensive accommodations of religious dietary meal requests." (*Id.*) *See Benjamin v. Coughlin, 905 F.2d 571, 579 (2d Cir.1990)* (asserting that prisoners have a right to receive diets consistent with their religious beliefs but that this right may be limited where accommodation is prohibitively expensive or administratively unfeasible). Second, plaintiff has failed to allege that DOCCS's policy regarding holy day menus has the primary effect of either advancing or inhibiting religion. Plaintiff does not claim that the holy day meals are inconsistent with his religious beliefs. Finally, DOCCS's policy does not foster excessive entanglement of government with religion. "In order to permit inmates to freely exercise their religion, *some* entanglement is necessary." *Muhammad v. City of New York Dep't of Corr., 904 F.Supp. 161, 198 (S.D.N.Y.1995)* (emphasis in original) ("[I]n the prison context, the [E]stablishment [C]lause has been interpreted in the light of the affirmative demands of the [F]ree [E]xercise [C]lause." (internal quotation marks omitted)). DOCCS developed a menu for holy day celebrations in order to accommodate inmates' free exercise right to receive a diet consistent with their religious beliefs. This does not constitute excessive government entanglement with religion. As such, plaintiff's claim regarding the holy day menus is dismissed.

**\*13** Next, plaintiff asserts that "the policy of requiring the Rastafarians to surrender 50% of their fundrais[ing proceeds] had the effect of a tax on religion." (Am.Compl., ¶ 24.) This allegation fails to plausibly allege a violation under the Establishment Clause. First, as plaintiff acknowledges, the policy has the secular purpose of providing funds to the Inmate Occupational Therapy Fund ("IOTF"), which is "for the benefit of the general population's use." (*Id.* ¶ 23.) The policy does not have the primary effect of advancing or inhibiting religion. The fundraising requirement is applied equally to religious and non-religious groups, and plaintiff does not adequately allege how the policy inhibits or burdens his religion. (*Id.*) Finally, the policy does not foster excessive government entanglement with religion. Thus, plaintiff's claim as to defendants' policy regarding fundraising proceeds is dismissed.

### 2. The Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). To state a claim for an equal protection violation, a plaintiff must plausibly allege "that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005). Courts in the Second Circuit have emphasized that "it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently ." *Gagliardi v. Vill. of Pawling,* 18 F.3d 188, 193 (2d Cir.1994); *see also Bishop v. Best Buy, Co. Inc.,* 08–cv–8427 (LBS), 2010 WL 4159566, at *11 (S.D.N.Y. Oct. 13, 2010) ("Well-pled facts showing that the plaintiff has been treated differently from others similarly situated, remains an essential component of [an equal protection] claim." (internal quotation marks omitted)). "While the *Turner* ... standard was established in the context of first amendment issues, it is also relevant to the assessment of equal protection claims in the prison setting." *Benjamin v. Coughlin,* 905 F.2d 571, 575 (2d Cir.1990). Thus, "the reasonableness of the prison rules and policies must be examined to determine whether distinctions made between religious groups in prison are reasonably related to legitimate penological interests." (*Id.*)

Plaintiff's claim regarding defendant Davis's alleged false report fails to state a claim under the Equal Protection Clause because plaintiff fails to allege that he was treated differently than others. In *Bishop,* plaintiff's equal protection claim, alleging that he was discriminated against on the basis of his race, was dismissed because the plaintiff "failed 'to allege or identify a single similarly situated [individual] who was treated differently .' " 2010 WL 4159566, at *12 (quoting *Sweeney v. City of New York,* 03–cv–4410 (JSR)(RLE), 2004 WL 744198, at *5 (S.D.N.Y. Apr. 2, 2004) *subsequently aff'd,* 186 F. App'x 84 (2d Cir.2006)); *see also King v. New York State Div. of Parole,* 260 Fed. App'x. 375, 379–80 (2d Cir.2008) (affirming dismissal of equal protection claim where petitioner "failed to identify a single individual with whom he can be compared for Equal Protection purposes"). Here, plaintiff makes no claim regarding how others were treated during their interviews for the drug treatment program. Thus, plaintiff's equal protection claim regarding religious stereotyping with regard to the alleged false report of his marijuana use is dismissed. As this is the only claim that implicates defendant Davis, she is dismissed from this case.

**\*14** Next, plaintiff alleges that being denied spiritual advisers for security reasons violates his equal protection rights because "[o]ther religious groups are allowed to have religious and spiritual advisors without breaching security concerns." (Am.Compl., ¶ 19.) This allegation is conclusory and fails to identify any specific religious group that is being treated differently. *See Bishop,* 2010 WL 4159566, at *11 ("Conclusory allegations of selective treatment are insufficient to state an equal protection claim."). Plaintiff's equal protection claim regarding spiritual advisers is dismissed.

### IV. Injunctive Relief

Defendants seek to dismiss plaintiff's claims for injunctive relief for lack of merit and mootness. (Def.MTD, pp. 17–20.) Defendants have not established that all of plaintiff's holy day claims are moot. Injunctive relief, however, may not be premised upon claims that this Court has dismissed.

Plaintiff asserts six claims for injunctive relief. (Am.Compl., ¶ B) First, plaintiff seeks to enjoin defendants from "continuing to deny plaintiff and other Rastafarians their holy days." (*Id.* ¶ B(1).) Second, plaintiff seeks injunctive relief to allow him to wear his turban. (*Id.* ¶ B(2).) Third, plaintiff seeks to enjoin

defendants from enforcing the policy which mandates that the Rastafarian inmate organization surrender half of the funds it raises to the IOTF. (*Id.* ¶ B(3).) Fourth, plaintiff seeks an injunction enjoining defendants from retaliating against him. (*Id.* ¶ B(4).) Fifth, plaintiff seeks to direct defendant Davis to expunge the "stereotyped information from plaintiff's institutional records." (*Id.* ¶ B(5).) Sixth, plaintiff seeks to enjoin all defendants from "continuing to deny him his right to freely practice his faith." (*Id.* ¶ B(6).)

Defendants assert that none of plaintiff's claims for injunctive relief can be sustained as a matter of law. (Def.MTD, p. 17.) "To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach v. Morse,* 440 F.3d 53, 56 (2d Cir.2006) (internal quotation marks omitted). Defendants reason that because "Plaintiff is unable to succeed on the merits of his claims" permanent injunctive relief is not warranted. (Def.MTD, p. 18.) At the pleading stage, defendants are correct only with respect to some of plaintiff's claims. The Court has found that plaintiff has plausibly alleged a constitutional violation with respect to his claims regarding the observance of Rastafari holy days and the wearing of his turban. Accordingly, plaintiff's claims for injunctive relief regarding these rights may not properly be dismissed. However, the Court has determined that plaintiff's claims regarding the purported false report of plaintiff's marijuana use and defendants' policy of collecting half of the Rastafari inmate organization's fundraising proceeds do not state a claim. Thus, plaintiff's claims to (1) expunge references to marijuana use from his institutional records and (2) enjoin defendants from requiring the Rastafarian organization to surrender half of their funds, are dismissed because the underlying claims upon which they are premised are dismissed.

**\*15** Plaintiff's claim that seeks to prevent future retaliation is also dismissed, as plaintiff fails to plead any facts whatsoever to show that defendants have or would retaliate against plaintiff. *See Iqbal,* 556 U.S. at 678 ("[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)); *see also Reiter v. Metro. Transp. Auth. of N.Y.,* 01–cv–2762 (JGK), 2003 WL 22271223, at \*15 (S.D.N.Y. Sept. 30, 2003) (denying plaintiff's request for a permanent injunction to prevent

retaliation because there was no showing that plaintiff would be retaliated against in the future.)

Next, defendants argue that injunctive relief is not appropriate concerning the religious calendar because "it is quite possible that this litigation could continue after Plaintiff's particular sect of Rastafarianism ceases to have followers that are inmates under DOCCS' supervision or custody" and "[a]s such, Plaintiff's request for injunctive relief would be moot." (Def.MTD, p. 19.) This argument lacks merit, as plaintiff brings his claims individually and he is currently an inmate at Woodbourne. "In order for a federal court to retain jurisdiction over a case, an actual controversy must exist at all stages of review, not merely at the time the complaint is filed." *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (internal quotation marks omitted). At this time, an actual controversy regarding the religious calendar exists as to the claims that defendants have not voluntarily accommodated. As such, not all of plaintiff's religious calendar claims are moot.

V. Personal Involvement

Defendants contend that plaintiff has failed to allege the personal involvement of defendants Fischer, Jacobson, and Leonard, and as such, they should be dismissed from this suit. (Def.MTD, pp. 15–17.) The Court holds that plaintiff has plausibly alleged the personal involvement of the three defendants at issue.

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). Individual liability under section 1983 may not be anchored in a theory of *respondeat superior. Hemmings v. Gorczyk,* 134 F.3d 104, 109 n. 4 (2d Cir.1998) (per curiam). "The bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995). Further, "[c]onclusory accusations regarding a defendant's personal involvement in the alleged violation, standing alone, are not sufficient." *Kee v. Hasty,* 01–cv–2123 (KMW)(DF), 2004 WL 807071, at \*12 (S.D.N.Y. Apr. 14, 2004).

In *Colon,* the Second Circuit held that the personal involvement of a supervisory defendant can be shown by evidence that:

**\*16**  (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873. The continuing vitality of the supervisory liability test established in *Colon* has come into question after the Supreme Court's 2009 decision in *Iqbal. See Reynolds v. Barrett,* 685 F.3d 193, 205 n. 14 (2d Cir.2012). There, the Supreme Court noted that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676.

The Second Circuit has not yet definitively addressed how *Iqbal* affects the *Colon* factors, nor have the district courts within this Circuit reached a clear consensus. *See Aguilar v. Immigration & Customs Enforcement Div.,* 811 F.Supp.2d 803, 814 (S.D.N.Y.2011). Despite the lack of agreement regarding the *Colon* factors, courts agree that the third factor, that defendant created a policy or custom under which unconstitutional practices occurred, has survived *Iqbal. Compare Bellamy v. Mount Vernon Hosp.,* 07–cv–1801 (SAS), 2009 WL 1835939, at \*6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third *Colon* categories pass *Iqbal's* muster-a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."), *aff'd sub nom. Bellamy v. Mount Vernon*

*Hosp.,* 387 F. App'x 55 (2d Cir.2010), *with Hodge v. Sidorowicz,* 10–cv–428 (PAC)(MHD), 2011 WL 6778524, at \*16 (S.D.N.Y. Dec. 20, 2011) ("[W]here the claim does not require a showing of discriminatory intent, the personal-involvement analysis set forth in *Colon* should still apply."), *report and recommendation adopted sub nom. Hodge v. Wladyslaw,* 10–cv–428 (PAC)(MHD), 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012). It is under this factor that plaintiff claims defendants Fischer, Jacobson, and Leonard were personally involved.

Plaintiff alleges that Brian Fischer, as the Commissioner of DOCCS, "has the statutory authority to promulgate rules, regulations, and policies governing the religious rights of prisoners within the department." (Am.Compl., ¶ 4.) Similarly he alleges that Catherine Jacobsen as Acting Deputy Commissioner for Program Services "had the authority to approve policies governing the religious programs in [DOCCS]," (*Id.* ¶ 5), and that Mark Leonard, as the Director of Ministerial, Family, and Volunteer Services "was responsible for the promulgation of policies affecting the religious rights of all Rastafarian prisoners within [DOCCS]." (*Id.* ¶ 8.) Plaintiff attributes DOCCS's policies on holy days and headgear to Fischer, Jacobsen, and Leonard, along with other defendants. (*Id.* ¶ A(1).) A defendant that creates a policy is considered personally involved in any unconstitutional practices that occur under the policy. *See Colon,* 58 F.3d at 873. In *Pugh v. Goord,* 571 F.Supp.2d 477, 485–86 (S.D.N.Y.2008), the plaintiff argued that certain defendants, by creating and continuing policies regarding the accommodation of Shi'ite Muslims, were personally involved in the deprivation of his right as a Shi'ite inmate to have a separate prayer service from the Sunni Muslims. The court agreed with the plaintiff and found that because plaintiff showed that defendants made "certain contributions to formulation of policy," he had adequately established personal involvement with regard to these defendants. *Id.* at 513 (internal quotation marks omitted). Similarly, plaintiff has plausibly alleged that defendants Fischer, Jacobson, and Leonard were involved in creating policies under which his right to free exercise was substantially burdened. Thus, these defendants are not properly dismissed from this suit at this juncture.

**\*17**  Plaintiff also alleges that defendant Fischer is personally involved in the alleged constitutional violations because he has written letters to defendant Fischer "complaining about the unconstitutional impediments to

plaintiff's ability to practice his faith," but Fischer has always referred plaintiff's complaints to subordinates. (Am.Compl., ¶ 25.) Defendants are correct in stating that this allegation cannot demonstrate the requisite personal involvement of Fischer. (*See* Def. MTD, p. 16.) "If the supervisor fails to respond to [a prisoner's] letter or passes the letter on to a subordinate to handle, the general rule is that the supervisor is not personally involved." *Lloyd,* 2014 WL 4229316, at *9; *see also Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (holding that the inmate failed to produce sufficient evidence to establish personal involvement of the prison commissioner, where the commissioner referred plaintiff's appeal letter to a subordinate); *Smart v. Goord,* 441 F.Supp.2d 631, 643 (S.D.N.Y.2006) *on reconsideration in part,* 04–cv–8850 (RWS), 2008 WL 591230 (S.D.N.Y. Mar. 3, 2008) (stating that defendant "cannot be held liable on the sole basis that he did not act in response to letters of protest" sent by inmate). Nevertheless, because plaintiff has plausibly alleged Fischer's personal involvement in creating policies under which unconstitutional practices have occurred, Fischer is not dismissed from this suit.

## VI. Qualified Immunity

Defendants argue that qualified immunity shields them from money damages. (Def.MTD, pp. 20–25.) On this motion to dismiss, the Court cannot conclude that defendants are entitled to qualified immunity as a matter of law. The case may look very different at the summary judgment phase.

Qualified immunity protects public officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). A government official is entitled to qualified immunity "if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001); *see also Luna v. Pico,* 356 F.3d 481, 490 (2d Cir.2004). In deciding whether defendants are entitled to qualified immunity, courts must look "to both the clarity of the law establishing the right allegedly violated as well as whether a reasonable person, acting under the circumstances the[n] confronting a defendant, would have understood that his actions were

unlawful." *Ford v. McGinnis,* 352 F.3d 582, 59697 (2d Cir.2003) (quoting *Hanrahan v. Doling,* 331 F.3d 93, 98 (2d Cir.2003) (per curiam)) (internal quotation marks omitted). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." *Coollick v. Hughes,* 699 F.3d 211, 220 (2d Cir.2012) (alterations and citation omitted). While a defendant may assert a qualified immunity defense on a motion to dismiss, "the defense faces a formidable hurdle when advanced on such a motion." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004).

**\*18** Defendants have failed to show that restricting plaintiff from celebrating certain holy days in a manner consistent with his religious beliefs, requiring Friday Sabbath services to be held on Wednesdays, and prohibiting him from wearing a religious turban do not violate clearly established law. An inmate has a "clearly established right to be free of unjustified burdens upon free exercise rights." *Salahuddin v. Dalsheim,* 94–cv–8730 (RWS), 1996 WL 384898, at *12 (S.D.N.Y. July 9, 1996) (citations omitted); *see also Turner v. Safley,* 482 U.S. 78, 89 (1987). In *Salahuddin v. Goord,* the Second Circuit held that because plaintiff's "free-exercise rights were substantially burdened by a joint-worship policy not justified by a legitimate penological interest," qualified immunity was not appropriate as "it was clearly established at the time of the alleged violation that prison officials may not substantially burden inmates' right to religious exercise without some justification." 467 F.3d 263, 275–76 (2d Cir.2006). Similarly here, because the Court holds that plaintiff has plausibly alleged that defendants substantially burdened his free exercise rights and, at this time, have not established a legitimate penological justification, defendants are not entitled to qualified immunity on the premise that their conduct did not violate clearly established law.

Whether defendants could have reasonably believed that they did not violate an established constitutional right depends, at this stage, "on whether, on the facts alleged in the Complaint, they had a reasonable basis to believe that that [sic] [their actions] served a legitimate penological interest." *Diggs v. Marikah,* 11–cv–6382 (PAE), 2012 WL 934523, at *5 (S.D.N.Y. Mar. 20, 2012) (denying defendants' motion to dismiss on the basis of qualified immunity, where plaintiff's religious beliefs

Case 9:18-cv-00416-DNH-TWD    Document 45    Filed 05/28/19    Page 132 of 146
Rossi v. Fishcer, Not Reported in F.Supp.3d (2015)
2015 WL 769551

were substantially burdened and the factual basis for whether defendants' actions were reasonably related to a legitimate penological interest was not yet developed). At this early stage, there is inadequate information to determine whether defendants were objectively reasonable in their beliefs regarding their proffered penological interests. *See Perez v. Westchester Cnty. Dep't of Corr.,* 05–cv–8120 (RMB), 2007 WL 1288579, at *6 (S.D.N.Y. Apr. 30, 2007). This determination is more appropriate for summary judgment. *See id.* at *6 ("It is generally premature to address the defense of qualified immunity in a motion to dismiss pursuant to Rule 12(b)(6)." (alterations and citations omitted)). Thus, defendants are not entitled to qualified immunity at this stage.

CONCLUSION

For the reasons outlined above, defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff's claims regarding (1) "family events," (2) holy day menus, (3) spiritual advisers, (4) fundraising proceeds, and (5) the reporting of plaintiff's marijuana use are dismissed in their entirety. Because the only claim plaintiff brought against defendant Davis is dismissed, Davis is also dismissed from this suit. Plaintiff's claims regarding (1) the religious calendar, excluding requests for "family events," (2) Friday worship, and (3) plaintiff's turban survive defendants' motion to dismiss.

**\*19** Counsel for defendants shall provide plaintiff with copies of all unreported decisions cited herein. This Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and *in forma pauperis* status is denied. *See Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 769551

**Footnotes**

1    The defendant's last name is spelled "Fishcer" on the docket in this case.

2    The defendant's last name is spelled "McCoy" on the docket and in the parties' briefs.

3    Plaintiff's Amended Complaint requests that the holy days at issue be added to the calendar with the designations of "Off Work Program (OWP), Meal Consideration (MC), and Special Consideration (SC)." (Am.Compl., ¶ 16.) In the hearings before Magistrate Judge Debra Freeman, plaintiff clarified that these designations would allow him to (1) refrain from working or attending programs, (b) attend a congregate worship service, and (c) eat a holy day meal with the Rastafarian inmate community. (July Tr., pp. 82–83.)

4    While the plaintiff in his Amended Complaint only requests that August 17 be designated as a "family event," he makes clear in the hearings before Magistrate Judge Freeman that he is asking for this designation to be added to both April 21 and August 17. (July Tr., p. 82.)

5    In the October 2014 declaration of Colonel Dennis W. Bradford, the DOCCS Director of Correction Emergency Response Team Operations, DOCCS consented to alter its policy regarding religious headgear. (Bradford Declaration (Dkt.98).) Colonel Bradford declared that plaintiff would be allowed to wear a turban that conforms to his religious beliefs as long as it complies with mandated color restrictions. (*Id.* ("[A]s long as plaintiff's turban is of an appropriate color DOCCS will accommodate his request to wear it within Woodbourne Correctional Facility.")) Thus, plaintiff's claim regarding the right to wear his turban may be moot. The Court will decide this question at a later stage after the parties have briefed the issue.

6    The Second Circuit had concluded that "special circumstances" may exist where the plaintiff reasonably misinterprets the prison's grievance regulations. *Hemphill,* 380 F.3d at 690. However, in *Woodford,* the Supreme Court held that untimely or otherwise procedurally defective grievances do not satisfy the PLRA's exhaustion requirement. 548 U.S. at 93. The Second Circuit has not yet determined whether the special circumstances exception to the exhaustion requirement survives *Woodford. See Chavis v. Goord,* 333 F. App'x 641, 643 (2d Cir.2009). The Court need not reach this issue in this case.

7    This case is distinguishable from cases where the CORC never renders a decision on the plaintiff's appeal. Under those circumstances, district courts in this Circuit have tended to hold that a motion to dismiss or for summary judgment for failure to exhaust should be granted without prejudice, allowing the plaintiff to refile his complaint once the CORC responds. *See Fuentes v. Furco,* 13–cv–6846 (AJN), 2014 WL 4792110, at *3 (S.D.N.Y. Sept. 25, 2014) (collecting cases). This approach "balance [s] the PLRA's goal of allowing institutions the first opportunity to address an inmate's grievances

2015 WL 769551

against the inmate's right to a federal forum when he has complied with all of the procedural formalities expected of him." *Id.* This logic, however, does not extend to the case at bar because the CORC has denied plaintiff's appeal, and thus has already been given the first opportunity to consider the grievance. *See Peoples,* 2012 WL 1575302, at *9.

8    The Second Circuit has noted that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord,* 758 F.3d 215, 220 (2d Cir.2014) (internal quotation marks omitted). However, the Second Circuit and judges in this district have continued to require such a threshold showing, particularly in cases where the parties have not argued otherwise. *See Ford,* 352 F.3d at 592 (applying the substantial burden test where the parties did not brief the issue and the plaintiff did not argue otherwise); *see also Salahuddin,* 467 F.3d at 275 n. 5 (declining to decide whether the substantial burden test applied where resolution of the issue was unnecessary for purposes of the appeal); *Woodward v. Perez,* 12–cv–8671 (ER), 2014 WL 4276416, at *3 (S.D.N.Y. Aug. 29, 2014) (applying the substantial burden test because plaintiff satisfied this threshold step). Here, the Court will apply the substantial burden test as neither party has argued against employing this standard.

9    In the Amended Complaint plaintiff identifies, but does not allege the significance of, certain holy days that defendants have denied him the right to celebrate. In the conferences and hearings before Magistrate Judge Freeman, plaintiff explained the religious significance of each holy day at issue and described how the days must be observed according to his faith. The Court deems these statements to be incorporated into plaintiff's pleadings. Considering these statements on the present motion to dismiss comports with the special solicitude afforded *pro se* litigants.

10    In the Amended Complaint plaintiff alleges that the denial of his religious turban violates his First Amendment rights, but he fails to allege the significance of the turban to his religious beliefs. In the hearings before Magistrate Judge Freeman, plaintiff explained the religious significance of wearing his turban. The Court deems these statements to be incorporated into plaintiff's pleadings.

---

End of Document                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2198759
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Elijah SANFORD, Plaintiff,

v.

Leslie BRUNO, Bklyn House Dir S.
Grandison, Investigator D. Allen, CDC
Hearing Officer Daniel Garcia, and DHO
Officer Patrick McFarland, Defendants.

17-cv-5132 (BMC)
|
Signed 05/11/2018
|
Filed 05/14/2018

**Attorneys and Law Firms**

Elijah Sanford, Hempstead, NY, pro se.

Kirsten McCaw Grossman, Kegan Andeskie, Nukk-Freeman & Cerra, P.C., Chatham, NJ, James R. Cho, United States Attorneys Office, Eastern New York, Brooklyn, NY, for Defendants.

## MEMORANDUM DECISION AND ORDER

Brian M. Cogan, U.S.D.J.

**\*1** This is a *pro se* action by a former federal prisoner who claims that he was wrongfully held in a custodial facility instead of a halfway house for 161 days. There is no cognizable federal claim; accordingly, defendants' Rule 12 motions are granted.

## SUMMARY OF COMPLAINT

In March 2007, plaintiff was convicted of violating 18 U.S.C. § 1951(a) and sentenced to 148 months in federal custody. On September 28, 2016, as the end of his term approached, the Bureau of Prisons reassigned him to a halfway house in Brooklyn known as Brooklyn House. Brooklyn House is owned and operated by a private contractor known as CORE Services Group, Inc. Defendant Leslie Bruno is the Director of Brooklyn House; defendant Steven Grandison is an investigator employed by CORE at Brooklyn House.

On either March 24 or March 29, 2017, plaintiff obtained a pass allowing him to visit his family home, with a date to return to Brooklyn House no later than April 6, 2017 at 1:30 p.m. But on April 5, the Nassau County Police Department arrested plaintiff for criminal trespass (apparently arising out of a domestic dispute involving plaintiff's daughter) and he was taken to a police precinct. Plaintiff maintains that his arrest was "deemed unlawful in a disposition."

At plaintiff's request, the police notified Brooklyn House of his arrest. When Bruno learned of the arrest, she contacted defendant Patrick McFarland, a Residential Reentry Manager for the Bureau of Prisons, and he obtained a federal detainer against plaintiff. Pursuant to the detainer, plaintiff was delivered from state to federal custody, and transported to the Metropolitan Detention Center ("MDC"). Thus, as a result of his trespassing arrest, plaintiff was unable to check back in to the Brooklyn House on April 6. The complaint is not clear if he was in state or federal custody on April 6, but in either case, he could not return to Brooklyn House.

Defendant Grandison, in his capacity as a CORE investigator, visited plaintiff at the MDC on April 12. He took plaintiff's statement, and delivered to him an already-completed incident report, charging plaintiff with "escape—technical." The incident report, which Bruno had prepared, misstated the mandated reporting date for plaintiff's return to Brooklyn House as April 5 instead of April 6.

On April 18, 2017, the Center Discipline Committee, chaired by defendant David Allen, held a hearing. It emerged at the hearing that the incident report misstated plaintiff's return reporting date (April 5 instead of April 6). The Committee did not render a decision. Instead, on May 2, Grandison and Allen visited plaintiff at the MDC and presented him with an amended incident report. The amended report corrected plaintiff's reporting date from April 5 to April 6, and gave more specifics about the terms of his release pass. After plaintiff received the amended incident report, the Committee held another hearing on June 6, 2017.

2018 WL 2198759

On June 8, 2017, the Committee, in a report reviewed and certified by defendant Daniel Garcia, a Disciplinary Hearing Officer, sustained the charge of "Escape (Technical)" as a result of plaintiff's failure to report back to Brooklyn House. The Committee's report essentially found that plaintiff knew that the Brooklyn House rules required him to timely return from his pass; that he had failed to do so; and that he was therefore in an "escape" status. The findings did not note that plaintiff had asked the police to notify Brooklyn House of his arrest; that plaintiff contended the arrest was illegal; or that plaintiff had failed to return not just because of his arrest, but because of the federal detainer of which McFarland had notified the police. The Committee recommended a sanction of "transfer[ ] to a more secure facility."

**\*2** Plaintiff appealed the recommendation of the Committee. His primary assertion, among a number of others, was that he had spoken to defendant Allen after the first hearing, and that he (Allen) told plaintiff that he had wanted to dismiss the charge after the first hearing and that someone had already decided to sustain the charge without his input. In other words, plaintiff alleged that his guilt had been predetermined at both hearings and, indeed, Bruno or other defendants had already drafted the Committee's report to sustain the charge before the hearings occurred.

On August 4, 2017, a BOP Regional Director sustained plaintiff's appeal and rejected the recommendation of the Committee on the ground that "a thorough review of the record reveals questions concerning the disciplinary process. Based on this review, it was determined this action and the sanctions imposed will be expunged from your disciplinary record." [1]

Notwithstanding this ruling, plaintiff was not returned to Brooklyn House or any other halfway house. He remained at the MDC.

Plaintiff, as petitioner, then commenced a proceeding for *habeas corpus* relief under 28 U.S.C. § 2241 before this Court on August 21, 2017. He failed to pay the required filing fee or complete the *in forma pauperis* application even after notice, and this Court therefore dismissed the *habeas corpus* proceeding on September 26, 2017. Sanford v. Quay, No. 17-cv-5029 (E.D.N.Y. Sept. 25, 2017).

It may be that plaintiff did not pursue *habeas corpus* relief because four days after he commenced that proceeding, on August 25, 2017, he commenced the instant case seeking damages. In addition, the public record reflects that he was released from custody on September 29, 2017, [2] which may have mooted his § 2241 proceeding had it not already been dismissed three days earlier.

In total, plaintiff claims that he served at least 161 days in the MDC that should have been served at Brooklyn House or another halfway house, and the damages he seeks are to redress the emotional injury and physical deprivations he suffered while at the MDC instead of the halfway house.

### DISCUSSION

Plaintiff has two theories as to how his rights were violated. The first has a procedural and a substantive component. The procedural component is that numerous constitutional and BOP rules violations attended the hearings, and he was denied procedural due process by the failure to adhere to those rules. As part of this, plaintiff contends that his guilt was predetermined and the hearings were a sham. The substantive component is that he was in fact innocent of the charges because his arrest by the Nassau County Police was illegal, and Allen and Grandison never should have caused McFarland to file a federal detainer against him. It was the detainer, plaintiff contends, that caused his failure to timely return to Brooklyn House.

Plaintiff's second theory is that his rights were violated by not returning him to a halfway house instead of keeping him at the MDC, at least once his appeal was sustained, and perhaps from the day of his transfer to the MDC.

The federal defendants (Garcia and McFarland) and the CORE defendants (Allen and Grandison) have separately moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) and 12(c), respectively. [3] The standard of review under both subparts of Rule 12 is the same. See Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010). In considering a motion to dismiss pursuant to Rule 12(b)(6) or 12(c), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. See Rothstein v. UBS AG, 708 F.3d 82, 90 (2d Cir. 2013). "[T]he tenet that a court must accept as true all of

the allegations contained in a complaint is inapplicable to legal conclusions," however, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

**\*3**  "[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976) ). A court must read a *pro se* party's pleadings liberally, interpreting them to raise the strongest arguments they suggest. Keeling v. Hars, 809 F.3d 43, 47 n.2 (2d Cir. 2015). If a liberal reading of the complaint "gives any indication that a valid claim might be stated," the court must grant leave to amend the complaint. See Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999) ).

### I. Federal Defendants

The most reasonable reading of plaintiff's claim against the federal defendants is they violated his right to due process of law when they failed to return him to the halfway house once he prevailed on appeal. Even if I assume for the sake of argument that plaintiff is correct, the question remains whether the law provides a remedy for this violation of his rights. For a plaintiff to enforce his constitutional rights he must have a cause of action— that is, there must be a statute passed by Congress or a judicially implied claim for relief. Here, plaintiff cannot point to any statute that would allow him to prosecute this action. The only question is whether there is a judicially implied claim for relief.

In Bivens v. Six Unknown Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." McGowan v. United States, 825 F.3d 118, 123 (2d Cir. 2016) (quoting Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66 (2001) ). The Bivens Court implied a private right of action under the Fourth Amendment for an unreasonable search and seizure claim against FBI agents for handcuffing a man in his own home without a warrant. Bivens, 403 U.S. at 389, 397. Since then, the Supreme Court has recognized Bivens claims in only two other circumstances: (1) under the Fifth Amendment's Due Process Clause for gender discrimination against a Congressman for firing his female

secretary, Davis v. Passman, 442 U.S. 228 (1979), and (2) under the Eighth Amendment's prohibition on cruel and unusual punishment against prison officials for failure to treat an inmate's asthma which led to his death, Carlson v. Green, 446 U.S. 14 (1980).

Although Carlson and Davis were handed down within a decade of Bivens, they mark the beginning of a still-unbroken period of nearly 40 years since the Supreme Court has authorized a Bivens damages action covering the exercise of any other constitutional right. This supports the majority's observation in Malesko that, since Bivens, "we have retreated from our previous willingness to imply a cause of action where Congress has not provided one." 534 U.S. at 67 n.3. It also supports the even stronger observation of two concurring Justices that

> Bivens is a relic of the heady days in which this Court assumed common-law powers to create causes of action—decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition.... [W]e have abandoned that power to invent "implications" in the statutory field. There is even greater reason to abandon it in the constitutional field, since an "implication" imagined in the Constitution can presumably not even be repudiated by Congress.

**\*4**  Malesko, 534 U.S. at 75 (Scalia, J., concurring) (internal citations omitted).

Notwithstanding the Supreme Court's retreat, lower courts have relied on Bivens as a blueprint for implying causes of action. Although acknowledging that the judicial damage remedy in Bivens itself is "extraordinary" and should rarely be applied in "new contexts," Arar v. Ashcroft, 585 F.3d 559, 571 (2d Cir. 2009) (en banc) (quoting Malesko, 534 U.S. at 69), lower courts have recognized implied rights of action premised on constitutional rights other than the three identified by the Supreme Court.

Recently, however, the Supreme Court has re-emphasized that courts should not imply rights and remedies as a matter of course, "no matter how desirable that might be as a policy matter, or how compatible with the statute [or constitutional provision]." Ziglar v. Abbasi, 137 S. Ct. 1843, 1856 (2017) (quoting Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001) ). "Given the notable change in the [Supreme] Court's approach to recognizing implied causes of action ... the Court has made clear that expanding the Bivens remedy is now a 'disfavored' judicial activity." Id. at 1857 (quoting Iqbal, 556 U.S. at 675).

Ziglar also made it clear that the *only* recognized implied rights of action are the narrow situations presented in Bivens, Davis, and Carlson. Practically speaking, this means that, post-Ziglar, even where a Court of Appeals had previously found a Bivens remedy, that court or a district court must reconsider whether one is available.[4] See 137 S. Ct. at 1865 (vacating the Second Circuit's holding in Turkmen v. Hasty, 789 F.3d 218 (2015) (panel decision), and Turkmen v. Hasty, 808 F.3d 197 (2015) (en banc), because the court failed to conduct the appropriate Bivens analysis); see also Vanderklok v. United States, 868 F.3d 189, 199-200 (3d Cir. 2017) (holding that, even though the Third Circuit had previously found a Bivens remedy in a First Amendment retaliation context, that precedent no longer holds in light of Ziglar and the court "must look at the issue anew in this particular context, ... and as it pertains to this particular category of defendants").

Thus, this Court must also look "anew" whether particular facts in this case give rise to a Bivens remedy.[5] In doing so, this Court is guided by additional principles articulated by the Supreme Court. Even though the Supreme Court has recognized causes of action in Bivens under the Fourth Amendment, in Davis under the Fifth Amendment, and in Carlson under the Eighth Amendment, those cases do not guarantee that any cause of action may lie under those amendments. In fact, the Supreme Court has refused to extend Bivens to contexts beyond the specific clauses of the specific amendments for which a cause of action had been implied, or even those classes of defendants facing liability under those same clauses. Compare Davis, 442 U.S. at 243-44 (permitting Bivens action against a Congressman for violation of an employee's Fifth Amendment due process rights) with Schweiker v. Chilicky, 487 U.S. 412, 428-29 (1988) (refusing to permit a Bivens action for

violations of Fifth Amendment due process rights in a social-security context). See also Wilkie v. Robbins, 551 U.S. 537, 541 (2007) (refusing to extend Bivens to invasion of property rights under the Fifth Amendment); Malesko, 534 U.S. at 63 (refusing to extend Bivens to alleged Eighth Amendment violations by employees of private prisons).

**\*5** Instead, the recognition of a cause of action is context-specific. The Supreme Court has set out a rigorous two-step inquiry for courts to determine whether to imply a Bivens cause of action in a new context or against a new category of defendants. First, the court must determine whether a plaintiff's claims arise in a new Bivens context. "If the case is different in a meaningful way from previous Bivens cases decided by [the Supreme Court], then the context is new." Id. at 1859. The Supreme Court did not offer an "exhaustive list of differences that are meaningful enough to make a given context a new one," but it did offer examples that "might prove instructive." Id. at 1859-60. The Court held that

> [a] case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider.

Id. at 1860.

If the case presents a new factual context for a Bivens claim, then the court proceeds to the second step and asks, "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." Wilkie, 551 U.S.

at 550. Irrespective of whether an alternative remedy exists, a federal court must also conduct a specific analysis, "paying particular heed ... to any special factors counselling hesitation before authorizing a new kind of federal litigation. Id. (internal quotation marks omitted). This second step is often referred to as the special-factors analysis. "The Court's precedents now make clear that a Bivens remedy will not be available if there are special factors counselling hesitation in the absence of affirmative action by Congress." Ziglar, 137 S. Ct. at 1857 (internal quotation marks omitted).

Although the Supreme Court "has not has not defined the phrase 'special factors counselling hesitation,' " the Court has observed that "[t]he necessary inference, though, is that the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." Id. at 1857-58. Put more simply, "to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." Id. at 1858.

Applying Ziglar's first step here, plaintiff's claim clearly arises in a new context. None of the three Supreme Court cases that have allowed Bivens claims arose in the context of a prisoner's due-process rights. Only one of them, Davis, involved a due-process claim at all, and that was the case-specific circumstance of a Congressman's firing a staffer because of her gender. Carlson may be the closest one contextually—it involved prisoners' rights—but an Eighth Amendment violation resulting in a prisoner's death is a long way from a due-process violation in which a prisoner spends the five months at the end of his custodial term in a prison rather than a halfway house. This case thus has next to nothing in common with the kinds of cases in which the Supreme Court has allowed a Bivens claim.

Under Ziglar's second step—examining alternative remedies and separately examining the "special factors"—the Court cannot recognize a Bivens action on these facts.

*6 There are certainly alternative remedies for plaintiff: at least two of them. Deprivations of constitutional rights while in custody can generally be addressed by habeas corpus relief, 28 U.S.C. § 2241, mandating the alleviation of the unconstitutional condition or the release of the prisoner. In addition, the Prisoners' Litigation Rights Act, 42 U.S.C. § 1997e, requires an administrative

process by which the Bureau of Prisons can itself correct any unconstitutional or, going even further, undesirable conditions of confinement.

Plaintiff is frustrated because he attempted to utilize both of these remedies (at least partially) but could not obtain the relief he sought. Plaintiff may have a valid point that § 2241 may not adequately protect constitutional rights in all circumstances: it only protects against future violations once the writ of habeas corpus is issued and it does not permit damages for past violations. Furthermore, when a prisoner uses § 2241 to remedy unconstitutional conditions of confinement imposed near the end of his custodial term, it may be difficult to obtain timely relief because those actions are often lengthy. Of course, if the unconstitutional condition of confinement, for example, had created a high risk of injury or death, rather than requiring a transfer from a prison to a halfway house, the higher stakes would likely have compelled an expedited disposition.

As to the administrative claim process itself, plaintiff correctly points out that his victory was pyrrhic because despite his continuing protests after he prevailed in the administrative appeal, he was never returned to a halfway house. But that, again, may have been because of the difficulty of the particular relief that plaintiff was seeking. Plaintiff acknowledges that he was told he would be transferred to a halfway house as soon as a bed was available. The authorities then either rescinded that decision or could not find him a bed. [6] In either case, plaintiff did not obtain satisfaction through the administrative process even though he prevailed.

However, just because Congress has not enacted a remedial scheme that would satisfy plaintiff on the facts of his particular case does not mean that the alternative remedial scheme that it did pass is inadequate under Ziglar. Congressional inaction or limited action may be as indicative of its intent as the creation of a remedy that would satisfy a particular plaintiff.

Here, in enacting the Prisoners' Litigation Rights Act, Congress expressly determined to create no new remedy, but merely to preserve such remedies as already exist under federal and state law. See 42 U.S.C. § 1997j. That obviously includes 42 U.S.C. § 2241. The fact that Congress chose not to codify, expand, or restrict Bivens indicates that it sought to address and resolve prisoner

claims through an administrative process, despite the imperfection of that (or, indeed, any) process. As the Supreme Court noted in rejecting a Bivens claim in the First Amendment context:

> The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue. That question obviously cannot be answered simply by noting that existing remedies do not provide complete relief for the plaintiff.

*7 Bush v. Lucas, 462 U.S. 367, 388 (1983). The overlapping administrative and judicial remedies that already exist to address plaintiff's situation here are thus adequate for purposes of determining whether to imply a Bivens remedy—even though those remedies did not work in this instance.

As to special factors, I see no compelling need for this Court to interfere in the BOP's bed assignment decisions. The discussion above assumes for the sake of argument that plaintiff suffered a constitutional violation by not being reassigned to a halfway house instead of a prison, but that is not at all clear. Even at common law, the tort of "wrongful confinement" appears to protect an inmate from unwarranted segregation from the general population—no case applies it to mandate a particular type of facility with less onerous conditions of confinement. Cf. McGowan, 825 F.3d at 126 (citing New York court cases). That is all the more reason to doubt that there is a constitutional dimension to such a claim.

I therefore hold that there is no Bivens claim against these federal defendants.

**II. CORE defendants**

In Malesko, the Supreme Court declined to extend Bivens liability to private prison companies that rendered services under a federal contract. 534 U.S. at 74. In Minneci v. Pollard, 565 U.S. 118, 131 (2012), the Court declined to recognize a Bivens action for 8th Amendment violations against the employees of a private prison contractor where state law provided a remedy for the alleged conduct. Minneci's holding was notable because a claim for cruel and unusual punishment under the 8th Amendment was one of the few Bivens claims the Supreme Court had recognized against federal employees. See Carlson v. Green, 446 U.S. 14 (1980).

Putting these cases together, most cases within the Second Circuit have declined to allow a Bivens action against the employees of federal contractors, whether or not Bivens would allow such an action if the defendants were federal employees. See Moore v. Samuel S. Stratton Veterans Admin. Hosp., No. 16-cv-475, 2016 WL 3647180, at *3 (N.D.N.Y. June 3, 2016); Shapiro v. Community First Services, Inc., No. 11-cv-4061, 2014 WL 1276479, at *6, *9 (E.D.N.Y. March 27, 2014); La Ford v. Geo Grp., Inc., No. 13-cv1978, 2013 WL 2249253, at *3 (E.D.N.Y. May 22, 2013); Brooks v. Sposato, No. 11 CV 2598, 2012 WL 6756944, at *5-6 (E.D.N.Y. Nov. 26, 2012), adopted by, No. 11-CV-2598, 2013 WL 29964 (E.D.N.Y. Jan. 2, 2013); Feldman v. Lyons, 852 F. Supp. 2d 274, 279 (N.D.N.Y. 2012); Acosta v. Robinson, No. 12-cv-2287, 2012 WL 6569766, at *2 (E.D.N.Y. Dec. 17, 2012). See also Vega v. United States, No. C11-632, 2012 WL 5384735, at *2 (W.D. Wash. Nov. 1, 2012), vacated in part on other grounds, 2013 WL 1333978 (W.D. Wash. April 1, 2013). But see Espinoza v. Zenk, No. 10-cv-427, 2013 WL 1232208, at *7-*8 (E.D.N.Y. Mar. 27, 2013) (recognizing Bivens action for First Amendment claim against employees of private contractor).[7]

*8 The instant case is somewhat different from these authorities because, unlike Minecci, it does not appear that New York law provides a remedy for wrongful confinement to a prison as opposed to a halfway house. See McGowan v. United States, 94 F. Supp. 3d 382, 390 (E.D.N.Y. 2015), aff'd, 825 F.3d 118 (2d Cir. 2016). But Minecci did not mandate a Bivens action whenever state law did not provide a remedy. Rather, the existence of a state remedy is a sufficient reason to preclude Bivens liability, but in the absence of a state remedy there may be equally compelling reasons to avoid further expanding Bivens.

In any event, this case is a poor candidate upon which to extend <u>Bivens</u> to private actors because, other than facilitate the BOP's failure to remand him to a halfway house, the CORE defendants did nothing wrong. Plaintiff has two complaints against the CORE defendants; both fail.

First, plaintiff contends that Bruno set the wheels in motion for the issuance of the detainer, which is what caused his "technical escape." But that is only half of the story. The detainer issued because plaintiff was arrested and was in police custody. Whether plaintiff was rightly or wrongly arrested was not for Bruno to decide, even if she could. I see no illegality in a halfway house reporting the arrest of one of its residents to the BOP; in fact, it is a lot easier to see impropriety in not reporting it.

Second, plaintiff contends that the disciplinary hearings were rigged because the incident reports were already filled out and his guilt predetermined. I will assume that

to be true. However, even though plaintiff could not obtain an adequate remedy, the administrative process did exonerate him of the charges. [8] His loss of procedural due process, which resulted in him spending completing his sentence in a prison instead of a halfway house, is not a sufficient basis to imply a right of action under <u>Bivens</u>.

## CONCLUSION

Defendants' motions to dismiss [29] and [31] are therefore granted. The Court certifies that any appeal would not be taken in good faith and therefore *in forma pauperis* status for appeal is denied. See <u>Coppedge v. United States, 369 U.S. 438, 444-45 (1962)</u>.

## SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 2198759

---

Footnotes

1    Plaintiff alleges that "the [Regional] Director agreed there were constitutional violations." He did not. He only said there were "questions concerning the disciplinary process." The Regional Director had discretion to simply vacate the charges rather than determining the merits of issues that arose during the disciplinary proceedings.

2    Federal Bureau of Prisons, <u>Find an inmate</u>, https://www.bop.gov/inmateloc/ (last visited May 11, 2018).

3    Leslie Bruno has not appeared in this action, although the docket reflects that she was served.

4    <u>Ziglar</u>'s treatment of <u>Bivens</u> can be analogized to *habeas corpus* relief under <u>28 U.S.C. § 2254(d)</u>. In the latter, by statute, a prisoner must show the state court's determination of a constitutional issue was contrary to or an unreasonable application of Supreme Court—not circuit court or district court—authority. That standard requires at least some similarity between the Supreme Court authority and the *habeas* case in which it is being invoked. <u>Ziglar</u> similarly suggests that if a <u>Bivens</u> action cannot reasonably be implied as analogous to the facts of <u>Bivens</u> itself, <u>Davis</u>, or <u>Carlson</u>, then it is inappropriate for a lower court to authorize that claim, even if pre-<u>Ziglar</u> circuit authority would have.

5    The Second Circuit had previously assumed, without conducting a special factors analysis, that a <u>Bivens</u> remedy was available for an unreasonable refusal to release an inmate from a special housing unit to the general population. See <u>Gonzalez v. Hasty, 802 F.3d 212 (2d Cir. 2015)</u>. In that case, the Second Circuit said a remedy "may" exist, but did not decide the issue. The Circuit's holding that a remedy "may" exist, together with the Supreme Court's mandate in <u>Ziglar</u>, supports this Court's decision to consider the particular facts of the case and determine whether a <u>Bivens</u> remedy is available.

6    Plaintiff alleges that the determination to remand him to the MDC was Bruno's doing because plaintiff had "personal/ intimate relations" with her and she was retaliating because he had used his pass to visit his fiancée. However, the documents annexed to the complaint suggest that Bruno had no involvement in plaintiff's claim once he prevailed on his administrative appeal, and the complaint does not allege otherwise.

7    <u>Espinoza</u> concluded that because New York law provided no remedy for the improper solitary confinement of an inmate, it was appropriate to extend <u>Bivens</u> to suits against employees of a private prison contractor. I think this was wrong in two respects. First, <u>Minecci</u> held that there could be no <u>Bivens</u> claim employees of a private contractor if state law provided a remedy to the plaintiff. But the converse does not automatically follow—even in the absence of an adequate state law remedy, there may be sound reasons under <u>Ziglar</u> and <u>Malesko</u> not to permit such claims. Second, as shown above, several New York courts have in fact found improper solitary confinement actionable under the tort of "wrongful

2018 WL 2198759

confinement." Cf. McGowan, 825 F.3d at 126 (citing New York authority for such a claim). Espinoza rejected this as inadequate because those cases rested on the 4th Amendment rather than the 5th, but it seems to me the issue is whether state law provides an adequate remedy for the conduct alleged, regardless of which constitutional provision is alleged to have been violated.

8    The complaint is not clear, but it appears that plaintiff stood to lose "good time credit" had the Regional Director accepted the Committee's recommendation, but that because the Regional Director dismissed the technical escape, he did not lose accrued credit.

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4948051
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jamel STEVENS, Plaintiff,
v.
The CITY OF NEW YORK et al., Defendants.

No. 12 Civ.1918(JPO)(JLC).
|
Oct. 11, 2012.

*MEMORANDUM AND ORDER*

J. PAUL OETKEN, District Judge.

**\*1** This is a an action brought under 42 U.S.C. § 1983 by a prisoner who alleges violations of his Thirteenth Amendment rights. On March 14, 2012, Plaintiff Jamel Stevens, proceeding *pro se,* filed his complaint against defendants New York Department of Correction, Warden Rose Agro, Captain Banks, and Officer Thorn. (Complaint, Dkt. No. 2 ("Compl.").) On March 23, 2012, the Court dismissed Plaintiff's claims against the New York City Department of Correction and added the City of New York as a defendant. (Order of Service, Dkt. No. 7.)

For the reasons set forth below, Defendants' Motion to Dismiss (Dkt. No. 24) is converted into a summary judgment motion limited to the issue of administrative exhaustion. The Court provides a period of limited discovery and sets a schedule for Defendants should they wish to brief a Motion for Summary Judgment on the exhaustion issue after discovery.

**I. Standard of Review**
On a motion to dismiss a complaint pursuant to Rule 12(b)(6), the Court accepts the complaint's factual allegations as true and draws inferences only in the plaintiff's favor. *See Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006). Nevertheless, to survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citation omitted).

"*Pro se* status does not ... excuse a plaintiff from compliance with the pleading standards of the Federal Rules of Civil Procedure." *Jenkins v. New York City Dep't of Educ.,* 2011 U.S. Dist. LEXIS 130815, at *7–8, 2011 WL 5451711 (S.D.N.Y. Nov. 9, 2011). At the same time, *pro se* complaints are read liberally and interpreted as raising the strongest arguments they suggest. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007). These rules govern the Court's analysis.

**II. Background**
Plaintiff's claim is grounded in alleged violations of his rights under the Thirteenth Amendment to the United States Constitution while he was incarcerated at the George R. Vierno Center at Rikers Island ("G.R.V.C"). He alleges that he worked in a Suicide Prevention Alert (SPA) position from March 2011 through August 5, 2011, and that he was promised $56 per week for a 2:00 p.m. to 10:00 p.m. shift that he worked every day. (Compl. at 3.) Plaintiff was paid a regular salary from March until the end of June, but alleges that he has not been paid for his work between June 27, 2011 and August 5, 2011. (*Id.*) He alleges that Officer Thorn, Captain Banks, and other officials repeatedly lied to him, "saying the problem would be resolved as long as [he] kept working" and warning him that he might not be paid if he quit his SPA role. (*Id.*) He accordingly continued to work, "expecting to receive back pay—to no avail." (*Id.*) He alleges that Officer Thorn "purposely did not process my pay." (*Id.*) Ultimately, he contacted the Legal Aid Society's Prisoners' Rights Project and then filed this lawsuit seeking remuneration.

**\*2** The New York City Department of Correction has established a grievance procedure, the details of which are elaborated in Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint. (Dkt. No. 25 ("Memo in Support") at 4–5.) In his Complaint, Plaintiff indicates that he spoke with a Grievance Officer named Ms. Motrie, "whom said that I was not on the work list and would not be paid." (*Id.*) In the narrative section of his Complaint, Plaintiff does not provide more detailed information about his efforts to access the grievance procedure. In the form section, though, Plaintiff indicates

2012 WL 4948051

that he was aware of the grievance process, checked "do not know" when asked whether the grievance procedure covered his claims, and checked "yes" when asked if he had "file[d] a grievance in the jail, prison, or other correctional facility where your claim(s) arose." (*Id.* at 4.) Specifically, he notes that he filed a grievance "at the grievance office" for "working and not receiving pay for my work." (*Id.*) When asked "what steps, if any, did you take to appeal [the grievance process] decision," he explains that "I went to the floor officers, then Captains Banks and Pressley, then Grievance, and then I contacted Prisoners Rights." (*Id.*) In his Affirmation in Opposition, Plaintiff adds: "I have gone through more than the extreme as far as exhausting my administrative remedies. I have also been running back and forth to grievance whom tried to discourage me by telling me that there was nothing else that I could do." (Affirmation in Opposition to Motion, Dkt. No. 30 ("Aff").)

### III. Discussion

#### A. Exhaustion Under the PLRA

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement is mandatory "regardless of the fit between a prisoner's prayer for relief and the administrative remedies possible." *Booth v. Churner,* 532 U.S. 731, 739, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001); *see also Shaw v. City of New York,* 08 Civ. 3997, 2009 WL 1110789 at *3 (S.D.N.Y. Apr.21, 2009) ("The PLRA's exhaustion requirement also applies to prisoners' suits whether they are pursuing monetary or injunctive relief, even if the relief they seek is not available through the prison's grievance process."). It covers "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

"[F]ailure to exhaust is an affirmative defense under the PLRA ... [meaning that] inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Nonetheless, "[i]f nonexhaustion is clear from the face of the complaint (and

incorporated documents), a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted." *McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003); *see also Pan i v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998) ("An affirmative defense may be raised by a [Rule 12(b)(6) motion to dismiss], without resort to summary judgment procedure, if the defense appears on the face of the complaint.").

*\*3* In contrast, cases where exhaustion cannot be determined from the face of the complaint present a special difficulty. Balancing the need to secure the PLRA's mandates of efficiency and early resolution of prisoner rights suits against litigants' interest in a just disposition of their suits, Judge Chin explained the need for a modified procedure in such cases. This need arises from the fact that "if, as is usually the case, it is not clear from the face of the complaint whether the plaintiff exhausted, a Rule 12(b)(6) motion is not the proper vehicle." *McCoy,* 255 F.Supp.2d at 249. Rather, where "nonexhaustion is not clear from the face of the complaint, a defendant's motion to dismiss should be converted, pursuant to Rule 12(b), to one for summary judgment limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused." *Id.* at 251; *see also, e.g., Shaw v. City of New York,* 08 Civ. 3997, 2009 WL 1110789 at *4 (S.D.N.Y. Apr.21, 2009) (converting a motion to dismiss for non-exhaustion under PLRA into a summary judgment motion limited to the issue of exhaustion).

#### B. Exceptions to the PLRA Requirement of "Proper Exhaustion"

Here, it is clear that Plaintiff has not exhausted his administrative remedies by completing the prison grievance process. Nowhere in his Complaint does Plaintiff suggest that he has done so; quite the contrary, he suggests that he began the grievance process, or at least spoke with a grievance officer, but encountered difficulties that led him to abort those efforts.

For that reason, the Court must address the series of cases decided in 2004 in which the Second Circuit recognized certain exceptions to rigid application of the PLRA exhaustion requirements. As the Second Circuit summarized in *Hemphill v. New York:*

A three-part inquiry is appropriate in cases where a prisoner plaintiff plausibly seeks to counter defendants' contention that the prisoner has failed to exhaust available administrative remedies as required by the PLRA, 42 U.S.C. § 1997e(a). Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements."

**\*4** 380 F.3d 680, 686 (2d Cir.2004) (internal citations omitted). If *Hemphill* is still good law, the Court must account for the possibility that Plaintiff's experience with the grievance process falls within an availability, estoppel, or special circumstances exception. *See id.*

After *Hemphill,* however, the Supreme Court held in *Woodford v. Ngo* that the PLRA requires "proper exhaustion." 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). "This means ... that a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Id.* The Court derived its account of proper exhaustion from administrative and habeas corpus law, where exhaustion is a familiar concept. *Id.* at 88–93. In so doing, the Court rejected a proposed interpretation of the PLRA exhaustion requirement that it labeled "exhaustion *simpliciter,"* on which view the PLRA "simply means that a prisoner may not bring suit in federal court until administrative remedies are no longer available ... [and] the reason why administrative remedies are no longer available is irrelevant." *Id.* at 88. The Court explained that whereas proper exhaustion secures "administrative agency authority" and "promotes efficiency," *id.* at 89, exhaustion *simpliciter* would allow "a party to

bypass deliberately the administrative process by flouting the agency's procedural rules," *id.* at 97. Noting that "exhaustion requirements are designed to deal with parties who do not want to exhaust," *id.* at 90, the Court imposed a broad rule of proper exhaustion. This interpretation of the PLRA "gives prisoners an effective incentive to make full use of the prison grievance process and accordingly provides prisoners with a fair opportunity to correct their errors," a procedural scheme that federalism renders "particularly important in relation to state corrections systems." *Id.* at 94.

Since *Woodford,* several courts have hinted that the Supreme Court's reading of the PLRA's exhaustion requirement may imperil *Hemphill* 's three-part inquiry— but the Second Circuit has not yet resolved the issue. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir.2011) (collecting cases); *see also id.* at 102–103 ("[S]ubsequent decisions have questioned the continued viability of this framework following the Supreme Court's decision in *Woodford v. Ngo* .... We have questioned whether, in light of *Woodford,* the doctrines of estoppel and special circumstances survived.... We too decline to reach the issue"). District courts have continued to apply the *Hemphill* inquiry. *See, e.g .,* Winston v. Woodward, 05 Civ. 3385, 2008 WL 2263191 at \*6 (S.D.N.Y. May 30, 2008) (noting that "this Court adheres to clear Second Circuit authority, as well as the approach followed by other district courts in this Circuit and applies the *Hemphill* three-part inquiry to Plaintiff's exhaustion claims").

**\*5** A close reading of *Woodford* does not suggest an easy answer to the question whether *Hemphill* survived the Supreme Court's reading of the PLRA. The Court concludes that *Woodford* is best interpreted in a manner that renders it compatible with, rather than fatal to, *Hemphill.*

The argument that *Hemphill* has been impliedly overruled would seem to follow from a straightforward application of the Court's unqualified description of proper exhaustion: "[A] prisoner *must* complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." 548 U.S. at 88 (emphasis added). The Court expressly declined to recognize an exception for constitutional claims, *id.* at 91 n. 2, and repeatedly emphasized the imperative of advancing the PLRA's goals of efficiency, federalism,

2012 WL 4948051

deference to administrative procedure, and improved quality of inmate rights litigation, *id.* at 89–91, 93–96. Further, while Justice Breyer concurred to indicate that the Second Circuit's approach is compatible with the *Woodford* majority, no other Justice joined him. *Id.* at 104 (Breyer, J., concurring) (noting that the Second Circuit has "interpreted the statute in a manner similar to that which the Court today adopts" and concluding that the "PLRA's proper exhaustion requirement is not absolute"). Thus, in this 6–3 opinion, the Opinion of the Court stands unqualified by Justice Breyer's concurrence. One might infer from his solitude that other Justices did not share Justice Breyer's enthusiasm for an interpretation of proper exhaustion that leaves room for *Hemphill*-like doctrines.

The better view, however, is that Justice Breyer accurately described the nature and scope of the Court's reasoning in *Woodford.* As he explained, "[a]dministrative law ... contains well-established exceptions to exhaustion.... Moreover, habeas corpus law, which contains an exhaustion requirement that is 'substantively similar' to administrative law's and which informs the Court's opinion also permits a number of exceptions." *Id.* at 103–104 (internal citations omitted). Given that the Court drew on administrative and habeas corpus law to guide its statutory interpretation, thereby crafting the novel doctrine of proper exhaustion under the PLRA, it is reasonable to infer that rules of equity and fairness familiar to those contexts should also be transposed into post-*Woodford* jurisprudence. *See id.* at 103 (citing cases that modify proper exhaustion requirements for, *inter alia,* hardship, futility, and inadequate remedies). Indeed, the *Woodford* majority suggested as much by expressly reserving judgment on how it would approach the hypothetical scenario "that prisons might create procedural requirements for the purpose of tripping up all but the most skillful prisoners." *Id.* at 102 (Alito, J.). And in his dissent, Justice Stevens specifically cited the Second Circuit decision in *Giano v. Goord,* 280 F.3d 670 (2d Cir.2004)—which allows exceptions to the PLRA's exhaustion rule for special circumstances and is part of *Hemphill* analysis—as an example of the many questions that *Woodford leaves open.* 548 U.S. at 121–22 (Stevens, J., dissenting). Further, whereas *Woodford* aimed virtually all of its fire at what one might describe as the *deliberate bypass horrible,* its policy reasoning about federalism and efficiency make far less sense in contexts where inmates have been effectively denied access to the grievance

process through the sorts of narrow circumstances that trigger relief under *Hemphill.* If anything, the *Hemphill* exceptions simply represent on a small scale the very same large scale injustices and deliberate run-arounds that the *Woodford* majority signaled may trigger different analysis. *See id.* at 102 (Alito, J.) (emphasizing that "we have no occasion here to decide how such situations might be addressed").

**\*6** Thus, a reading of *Woodford* that called *Hemphill* into question would fail to appreciate the significance of the Court's reliance on administrative and habeas corpus doctrine, overextend its policy reasoning, and undervalue its sensitivity to circumstances where malfeasance by prison administrators effectively destroys any chance of legal remedy. For these reasons, Justice Breyer's view that *Woodford* is compatible with precedent like *Hemphill* reflects not merely Justice Breyer's view, but the better reading of the Court's opinion in *Woodford.* Indeed, with a strict background rule like *Woodford,* decisions like *Hemphill* play an even more critical role in avoiding the potential for injustice wrought by a procedural regime that values efficiency, administrative review, and federalism over potentially meritorious claims that unsophisticated inmates seek in good faith to remedy through the grievance process.

### C. Converting to a Summary Judgment Motion

Because this Court concludes that *Hemphill* remains good law, and recalling that at this stage in the litigation the Court reads all facts in the light most favorable to Plaintiff, the sole question that remains is whether Plaintiff may fall within a *Hemphill* exception. Specifically, Plaintiff alleges that he was told by a Grievance Officer that "there was nothing else that I could do." He adds in his Affirmation in Opposition that "I have also been running back and forth to grievance." Given that his Complaint answers "yes" when asked whether he filed a grievance and suggests (with only minimal detail) a complicated factual background of interactions with the prison grievance process, the Court cannot conclude at this early stage in litigation that Plaintiff's claims are barred by exhaustion. *Cf. Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001) ("Particularly important in this case is the well-established principle ... that we include in [motion to dismiss] analysis not only the assertions made within the four corners of the complaint itself, but also those contained in documents attached to the pleadings or in documents incorporated by reference"). It is plausible,

2012 WL 4948051

on the basis of facts alleged in the Complaint, that the *Hemphill* exceptions of estoppel and special circumstances may apply.

For that reason, following Judge Chin's reasoning in *McCoy v. Goord,* the Court concludes that "defendant's motion to dismiss should be converted, pursuant to Rule 12(b), to one for summary judgment limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused." 255 F.Supp.2d at 251. Courts have applied this modified procedure to the specific issue of whether *Hemphill* exceptions defeat a motion to dismiss for lack of administrative exhaustion. *See, e.g., Smalls v. Jummonte,* 08 Civ. 4367, 2010 WL 3291587 (S.D.N.Y. Aug.13, 2010) (Batts, J.).

**\*7** Of course, a district court must afford "prior notice to the parties before converting [a] motion to dismiss into a motion for summary judgment." *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 767 (2d Cir.1983). "Notice is particularly important when a party is proceeding *pro se* and may be unaware of the consequences of his failure to offer evidence bearing on triable issues." *Id.* Pursuant to Federal Rule 12(d), "if on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties

must be given a reasonable opportunity to present all the material that is pertinent to the motion."

For that reason, the Court will allow a period of discovery limited to the issue of administrative exhaustion, concluding on January 4, 2013. The Court also establishes a summary judgment briefing schedule to commence upon the completion of limited discovery: Filings by Defendants in support of summary judgment due January 21, 2013, any response by Plaintiff due February 22, 2013, and any reply by Defendants due March 6, 2013.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the complaint with prejudice shall be converted to a motion for summary judgment limited to the issue of exhaustion under the PLRA, subject to the limited discovery and the briefing schedule described herein.

The Clerk of Court is directed to close the motion at docket entry number 24.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4948051

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.